Appeal Nos. 24-5782, 24-5779

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

SHANE BEARD, HILDA PEREZ and N.P., a minor, by and through Guardian ad Litem, Donnie R. Cox,

*Plaintiffs/Appellants/Cross-Appellees,*

vs.

COUNTY OF STANISLAUS et al.

*Defendants/Appellees/Cross-Appellants*

_____

On Appeal From a Decision of the United States District Court,
Eastern District of California, Case No. 1:21-cv-00841-JAM-CSK
_____

**APPELLEES'/CROSS-APPELLANTS'S
SUPPLEMENTAL EXCERPTS OF RECORD,
VOLUME 1 OF 3**
_____

PORTER SCOTT
A Professional Corporation
John R. Whitefleet, SBN 213301
2180 Harvard St. STE 500
Sacramento, CA 95815
Telephone: 916.929.1481
Facsimile: 916.927.3706
Attorneys for Defendant/Appellee
County of Stanislaus

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF CALIFORNIA
 2                             --oOo--

 3   SHANE BEARD, et al.,        ) Case No. 1:21-cv-00841-JAM
                                 )
 4              Plaintiffs,      ) Sacramento, California
                                 ) May 28, 2024, 9:15 a.m.
 5          v.                   )
                                 )
 6   COUNTY OF STANISLAUS, et al.,) Re: Trial Day 9
                                 )
 7              Defendants.      )


 8                      TRANSCRIPT OF PROCEEDINGS
 9             BEFORE THE HONORABLE JOHN A. MENDEZ
                SENIOR UNITED STATES DISTRICT JUDGE
10
     APPEARANCES:
11
     For the Plaintiffs:      POWELL & ASSOCIATES by
12                            MR. ROBERT ROSS POWELL
                              925 West Hedding Street
13                            San Jose, California  95126

14                            LAW OFFICE OF SAMUEL H. PARK, APC
                              MR. SAMUEL PARK
15                            374d Bergin Drive, Suite 2
                              Monterey, California  93940
16
     For the Defendants:      PORTER SCOTT by
17                            MR. JOHN ROBERT WHITEFLEET
                              2180 Harvard, Suite 500
18                            Sacramento, California  95815

19
                        MARYANN VALENOTI, RMR, CRR
20                        Official Court Reporter
                          501 I Street, Suite 4-200
21                         Sacramento, CA 95814
                          mvalenotiRMRCRR@gmail.com
22                          (916)930-4275

23   Proceedings reported via mechanical steno - transcript produced
     via computer-aided transcription
24

25
```

MARYANN VALENOTI - U.S. DISTRICT COURT - (916)930-4275

2

1                        I N D E X

2    CLOSING ARGUMENTS                         PAGE

3         On Behalf of Plaintiffs ................... 26
          On Behalf of Defendants ................... 98
4         Rebuttal on Behalf of Plaintiffs ......... 119

5    JURY INSTRUCTION ............................ 127

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

SER-0003

3

```
1          SACRAMENTO, CALIFORNIA, TUESDAY, MAY 28, 2024
2                              --oOo--
3          (In open court outside the presence of the jury.)
4          THE CLERK:  Please remain seated and come to order.
5    The Honorable John A. Mendez, Senior United States District
6    Judge, now presiding.
7          Calling civil case 1:21-cv-00841, Beard, et al. versus
8    County of Stanislaus, et al.
9          THE COURT:  All right.  Good morning.  Outside the
10   presence of the jury.  A number of briefs were filed this
11   weekend.  I got your draft of the jury instructions and Verdict
12   Form, so let's jump into those.
13         In terms of Mr. Anderson, the defendants have argued
14   that I should grant a Rule 50 on the second count as well with
15   respect to Mr. Anderson.  You didn't respond to that
16   specifically, Mr. Powell or Mr. Park, so I want to give you an
17   opportunity to respond to the argument that there's really no
18   basis for finding liability on the second count if I've granted
19   the Rule 50 on the first count as to Mr. Anderson.
20         MR. POWELL:  Yes, Your Honor, our briefs were
21   completed when we saw that his had come in and I believe sent.
22         The distinction, I think, between that Fourth and
23   Fourteenth is that in the Familial Association arena, the
24   second prong of the shocks the conscience standard, which is
25   the only one that we think applies --
```

4

1        THE COURT: Deliberate indifference.

2        MR. POWELL: Yeah, deliberate indifference and the

3 time to, you know, think about it and reflect about it, is -- I

4 mean, Mr. Anderson, through his testimony, did testify to

5 having reviewed the warrant application, not having checked or

6 verified a single thing, and approving it.

7        And as the evidence has shown, Mr. Anderson was

8 actually involved in this case a lot sooner than he even had

9 testified. He basically had testified that he first became

10 aware of it when it came to Cobbs and Jones, but he was at the

11 original CAIRE interview on January 28, 2019. He talked with

12 Mr. Sosa, Sr. In fact, at one point -- this is beyond probably

13 what you need to know or hear -- Mr. Sosa, when he calls back

14 to the department a little later with one of his many claims

15 about sexual abuse, he's looking to speak to that social worker

16 he spoke to before, and I'll never get to the fact that he's

17 talking about Mr. Anderson, but it seems like it.

18        So, Mr. Anderson was rather intimately involved in

19 this case for much sooner than he testified to being in it.

20 It's literally in the emergency response referral

21 investigations for -- 2/12 is it -- 2/21/19, and as a

22 supervisor then to just say, Yeah, that looks great, when he

23 knows that in those referrals there's tons of references to

24 mother being "protective," the children all feeling "safe,"

25 it's replete.

5

1          So that would be our argument, Your Honor, that he

2     shouldn't be allowed off on either, quite frankly, but in the

3     Fourteenth Amendment realm, the deliberate indifference

4     standard applying, there should be a supervisory instruction.

5          THE COURT:  Well, you're asking the jury to hold him

6     liable as a supervisor or as an individual?  I didn't -- you

7     say, I didn't include a supervisory jury instruction because I

8     wasn't sure.  I don't think the supervisory instruction fits in

9     the second cause of action.  If he's going to be held liable,

10    it would have to be his individual acts, because he didn't

11    do -- as a supervisor, the only thing he did was he briefly

12    looked at the warrant.  And that's, as we know from case law,

13    isn't enough to be held liable as a supervisor.  You can't hold

14    CPS supervisors liable for a constitutional violation simply

15    because they briefly reviewed a warrant.  The social worker who

16    drafted it is the one responsible.

17         MR. POWELL:  There was a participation instruction

18    that we had in the original submission that we did and that

19    didn't survive either.  I felt that doesn't require that that

20    person specifically did the constitutional violation, it's that

21    they participated in it.

22         THE COURT:  Well, I don't know, I haven't gone through

23    all the exhibits, but how do we know that he was at the first

24    CAIRE interview?  I don't know what you mean by he was there.

25    He obviously didn't conduct the interview, but is there

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

6

1    something in the logs or the --

2             MR. POWELL:  Yes.

3             THE COURT:  Okay.

4             MR. POWELL:  It's in the logs.

5             THE COURT:  It says what, he was there?

6             MR. POWELL:  He was there, spoke with Mr. Sosa, then

7    he was staffed on one of the later referrals, and we had

8    testimony on that, I believe.

9             THE COURT:  What do you mean "staffed"?

10            MR. POWELL:  He was consulted as their supervisor at

11   various points prior to July 11 and 12.

12            THE COURT:  Well, that's two points:  The CAIRE

13   interview in January, and then you say there's something where

14   he was --

15            MR. POWELL:  Yeah, I can get to it, Your Honor.

16            THE COURT:  You're talking about Jones consulted with

17   him?

18            MR. POWELL:  I'll have to check if it's both, but I

19   can get there.  Give me one second, please.

20            Mr. Anderson's first involvement is shown in

21   Exhibit 58.  On May 8, that's his first involvement with the

22   family with Ms. Jones consulting with him.

23            THE COURT:  Okay.  He's is not involved with the

24   family, he was consulted by one of his social workers, right?

25            MR. POWELL:  True.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

7

1        THE COURT:  As a supervisor.

2        MR. POWELL:  As a supervisor.  Unfortunately, his name

3   is on the top of every page.

4        THE COURT:  Simply being consulted isn't sufficient to

5   a finding by a jury that he was the cause of the constitutional

6   violation.

7        MR. POWELL:  Then there's, of course, his involvement

8   in the TDM in which, by our client's testimony, he was the main

9   focal person, threw down the binder or folder, however you wish

10  to look at it, a very active role in the TAP staffing, rolled

11  right into the TAP staffing and blessed the warrant, which

12  having looked that thing over for the weekend --

13       THE COURT:  Again, involvement in the TDM, nothing

14  happened in the TDM other than the meeting was held and he

15  yelled at your clients.  Again, that's not a constitutional

16  violation.  That's not the cause of a constitutional violation

17  here.

18       The TAP staffing, again, he's part of the staff.

19  Everyone else in that meeting has now been dismissed other than

20  April Cobbs, who was the moving force behind the removal.

21       I don't see him -- he didn't do anything other than he

22  was a supervisor, and that's not enough for supervisor

23  liability.

24       Even your proposed jury instruction says, In order to

25  prevail on the 1983 claim against the supervisory defendant,

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

8

1    you must prove -- in looking at 2(a) -- that he directed his

2    subordinate Cobb, in the acts and omissions and that he set in

3    motion a series of acts.

4         The evidence doesn't support either of those.  He

5    didn't set in motion, Cobbs set in motion what occurred.  He

6    didn't direct Cobbs.  He was part of a team that came up with a

7    recommendation.  She then did the investigation and pursued it.

8         Then it says that, "He knew that she was engaging in

9    unconstitutional acts."  He didn't know, he didn't look at

10   the -- he didn't draft the warrant.  And then, "He disregarded

11   the note, an obvious consequence of a training deficiency."

12   There wasn't evidence of that.  And, "He engaged in conduct

13   that showed a reckless or callus indifference to the

14   deprivation of subordinate rights."  Again, there is no

15   evidence that would support a finding by the jury that all

16   those elements have been met.

17        MR. POWELL:  Your Honor, in the context of -- near the

18   end of that instruction, which I don't have in front of me,

19   about the constitutional violation where we're talking about

20   judicial deception, I think it does apply because he did have

21   intimate knowledge of the case, like I said, as far back as

22   May -- earlier, actually, in 2019.  And having that kind of

23   knowledge -- and then there's -- I think that makes him liable.

24        Then there's something else that's very important

25   about Exhibit C that counsel put in as an exhibit, their

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

9

```
1    Protective Custody Warrant Policy.  There are a number of
2    things, I'll just give you a couple real quick, that are
3    supposed to be in that Protective Custody application
4    regardless of whatever else you're going to put in for your
5    substance, and Mr. Anderson, his job would be to catch those
6    things, and they undermine the validity of this warrant
7    significantly.
8            THE COURT:  Say that again, his job would be what?
9            MR. POWELL:  Well, these are policy things.  I submit
10   that's why a supervisor is there, to make sure that they're
11   doing the policy -- following, at least, the policies, and this
12   warrant, woefully, misses the mark.
13           It says -- this is from, again, Exhibit C, Page 9,
14   that's where I need to go.  So, there's these glaring problems
15   with it, and Mr. Anderson, as a supervisor, I believe, would
16   have a supervisory obligation to see and correct these things.
17   But there's --
18           THE COURT:  There again we're in this realm of "I
19   believe he would."  Where is the case law that says that?  I
20   mean, Judge Shubb's case says exactly the opposite.  You can't
21   hold the supervisor to that level, especially when you're
22   dealing with an alleged constitutional violation and especially
23   in the CPS context.
24           I know you believe that, but there's got to be more
25   than just your belief.  There's got to be case law that
```

10

1    supports your view that that's -- you know, give me a case

2    where a supervisor similar to Anderson has been held liable.

3    That's all I need from you, and I haven't gotten that.  As

4    opposed to the other cases which say, You can't do that, Judge.

5    You can't -- a jury can't find this guy liable.  He wasn't the

6    one that was the moving force behind the constitutional

7    violation.  It was April Cobbs.  She's front and center.

8         But to try to hold him liable under these

9    circumstances -- and he wasn't intimately involved.  He was

10   aware.  He's got hundreds of cases.  So for you to say he was

11   intimately involved isn't supported by the evidence of this

12   case.  So I need something more to, I think, to keep him in

13   this case.

14        Is there a case out there?  I mean, you've done a lot

15   of these.

16        MR. POWELL:  Well, I can't say I've done a lot of

17   supervisories.  Most of my work for the first 11, 12 years were

18   warrantless removals, so only the individuals were on the hook.

19        Although in *Oralee Anderson versus County of Sonoma*,

20   supervisor was held to answer, and he did not have, like,

21   on-the-ground participation in the removal.

22        You laid out the elements that we have in our

23   supervisory instruction.  We believe that his reviewing and

24   basically ratifying this warrant application, which is so

25   constitutionally deficient and filled with lies that he should

SER-0011

11

1  have known or was reckless disregard not to know from his own

2  involvement in the case justifies keeping him in.

3          Now, a case law, off the top of my head, Tuesday

4  morning after Memorial Day, and a ton of computer problems,

5  Monday, I can't give you one, Your Honor.

6          THE COURT:  Okay.

7          Mr. Whitefleet.

8          MR. WHITEFLEET:  Briefly, Your Honor, what it sounds

9  like to me is Mr. Powell is arguing *respondeat superior* on

10  behalf of Mr. Anderson, which I believe the case law supports

11  that that's not a basis.

12          THE COURT:  You know, out of an abundance of caution,

13  sometimes courts let claims go to a jury obviously knowing that

14  you can renew a motion following a jury verdict.  And again,

15  one of the reasons is if there's a defense verdict -- there's a

16  lot of issues that have been created in this case for a

17  possible appeal on both sides, but I mean, are you confident

18  enough that the law that you cited and the law that I reviewed

19  is sufficient to -- for the Court to grant a Rule 50 on the

20  second count, or would you prefer that I allow the count to go

21  to the jury and then we see what happens?

22          MR. WHITEFLEET:  I'm confident, Your Honor, and here's

23  why:  Because the basis for the Familial Association claim is

24  the underlying violation of the Fourth Amendment, which is

25  based on judicial deception.  So my understanding of the case

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

12

1    law is that unless there is a judicial deception claim against

2    Mr. Anderson, then there can be no claim against him on

3    Familial Association.

4         THE COURT:  Well, I don't disagree with that.  It's a

5    question of is there sufficient evidence for this jury to

6    find -- possibly find that he can be held liable as well.  The

7    case that we discussed at length on Friday would clearly cut

8    against that, and it's not -- in fact -- by the way, if I used

9    the phrase, the transcript will show it, in no way did I find

10   that district court case, even from the judge on my own court,

11   is binding authority, but it certainly is instructive when

12   there's a lack of other authority out there.

13        And given the incredible similarity between the case

14   that Judge Shubb decided and then we discussed in this case, I

15   don't see any reason not to follow it.  Even though it was a

16   summary judgment motion, the legal principles that Judge Shubb

17   laid out still lead this court to believe that it should be

18   taken seriously.

19        Go ahead, Mr. Powell.

20        MR. POWELL:  Yes, I don't know if the Court's able to

21   pull up the actual warrant itself, but -- and the Court, I

22   know, is very familiar, unless it's purposefully forgotten it,

23   juvenile dependency law.  That shows --

24        THE COURT:  I'll pull up -- I got it right here.  What

25   do you want me to look at?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

13

1         MR. POWELL:  I'm sorry, what did you pull up?

2         THE COURT:  The warrant.  I carried it with me all

3  throughout the trial.

4         MR. POWELL:  And I don't know if the Court has had a

5  chance to sit and digest it like I would, or if it would even

6  have a need to, but that warrant doesn't even comply with the

7  necessary showing of a child coming within Welfare and

8  Institutions Code Section 300.

9         It doesn't show that the child has had anything -- and

10  I'll confine myself to Subsections (a) through (d), they're the

11  only ones, really, at play here -- and every one of those

12  sections requires the child has suffered or there is a

13  substantial risk that they will suffer.

14         You won't find even a claim of substantial risk that

15  the child will suffer, whatever, intentional harm, negligent

16  harm, you know, food, clothing, shelter; (c) emotional abuse;

17  (d) sexual abuse, it's not even claimed in there.  The warrant

18  is so horribly deficient -- the application, I should say.

19         THE COURT:  Well, in 4(c) on Page 3, that's the basis

20  that requests for the order claiming that N.P.'s physical

21  environment poses an immediate threat to his health or safety

22  and there's no reasonable services available, which, if

23  provided to the child's parent, would eliminate the need to

24  remove the child.

25         Now, again, that's the crux of this case.  I

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

14

1    understand your argument, but there is, at least from the

2    defendants' point of view, a basis.  And then in Cobbs' point

3    of view, the details that you provide in Section 7 support that

4    request.

5          Again, Anderson isn't familiar enough with this case

6    to know, obviously, everything you know now and we know now,

7    and then it comes back to can you hold him to that, that

8    standard?  Hindsight's 20/20, and in hindsight I don't know if

9    you -- I don't know if you could get him to admit it, but if

10   he'd look at this differently, but that wasn't -- that's now.

11   That wasn't then.

12         And I come back to this -- I haven't found a case

13   where under similar circumstances a supervisor's been held

14   responsible.  I mean, I'm even thinking in the -- obviously, in

15   the law enforcement context and even in that context I just

16   haven't seen a supervisor be held liable.  And in most of the

17   police cases the supervisor's found to get qualified immunity.

18         The supervisor really has to be much more involved.

19   The classic case, I'm sure you're aware, under qualified

20   immunity are those cases out of L.A. where the sergeant is

21   directing the -- Stacey Koon, I think the guy's name was, was

22   directing his police officers to engage in constitutional

23   violations.  That's the extreme, but that's -- you know,

24   Anderson isn't there.  And I haven't found a case, and you

25   haven't given me a case, where he might possibly be held

15

1   responsible for his acts under the facts in this case.

2           MR. POWELL:  Could I --

3           THE COURT:  Go ahead.

4           MR. POWELL:  This part that you read, (c), "The

5   child's physical environment poses an immediate threat to the

6   child's health or safety," that doesn't comport with any of the

7   allegations.  That is literally the physical environment.

8   Those are for houses that are -- you know, that don't have

9   heating in the winter, don't have cooling in the summer, don't

10  have water, don't have sanitation.  That is a throwaway, and

11  that is exactly what a supervisor should question.

12          And he says he reviewed it, and he didn't question it.

13  And you recall his testimony on the stand was, Oh, when it's

14  like kids who are, you know, touching each other type stuff,

15  well, that's general neglect.  That's not even sex abuse.

16          So if the Court was -- in looking at (c) was thinking

17  that's the reference to the 300(c), it isn't.

18          By the way, Your Honor, this entire warrant starts on

19  the premise of -- it's founded up -- it's on Page 1, starts on

20  Page 1, and it says, "A protective custody order will issue

21  under Welfare and Institution Code 340," and then it lists

22  three cases -- four cases, one of which is mine, and every

23  single one of those is actually a warrantless removal case.

24          Now, apparently the supervisor didn't catch that

25  either.  So is it reckless disregard, deliberate indifference?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

16

1   Yeah, I think it is.

2          THE COURT:  I know you think, again, we're back to --
3   I know you think it is.  Give me a case, give me a case, give
4   me a case, because what you think and what the law says,
5   especially in this area, are two different things.

6          I mean, the law's unfavorable, let's face it.  These
7   are really difficult cases for plaintiffs, and there aren't,
8   especially now in the qualified immunity area, given what the
9   Supreme Court's done with that.

10         So I get it, these are all terrific arguments that
11  you're going to raise with the jury against April Cobbs, I just
12  don't think you can loop in Mr. Anderson as well under these
13  facts absent some case that tells me otherwise.

14         MR. POWELL:  Is the Court saying that -- what it's
15  saying now is under qualified immunity he's off the hook for
16  whatever his supervisory role encompassed, or simply, there's
17  not enough evidence to establish that he did anything?

18         THE COURT:  That's a good question.  I think it's
19  both, actually because even if you assume there's a
20  constitutional violation, I'm unaware of any case that would
21  have put him on notice -- the second prong of qualified
22  immunity that would have put him on notice as the supervisor,
23  that the conduct he was engaged in is, you know, a
24  constitutional violation.

25         That's what I'm looking for from you in terms of is

17

1    there something that should have put him on notice that the way

2    he was acting in the result of having the child removed, would

3    have put him on notice that he could be held liable?

4          The Cobbs situation is different.  There's more than

5    sufficient case law out there to put a social worker on notice

6    that if you're going to engage in judicial deception and

7    fraudulent conduct, that you can be held liable.  But again,

8    he's a supervisor, he wasn't intimately involved.

9          MR. POWELL:  If I may, borrowing from my co-counsel,

10    Mr. Park, I've referenced *Boyd v. Benton* a couple of times

11    here, and again, it was annotated in our jury instruction, and

12    not only requires that you be an integral participant -- and I

13    don't see how the evidence does not establish that Eric

14    Anderson was an integral participant.  He, again, was involved

15    much earlier than he said as a supervisor, at the TDM, at the

16    TAP.  It doesn't matter if others have been dismissed.  There's

17    no relevance to whether or not he was an integral participant.

18    He set something in motion --

19          THE COURT:  Give me the name of the case again.

20          MR. POWELL:  *Boyd v. Benton*.  I'll give you the cite.

21          THE COURT:  Give me the cite.

22          MR. POWELL:  374 F.3d 773, pincite here 780, and I

23    know there's another case.

24          THE COURT:  Is that a Ninth Circuit case?

25          MR. POWELL:  Yes, Your Honor.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

18

1          THE COURT:  What year?  Was it is before 2019?  It
2     would have had to have been --
3          MR. POWELL:  We have another case, too.
4          THE COURT:  It would have had to have been decided
5     before 2019.
6          MR. PARK:  *Boyd v. Benton* would be 2004, Your Honor.
7          THE COURT:  What's that?
8          MR. PARK:  2004.
9          THE COURT:  2004.  Give me the facts of the case, was
10    it a social worker?
11         MR. POWELL:  No.
12         THE COURT:  Was it a supervisor in a social worker
13    setting?
14         MR. PARK:  This is a case that lays out the elements
15    of integral participation in a civil rights violation.  This is
16    a case where a police officer has formulated a plan to go into
17    a home, and they deployed flash-bangs, and I think there was --
18    a child was injured in the case.
19         So merely being on scene without knowledge of the plan
20    was not enough to hold certain officers liable, but the ones
21    that understood what the plan was going to be and took one step
22    in furtherance of that plan, were held to be integrally
23    participating in the civil rights violation.  By setting in
24    motion the unconstitutional violation you can be held liable.
25         THE COURT:  But you see that Anderson didn't set in

               MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

                                                              SER-0019

19

1    motion this constitutional violation.  Cobbs did.

2         MR. PARK:  Your Honor --

3         THE COURT:  It's completely different.  I mean, it

4    wasn't his plan.  It was Cobbs.  She went out to the house.

5    She is the one that made the decision to remove the child.

6    Sure, the others agreed to it in the TAP, but you can't hold

7    Anderson in a different light from the other six people that

8    were in there given you've already dismissed all of them.  And

9    he didn't do anything more than any of those other six.

10        And then, again, you keep -- I know you're focusing on

11   he reviewed, in quotes, "the warrant."  He looked at it.  And

12   under these circumstances, at least I haven't seen a case that

13   under those similar circumstances, simply reviewing a warrant

14   is enough to allow the case to go to the jury to decide if he

15   should be held liable for a constitutional violation.

16        And again, he's entitled to qualified immunity, and I

17   don't believe *Boyd* puts him on notice that he's likely to be

18   held liable for a constitutional violation given his actions.

19   So if that's your best case, that doesn't persuade me that he's

20   not entitled to qualified immunity either.

21        MR. POWELL:  Well, Your Honor, I submit that in the

22   *Boyd v. Benton*, it's quite a succinct analog because the

23   supervisors, I think, two were held liable under the integral

24   participation theory.  They didn't throw the flash-bang, they

25   participated in it.  They made the decision, and that's clear.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

20

1    And again, I don't believe that not suing others, we could have

2    chosen to never name them, in theory, that would not undermine

3    in any way, shape or form Mr. Anderson's role.

4        And finally, we've got a lot of facts in this case

5    with regards to Mr. Anderson's participation from earlier than

6    he testified.

7        THE COURT:  Hang on, let me read this again.  Again,

8    this is a case that Judge Shubb decided last month, but he

9    writes, "Plaintiffs have not identified, and the Court is

10   unaware of, any authority holding that a supervisor must review

11   the underlying evidence or documentation for a warrant

12   application prepared by the subordinate.  Omissions or

13   misstatements resulting from negligence for good faith mistakes

14   will not invalidate an affidavit which on its face establishes

15   probable cause, and a claim of judicial deception may not be

16   based on an officer's erroneous assumptions about the evidence

17   he has received.  The supervisor's reliance on the social

18   worker's representations thus cannot form the basis for a

19   judicial deception claim.  If there's not a judicial deception

20   claim, then you can't hold him responsible for the familial

21   relation claim either."

22       That's what's missing, it's the same situation here.

23       MR. POWELL:  It is and it isn't.  The issue of whether

24   someone must review becomes moot when someone did review, and

25   that's what Mr. Anderson did.  Now, Mrs. I believe it's Smith

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

21

1    in the other case, and I don't recall at the moment what all of

2    her role was, but in this case Mr. Anderson did review.

3              THE COURT:  So did Smith, Smith in this case reviewed.

4              MR. POWELL:  And he -- pardon me?

5              THE COURT:  Smith didn't sign the warrant application.

6    As far as the Court can discern in the other case, your case

7    before Judge Shubb, you call it -- it's *O'Neel versus City of*

8    *Folsom*, the supervisor's only involvement with the warrant

9    application was his review of it in his capacity as the social

10   worker's supervisor.

11             The supervisor did not review the underlying evidence

12   or documentation.

13             MR. POWELL:  So we don't have an "only" situation.

14   Like I said, there are emergency response referral informations

15   that run -- I haven't yet been able to get there to them -- but

16   there's at least two to three that he's involved in before

17   July 11, 12 where he's also involved again.  So again, that's

18   personal knowledge of things that happened at those.

19             And if the Court's going to give us a break, I can

20   pinpoint the ones and share those with the Court where he

21   did -- where he was involved.

22             Now, the Court can say, Well, he was just consulting,

23   but no, he was literally physically there with Mr. Sosa at the

24   CAIRE interview.

25             I'm going to have Mr. Park --

22

1          THE COURT:  That was the CAIRE interview with Freddy.

2          MR. POWELL:  Correct.

3          THE COURT:  And there's no evidence that he knew about

4     the entire family or N.P. or what was going on or the 52 --

5     alleged 52 referrals.  So, showing up at a CAIRE interview, if

6     you can show me a case -- you're trying to take a few isolated

7     incidents and then argue he was -- he was, as *Boyd* says, he was

8     an "integral participant."  You don't have evidence that he was

9     an integral participant.  All you have is evidence that he

10    was -- he was a supervisor who attended a TDM and a TAP, threw

11    his binder down, got mad at the parents and reviewed a warrant.

12         You're trying to -- I think you're trying to take what

13    little evidence you have and turn it into more than it is.  So

14    there's lack of sufficient evidence and there's also qualified

15    immunity.

16         So the record's clear, you've made your point, I'm

17    going grant the Rule 50 motion as to Mr. Anderson.  So I'm

18    going to revise the jury instructions and the Verdict Form.  We

19    need to go -- I need to get any feedback you want on the jury

20    instructions that I gave you.  If there's any objections,

21    anything that you think I should add, let's go over those now.

22         MR. POWELL:  One thing I think is glaring is in the

23    punitive damages instruction.

24         THE COURT:  Let me grab it.  Punitive damages, it's

25    19, yeah.

23

```
1            MR. POWELL:  The sentence in the second paragraph
2    reads as if plaintiffs would have the burden of proving all
3    three claims because of the "and."
4            THE COURT:  Okay.  You want "or"?
5            MR. POWELL:  Yes, "or".
6            MR. WHITEFLEET:  No objection to the change.
7            THE COURT:  All right.  Then I'll get you revised
8    instructions without Mr. Anderson's name in it.
9            We'll start closing arguments at 10:00.  No time limit
10   on how long you want to take.  And then depending on where
11   we're at after closing arguments, I'll either instruct -- I
12   probably will instruct before lunch and then we'll send them
13   off, and they can get something to eat and then start
14   deliberations this afternoon.
15           Okay.
16           MR. POWELL:  Your Honor, did you have any --
17           THE COURT:  Wait, sorry.
18           MR. WHITEFLEET:  You're not instructing before
19   closing?
20           THE COURT:  I do not instruct before closing.
21           I'm sorry, I wanted to make a record on the request to
22   limit damages and adding the limitation on damages based on the
23   case that defendants submitted.  I'm going to deny the request.
24   I'm not going to include the limitation.  I think the
25   distinction that was raised by the plaintiffs in their brief
```

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

24

1   responding to the request was sufficient.  I don't believe

2   under the facts of this case -- yeah, this is the one that was

3   a Procedural Due Process as opposed to a Substantive Due

4   Process claim.

5          This is a close question, but I don't think there's a

6   basis for adding a limitation of damages to the jury

7   instruction, so I'll deny that request.

8          Okay.

9          MR. POWELL:  Did the Court have a ruling on whether

10  it's -- apparently it's not going to, at least right now, take

11  materiality from the jury?

12         THE COURT:  Oh, thank you.  No, I'm not, I'm not going

13  to do that either.  That will be up to the jury to decide.

14         Again, Mr. Whitefleet, depending on the verdict, you

15  can renew the Rule 50 motion.  I'll take another look at that,

16  but for now, it's going to get submitted to the jury.

17         MR. WHITEFLEET:  Any objection to referencing the

18  language of the jury instructions?

19         THE COURT:  Well, no, absolutely.  That's why I'm

20  going to get them out, I'll give them to you.

21         MR. POWELL:  Wait, I missed that, I'm sorry.

22         THE COURT:  I'm going to give you the jury

23  instructions without Anderson, with only Cobbs, so yeah, you

24  can put them up on the screen.  You can reference them all you

25  want.

25

```
1        MR. POWELL:  Is that Elmo thing here?  Because I've
2   got mine marked up using my colorful patterns.
3        THE COURT:  Yes, there's an Elmo under there.
4        Do you know how to use it?
5        MR. POWELL:  Hopefully it will all come back to me.
6   Actually, this is a nice stereo system.
7        THE COURT:  You got 10 minutes to figure it out.
8   We'll get the instructions out to you right now.
9       (Recess taken 9:52 a.m. to 10:12 a.m.)
10       THE CLERK:  Court is back in session.
11       THE COURT:  All the jurors here?
12       THE CLERK:  We're missing two, but I'm sure they're
13  here by now.
14       THE COURT:  Go check.
15       THE CLERK:  They're all here.
16       THE COURT:  All right, bring in the jury.
17      (In open court in the presence of the jury.)
18       THE COURT:  Good morning.  All jurors are present, all
19  parties are present.  Ladies and gentlemen, this is the portion
20  of the trial where the lawyers will deliver their closing
21  arguments to you.  Then following the closing arguments, I will
22  give you your written jury instructions and go over the jury
23  instructions with you.
24       Closing arguments are not evidence, but they're the
25  lawyers' opportunity to summarize the evidence in this case to
```

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

SER-0026

26

Closing Argument - Plaintiffs

1  you and to discuss with you the claims, and possibly they will

2  make reference to the jury instructions, which they're allowed

3  to do as well.

4        Then once we instruct you, you will begin your

5  deliberations.  We'll send in all the exhibits to you and have

6  you begin your deliberations.

7        So with that, Mr. Powell, you may deliver the

8  plaintiffs' closing argument.

9            CLOSING ARGUMENT ON BEHALF OF PLAINTIFFS

10       MR. POWELL:  I'm going to start where I started my

11 opening statement and that's thank you for being here.  You

12 appear to be a very attentive jury and that's much appreciated

13 by all concerned, I assure you.  The system is not worth a darn

14 if people aren't --

15       THE COURT:  We can't hear you.

16       MR. POWELL:  I realize I might put you asleep a little

17 bit with the April Cobbs deposition, but the judge's idea when

18 he stops at 1:30 is great because in all the other trials I've

19 been to, after lunch we sometimes lose the entire jury.  You

20 hear people sawing logs.

21       I want to share a couple of my favorite historical

22 sayings, ones that I hope you will ponder when you are together

23 in the jury room.  The first is, "I'm from the government and

24 I'm here to help."  Everybody knows, I think, that comes from

25 Ronald Reagan years ago.

27

Closing Argument - Plaintiffs

1    Another is, "When you are a hammer everything looks
2    like a nail."
3    Another, to me, one of the most profound in my role as
4    a plaintiff's civil rights lawyer, and that is from an English
5    historian named Lord Acton, born in 1834, died in 1902, and he
6    says, "Power tends to corrupt."  Absolute power tends to
7    corrupt -- I'm sorry, "Absolute power corrupts absolutely."
8    Now, this last one is a saying of sorts that I'm going
9    to share now, but it was in the form of a question asked by my
10   colleague, Mr. Whitefleet, of Ms. Perez on the stand, and it
11   relates to those sayings, I believe, that I just gave you.  I
12   submit the entire case does.
13   You've already been told that the statements of
14   Mr. Whitefleet, Mr. Park and myself, they're not evidence, but
15   I am going to be pointing to evidence here and so all I'm doing
16   is arguing which is what this is for.
17   Anyway, I thought this question was thought provoking
18   in a huge way, and in this case the implications of the
19   question I'm about to discuss is, in a very global way, the
20   reason I'm here arguing this case in front of you today.  I
21   don't know if anyone here in this jury box found it profound
22   and disturbing as I did, or even noticed it, but I submit you
23   should.  The question was this, in two parts, though admittedly
24   I don't have a transcript, so hopefully your memory is close to
25   mine, Question -- speaking to Ms. Perez on the stand -- So, in

28

Closing Argument - Plaintiffs

1   the juvenile court when they took jurisdiction over N     and
2   you had to do services, what kind of services did they give
3   you?

4           Hilda was puzzled at first and then Mr. Whitefleet
5   offered, Were they like parenting classes and counseling?

6           And Ms. Perez responded in the affirmative.  That's
7   all I can say.  I believe she said yes, but she was like, Yeah,
8   that's what it was.

9           And the question that followed was this, or something
10  darn close to it:  Did you ever think after all that and wonder
11  if it was all really worth it?

12          I could have objected.  I didn't.  I was momentarily
13  stunned, because I took that, maybe in a plaintiff's civil
14  rights attorney way, and for me it was heard as this:  Did you
15  ever think that you shouldn't assert your rights to an attorney
16  when you're in a room filled with government actors, one of
17  whom has already told you she can take your children, and/or
18  should you not ask for whatever evidence was gathered against
19  you, and instead, just go along with what the government actors
20  or room full of government actors want you to do?

21          And the added bonus question:  Should you just go
22  along when you haven't done a single thing wrong; should you do
23  that?

24          I'm sorry, but my answer and the answer to the U.S.
25  constitution is no, you shouldn't.  The constitution is

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

29

Closing Argument - Plaintiffs

1    supposed to be a restraint on government power, not a license

2    to violate people's rights if they dare to assert them.  It

3    should not be the case that by asserting your rights, they use

4    it as a basis to violate them, which is replete through the

5    comments about cooperating:  You didn't cooperate with me.

6            I'm going to go now to a broad overview of the facts

7    and specifically, you know, trying to stick with the timeline a

8    little bit.  And I realize you may not need it, but I have a

9    job to do up here, some things I'm supposed to do no matter

10   what.  We've got Hilda here with five children with Horacio

11   Garcia at the time of the July 2019 removal of N    .  The ones

12   that were still minors from that family were ages 13, 11 and 8.

13   And then, of course, Freddy, Jr. with Mr. Sosa, who was age 5

14   at the time of the removal.

15           April Cobbs came into the scene fully on the July 12,

16   2019 referral, but you'll actually see her in the evidence

17   having attended something with Ms. Jones earlier.  But when she

18   came in, it was about an alleged shower touching incident

19   between William and Freddy, Jr.  William, who was already

20   "Victoria" at that point, I believe.  It was reported by

21   Mr. Sosa.  You will see his name on the last page of the

22   July 12, 2019 referral, and that's Exhibit 70.

23           Hilda said she was unaware of any claim of such

24   touching and told Cobbs that about two years earlier was the

25   last time they had showered together.  At that time, then,

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

30

Closing Argument - Plaintiffs

1   Victoria was 6 and Freddy was about two and a half years old.
2   On Mrs. Cobbs theory, had Hilda known about that, she should
3   have made a CPS referral.
4        I submit to you it's ridiculous, and on the same plane
5   of ridiculous is Mrs. Cobbs saying someone, anyone needs to
6   make a report about what happened in the blanket tent.  These
7   were just excuses for retaliation.  This is an episode of "Mean
8   Girls," for anybody who knows that movie, that's what this is.
9        You heard mom talked to the kids when she found out
10  about that.  But you don't have to just take it from her, it's
11  also in the delivered service logs from Ms. Jones'
12  investigation on July 12, that is on Exhibit 60, Page 2.  And
13  to call what Ms. Cobbs called it, "perping" on a sibling.
14  Well, if that is perping, then there may have been as many as
15  2 million young brothers and sisters in a bathtub across this
16  globe right now while I've been talking that touched the other
17  kid's privates.
18       Yeah, of course we don't condone it.  We don't say
19  "great," but you don't freak out either, and you sure as heck
20  don't call CPS.  "I'm from the government, I'm here to help."
21  It didn't work out here, did it?
22       Now, I admit that's my view, and other people,
23  including those of you on this jury, you might think that that
24  was a horrid first step in grooming by Victoria, but I would
25  say that that's akin to taking a statement -- a claim by George

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

SER-0031

31

Closing Argument - Plaintiffs

1   Carlin literally where he said, "Mothers milk leads to heroin."

2   He was a comic, and I think that would be comical.

3           I would rather that your first thoughts are what is

4   this Alfredo, Sr. guy doing with his progression of claims of

5   sexual abuse of Freddy starting in hard in December of 2018?

6           He's on it, man.  He's got one at noon.  He's got

7   another one at 2:45 talking to a therapist.  Comes back again

8   February of 2019.  He's just hammering those things.

9           He escalates, you'll see it, to oh, no, Christopher is

10  masturbating Freddy, which, by the way, was evaluated out.  So

11  ridiculous was it on its face.  Christopher wasn't asked

12  anything about it when Cobbs had him right there at the house.

13  You won't see him masturbating when I get to the warrant, you

14  won't see that in there.

15          So, I also hope you're asking yourselves, How does

16  Cobbs, or any of the others, just ignore to the extent that it

17  is left out of the warrant application -- which I'm going to

18  refer to as a "WAP," only because I have been for four and a

19  half years, and I think it's a pretty good word.  It sounds

20  like a slap to the face, which is what I think this case was.

21          I don't know how it could be ignored that Mr. Sosa is

22  doing exactly what this agency is claiming is so outrageous, a

23  mother, so outrageous.

24          Alfredo, Sr. is the reason for the first CAIRE

25  interview.  You heard that, you didn't hear anybody refute it,

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

32

Closing Argument - Plaintiffs

1    because he was, and how the tables turned, and they brought the

2    hammer down on Ms. Perez.  We'll never hear the truth.  That's

3    my opinion, we'll never hear the truth.

4            Okay.  So then, of course, there's the visit on

5    July 12 to the home, and you've heard all about that, I will

6    only touch on it a little bit.  You -- through the blessings of

7    modern technology and some smart people who started up their

8    recordings, you know more than any other jury would have known

9    10, 15 years ago.  God bless body cameras.  That's what the

10   civil rights attorney said.  A lot of the truth gets buried

11   when it's just between humans.

12           So anyway, you have in your items that you can look

13   at, Exhibits 93, 94 and 95, those are the recordings in the

14   home, and you can hear Mrs. Cobbs talking to Hilda.  You can

15   see, as Hilda sounds, the way she describes her when we get to

16   this warrant application.  And I'm warning you, the Judge did

17   tell me I could take as much time as I'd like, so I'm going to

18   hurry through it, but I'm not going to speed race, but 93, 94,

19   95.

20           So, at that time, in July, the Garcia children had

21   been living with their mom for approximately four years because

22   the father, Horacio, hadn't so much as attempted to visit with

23   them under a court order that allowed him to do so if he would

24   simply sign up for the supervised visitation.

25           As for Mr. Sosa, well, in unrebutted testimony --

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

33

Closing Argument - Plaintiffs

1   everybody, I assume, knows that means nobody said otherwise --

2   he had a restraining order put on him because why, Shynelle

3   Jones told Hilda to file for one after she was involved in the

4   April 11, 2019 referral where Freddy, Jr. had a bunch of marks

5   on him, a bunch of marks.

6        At that referral, Dr. Ray Dotta, who was a female

7   doctor, could not rule out physical abuse of Freddy, Jr.,

8   because the marks on the child's arms were, quote, "Not of the

9   kind received in normal daily activities."

10        Dr. Dotta also happened to say to Mrs. Jones, and

11   Mrs. Jones included it in her logs, quote, "Mother presented

12   appropriately."  This is, what, not quite three months before

13   Ms. Cobbs comes in and decides, Oh, she's got mental health

14   problems.  She's got mental health problems.  So Dr. Dotta

15   says, "Mother presented appropriately," and you could find that

16   on Page 2 of Exhibit 58.

17        Apparently, this medical doctor couldn't diagnose

18   mental health issues as readily as Ms. Cobbs could with her

19   marriage and family therapy internship license.

20        Now, another interesting thing, when we get to the

21   warrant you'll see there's this gestalt of, Oh, mom minimized

22   things.  So did Mr. Beard.  They didn't care.  They didn't do

23   anything.  Right in the July 12 logs is Christopher saying that

24   mom sat him down, him and Freddy, Jr., talked to him about

25   boundaries, and then you heard his testimony about what he did,

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

34

Closing Argument - Plaintiffs

1    like, Make sure I'm not alone with Freddy.

2         This wasn't told to the court in the warrant

3    application.

4         We all know what happened on July 19.  If I was Johnny

5    Cochran, I would probably play that removal tape again for you,

6    but I'm not.  You saw it.  It's not hard to imagine the pain of

7    an event like that, but again, thanks to technology, you got to

8    see it in this case.  That's very real.  And it's very rare

9    that you get to see it.

10        Remember the testimony, the juvenile court system is

11   close --

12        THE COURT:  Get close to that mic.

13        MR. POWELL:  Remember the testimony -- I wish this

14   moved with me, Your Honor.

15        It's a closed system.  You don't get to get this close

16   to what goes on except in a case like this.  So this might be

17   why I talk longer.

18        Next I'm going to go through the jury instructions.

19   These are -- these are -- this will sound puffery, the majesty

20   of the law.  These weren't developed last week.  These were

21   developed over a lot, a lot, a lot of years.  Some of them, the

22   actual judicial deception part, at least in the civil social

23   worker arena, is fairly recent.  And they don't -- you know,

24   there's no case cites in here for y'all, but please know these

25   are what we're going to go through, and I'm not going to go

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

35

Closing Argument - Plaintiffs

1   through them all, so don't worry about that either.

2          Who stapled this?

3          In my own defense and my co-counsel's -- or my

4   associate -- my colleague, these got changed like about 30

5   minutes ago, so best laid plans.

6          All right.  We're going to get to the "substantive"

7   stuff.  Again, I'm not going to go through all of it.

8          This is Jury Instruction Number 4.  This is what we're

9   down to here today, okay.  N.P., of course being N      , we do

10  our best to keep that from being out in the public domain, his

11  full name, and he's got a claim against Mrs. Cobbs for

12  Unreasonable Seizure under the Fourth Amendment.  Then he and

13  his parents have a Fourteenth Amendment Substantive Due Process

14  violation of Familial Association.

15         Familial Association, the law on that is so old,

16  really old.  I think it was back to the old 1800s.  You have a

17  right to the care, custody, and control of your children, you

18  know, and it is felt by many to be one of the most inviolate

19  rights that we should have -- that we have, but you learned

20  here that it's not always inviolate.

21         I think this is an important instruction in every

22  case:  Evidence may be direct or circumstantial.  This last

23  sentence, that the law makes no distinction between the weight

24  to be given to either, it is for you to decide how much weight

25  to give any evidence.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

SER-0036

36

Closing Argument - Plaintiffs

1          This next instruction, it's actually kind of a
2    commonsense listing of things that anyone should do when
3    they're trying to figure out if somebody's telling them the
4    truth, whether they're not telling the truth because they don't
5    bloody know what they're talking about or they're lying to
6    them, and it basically lists those kind of things.  So it's
7    probably going to be just like a refresher to your commonsense,
8    but we do have an instruction on it.  And this is the second
9    part of it.  It's a page and a third, allows you to decide to
10   take the wheat from the chaff.
11          Next, Instruction Number 10.  And I don't have to show
12   you this, that's really more like a defendant would show you
13   that and say, Look, you don't have to give Judy Ho -- Dr. Judy
14   Ho anymore weight than you give anybody else.  Well, I'll leave
15   that up to you.  But certainly her credentials speak for
16   themselves.
17          Another aspect of -- and a pretty big aspect, it's
18   pretty prominent in this case, if you listen to all the
19   testimony.
20          I have another thing that addresses what accounts for
21   evidence and credibility.  Just a couple more of these.
22          Now, under the law we have this concept of causation,
23   right, did somebody do something and it caused something to
24   happen to somebody else.  Same cause as the way you think of it
25   in everyday life.  It doesn't have to be the only cause, it

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Closing Argument - Plaintiffs

1   just has to be a substantial factor.  And a reasonable person,

2   which all of you are, would have to consider it to have

3   contributed to the harm.  And it need not be the only cause of

4   the harm, but it must be more than trivial or remote.

5           Next, Jury Instruction Number 14.  This is unique to

6   civil rights law.  A person has to be acting under color of

7   law; meaning they are employed by a government entity doing

8   something that they do for that government entity.  In this

9   case it was stipulated to, it's kind of clear, but if you

10  prove -- if we prove to you Numbers 2 and 3, that Ms. Cobbs

11  deprived my clients of their particular rights under the U.S.

12  Constitution, Fourth and Fourteenth, then we have that false

13  imprisonment that you'll read, that's a state law claim, state

14  law.  It's obviously very similar to being seized, and that

15  Mrs. Cobbs' conduct was an actual cause of the injuries, then

16  we have shown you all of the elements because color of law has

17  been stipulated to.

18          This talks about us having the burden, no problem.

19  You'll find it hard to believe we didn't need it, but I'm going

20  to take you through it, make sure you caught all the mileposts

21  along the way.

22          This is basically the heart of what brought us here.

23  Judicial deception, lying, omitting, trying to twist, twist the

24  facts you know about, you know, leave out the things that don't

25  support where you want to go.  That's what this case was about.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

38

Closing Argument - Plaintiffs

1   That's its core.  It gives you the parameters.

2           We have to show probable cause.  There was a -- or

3   actually what Mrs. Cobbs was supposed to show on Line 14, she

4   was supposed to show probable cause that there exists

5   substantial danger; substantial danger to the safety or to the

6   physical or emotional health of the child.

7           Please hear this:  There are no reasonable means to

8   protect the child's safety or physical health without removal.

9   That's how bad it is, that's how bad it is.  If my clients were

10  smoking crack and their kid was running around in a poop-filled

11  diaper every day, we wouldn't be here.  That's not the case.

12          These are the standards.  Please take a good look at

13  15, and be aware of this:  We need to show not that she did it

14  intentionally.  I think you'll see plenty of instances where

15  you can't conclude that she did, but we can do it showing a

16  reckless disregard for the truth.  So you knew, but you didn't

17  say it, and it was material.

18          Judge might have said, Hey, what's this about?

19          It's enough if the judge would have said, hmm, I want

20  to hear more because something's not adding up here.  But if

21  you're skillful and you take the time, you can leave out all

22  the things that will even cause the judge to do that.  This is

23  what gets me hot.  This is why we're here.

24          Now, that was the Fourth Amendment standard there for

25  the removal of N    , and it applies in the judicial deception

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

39

Closing Argument - Plaintiffs

1    arena to the Fourteenth Amendment claim as well.

2            Still judicial deception's at the core.  This is the

3    Fourteenth Amendment, little different.  In other words,

4    judicial deception is the road that was taken to smash the kid

5    on the Fourth and to smash the parents on the Fourteenth, all

6    through judicial deception.

7            And this is important, and it's subtle.  You'll see it

8    says there are two tests to decide whether defendant's conduct

9    shocks the conscience, right?

10           Then it says, "Which test applies turns on the

11   specific circumstances of the underlying events in each case."

12           This is important.  If you find that the encounter at

13   issue escalated so quickly that Defendant April Cobbs had to

14   make a snap judgment, then we have to show there was a purpose

15   to harm; purpose to harm.

16           However, if you find the situation evolved within a

17   timeframe that allowed Defendant April Cobbs to reflect before

18   acting, the plaintiffs must show she acted with deliberate

19   indifference.  So I hope you all can appreciate that for the

20   distinction that it is.

21           Purpose to harm -- I'm going to do this just to mess

22   with you -- which I think is true.  I think that's what

23   happened.  I think that what certainly Ms. Perez did is what

24   people who do what I do call she committed "contempt of social

25   worker."

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

40

Closing Argument - Plaintiffs

1          Power tends to corrupt.  Absolute power corrupts

2     absolutely; that's what she did.  She dared to ask for an

3     attorney.  She dared to ask for discovery.

4          But let's go back to the timeframe issue in this

5     Instruction Number 16, okay?  Did she have tame to reflect

6     before acting, before filling out that warrant, maybe

7     rethinking what she was doing?  She sure the hell did.  She had

8     time to go out and remove six other kids.  She had time to do

9     that.  She had four days to do that.  And really, if there

10    would have been something based on July 12, well, she should

11    have done something then, but she didn't.  So did she have time

12    to reflect, yeah, she had a lot of time to reflect.

13         But reflection wasn't her strong suit.  Getting

14    annoyed was her strong suit.  Flexing her muscle, that was her

15    strong suit.

16         This is that state law reference that I said to false

17    imprisonment.  It's certainly conceptually parallel to, you

18    know, seizure under the Fourth Amendment.  It has slightly

19    different elements.  I encourage you to look at all of this.

20    Look at all these jury instructions.

21         Now, this is about damages, and it is what it is.  I

22    submit when we get there -- if your only knowledge of court is

23    from TV, you won't hear from me what you hear on TV about

24    damages.  I think I've come up with a very fair and reasonable

25    way that gives a nod to the wisdom of the jury, to the

41

Closing Argument - Plaintiffs

1    collective value of having people who are considered to be

2    peers in the jury box, members of the community, who might be

3    affected the same way.

4         So this is pretty straightforward, mental or emotional

5    pain and suffering.  And it was already experienced in

6    Number 2, that with reasonable probability will be experienced

7    in the future, like every time a county car goes by and when

8    you have to drive too close to the juvenile dependency offices

9    or the court.

10        Now, this is something called punitive damages.  This

11   is what you hear about in the news, right?  Remember McDonald's

12   brewing up hot coffee?  I don't know if people know that

13   they've been told like five times to stop that, and they

14   didn't.  The lady had it in her lap and it ended up burning her

15   privates.  So those who thought that that award was ridiculous,

16   I don't think they knew those facts.  They had plenty of

17   notice.  They had been told several times, Your coffee's too

18   damn hot.

19        So punitive damages are to punish.  It requires that

20   we show that the harm defendant caused, the conduct was

21   malicious; that's kind of like the top of the mean chain.

22   Oppressive, a little lower, or in reckless disregard of the

23   plaintiffs' rights.

24        So whenever somebody tells you, Oh, you have to show

25   malicious.  No, they're wrong.  You have to show that somebody

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

SER-0042

42

Closing Argument - Plaintiffs

1   was aware of the rights that they were violating and they just

2   recklessly went ahead and did it anyway.

3        You heard every -- I believe of the social worker

4   witnesses who testified, they talked about being well aware of

5   the harm, the life-long harm that children for sure can suffer

6   and parents can suffer as a result of an event like this.

7        And we got a little extra piece of evidence, I didn't

8   know it was coming:  Ms. Johnson asked on the stand what drew

9   her into the work that she did or what she had been involved

10  with before.  She described an incident where her daughter was

11  taken.  I didn't question her about the kid because I know.  I

12  represent people like this all the time.  I had kids.  She said

13  that her child was taken and that she suffers still from PTSD.

14       Now, we know from her testimony she had been with the

15  department, I think it was four years.  She had been with the

16  department before July 19.  So whatever happened to her

17  daughter happened at least five years prior to now, and

18  conceivably more than that, and she still suffers from PTSD.

19  Those were her words under oath.  It's very real.  It's very

20  real.

21       So guess what on this?  I'm not going to give you a

22  dollar amount when I get there.  I'm not.  I just want you to

23  award something.  I want you to show that it was malicious, it

24  was oppressive, it was with reckless disregard because it was.

25  It was horribly, horribly unnecessary.  Maybe now my clients

43

Closing Argument - Plaintiffs

1  can look back on them and say, Was it worth it?  Was it worth
2  it to lie, to treat me like that, do that to my children,
3  separate everybody?
4          "You may consider the relationship of any award of
5  punitive damages to any actual harm inflicted on the
6  plaintiffs."  Of course, use that, but again, you're not going
7  to get a dollar amount.  I mean, I can bring it up again,
8  probably will, but I ask that you do award punitive damages.
9  It was punitive.
10          This is an important area of civil rights law because
11  it's unique.  You can't do this with a false imprisonment
12  claim, and I can almost guaranty you defense counsel is going
13  to come up here and tell you -- he didn't show any damage on
14  N   .  He's nine months old, you know.  Oh, his dad says he
15  cried when he'd leave the room.  I don't know.
16          I think probably there's more than one or two of you
17  in this jury who have a life experience that informs them about
18  the realities of that, of what it can be like to have something
19  that traumatic happen no matter what your age and how it might
20  affect you in the future.
21          Well, we know from Ms. Johnson it happened to her
22  daughter, but we don't know how old she was.
23          In any event, nominal damages.  That's saying that if
24  we prove on the Fourth and the Fourteenth, but you don't
25  believe that my clients had any damage, including N   , then

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

44

Closing Argument - Plaintiffs

1    you still award a dollar basically, you award a dollar.

2            I believe that's it for the jury instructions.

3            I'm going to talk with you a bit about all this

4    evidence that you're going to have in that jury room.  There is

5    eight of you, and it might seem overwhelming if you look at the

6    stack of paper, but if you divvy it up, it shouldn't be that

7    bad.

8            I want to make a couple points.

9            There's an important claim made by Ms. Cobbs in her

10   warrant application, and that is something I am going to

11   dissect.  If it wasn't so filled with lies, I wouldn't need to,

12   but it is.  She makes the claim that there's been nine sex

13   abuse referrals in the last year, six sex abuse referrals in

14   just 2019.  So you can actually check that for yourselves by

15   looking at the ERRIs, you know, and there's a pattern.  There's

16   an Emergency Response Referral Information as Exhibit 4, and

17   then there's going to be delivered service logs, because it

18   said something other than evaluate out, like immediate response

19   or ten-day response.  There's going to be delivered service

20   logs behind them.

21           I'm not going to go all the way back and spend your

22   time looking at all of them, but I am going to tell you what

23   you'll find if you look in the 2011, 2012, because Mrs. Cobbs

24   made comments in the warrant application about, Oh, these have

25   a theme of sexual abuse of relatives and da, da, da.  Well,

MARYANN VALENOTI - U.S. DISTRICT COURT - (916)930-4275

Closing Argument - Plaintiffs

1  they do, but 2018 and '19, that was Mr. Sosa doing all that.
2  My client had a claim, too, based on what the boy said, in
3  which he had a tear near his rectum, but hey...
4      I want to go back and point out to you that in the
5  2011, 2012 timeframe, when my client was going through
6  postpartum, okay, she just about lost her child when the child
7  was born, all right.  I've never been through a pregnancy, but
8  that's got to be pretty tough.  That scarred her good.
9      What you'll find, if you go back and read those
10  referrals from that timeframe, is that when she was at that
11  point in her life, she did the right Solomon's choice.  She
12  says in those delivered service logs, It's okay.  I'm not good
13  for my kids right now.  Let them stay with dad.  Let them stay
14  with Horacio.  That's what you'll see.  Okay.
15      Now, leaving out that it was years old -- I really
16  want you to note she left it out that it was years old.  She
17  just did this broadbrush, Mrs. Cobbs, because she was trying to
18  snare them.
19      But that's what you'll find, It's okay.  Let the kids
20  stay with dad.  I'm not in the best of shape.  That takes a
21  certain level of selflessness, you know, to do that.  Obviously
22  my client loves kids; she's got, like, seven to show for it.
23      So that's in what I call Part 1, okay.  That's
24  everything prior to the July 29, 2018 referral.
25      So when it comes to focusing in, I ask you to really

46

Closing Argument - Plaintiffs

1   start looking close when it comes to the July 29, 2018 referral
2   and thereafter.  That's where you see the Sosa, Sr. escalating
3   claims of abuse.  That's where you can realize that -- the
4   first CAIRE interview that Mrs. Cobbs says is essentially mom's
5   fault.  It was actually Mr. Sosa.  That's where the rubber
6   meets the road.  And if I didn't have the Adobe Acrobat
7   problems I had yesterday, I'd be flashing all these in front of
8   you.
9           One thing I did want to do with my colleague,
10  Mr. Park, because this is another theme.  I got to tell you,
11  this theme definitely runs throughout.  Even during the bad
12  times when mom was messed up, you know, the postpartum and all
13  that, and that is how many times these children at various
14  stages told social workers that they feel safe, which you won't
15  see in the warrant application.  It's not in there, not one
16  time, and yet every kid said it multiple times, including to
17  Mrs. Jones, who sat right next to Mrs. Cobbs.
18          Do you want to take him through the "safe"?  Push it,
19  pushing my technical limit right there.
20          What Mr. Park's going to do is he's simply going to
21  put in the word "safe" and jump through -- I think we divided
22  it into two parts, like I said, prior to July 29, 2018, and
23  second part July 29, 2018.  That's the only one we're going to
24  do right now, right, but if you want the look for others, I
25  assure you they're in there in the first part, too.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

47

Closing Argument - Plaintiffs

1        Okay.  We got Chris -- slow down.

2        MR. PARK:  Sorry, let me start back.

3        MR. POWELL:  Alfredo again.

4        MR. PARK:  This is the first one.

5        MR. POWELL:  All right.  First one, Christopher, this

6   is in April 2019, saying he feels "safe" at home.

7        Next.

8        Damien, "safe" living at home with his mother.

9        Next.

10       Alfredo, again, on July 1, at the CAIRE interview.

11       Stop a second, please.  Next "safe," please.  I think

12  that's -- unless you can scroll up just a little, Sam.

13       So, basically this is Alfredo saying he feels "safe"

14  with mother and father.

15       Next "safe."

16       That's him again.  Victoria now, she feels "safe" at

17  home.

18       Next "safe."

19       Destiny, she feels "safe" at home.  She's 17 at that

20  point.

21       And I want to stop you just a second, Mr. Park.

22       For any of you who have had teenagers, we've been

23  through that, I just want you to know that Destiny was kind of

24  a young teen back in the 2011-2012 timeframe.  So things go on

25  with teenagers.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

48

Closing Argument - Plaintiffs

1      Here we're now on -- who is it, it's Christopher again
2  feeling "safe" at home.  Damien, again, feeling "safe" at home.
3      Next.
4      Here we are go, this is a broad one.  "Social worker
5  spoke to other children in the home.  Indicated they feel
6  'safe' at home denying any abuse.
7      "The children all reported feeling 'safe' with parents
8  and denied any abuse.  Situation stabilized."
9      Can you roll up, Mr. Park, and show them what time
10  that is where the situation stabilized?
11      July 2, 2019.  Ha. The situation stabilized, but April
12  Cobbs shows up on 7/12, and by 7/15 the situation is so
13  unstabilized we have to rip a nine-month-old from his parents?
14  Again, you're not going to get the true story.  That's what
15  happened, though.
16      All right.  Is there anything else, Mr. Park?
17      Christopher again -- I think it's looping.
18      MR. PARK:  This is looping.
19      MR. POWELL:  Okay.  So safety not an issue.  Now, of
20  course, what you hear when I ask you questions about that -- of
21  have those documents -- of course I have those documents when
22  I'm asking them questions in depositions.  Everybody downplays
23  that.  Ms. Cobbs agrees that it's important, they need to ask
24  it, right, but then it says, Well -- like Mr. Anderson, he did
25  it best, he said, Well, that just means the child perceives

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

49

Closing Argument - Plaintiffs

1   that they're safe, huh.  I think that's being dismissive,

2   Mr. Anderson.  And you get the same answers from Cobbs, from

3   Jones.  It's what goes on.

4          Now, I am about ready to go -- oh yeah, I want to take

5   you through Exhibit C.

6          Mr. Park, would you please put up Exhibit C?

7          Now, Exhibit C is a document that the defendants put

8   into evidence.  And I'm going to have Mr. Park take you to

9   Page, I believe it's 7, if we're on the same wavelength.

10         Are you there?  There it is.  Boom.

11         All right.  Do you see that paragraph that starts the

12   application portion of the form is a Sworn Statement, right,

13   and it's talking about, you know, how you request the

14   Protective Custody Warrant.

15         This is the standard, and I'll submit to you it's

16   lifted off the state law, as it is per statement.  But it

17   actually all derives from federal law.  It says, "The assigned

18   social worker must have reason to believe from the initial

19   investigatory contact with the child and/or the child's

20   residence, that the child has suffered or is at substantial

21   risk of suffering serious physical or emotional harm including

22   sexual abuse and neglect," right.

23         (Technical interruption.)

24         MR. POWELL:  I actually don't know how to turn that

25   feature off, Your Honor.  I assume she -- here.  She's

50

Closing Argument - Plaintiffs

1   everywhere.

2          So please note that language, because guess what, you

3   won't find even a claim by Cobbs that the child's at

4   substantial risk.  You certainly won't find a claim that N

5   was inappropriately touched by anybody, and you won't find --

6   it's just the whole warrant application is so weak, it's so

7   clearly just something to stab these people.  You see N    's

8   name in there six times, six times, and two of them are where

9   it kind of has to be in the caption, and then identifying the

10  child.  And then there's two more in two paragraphs that are

11  right next to each other where it's basically Cobbs saying, I

12  want a Protective Custody Warrant for this child.  And I'll

13  show you that, but -- I'm sorry.

14          Here we go.  Now, A, on Page 7 of Exhibit C.  It also

15  says, It must state the specific reasons or statutory grounds

16  under Section 300.  Well, what does that mean?  Well,

17  Section 300 has various things under it.  It's not just 300,

18  it's got subsections.  Maybe it's about sexual abuse, maybe

19  it's about physical abuse, maybe it's about intentional abuse

20  of a child.

21          Negligence, stuffed in (b), neglect.  You won't see

22  that no more.

23          Now, I just want to show you this, too.  Again,

24  because there's only a few places you can talk to people this

25  freely.  1(b) under "Social Worker's Professional

51

Closing Argument - Plaintiffs

1    Qualification," it talks about how you're supposed to put in

2    your qualifications, you know, how many allegations you've

3    investigated.  And then it says, "If the assigned ER worker is

4    new with minimal experience investigating referrals, the

5    worker's supervisor should be the affiant."

6         Oh, you mean the person who didn't do any personal

7    investigation whatsoever?  Let's just have them sign under

8    oath.  Gives you some idea what the culture might be like when

9    it comes to telling the truth at Stanislaus County's Community

10   Service Agency.  Yeah, you just sign it.  Yeah, you weren't

11   there.  You didn't speak to anybody.  You just sign it under

12   oath.  No big deal.

13        Page 8.  It says, "Check a box which matches the

14   reason why the Protective Custody Warrant is being requested,"

15   and we'll go over that in this application here.

16        Then if you go down to Sub (1), Mr. Park, right there.

17        "Document the specific risk factors that place the

18   minor at immediate risk for physical, sexual, emotional harm.

19   Immediate medical care, high danger of physical abuse or sexual

20   abuse."  "High," that's up there with the word "substantial."

21        And then it has a third and separate, "The child's

22   physical environment poses a risk of harm."  That's its own

23   thing, right.  By God, that's talking about a house, terrible

24   living conditions, living with cockroaches, there's no power,

25   there's exposed wires.  It's not what Ms. Cobbs said.  It's

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

52

Closing Argument - Plaintiffs

1   not.  She didn't know what to check.  She's spit-balling with

2   this warrant application.  She's going to win.  She's going to

3   show you're bad parents, and here's the proof why I took your

4   child.

5        Those things that you're reading there in Sub (1),

6   those are like the steps in 300.

7        Number 2, "Document any relevant CPS history,

8   substantiated referrals."  You won't see that in the warrant

9   application either.  There's a couple, there is a couple.

10  They're not in there.  "Criminal history of the parents."  God,

11  as much as I've looked at that, I don't know the answer to

12  that.  We'll look at it together.  But they had none.  I know

13  that.  I think that is in there.

14       And then, "Guardians, caretakers or persons living in

15  the child's home."  God, why would that be important?  Well,

16  that could be because if there's another home that the kid can

17  live in, then we wouldn't need to remove him if there was

18  someone safe.  But because Mrs. Cobbs was out to get them all,

19  she had to come up with some cockamamie story about Mr. Beard,

20  who's also like an afterthought in the warrant application.

21       Then it says, "Provide specific details concerning

22  attempts to resolve the investigation without the need for

23  Protective Custody Warrant."  I will get into that when I get

24  to the warrant application itself.

25       Next, Number 4, "Document the source of information if

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

53

Closing Argument - Plaintiffs

1   it is not directly observed by the social worker, and the

2   reasons the social worker believes that that person could be

3   reliable, including whether or not the reporter is a mandated

4   reporter." Bingo. I asked about that, right, I told you about

5   that in the opening statement, and then I don't remember who it

6   was got up there and told us, Oh, no, that's not important. I

7   don't know if it was Mr. Anderson or Mrs. Cobbs. That was the

8   take. That was the lean. Oh no, it doesn't matter, it's a

9   mandated reporter. Well, you're supposed to say it. Guarantee

10  you're not going to see that in the warrant application.

11  You're going to have the warrant application back there. All

12  right.

13        Now, again, with the understanding that you have to

14  have context -- I'm done with C, thanks. You have to have

15  context to determine if somebody lied flatout, you know,

16  intentionally lying. Are they just being reckless, you know,

17  they're not doing what they're supposed to do and they don't

18  give a damn, and then they're just completely incompetent. You

19  could also consider those who have mental health issues and

20  then they lie, but that's not what we have here, and here I

21  know.

22        So I want you to keep in mind, as we go into this

23  here, that I'm giving you these as context points for making

24  those decisions. Did she lie intentionally? Did she lie

25  recklessly? There's not a lie or an omission in this warrant

MARYANN VALENOTI - U.S. DISTRICT COURT - (916)930-4275

54

Closing Argument - Plaintiffs

1  application that wasn't, at the very least, reckless.  And I

2  think much of it was very, very intentional.

3          My client had committed contempt of social worker.

4          Shane Beard, who didn't need to be there, which you

5  heard yourself on the tape, he got up and left when his fiancee

6  left, that's why he was unable to show them his protective

7  capacity, I guess.

8          All right.  I want to point out a truism about money.

9  I learned this.  I've been very involved in the "lying is

10  against the law" movement.  It's much more risky, even little

11  kids figure this out, it's much more risky to just state an

12  outright lie, there could have been an unknown witness, right,

13  could have been a photograph or video recording, or as we had

14  in this case, audio recordings, right.  That's too much risk.

15  It's better to go the route of omissions.  If you've got

16  omissions, then you've created an excuse list, right.  Simple

17  and easy, "I didn't remember," "I forgot," right, or, "I must

18  have forgot that one."  All familiar to "the dog ate my

19  homework."

20          So, this is a list of things that Ms. Cobbs knew or

21  had information on or had access to before she ever created the

22  WAP:

23          First, Cobbs had access to the entire CWS CMS, every

24  call in on this family, every DSL where there was a

25  investigation, that's one.

Closing Argument - Plaintiffs

1      Secondly, per her WAP itself, she was, quote, "By
2   virtue of her education, training and experience," quote,
3   "qualified, authorized, and currently assigned to conduct child
4   abuse and neglect investigations under Welfare and Institutions
5   Code Section 300." Actually, I don't believe any of that's
6   accurate, but she did, and that's her claim. So we got to hold
7   her to it.
8      Third, having been there for one year and 10 months,
9   she surely knew referrals and reports. The distinction being
10  that the latter reports are not investigated. And they're all
11  tracked on the mother's name.
12     This question, this answer you heard from her, and I
13  quote, Question: "Okay, so what did you mean when you said
14  'her 52 referrals'; what does that mean?"
15     Answer: "Because the CPS history goes under Hilda's
16  name." So she knew that. You won't see that distinguished in
17  the warrant application.
18     Fourth, she testified -- this is important -- she
19  testified she read every DSL for a referral that led to an
20  investigation. Right, that's the only ones that would have
21  DSLs and she read them all.
22     Here's the exchange.
23     Question: "Okay, so did you read all the delivered
24  service logs for at least the cases that were not evaluated
25  out?"

56

Closing Argument - Plaintiffs

1        Answer:  "I reviewed the service delivery logs, yes."

2        So all those that you have in there, between 1 and 71,

3  she read them.  You wouldn't know it when you looked at the

4  warrant application, trying to save that for later.

5        She also testified she knew about the phenomenon of

6  duplicate referrals, as did Mr. Anderson, as would anybody who

7  worked there for more than a couple of weeks, they would know

8  that, if there's duplicates.

9        Six -- this is also important -- she said she had all

10  the medical records in front of me before writing the warrant

11  application as found in this exchange, you heard this

12  yourselves.

13        Question:  "So, ma'am, is it accurate to say that you

14  did not determine, before filing an application to have her

15  child removed, where the various locations of what you

16  described as numerous different doctors were; is that true?"

17        Answer:  "At that time I had that information in front

18  of me.  I do not have it now, nor can I tell you where she went

19  or how many times."

20        She had that information in front of her then.  Could

21  have told the court that then, but instead I should paint it

22  with a broadbrush; it doesn't have to be the truth.

23        Seven, there was testimony she had not spoken to a

24  single of the doctors or nurses from the later events, the

25  multiple doctors and offices for sex exams that she says Hilda

57

Closing Argument - Plaintiffs

1   was alleged to have taken Freddy to.  And Mr. Anderson, when he

2   was on the stand, confirmed that he didn't believe she had done

3   so himself.

4            Number 8, she had been told by Alfredo, Sr. -- she had

5   been told -- Mrs. Cobbs had been told by my client, Hilda

6   Perez, that Mr. Senior [sic] himself had been a victim of

7   sexual abuse by an uncle, and you hear that in Exhibit 93.  We

8   didn't have an expert opine on it, but you might infer that

9   that means you should probably take a look at that situation

10  closely rather than just drop the child off, which is what was

11  done.

12           Ninth, Ms. Cobbs had been told by Freddy, Jr. -- or

13  been told that Freddy, Jr. was already in a counseling group at

14  Kids Haven, which Hilda described as a trust group that helps

15  children in establishing boundaries.  That's on the tape,

16  Exhibit 94.

17           So how do you tell the Court, dismissed it -- dismiss

18  it, doesn't care.  You do it because you have a vendetta.

19           Tenth, Mrs. Cobbs herself stated she can see, quote,

20  "Hilda is very attentive."  And she adds, "I would have lost my

21  patience a long time ago," end quote.  That's also in the tape,

22  Exhibit 94.

23           Eleventh, Cobbs told Hilda and Shane she herself had

24  suffered from postpartum depression, in a wholly unsolicited,

25  created way that leads me to believe she then knew the genesis

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

58

Closing Argument - Plaintiffs

1    of the 2011, eight-year earlier referrals about Hilda suffering

2    from mental health issues and that it involved postpartum.

3    Okay.  Why the hell else do you bring it up?

4            Twelfth, and this is subtle, it's not a big deal, but

5    I already wrote it down, so you got to hear it -- so, to the

6    extent that Cobbs may have been alluding to a custody battle

7    motive when she was talking to Hilda in the house, Exhibit 94,

8    again, Hilda points out to her that she's got pictures in her

9    house of Freddy, Jr. and Freddy, Sr.  Do you know why?  Because

10   that's what a good parent does, you know.  That's what a good

11   parent does.  We could put family law attorneys out of business

12   if people could just behave like their children are more

13   important than themselves.  I did enough of that to not do it

14   anymore.

15           What's the other one here?  Yeah, that's in Exhibit

16   94.

17           Thirteenth.  Now, you remember there's -- I think you

18   would have picked up on there's a big dispute about what was

19   this TDM for, what was this TDM for?  Was it for the whole

20   family?  Was it for just Freddy?  You know, that's why

21   Mr. Beard didn't have to go.  And it is telling when Cobbs was

22   at the house, she literally says this on Exhibit 94, she says

23   this about the TDM:  "We'll sit down and figure out what the

24   next plan" -- I'm sorry, on her referral, she's there on

25   referral, has nothing to do with N      , because remember, none

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

59

Closing Argument - Plaintiffs

1    of the referrals have anything to do with N⸱   , not one.  She's

2    there on that, and she says, "We'll sit down and figure out

3    what the next plan of action is because, I don't know, 34

4    referrals, that's a lot," Exhibit 94.  Which is interesting

5    because the warrant application says 52 reports from referrals.

6          Fourteenth, there had never been any referral about

7    N⸱  of any kind, much less being touched inappropriately.

8          Question to Ms. Cobbs:  "Did you receive any evidence

9    from any source before you sought a warrant application that

10   N⸱    had ever been touched inappropriately?"

11         Answer:  "N⸱   , no."

12         Fifteenth, she knew the parents lived in separate

13   homes.

14         Question:  "You were aware that the parents did not

15   live together at the time, correct?"

16         Answer:  "Yes."

17         Sixteenth, she knew virtually all of the referrals,

18   more than 80 percent of them, were made by mandated reporters,

19   and that over 30 of them were evaluated out.

20         Seventeenth, she knew the potential for significant,

21   long-term psychological harm to N⸱    and his parents from

22   removal.  This exchange:

23         Question:  "Now also, prior to your involvement with

24   Hilda, Shane and their children, you were aware that the

25   removal of children can have a significant, long-term

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

SER-0060

60

Closing Argument - Plaintiffs

1   psychological consequence for those children, right?"

2          Answer:  "Yes."

3          Question:  "Then you were aware that also is true for

4   the parents, correct?"

5          Answer:  "Yes."

6          Eighteenth, she and Jones had called to Hilda while in

7   the same car, only five minutes after leaving the home or so on

8   July 12.  That was Hilda's unrefuted testimony.

9          At that time they called to advise of a different time

10  for the July 15 TDM, and in that conversation Shane was never

11  in any way told he should come, and indeed, the only

12  conversation about Shane was pretty much like this:  Umm, so

13  it's okay for Shane to come and things like that?  Not long

14  after that in this same call was this statement by Jones:

15  "Hilda" -- and that other statement was from Jones, too --

16  "it's okay for Shane to come and things like that."  And then

17  she says, "And as for Shane" -- this is Hilda, "And as for

18  Shane, is this attendance mandatory?"

19         Social Worker Jones:  "No."

20         And finally this plenary statement, as well, this is

21  Mrs. Jones:  "So you don't have to bring anyone, but you're

22  welcome to if you'd like."

23         All of that is in Exhibit 95.  It was undisputed,

24  Cobbs was in the car.

25         Nineteenth, she knew, Mrs. Cobbs knew, it's literally

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

61

Closing Argument - Plaintiffs

1   in the warrant application, that she is supposed to explore
2   alternatives to removal of a child, and yet this is from her
3   deposition that was played at trial, this supports it.

4   Question:  "You were also trained prior to July 19,
5   2019, that you should explore what a parent is willing to do to
6   mitigate whatever risk of harm you believe the child is
7   facing?"

8   Answer:  "Yes."

9   Twentieth -- now, this one I can't say with a hundred
10  percent certainty -- I like that, to be honest with folks --
11  but as I said, this has all been proffered to you under the
12  concept of direct and circumstantial evidence, and in the end
13  you decide the truth as the jurors.

14  Simply stated, Number 20 would be that Cobbs knew
15  Shane had indicated he would do anything, up to and including
16  separate from Hilda, anything at all, to have his child -- to
17  avoid having his child taken, and he testified about this in
18  trial.  Okay.

19  So please know these facts.  In addition to the fact
20  that was undisputed as between Ms. Jones and Ms. Cobbs, that
21  they each had referrals about Hilda and her kids, and they went
22  to the house on July 12, together, which is -- Ms. Jones
23  testified as follows:

24  Question:  "Yes, in other words, you know --
25  "Yeah.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

62

Closing Argument - Plaintiffs

1    "What's the first time, maybe, April walked up to you
2    in the hallway and said, Hey, I'm working a case with this
3    family, too, whatever it might have been?"
4        Answer:  "I want to say the reason I went with her is
5    because she sat next to me, and she had received the immediate
6    call, and I said, Well, I'm going to -- I'm going to go because
7    I need to get mine done, too.  That way we don't have to go out
8    two separate times and question the kids."
9        Next question:  "How long had she sat next to you
10   before the referral came in that Mrs. Cobbs received?
11       "I think we sat" -- this is Mrs. Jones now -- "I think
12   we sat next to each other.  If it came in in 2019, maybe two
13   years we sat next to each other.  I always sat in the same
14   spot."
15       Question:  "Understood.  How long had you known April
16   Cobbs by that time?"
17       Answer:  "Let's see, that was 2019.  I met April in
18   like 2016."
19       So, they're good friends.  Five years, been to each
20   others' houses, desks next to each other.  Does anyone believe
21   they didn't talk about this family and anything that came up in
22   it?
23       One of the earlier referrals in April, Ms. Cobbs
24   actually joins Mrs. Jones, can't remember right now if it's the
25   April 11 or April 26, but she's there.  So, again, consider

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

63

Closing Argument - Plaintiffs

1    that.

2              As we showed you, every kid who could talk said they

3    were safe, that's the 21st.  The 22nd -- we're almost at the

4    end -- we are at the end.

5              Other than Mrs. Cobbs' own marriage and family intern

6    license, upon which she stated she could make mental health

7    diagnoses, it had been seven years since there had been a

8    single referral from any source claiming anything about Hilda

9    having mental health issues.  Certainly, there's no expert of

10   any kind, probably Sosa, Sr.

11             All right.  I'm going to turn to the warrant

12   application now.

13             THE COURT:  Why don't we take a short break.

14             MR. POWELL:  Thank you.

15             THE COURT:  Take 10 minutes, come back at 11:30.  All

16   admonitions apply.  Please report any violations of admonitions

17   to the Court.  See you in 10 minutes.

18        (In open court outside the presence of the jury.)

19        (Recess taken 11:19 a.m. to 11:31 a.m.)

20             THE CLERK:  Please come to order.  Court is back in

21   session.

22             THE COURT:  Bring in the jury.

23        (In open court in the presence of the jury.)

24             THE COURT:  All right.  All jurors are present, all

25   parties are present.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

64

Closing Argument - Plaintiffs

1      Mr. Powell, you may continue your closing argument.

2      MR. POWELL:  Thank you, Your Honor.

3      All right.  Can we get 72 up on the screen.  Scroll on

4  down some, Mr. Park.  More.  Clear down to Page 2, Check Box B.

5  Right there.

6      All right.  In this warrant app, this checkmark B, all

7  right, refers to Section 300 of the Welfare and Institutions

8  Code, right.  You remember from the policy document there's

9  supposed to be a designation of the section, it's not in there,

10  but there's this form, so she had to pick something, right,

11  when you're trying to make something happen.

12      Scroll on down a little bit more, Mr. Park.  Stop,

13  stop.

14      Now, this is the first instance where, in Paragraph 3,

15  their location of children, something could have been said

16  about the fact that the parents don't live together, but it's

17  not.  It says it's the residence for herself and the child.  Is

18  it a lie?  No.  Just pointing out some things.

19      Going down to sub C, okay, this is the part, this

20  little box C is checked under Item 4, "Request to Take Custody

21  Order."  You see she had nothing else to check, right, but the

22  child's physical environment, that's, again, a house with

23  exposed wires, cockroaches, dirt, feces, piles of crap,

24  garbage; it's not this.  The physical environment, physical.

25  That's the only thing that she's checked.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

65

Closing Argument - Plaintiffs

1          Go down.

2          I want to point out --

3          Could you go back to C.  Yeah.

4          Immediate threat.  Well, that's a lie in its entirety.

5     That one of the other children are going to touch N      's

6     genitals.  He's nine months old.  Someone's touching his

7     genitals 7 to 10 times a day and then doing it with a cold,

8     damp paper cloth to boot, front to back, side to side, okay.  I

9     don't know, again, forgive me, I think it's preposterous.  I

10    think the whole thing is preposterous.

11         Go to the next page, down under 7.

12         This is where she says there's been 52 referrals and

13    reports.  Now, that's not a flatout lie, it's actually 51.  One

14    of them has nothing to do with her.  It has to do with

15    Horacio's girlfriend's kid.  Nothing to do with her, and then

16    she paints the broadbrush.

17         Nothing like what we see in Exhibit C, let me take you

18    there real quick.

19         Just a second, Mr. Park, and I'll take you there.  If

20    could you go to Exhibit C real quick for me, Mr. Park, and go

21    to Page 17.  If you can go into the heading examples of needed

22    documentation.  There we go.

23         I brought this up at trial.  Look at the comparison

24    between what "specific" means and "conclusionary."

25         Scroll up a little more, show them more of it.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

66

Closing Argument - Plaintiffs

1      Do you see that?  How about the next one was B, B.

2  The bathroom had no toiletries and was smelly.  That's pretty

3  much what Mrs. Cobbs has done here, you know.  She just paints

4  this big broadbrush, you know, don't have any details.  I'll

5  get you, I'll get you, Judge.  Show her one more, C -- show the

6  jury one more, not her.  Do you see the difference?  Do you see

7  the difference between being honest and being what she was?

8      That's it right there.  Can you go back to Exhibit 72,

9  please.

10      All right.  Now, I want to point out something here,

11  do you see that word "appears" down there, the third line up

12  from the bottom, "There appears to be times with a heavy flow

13  of reports.  And then seemingly a vacuum in which there are no

14  reports for a period of time."

15      Well, for the moment, just focusing on the word

16  "appears."  It is in this document five times.  Five times she

17  says something "appears," okay?

18      Well, hang on.  You're supposed to be putting down

19  facts, not "it appears."  "It appears to me."  "I believe."

20  Not conclusions, facts, but that's what she supplants facts

21  with is "appears," and it's throughout, the five of them.

22      Again, he already went past it, so I won't ask Sam to

23  go back up, for Mr. Park to go back up, but No    's name appears

24  on the first page in what is called the "caption," so it's got

25  to be there because it's got to be there.  And then when it

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Closing Argument - Plaintiffs

1    starts talking about the affidavit it says it's re, regarding,

2    N   Perez, that's twice where "N   Perez" is in there.

3         Now there appears to be times with heavy flow of

4    reports and then seemingly a vacuum in which there are no

5    reports for a period of time.

6         She knew, she knew that the kids had been with her for

7    like four years.  She knew that she had gotten the custody

8    order from Mr. Garcia after the -- you know, treating Victoria

9    like he did, buzzing her hair.  Nice guy.  So she knows why

10   there's a vacuum, it's because the kids are safe with mom.  And

11   there's no complaints about touching, and the two touching

12   complaints in these records, the shower thing, that was over

13   two years ago, or about two years back, okay, when Victoria was

14   six and Freddy was two and a half to three.  Ms. Perez

15   testified about that, nobody refuted it.

16        And then the blanket tent fort, by Christopher's

17   recollection, was December, in the records, when it's being

18   first investigated, you didn't know that.  Actually the blanket

19   tent fort thing had been investigated months earlier, in April,

20   Ms. Jones did.  She didn't rush and take any kids.  She didn't

21   separate all the other kids.  I believe it's the April 26

22   referral.

23        So here starts the vagary, here starts the puffery,

24   here on page, what is it, 3?  Page 3, yeah.  Now, she says,

25   "The common themes in these episodes and reports has been

68

Closing Argument - Plaintiffs

1   sexual abuse to Ms. Perez's children or relatives." The
2   biggest chunk of anything to do with sexual abuse was in 2012
3   when Destiny was actually having sex as a 10-year-old with one
4   of Mr. Garcia's kids -- or his girlfriend's kid, nephew. Who
5   was making the calls at that time? It was her, Ms. Perez, the
6   unprotected parent, who went and got a court order so that she
7   didn't have to -- Destiny didn't have to be around that kid,
8   even though Destiny, you can see in the logs, she didn't really
9   want to be around that kid, her, she brought that court order.
10  This woman who's not protective, who's dismissive about sexual
11  abuse. It says, "Concerns pertaining to Ms. Perez's mental
12  health."
13          Ms. Cobbs looked for every drum that she could beat,
14  okay. And again, other than Mrs. Cobbs in 2019 applying her
15  skill and knowledge and saying, Oh, I have mental health
16  concerns for Hilda, all the other stuff is postpartum in the
17  near death of her child. You think that -- maybe the judge
18  would have liked to know that instead of this, oh, the theme.
19          Next, please.
20          At the next page at the very top, since the beginning
21  of the year in 2019, there's been six sexual abuse allegations
22  pertaining to Alfredo allegedly being perpetrated on by his
23  father during a visit. That's just flatout false.
24          Like I said, if you just focus even on the December 5,
25  2018 forward, you can see this is false. And, of course, it

MARYANN VALENOTI - U.S. DISTRICT COURT - (916)930-4275

69

Closing Argument - Plaintiffs

1    doesn't mention Freddy, but even the February 21, 2019

2    referral, that's made by Alfredo, Sr., and that's where the

3    12/5/18 referrals have grown from touching, to Christopher

4    masturbating little Freddy, Jr., the five-year old, and it's

5    treated like an evaluate out.  That's Exhibit 56 that I'm

6    talking about right now for anybody who's writing this down.

7         So far-fetched and ridiculous; it is.  EO'd, it's

8    evaluated out and neither social worker asks Christopher about

9    it at all on July 12.

10        And then, this is also left out, if you go to the

11   April 11, 2019 referral, that's Exhibit 57, in there, medical

12   staff reports that they suspect physical abuse.  It's right

13   there, medical staff of Freddy, Jr.  And Dr. Dotta says, also

14   in Exhibit 57, she can't confirm child abuse, but, quote, "Does

15   not believe they came" -- the marks on the child's body --

16   "from normal daily activities such as running and playing."

17        You think the judge might want to know that when he

18   reads somewhere else in this warrant, Oh, the other fathers,

19   you know, they were totally safety planned with them.  Do you

20   think he might go, Well, wait a minute, three months earlier

21   the doctors were suspecting physical abuse?  So that's just a

22   flatout lie.

23        Well, again, it might be six, but there -- Sosa, Sr.,

24   and one of them is so transparently a therapist that Mr. Sosa's

25   got the ear of, you know, it might have been a custody battle,

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

70

Closing Argument - Plaintiffs

1    it might have.  Guess what, that doesn't mean you rip babies

2    who are a part of the custody battle away from their parents,

3    you just don't do that, not if you're sane.

4          Next -- next sentence, "All of these reports and/or

5    referrals have not been confirmed by CPS."  I'm not even sure

6    what that means, since they're not a crack squad doctor.  "And

7    medical findings suggest no physical signs of sexual abuse to

8    the child; however, the child has allegedly told Ms. Perez

9    (mother) that these things are happening."

10          Well, there is actually a reference to Freddy telling

11    the social worker, Ms. Jones, I believe in the February 21, '19

12    referral, that he did tell his mom that he had things poked in

13    his bottom because he wanted her to make an appointment.  And

14    if you read these things, you'll see that Freddy is a bit

15    bouncing off the walls kind of a kid, and he's only five at

16    that point, so it might have been the beginning of something

17    with Freddy.

18          In any event, no physical signs of sexual abuse.

19    Well, that's a flatout lie because there was a physical sign.

20    There was a scratch near the rectum.  Those don't come

21    anywhere.  Where do you get them?  So there was a sign, but

22    that's not in here.

23          Moving on to her puffery about hospital records, she

24    says, "Based on the amount of information received from

25    hospital records from different providers, as far as Valley

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

71

Closing Argument - Plaintiffs

1  Children's Hospital located in Madera, it is difficult to tell
2  how many times he has been taken to the doctor for alleged
3  sexual abuse."

4        Well, how difficult is it?  You said you had the
5  documents.  How difficult is it?  She had no answer for that.
6  How could you have an answer for that?  Truth didn't matter to
7  Ms. Cobbs here.

8        She was asked at deposition, Question:  "And then you
9  said something about he went through forensic exams.  How many
10 of those do you believe he went through?"

11       Her answer:  "I know for sure at Valley Children's.  I
12 don't know about how many, if he's had another one, but I know
13 he's been looked at by medical professionals."

14       So that was the state of her knowledge, and yet she's
15 telling the Court numerous -- you will see the words "numerous,
16 multiple" in this entire specious document.

17       Now, here again, next sentence, here comes "appears,"
18 appears Number 2, "It appears to be clear from the medical
19 records, is that although Ms. Perez lives in Patterson, she has
20 taken her child to numerous other medical offices for exams and
21 assessments of sexual abuse, only to be rebuffed that there is
22 sexual abuse evidence in regards to physical signs."

23       Now, couple things about that:  Why does she keep
24 talking about physical signs, why does she do that?  All right.
25 Because she knows darn well, and she's asked about it and she

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

72

Closing Argument - Plaintiffs

1   testified in the video that was played, that sexual abuse comes
2   all the time without physical signs, all the time.  And she's
3   trying to justify the eventual move of taking Freddy, Jr. over
4   to dad's.  She's lying to herself.

5          Second "appears" in there.  The fact that she lives in
6   Patterson -- again, I don't know how much the jury knows about
7   Patterson, but it's not a thriving metropolis.  And she tells
8   the social workers in either 93 or 94, Exhibit 93 or 94, that
9   the doctor told her to take the kid over there, to take the kid
10  to another hospital, which is common.  Told them, I go to a
11  clinic.  I'm not rich.  I go to a clinic.  I see different
12  doctors.  That's how it works.  That's not in here.

13         She could not give a single location amongst
14  multiple -- single doctor, amongst numerous different doctors,
15  with the records right in front of her.  Does that sound
16  honest, does that sound legit?  Of course it doesn't.

17         Then she goes into kind of a Munchausen by proxy
18  argument.  I'll just submit to you it's really disfavored these
19  days, but that's all you got.  If you got to punt, you punt.
20  This paragraph that starts with, "Based on differing locations
21  and numerous different doctors," which again, you never hear a
22  number on any of them, "it appears" -- whoop, there it is
23  again, "appears," third time -- "that Ms. Perez is simply
24  unwilling to accept medical information that suggests that her
25  son has not been abused sexually."

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

73

Closing Argument - Plaintiffs

1      Well, it's interesting because I suggest to you that
2  Ms. Cobbs is willing to ignore medical information that
3  suggests he may well have been abused sexually.
4      Now, this gets really interesting, "On July 11, I
5  received another referral of many alluding to or concerned
6  about sexual abuse.  The concern listed in this referral
7  allegation was that Alfredo had again been exposed to another
8  hospital visit."
9      Now, go look at the referral.  He had gone to the
10 doctor.  He had -- that wasn't even sexual abuse on that one.
11 She says, "At this juncture the agency and social worker,
12 Cobbs, became concerned that Alfredo was being forced into
13 exams, questioning and ongoing sexual abuse assessments
14 conducted by, again, numerous people and facilities based on
15 Ms. Perez's perception that he has been abused despite
16 information to the contrary."
17     You know, when you listen to that tape and you look at
18 the deliberate service logs, what you'll read is that Freddy,
19 Jr. is saying these things.  Why is he doing it?  I don't know.
20 He's five years old.  You'll also see that when Ms. Jones is
21 talking to Freddy on the April 11 or April 26 referral, she
22 says, The kid can't tell the difference between a truth and a
23 lie.  She's asked why did she put it in her log?  She said she
24 wanted people to know.  What kind of people would she want to
25 know?  Well, she would want people like April Cobbs to know,

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

74

Closing Argument - Plaintiffs

1   people who claim that they read all of the logs so that they

2   would know.  It's a credibility problem with the little boy.

3   Ms. Jones talks about the child jumping all over as well.

4         Now, this was troubling -- and by the way, "ongoing

5   sexual abuse assessments," she doesn't tell us what that is.

6   We have one thing on record, Dr. Rodriguez must have spread his

7   cheeks to see a scratch down near his rectum, that's it.

8   There's nothing said in here either about these sexual abuse

9   assessments, because a forensic interview is a forensic

10  interview, it's a videotaped conversation.  In today's day and

11  age we're all doing that everyday.

12        So still to this point you haven't heard a word about

13  Freddy, Sr. in all of his referrals, and you won't.

14        Next sentence:  "According to CMS at this juncture,

15  Alfredo, Jr., minor, has also had two CAIRE child abuse

16  interviews, referrals and exams.  The CAIRE center is a special

17  entity specifically for sexual abuse victims."  First of all,

18  that's wrong, but that's okay.  "The victims are interviewed by

19  a forensically sexual abuse interviewer and the environment is

20  child friendly."

21        Well, I just want to, for a moment, he's no longer a

22  defendant right now, do you remember what Mr. Anderson said

23  when I asked him, he said, It's hard to tell whether being

24  ripped from your parents or going to a CAIRE interview in a

25  child friendly room was more traumatic.  Really, really.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

75

Closing Argument - Plaintiffs

1    That's her supervisor.  Maybe it's trickle down.

2         There was no disclosures during these interviews.  No,

3    there isn't, but it doesn't change the fact that she was aware

4    there had been a scratch near his rectum.  I don't know where

5    the scratch come from, but it seems like it deserves a mention

6    when you're asking a judge to take away someone else's child

7    for it.

8         By the way, if you haven't noticed, it's all about

9    Freddy and nothing about Shane Beard in here, ain't nothing

10   about N    Perez.  We'll get to it, but it's at the end where

11   it says, I want a warrant to take that kid.

12        By now you'd think the thing about masturbated is in

13   there.  It's not.  Why?  Because that came from Sosa, Sr., I

14   imagine.  The judge allowed the witness to try and answer the

15   question, Why was the hammer only brought down on Hilda Perez?

16   I don't even remember her answer.  It doesn't matter.  It was

17   "Mean Girls."

18        Now, this gets, again, real interesting, maybe not to

19   you at this point, but it is interesting.  During this

20   investigation she claims that while she's out there, on

21   July 12, she was made aware of an incident involving Alfredo,

22   Jr. being touched inappropriately by her older son Christopher

23   while playing a game in a fort made out of blankets.

24        Sam, would you please go to the second ERRI, Page 17.

25   This is Exhibit 60 DSL for April 26, 2019.  Let me get there

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

76

Closing Argument - Plaintiffs

1    myself.

2          You got that up?  Okay.

3          So here it says -- this is again July 12, Christopher

4    disclosed that the night of the incident his mother called him

5    into her room along with Alfredo and she talked to them, talked

6    to them about boundaries, you know, inappropriate touching.  I

7    mean, really, what in the heck else are you supposed to do, you

8    know?  Do you think it's legitimate to say, Call CPS, call law

9    enforcement?

10          So anyway, if you go further up in that log, you'll

11   see that --

12          Here, Sam.

13          This was disclosed, the "Sleepy Sleepy," to the extent

14   it was disclosed to Cobbs because she never read, even though

15   she said she did maybe, she never read the actual referrals.  I

16   suspect that's a possibility.  That would put her squarely in

17   the reckless disregard category, then, wouldn't it?  Guess who

18   brought it up?  Hilda brought it up.  Hilda brought it up.  So,

19   she wasn't trying to hide anything, she wasn't condoning it.

20          Now, a little further down, during this

21   investigation --

22          I'm sorry, Sam, can you go to 72 again, 72?  Thank

23   you.  Keep going a little bit.  "At current time," there you

24   go.

25          "At current time I also investigated more referrals

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

77

Closing Argument - Plaintiffs

1   regarding sexual abuse."  Look at the way it's written.  "I
2   also investigated more referrals regarding Ms. Perez regarding
3   sexual abuse allegations."  Still not a mention of all the
4   referrals from Sosa, Sr.
5           And here comes the conclusionary.  Do you see where it
6   reads, "Ms. Perez appeared" -- I think that's the third or
7   fourth -- "appeared to minimize the allegations and made no
8   efforts to make the appropriate reports regarding this
9   allegation."
10          Well, that's true.  She didn't make any reports, but
11  it's not material because no report needed to be made, at all.
12  But again, Ms. Cobbs was reaching.  She's reaching at this
13  point.  And here's where she twists the words, this next
14  sentence about -- she says, "Additionally, Christopher, a
15  minor, admitted that he touched Alfredo, Jr. inappropriately."
16  No, he didn't.  That's not what Christopher said.  Christopher
17  said he asked him to touch him.  He touched his belt buckle
18  once and then he felt it was wrong, he didn't do it again.
19          But read the next sentence -- by the way, that's what
20  he says in the delivered service logs and that's what he said
21  on the stand.  The way she writes it, "He," referring to
22  Christopher, "reported that Alfredo, Jr. asked him to touch his
23  ding-a-ling, and he knew that it was wrong but he continued to
24  do so."
25          But if you go back and read Cobbs' own logs, that's

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

78

Closing Argument - Plaintiffs

1   not how it happened.  He touched a belt buckle, and said no,

2   that's wrong.  She makes it sound -- she twists it, it's easy

3   to do, and says, Oh, no, he knew it was wrong and he touched

4   him anyway.  No, he touched him anyway and said, That's wrong,

5   I'm not going to do that again.  Is it subtle, yeah, but then

6   lying is often subtle, isn't it?

7           Then this gets really interesting.  "Ms. Perez

8   appeared to have inconsistent stories regarding the

9   aforementioned incident and reported that she could not recall

10  which child made the disclosure."  That's a flatout lie.

11          Can we get up Exhibit 71.  I know I didn't have it in

12  your queues, I apologize.

13          Seventy-one, so that sentence just read, "She could

14  not recall which child made the disclosure."

15          Mr. Park, if you'll go down -- it's on the first page.

16  Go down to the paragraph that starts, "Hilda reported that she

17  was not aware."

18          And by the way, this is where you see the thing about,

19  well, basically Alfredo and Victoria, they used to shower, but

20  it's been approximately two years ago, that's the top of that

21  paragraph, but a little further down, again, this says she

22  could not recall which child made the disclosure.  Here it is.

23          She went on -- went on, continue to report, Oh, I know

24  what happened.  Christopher told me that Alfredo told him

25  "touch his," and pointed to his privates.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

79

Closing Argument - Plaintiffs

1          Now, why the next sentence says, "This social worker
2     asked her how she remembered this information all of a sudden,"
3     I don't know.  Except that, again, this is something that that
4     whole thing was investigated back in the April timeframe.  But
5     it's another -- that's just a boldfaced lie.

6          Now starts "appears."  Number 4, "appears" shows up
7     again.

8          Go back to 72, please.  Can you go to 72, Page 6.
9     Thank you.

10         "Appears" shows up again.  It says, "Appears does not
11    provide adequate supervision for her children as evidenced by
12    her not knowing what her children were doing in this fort,
13    which allowed Christopher and Alfredo, Jr. to have
14    inappropriate boundaries."  Seriously?  That allowed them to
15    have inappropriate boundaries, because she wasn't watching them
16    24/7, even though everybody who was asked says, No, you can't
17    watch kids 24/7.  You got to cook for the kids, feed them, too,
18    and clean.

19         Now, the next sentence says, "Additionally, this
20    social worker would like to note during this investigation
21    Ms. Perez appeared to be in a gaze and spoke in a soft tone,
22    almost in a whisper."  Now, I realize you cannot see Ms. Perez
23    in Exhibit 93 and 94, but you can hear her.  She's clearly
24    actively engaged in the conversation being cut off repeatedly
25    by the hammer and she's just a nail.  She's engaged in a

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

80

Closing Argument - Plaintiffs

1   conversation, she's speaking a little bit softly, not like she

2   did sometimes on the stand here.

3        Well, why might that be?  How about because she's in

4   the house filled with kids and they're talking about sexual

5   abuse allegations.  They don't want to embarrass, you know,

6   Christopher, Freddy, they're there, they're in the house.  But

7   that's what Ms. Cobbs does to twist it.

8        You realize, you don't get to see these before they go

9   to the judge, nobody gets to see these and say, Hey, wait a

10   minute, that's not true.  No, they've got your kids.  They've

11   got them for days before you get in.

12        Further -- now, finally, here comes -- well, actually,

13   the next comment is great.  "At the present time" -- this is

14   where she talks about the ninth CMS referral regarding sexual

15   abuse allegations within the past seven months.  Well, first of

16   all, again, that's completely wrong there.  It's just

17   completely wrong.  You won't see it in the logs.  She doesn't

18   seem to know the difference between physical abuse and sexual

19   abuse.

20        Additionally, this is the first time we start hearing

21   about Shane Beard.  We're, what did I say, six pages in?  Yeah,

22   we're in six pages.  "Shane Beard, Ms. Perez's fiancee, was

23   aware of the agency's concerns but failed to be a protective

24   parent and has made no new plans to remedy the issue."

25        What in the world is she talking about there?  What is

81

Closing Argument - Plaintiffs

1    he supposed to do to remedy the issue?  He means the touching
2    that happened back in December or January under a blanket fort
3    tent or the showering that occurred approximately two years
4    prior between a six-year old and a two-and-a-half to three-year
5    old?  This is absurdity.  This is not telling the truth.

6         "No new plans to remedy the issue."  Mother had
7    already spoken to them.  It's in the logs.  You just saw it.
8    They knew it.  Jones and Cobbs were together.  You'll notice
9    little efforts in their testimony to kind of say, Well, you
10   know, I'm not sure if we were together when we both went over
11   to the house together to get the job done together to save
12   time; interview children one time instead of dragging them
13   through it twice.  Lord.

14        Now, again, that's the only thing on Shane Beard.

15        Next paragraph, "In an attempt to remedy some or most
16   of the concerns pertaining to sexual abuse," and now it says,
17   "And primarily to mother's seeming mental illness."  "Seeming,"
18   that's really just another word for "appears," isn't it?
19   "Services were offered in regards to family maintenance,
20   however, this was never cleared up or hashed out as to whether
21   she would or would not engage."

22        I don't know where that comes from, but it's basically
23   not telling the truth.  And at this point I thought she could
24   diagnose, so why isn't she telling the Court, Oh, she's got
25   whatever, schizophrenia, whatever she's got, why isn't she

82

Closing Argument - Plaintiffs

1   telling the Court that?

2         The only place you'll find any mention of family

3   maintenance -- there is a mention of family maintenance, it's

4   in Exhibit 58.  It's the DSLs of the investigation of April 11

5   where the doctor could not rule out child abuse, and what does

6   it say?  It says, "Social Worker Jones discussed FR services

7   and family maintenance.  Hilda disclosed that she is interested

8   in counseling services through FRC."

9         So I don't know what that means, couldn't hash it out,

10  didn't hash it out.  It's seven months later.  I don't know if

11  there was testimony about whether my client was in FRC services

12  yet at that point, but there was no anything but cooperation.

13  Like, Yeah, I'll take that, that's good.  And when you go back

14  to those 2011, 2012, 2015 FRC, PRC, ABC, baby.  They're getting

15  counseling.  These aren't people who are immune to the concept

16  of the kids need counseling in a huge divided family.

17        They treated my client like scum.

18        Next another "appears."  "Appears" number 5 is coming

19  up.  They start talking about the TDM debacle.  You can believe

20  who you want to believe about what happened there.  It sounds

21  like everybody's in agreement.  Ms. Perez asked for an

22  attorney, asked for her discovery.  You can believe who you

23  want to believe.

24        When Mr. Anderson got so volatile he felt it necessary

25  to slam something down on the table, you know, telling me, Hey,

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

83

Closing Argument - Plaintiffs

1   no attorneys here, but you do know this because this is
2   unrefuted, we had a man named Howard Courney up here 350 to 400
3   times.  He's been to these TDMs, and he can -- three attorneys,
4   three attorneys, does that sound right?  Why can't you have an
5   attorney?  When they talk in that jury instruction about time
6   to reflect, well, you could call Ms. Perez back and say, Hey,
7   you know, once you get your attorney, let's schedule another
8   day.  No, it's too late.  She had committed contempt of social
9   worker.  They were scurrying to get the other kids removed from
10  the house, which ironically, leaves no children to supervise in
11  the Perez Beard home.  I guess nobody caught the irony of that
12  at the time.  And sometimes you can't catch things when you're
13  so blinded because you've been offended and you're a hammer.
14          But anyway, there's another "appears."
15          Where are we at, can you scroll down a little bit?
16  Okay, cool, thank you.
17          Yeah, she wanted an attorney.  It says in here how
18  before the meeting she wanted an attorney and discovery.
19  Absolutely true.  "I observed Ms. Perez to be quiet and soft
20  spoken, but when she began to speak her affect was flat and her
21  requests were confusing to this social worker."  I could have a
22  field day with that last part, but I won't.
23          Her affect was flat.  What is she trying to convey?
24  Is she trying to continue and continue and continue to convey
25  my client's got a mental health problem; she can't have her

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

84

Closing Argument - Plaintiffs

1   kids; she can't raise her kid who successfully made it nine

2   months?  That's what's happening.  It's all part of a

3   broadbrush.

4          And of course, the way she describes the TDM, again,

5   you'll just have to decide for yourself.  Do you think it was

6   real calm when the fourth parent in 350 to 400 TDMs had come in

7   and said, I want an attorney?  Do you hear what he said, Oh

8   gosh, why do you want one?  Or they blew up, like my clients

9   described, like Mr. Beard's mother described as well?

10          And then she says -- again, this is a recasting --

11  "Due to this, my supervisor advised Ms. Perez that the

12  information that we have is concerning and the decision will

13  have to be made by the agency without her input in regards to

14  where her referral/case will need to go to be best addressed.

15  Unfortunately without family cooperation and engagement,

16  voluntary services cannot be used to remedy the current issue."

17          I don't know.  Those three -- she's not here --

18  Mr. Beard's mother, Mr. Beard, Ms. Perez, little different

19  story, right.  If you don't stay right here, we're going to

20  take your kids in an hour.  I'm not in here.  Had that been in

21  here, the judge might have said, Wow, this social worker's off

22  the hook.

23          Another day in Stanislaus County.  So now we finally

24  get to have N    mentioned a couple more times because we're

25  getting near the end of it.  This paragraph starts -- thank

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

SER-0085

85

Closing Argument - Plaintiffs

1   you, Sam -- "Community service agency is requesting protective
2   custody." Yeah, they were. And she says, "No , being so
3   young, he's unable to protect and care for himself from the
4   risk of ongoing, unmitigated sexual abuse occurring in the
5   home." I don't know, does that even faintly echo as true,
6   really?
7            Now that you know when things happened, how they
8   happened, two things happened, what they were, does that ring
9   true?
10           This last paragraph, "Ms. Perez has four other minors
11  in the home but their respective birth fathers have filed for
12  full custody mitigating safety concerns for our agency."
13           Well, that's great. Mitigating safety concern for our
14  agency. Remember Mrs. Cobbs at the home, she's talking to
15  Hilda and she's saying, Do you believe in your heart of hearts
16  that this man's capable of committing sexual abuse, you know,
17  on his kid? And she's saying, Well -- she tried to say a
18  couple times, Well, based on what my kid's saying -- cuts her
19  off, cuts her off -- then she says, finally, Yeah, I think it's
20  possible.
21           Apparently, Ms. Cobbs disagreed. So Ms. Cobbs, being
22  the hammer, wielding the power, she decided, I'm going to take
23  the kid and I'm going to give the kid back to the man who may
24  very well be abusing him. Certainly there's concerns about
25  physical abuse, but she never told the Court that. And she

86

Closing Argument - Plaintiffs

1    doesn't tell the Court when she says this sentence about the

2    fathers having filed for custody.  She doesn't tell them, Well,

3    that's because we went and told him, you saw the safety plan,

4    right?  If you don't do this, we're going to intervene and

5    we're going to remove the kids from you.  Again, the hammer,

6    the hammer, absolute power.

7            I got a couple of footnotes here.

8            Now, this is classic, classic juxtaposition.  She

9    claims that having the kids removed by the fathers without

10   telling the Court the whole story, that has mitigated the

11   safety concerns, right.  And so she's sending the five

12   children -- yeah, at least the three who are minors for sure,

13   back to Horacio Garcia, Sr.'s home, and that's the home where

14   several years earlier, Destiny, at age 10, was having sex with

15   a 13-year old.  Left that out, too.  Wouldn't be prudent to put

16   it in.

17           Now, compare that to the treatment of mom.  While

18   suffering postpartum and depression after a traumatic birth,

19   she's called out for suicidal ideation eight years prior by

20   Cobbs.  Of course, she doesn't tell the Court about the eight

21   years, she never tells the Court that.  And then Hilda and

22   Shane's child is taken for a one-time belt buckle touch in a

23   blanket fort and a six-year old and a two-and-a-half to

24   three-year old showering two years ago?

25           How do you reconcile that?  You can only reconcile

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

87

Closing Argument - Plaintiffs

1    that happening because somebody had to lie and not tell the

2    whole truth, and it was Ms. Cobbs.  She's a professional, I'm

3    submitting.

4          Almost there.  Last page, folks.  A few more things,

5    but it's the last page of this.

6          Now, how does Ms. Cobbs sum up what happened in terms

7    of why this kid was taken into protective custody?  It says on

8    Exhibit 71 -- that's again Cobbs' own notes.  It talks about

9    the TDM, it talks about the TAP -- the TAP meeting, it says,

10   quote, "N   Perez was placed into protective custody due to

11   Hilda Perez and Shane Beard's lack of cooperation during the

12   scheduled team decision meeting and Shane's inability to

13   demonstrate a protective capacity regarding the agency's

14   concerns."

15         Imagine having your child taken because you didn't

16   cooperate, especially Shane, who didn't even need to be there.

17   You guys are seeing the ultimate, you know, bicep flexing of a

18   government entity right here.  That's what you're seeing in

19   this case.  It happens in many, many sectors of government, but

20   it happens in CPS, at least we can say it happened here.

21         Now, her final paragraph -- of course, there's no --

22   almost no paragraph is immune from lies and deceit, puffery or

23   omission, again, based on her training and experience, again,

24   referencing no physical evidence to support her concerns,

25   refusing to acknowledge that there was some physical evidence.

Closing Argument - Plaintiffs

1   Again, numerous sexual abuse assessments and evaluations.  All
2   of it's conclusions, it's all conclusions.
3       This warrant, if it's going to be accepted as
4   establishing probable cause, it could have said, I'm April
5   Cobbs, I'm a hell of a great social worker, and I think your
6   kid should be taken.  That's what it could have said.
7       "Higher level of intervention is necessary.  I'm
8   requesting a protective custody order for the physical removal
9   of N    Perez."  Here's where N   's name shows up two more
10  times, and then it was back on that other page, too.  But
11  there's something she says here, "Ms. Perez and Mr. Beard were
12  unwilling to engage in voluntary services, although offered and
13  explained numerous times."  There it is again, "numerous,"
14  "multiple."
15      Did you hear any evidence of voluntary services
16  explained "numerous" times?
17      I'm not telling you -- I'm not asking you to do it,
18  but if you look through every single one of the delivered
19  service logs that you're going to have in that jury room,
20  you're not going to see that, you're not.  It's another
21  boldfaced lie.  You don't hear it on the tapes.  She talks
22  about, We have them.  She doesn't offer them.
23      And note, I am concerned that Baby N    is at risk.
24  Well, that's a shame because in order to establish it, you have
25  to show that he's at substantial risk.  At substantial risk and

89

Closing Argument - Plaintiffs

1    immediate threat.  She doesn't do that.  "Substantial" is also

2    in the jury instructions that you will read in this federal

3    matter.  I'm going to submit to you that the law tends to

4    follow it itself.

5         When you -- I'm going to let defendant get to the

6    petition and let you see if there's any sexual abuse claim,

7    because they have a section for that, they do, Section 300,

8    makes sense, right.  You won't see it.

9         Now, finally on this, the taking from Shane Beard, and

10   please understand, it should be obvious, it's ridiculous that

11   this child was taken from either of these people.

12        THE COURT:  Can't hear you.

13        MR. POWELL:  It's ridiculous that this child was taken

14   from either of these people, but Shane's got a nod above that,

15   because he didn't have a history with two not stellar, former,

16   you know, partners.  So they had to get Shane.  In order to put

17   the hurt -- in order to put the hurt on them for not cowering

18   on bended knee, they had to get Shane.  And yet -- this is from

19   the deposition of Shynelle Jones, which you heard here.  And

20   she offers an alternative, which the warrant application says

21   right in it, it says you'd have to show that there's no

22   other -- nothing that would eliminate the need for removal.

23        Here it is, Question -- this is me asking Ms. Jones:

24   "So you would say that of the five times where you took less

25   than all, one of the circumstances on a couple of occasions

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

90

Closing Argument - Plaintiffs

1    might have been that the child for whom you did not seek to

2    remove, they didn't live primarily in the home that you were

3    removing the other child or children from; is that all

4    accurate?"

5          Answer:  "That's accurate or either they had, like,

6    another parent they could go live with that was safe," end

7    quote.

8          If they would have told the Court the truth, at the

9    very least, that child would not have been taken from Shane.

10   The child should never have been taken from Hilda either.  All

11   those children felt safe in her care.  They lived with her for

12   four years, except for Freddy, he was back and forth with

13   Mr. Sosa, which allowed him time to call in sex abuse claims at

14   her house that grew increasingly more intense.

15        Couple more.  Mr. Beard, quickly, on the juvenile

16   proceedings, Mr. Beard testified, he got on the stand.  He

17   testified.  All is unrefuted.  Nobody said otherwise.  In fact,

18   I think Mr. Granados even agreed when he was on the stand.  No

19   real opportunity to present evidence until jurisdiction, right?

20   And he's on the stand most of the morning, and then, oh,

21   settlement is reached.  Oh, kid goes back, you know.

22        Now, opposing counsel, when he gave his opening

23   statement, using the word "minimize" again, he seemed to

24   minimize the idea of two, two-and-a-half months, or something

25   like that, the children were out of the parents' care -- the

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

SER-0091

91

Closing Argument - Plaintiffs

1    child was out of the parents' care.  But as Mr. Beard pointed

2    out, I had to miss his first steps, you know, his first words,

3    which we all know are da-da, just because it's easier for

4    babies to say.  So keep that in mind when we get to damages.

5         I'm not at damages, but I'm getting close.  I'm sure

6    you're glad to hear it.

7         None of that was refuted.  Closed session,

8    Court-appointed attorney.

9         Next, I'm going to take you to the Verdict Forms.

10   Now, I'm sure that all of you all know what this means, just by

11   the name of it, "Verdict Form."  It's the document that you

12   will be given at the end to basically memorialize your

13   decisions.

14        THE COURT:  It's not up on the screen.

15        MR. POWELL:  Pardon, Your Honor?

16        THE COURT:  It's not up on the screen.

17        MR. POWELL:  Okay.  Thank you.

18        Personally, I think it's insulting to have to show you

19   people these because, I don't know, they're pretty

20   straightforward and all, but in the law we try to wear belt and

21   suspenders all the time.  So I'm going to take you through them

22   real quick.  And this first one is on the state law -- I'm

23   sorry, no, this one -- first one is on for Nᵢ   , and it's about

24   his Fourth Amendment right, you know that Fourth Amendment

25   right to be free from an unreasonable seizure or search.  And,

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

92

Closing Argument - Plaintiffs

1  of course, I would like it if you checked the "yes" box; my
2  clients would like that.  In fact, these are some of the most
3  straightforward, simple Verdict Forms I've ever seen, so I'm
4  not sure why I'm doing this except, again, it's habit.

5       Then it breaks it down, is Hilda, did she do the same
6  thing with her Fourteenth Amendment rights?  Did she prove it
7  by a preponderance of the evidence?  And you've all heard this,
8  right, you've seen it on TV, a preponderance of the evidence,
9  that means like even scale and a feather lands on this one,
10  then you've proven it.  You don't have to prove it like this,
11  you just have to prove it like this.  I think we've proved it
12  like this, but you'll let us know.

13       So these are all, again -- in this case plaintiffs are
14  asking these all be checked yes, because we think all of these
15  things are true.  We think we've proven, by a preponderance of
16  the evidence, that both Hilda and Shane and N    's Familial
17  Association rights have been violated.  We think that we've
18  shown that N    was falsely imprisoned under the law.  That's
19  in the jury instruction, you'll look at the elements, you'll
20  notice that did he show that?  I think you'll conclude he did.
21  If you do, you'll check it with a yes.

22       Damages.  What if I told you that not everybody is
23  always in it for the money?  What if I told you that people
24  come -- these cases, they frequently -- they don't want it to
25  happen to anybody else.  I can't believe how many times I hear

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

93

Closing Argument - Plaintiffs

1   it, but I have to tell them, It'll happen -- It'll happen.  It

2   may have happened while we are talking.

3          THE COURT:  Can't hear you.

4          MR. POWELL:  I have to tell them, It will happen.

5   Your case won't stop it from happening.  It happens, it

6   happens, it happened here.  So we break up damages -- now, in

7   this case there's just noneconomic damages, pain and suffering,

8   kind of like what you saw on the video, 73.  It's broken into

9   Hilda and Shane and then here's N    right here.

10          And then punitive damages, which I've already

11  discussed, I would just like you to award some.  I would like

12  you to award some.  I think much are warranted, but I'll leave

13  that entirely up to you.

14          This is that nominal damages that you saw in the jury

15  instructions.  There's the corresponding Verdict Form for that.

16          So I'll wrap up with damages and hand this over to my

17  colleague, Mr. Whitefleet, who I've actually known for over a

18  decade I think, going on two.

19          I submit to you it is hard for any of you or me to

20  account for the pain of having your baby taken, and, you know,

21  I don't just mean like baby babies, I mean kids right up until

22  they're adults.  That's why we all want to, I believe, pass

23  away before our kids do, because that's one of the worst pains

24  that we could have.  I lost a brother.  My father had a tough

25  time.  My brother was 30.

94

Closing Argument - Plaintiffs

1    So when it's a baby, you know, I mean, Jesus, the
2  whole world's ahead of you with that baby.  Suddenly those
3  nights where you're up at 11:00 p.m., 1:30 a.m., 3:30 a.m.,
4  5:30 a.m., holding them, trying to keep your head up, not drop
5  them, and you're hating it, those are really sorely missing
6  once they're gone and your house is not the same.  So both
7  Hilda and Shane had to go through that.
8    A lot of attorneys would say, Oh, no, you got to give
9  that jury a number.  I'm not going to.  You're going -- I'm
10  going to ask you to because I'm not a hammer and you're not a
11  nail.  I'm going to ask you to consider it like this:  So each
12  of you has a different background, a different income and asset
13  base, you know, some of you may be filthy rich, some of you may
14  be paycheck to paycheck, but I don't honestly remember how many
15  are parents.  I remember for sure a gentleman is a parent.  I
16  got parents on here.  So I'm asking you to ask yourself, what
17  would the reasonable person who's got the resources that you
18  have, you know, what would that reasonable person be?  How much
19  would they pay to not have this happen to them.
20    You know, if it's Mr. Forbes, how much would he pay to
21  not have this happen?  You know, if it's a new carpenter in the
22  union, he's not making much, how much would he pay, but he's
23  got a couple of cars, but how much would he pay?  How much
24  would the reasonable person pay, given their own set of
25  resources, to not have this happen to their child, to not have

95

Closing Argument - Plaintiffs

1  this happen to them?  That's the number I ask you for.

2          And I don't know what it is if my kids were not taken,

3  and your kids, from what I understand, were not taken.  So for

4  some of you, that may be a bit in a vacuum, some of you it may

5  not because you have nieces and nephews.  Even if you don't

6  have kids, you got a brother or sister and they got kids and

7  you love them.

8          So that's the damage number.  What would the

9  reasonable person, given their resources, pay to not have this

10  happen to their child?  To not have it happen to them, to not

11  freak out every time a county vehicle goes past your house, to

12  not freak out anytime somebody knocks on your door and they

13  happen to be wearing a county badge, but they're there because

14  they want to talk about voter rules or want to talk about a

15  property assessment, how much would you pay?

16          Because it doesn't go away, you can't take this back.

17  You can't give Mr. Beard or Ms. Perez back missing that child's

18  first steps.  You can't.  The system is not imperfect because

19  of that, it's just that the system has to work in reality, and

20  we can't do it.  But if anybody comes up with a time machine,

21  please see me after the trial and we'll see if we can't make a

22  dent in it and not have this happen.  You folks would have all

23  been free to go on with your lives for two-and-a-half weeks.

24          Thank you very much.  I'm going to need a moment to

25  unplug this and get it out of the way for Mr. Whitefleet.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

96

Closing Argument - Plaintiffs

1          THE COURT:  Okay.  What we're going to do is take a
2    break, allow you enough time to get some food, and then we'll
3    come back after.  So we'll come back -- it's 12:30 now.  Come
4    back at 1:15.  You don't have to stay together, you can
5    separate during lunch.  There is a cafeteria on the second
6    floor.  Take about 45 minutes, and then we'll come back after
7    and have Mr. Whitefleet do his closing argument and then I'll
8    do the jury instructions.
9          Please don't discuss the case with anyone.  Don't
10   discuss the case amongst yourselves.  Don't do any independent
11   investigation and research, and report any violations if
12   anybody tries to violate those admonitions.
13         And then we'll see you in about -- 45 minutes should
14   be more than enough time for you to grab something to eat.
15   Okay.  See you then.
16         (Lunch recess from 12:35 p.m. to 1:23 p.m.)
17         THE CLERK:  Please come to order.  Court is back in
18   session.
19         THE COURT:  Bring in the jury.
20         MR. POWELL:  Your Honor, can I ask you a quick
21   question?
22         MR. WHITEFLEET:  Can I have a quick question, too?
23         THE COURT:  Go ahead.
24         MR. POWELL:  Go ahead, Mr. Whitefleet.
25         MR. WHITEFLEET:  I'm assuming you're going to allow

97

Closing Argument - Plaintiffs

1   plaintiff to do a rebuttal closing?

2          THE COURT:  That's not an assumption, but do you want

3   one?  If so, I'm going to limit you.

4          MR. POWELL:  Absolutely, yeah.

5          THE COURT:  Okay.

6          MR. POWELL:  I don't know what he's going to say.

7   That was his, and mine, with his blessing, was we feel like

8   it's with somewhat of confidence that this jury won't be

9   walking back in tonight to render a verdict.  I'm wondering if

10  it would be acceptable to take their temperature after maybe

11  they've been in the jury room an hour or so and see what their

12  feelings are about that, like, Oh yeah, we know we're not going

13  to finish --

14         THE COURT:  No.

15         MR. POWELL:  No.

16         THE COURT:  Once they start deliberations --

17         MR. POWELL:  They can do what they want.

18         THE COURT:  -- they can do what they want, yeah.

19  You'll have no more than 15 minutes in terms of a rebuttal, and

20  I will cut you off.

21         MR. POWELL:  Okay.

22         THE COURT:  Okay.  Bring in the jury.

23     (In open court in the presence of the jury.)

24         THE COURT:  All jurors present, all parties present.

25         Mr. Whitefleet, you may deliver the defendant's

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

98

Closing Argument - Defendants

1   closing argument.

2          MR. WHITEFLEET:  Thank you, Your Honor.

3          CLOSING ARGUMENT ON BEHALF OF DEFENDANTS

4          MR. WHITEFLEET:  Ladies and gentlemen of the jury,

5   first and foremost, just like my colleague did, I want to thank

6   you for your time, your patience, your attention, and they do

7   call this a civic duty, even though it is an inconvenience.  I

8   recognize that is part of the process, and it's an important

9   part of the process even though sometimes you wonder why is

10  this my lot in life to have to do this, but we do really

11  appreciate your part of this process.

12         Ultimately, in these kind of cases, the civil cases,

13  you are the arbiter of the facts.  You are the decider.  You

14  are the judge, essentially, in terms of how this goes.

15         And so this is now my opportunity to tell you how I

16  think the facts are, and I'm going to do so briefly.

17  Plaintiffs' counsel gets to do a quick, short rebuttal, and so

18  some of the things that I'm going to be able to say, I have to

19  say during my time, so I want you to consider those things

20  because that's my job and my obligation.

21         But overall, we as a society demand that the

22  government look into sexual abuse, physical abuse, emotional

23  abuse of children.  That's why that our state has promulgated

24  that two-plus inch thick -- the standardized directives.  And

25  I'm not going to go through any of it, and you're welcome to go

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Closing Argument - Defendants

1    through it, but those directives dictate how the social workers

2    do their job.  And ultimately, the law also says, you know, you

3    can actually remove a child warrantlessly, but in this case it

4    did so via the warrant.

5           So despite all the other things you heard up on the

6    stand, this case is now narrowed to essentially the claims

7    against April Cobbs arising from the warrant.

8           So what I'm going to try and do is sort of give you a

9    framework given the jury instructions.  It's amazing to me

10   after my 20-plus years of practicing and the hundreds of years

11   that this is all you get to decide this case, and it's

12   synthesized in just a little bit of verbiage.  How you

13   interpret that and how they work together is what I want to try

14   and help you do.

15          So, the primary issues I really want to talk about are

16   credibility of the witnesses, briefly talk about burden of

17   proof -- you already heard some of that -- and then the meat,

18   the determination of whether there was a violation of the

19   constitution, the Fourth Amendment, Fourteenth Amendment.

20          The Fourth Amendment arises from the warrant, and the

21   Fourteenth arises from alleged violations of the Familial

22   Association.  And while they're distinct, they're essentially

23   the same and here's why:  The Fourth Amendment applies to No  .

24   The Fourteenth applies to the parents.  So it's really the

25   same -- essentially the same claim all arising out of the

100

Closing Argument - Defendants

1   warrant.  The law has decided that the child can only assert a

2   Fourth Amendment claim and the Fourteenth Amendment claim is

3   the parents.  So that's the distinction, that's why there's

4   essentially the three claims.

5          Then I'm going to talk about causation, which is

6   critical to any analysis and there's a separate instruction on

7   that and how that works for damages.  While I ultimately don't

8   think that you'll get the damages, it is my obligation to at

9   least talk about them.

10         All right.  So the first issue is credibility, and in

11  Instruction Number 9, you'll see it talks about, In deciding

12  the facts, you have to decide what testimony to believe and

13  what testimony not to believe.  So in an ordinary case it's

14  more about, you know, opportunity to see things, hear, know

15  things based on memory.  It's also about motivation.

16         So when it talks about the witness' bias or

17  prejudices, interest in the outcome of the case, those are

18  things that you have to take into account, and each person may

19  see these differently.  Witnesses can remember things

20  differently.  Ultimately, how Ms. Cobbs heard things during the

21  interview of Ms. Perez may be different from how she heard it,

22  and even though there was -- the majority of that interview was

23  not on the tape and the bulk of it had already been determined.

24         How one perceives things can be different based on

25  what you come into it.  So ultimately, because you have to

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

101

Closing Argument - Defendants

1    decide whether the warrant contained misrepresentations or

2    material omissions -- both have to be material, by the way --

3    in terms of what Ms. Cobbs drafted and then presented to the

4    Judge, who signed it, and that goes to the credibility.

5          So I want to consider -- I want you to consider a

6    couple things about Ms. Perez's credibility.  When she was up

7    on the stand and she said, My first interaction with CPS had

8    nothing to do with mental health, and yet it was clear from the

9    records that there was quite a bit of mental health issues that

10   she didn't tell you about, that I had to bring out on cross.

11   She completely omitted that.

12         She also claimed that Ms. Cobbs had blamed her for

13   having postpartum.  Well, you heard on the tape Ms. Cobbs

14   actually said, Oh, I had postpartum, so I understand.  So

15   that's the difference between perception and credibility.  She

16   has the motivation to say Oh, you're blaming me, when, in fact,

17   Ms. Cobbs was trying to be sympathetic.

18         You could also infer from Ms. Perez's testimony

19   whether it's reliable based on your commonsense and whether the

20   things that she said made any sense to you.  Does it make sense

21   that a mother of six would not know that ingesting drugs would

22   get into her breast milk?  I submit to you, no.  So commonsense

23   would mean that in terms of that testimony can you credit her

24   as being believable?

25         Now, to be fair -- to be fair to how you look at these

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

102

Closing Argument - Defendants

1   things, you can assess some things as being credible and others

2   as not being credible.  You can accept part, you can discount

3   others.  That's up for you to decide, ultimately.

4           So the other thing, right, in terms of credibility of

5   Ms. Perez, you heard testimony where she brought a young Freddy

6   to a doctor under the suspicion of -- that he was being abused

7   by her [sic] father, and one of the things she said was, Oh,

8   well, I asked him what happened, and Freddy would not disclose.

9   What five-year old doesn't tell her mother that, I just fell

10  down, or nothing happened, or da, da, da?  Well, I'll tell you,

11  a five-year old child does do that when the mother says, This

12  is your father's fault, isn't it?  Provides leading questions,

13  forces the issue.  A child will automatically tell you what you

14  want to know.  They sense it.  Your father did this to you.

15  Yes, even if it's not the truth.

16          So we know from the evidence -- I'll show you a little

17  bit later, right, that Freddy was being essentially used in a

18  custody battle by these multiple -- multiple CAIRE interviews,

19  the multiple doctors, and ultimately, that's what the warrant

20  was about, was her ability to supervise the children and

21  protect them.  And when you have all these other allegations of

22  potential sexual conduct going on inside the house, how would

23  she be able to protect N   ?

24          So burden of proof, that's Instruction Number 2, more

25  probably true than not true.  Whether you believe something is

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

103

Closing Argument - Defendants

1   more probably true or not true depends on how you weigh the

2   evidence.  So my colleague is right, if the scales tip in one

3   direction or another, that's a preponderance if you believe

4   that's -- the plaintiff has proved it.  So if their proof is --

5   tips the scale up 51 percent, that's a preponderance.

6          It's difficult to do, but when you feel like there's

7   equal evidence, then that's not a preponderance.  But

8   ultimately, if you feel like, oh, they just haven't proven that

9   certain facts in the warrant are not misrepresentations, were

10  not proven, certain facts should have been in there, then

11  that's not by a preponderance.

12         So with the credibility issues in mind, with the

13  burden of proof in mind, the heart of the matter is Instruction

14  Number 15.  And this is prefatory stuff, is about protective

15  custody order, a warrant is a written order signed by the

16  judge, which we know was that, in fact, the case here.  It was

17  signed by a judge.

18         So the real issue is on the bottom of this, To prove

19  April Cobbs deprived plaintiff of his Fourth Amendment rights,

20  must prove the following additional elements:  Submitted to a

21  judge a warrant that contained one or more misrepresentations

22  or omissions material to the finding of probable cause.  That

23  word is later defined in the instruction, "material."

24         But it's not just that there were falsities or

25  omissions that were material.  Plaintiff must also prove that

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

104

Closing Argument - Defendants

1   she made those representations either intentionally or with
2   reckless disregard for the truth.
3        Intentional falsities, there have been none.  She's
4   just doing her best to try and summarize the delivered service
5   logs to the best of her ability.  You heard her say she didn't
6   go line by line.  She didn't figure out whether, Oh, these
7   facts should be included, these facts should be omitted.  This
8   was a summary, her impressions.
9        To show materiality, "The plaintiff must demonstrate
10  the judge would not have issued the warrant if the false
11  information had been excluded or been missing, omitted, or
12  missing information had been included."
13       I heard plaintiffs' counsel during his closing
14  argument make a few admissions that there were parts of that
15  warrant that were true.  The numbers may be true, there were
16  some other things that were accurate.  But remember, this is
17  about supervision, and so whether the warrant had conclusions
18  doesn't make it false, it just makes it vague.  A conclusion,
19  being nonspecific, doesn't mean it's an omission, it just means
20  it's compact.  If she's giving her impressions of the
21  circumstances, as plaintiffs' counsel pointed out to you, she
22  used "appeared."  It appeared to me this.  It appeared to me
23  that.  She's providing her professional opinion about how to
24  interpret the facts.  That doesn't make it false.  It gives her
25  opinions.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

SER-0105

105

Closing Argument - Defendants

1        The plaintiffs' counsel pointed out the policy and, of
2    course, the policies are guidelines in terms of how to
3    essentially procedurally write up the warrant, and says, you
4    know, Don't include falsities.  And while it might have said,
5    "be specific," and while this warrant could have been more
6    specific, I would put to you that if she had included more
7    information, it would have been not favorable to Ms. Perez and
8    Mr. Beard.
9        We know from the evidence in this case how much
10   unfavorable information there were in those DSL logs.  I just
11   want to highlight a few for you.
12       Rather than pulling it up on the computer I'm going to
13   use this because it's quick, and I don't have to worry about
14   going through it.
15       Exhibit 22, 2015, Javier, Jr. molested William.  Okay.
16   Yeah, that's not in the warrant, that's not favorable to her.
17   What do you think?  If a judge had that information, would he
18   be more likely or less likely to have issued the warrant?  I
19   think more likely.  And I think that's the same with the
20   majority of information in those service logs.
21       You didn't hear Ms. Perez talk about that, I had to
22   bring that out in cross.  She didn't talk about her
23   interactions with CPS.  I mean, you can read all these things
24   that are in evidence.  And if you took the time to read it, you
25   would see that she said that, Oh, well, her solution was I just

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

106

Closing Argument - Defendants

1    won't bring him to my brother's.  Then you'll see later

2    injuries where she had brought him back to the brother's.  So

3    this is again about supervision.

4              Exhibit 23, the molestation by Javier was not the

5    first time it happened.  Destiny forced her mother to call the

6    police.  That's not favorable to her.  Okay, yeah, that's not

7    in the warrant.  A judge would have been more likely to have

8    issued the warrant with this information in it.  How many times

9    has this happened before?  He stated four or 10 times.  Damien

10   said he didn't want to go to Javier's house because he knew

11   something would happen.

12             Junior said this happened before.  William and Javier

13   would be caught in the garage naked with no clothes on.

14             Exhibit 27, Destiny and Horacio, who were 11, were

15   responsible for the younger children.  When Javier was

16   molesting Damien, guess where Hilda Perez was?  In the kitchen

17   cooking.

18             Destiny here, Exhibit 33, worries about having to

19   watch the kids all the time, heat up the food for everyone

20   while Horacio watched the children all the time when mom was at

21   work.  She worries about her brothers at her mom's wanting to

22   go back.  That's 2016.

23             This report is, Mother leaves Horacio in charge with

24   the younger children for nine to 10 hours.

25             Freddy fell off a chair, guess where mom was when it

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

107

Closing Argument - Defendants

1   happened?  In the kitchen cooking.  She said that all her
2   children were present during the incident and witnessed that
3   happening.  Well, that's not true.
4        Here's Destiny saying she didn't see what happened
5   because she was in the back room with all the other siblings.
6   Victoria, William, Destiny, Christopher are in the mother's
7   bedroom by themselves unsupervised.  Victoria, she didn't see
8   Freddy fall.
9        All right.  So now Exhibit 55, this is the first
10  report of being in a fort touching each other.  What's omitted
11  in the warrant is that there's a report that Christopher
12  grabbed Freddy's testicles.  Okay.  If that were in the
13  warrant, would a judge have been more likely or less likely to
14  issue a warrant?  More likely.
15       Here we have this social worker, Lawrence Jones --
16  different Jones -- doing this investigation.  Then this is the
17  later allegation about the "Sleepy Sleepy" game.  They had a
18  name for the game.  They had a name for it.  You're telling me
19  that this was a one-time incident?  They had a name for it.  No
20  child is engaging in what Christopher admitted is inappropriate
21  touching, and they had name for it?  You can't tell me that
22  this was just a one-time incident.
23       So let's talk about whether there was information,
24  sufficient information, about Mr. Beard being willing to take
25  action.  When you hear allegations that there are inappropriate

108

Closing Argument - Defendants

1    touching going on, at least a parent might say, Well, what are
2    we doing to make sure little N    isn't being exposed to that?
3    What can I do to make sure that N    isn't in the same room
4    with Christopher or William or the other kids that had been
5    doing the inappropriate touching.  Did you hear any testimony
6    in that regard?  No, you did not.  He didn't make any inquiry
7    about that, and he lives in a separate -- with his
8    grandparents.  He doesn't live with them.

9         So the question plaintiffs' counsel puts to you, Oh,
10   well, that's an omission.  It's not material because it's not
11   favorable to him.  If, in fact, that was put in the warrant
12   that he doesn't live there, that means the judge could say,
13   Well, then he has no ability to control what N    is exposed
14   to.  None.  You don't live there.  He didn't take care of N    .
15   He went over after Game Stop, 9:00, 10:00 o'clock at night.
16   That's not in a position to be able to take care of him, to
17   protect him.

18        Also not in the warrant, a mandated reporter that says
19   Christopher masturbated Alfredo.  Okay, that's not in the
20   warrant, too.  Don't you think that that would be misfavorable
21   to the plaintiffs?  A judge would have issued this warrant so
22   fast.  Instead he's complaining about generalities and it being
23   vague.  That doesn't make it false.  It doesn't make it
24   material omissions; "material," meaning that a judge would not
25   have issued the warrant.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

109

Closing Argument - Defendants

1   Here we have Alfredo disclosing that Christopher
2   touched him in his genital area.  This is May 2019.  So when
3   you have multiple reports of children building a fort, touching
4   each other, as a social worker, their opinions were it's not
5   enough to simply just say, "Don't do that again, kids."  That's
6   not enough.  You got to teach them about wrongs and rights.
7   The fact is when you have a game, extra steps should be or at
8   least inquired about, How do I do this?  How do I inquire?
9   They weren't willing to do it.
10   Multiple doctor visits.  I wanted to just highlight
11   this one, it's on 60.  This is what Chris heard her mother say
12   to Freddy:  Did your daddy do things like that?  That's a
13   leading question.  What's he going to say?  Yes.
14   So when there's the allegations of, well, okay, the
15   father must have done it, isn't it reasonable to believe that
16   they're pitting Freddy against the father?  The Patterson
17   police officer thought it was.
18   This is Stephanie Herrera talking to the Patterson
19   police officer after the criminal complaint:  Alfredo is in the
20   middle of a custody issue.  If you're not subjectively aware
21   about how your actions reflect upon the kids, you don't
22   understand that, Hey, if I do this, this is how they might
23   react.  You don't understand, you don't have that objectivity
24   to be able to say maybe I should be doing something different.
25   But when you have two kids that are cutters, a child

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

110

Closing Argument - Defendants

1    that has had sex at 10, multiple children being molested in the

2    home, it seems like, and I think reasonably so, an impression

3    could be formed, a conclusion by a social worker, you're just

4    not supervising the kids enough.

5          Back to Instruction Number 15.  I want to highlight

6    another section here, "Reckless disregard for the truth.

7    Highly unreasonable conduct is an extreme departure from

8    ordinary care presenting a danger, misleading a reasonable

9    judge into concluding that probable cause has been established

10   when that danger is either known to the defendant or so obvious

11   that the defendant must have been aware of it."

12         When you read all these service logs, it's the

13   opposite of this.  A reasonable social worker would have -- and

14   this is what you have to look at.  A reasonable social worker

15   would have looked at these service logs and think, I think the

16   bigger picture here is regardless of whether the kids feel safe

17   or not, is whether this parent is properly supervising the

18   other kids so that N    is properly protected.  That's what was

19   put in the warrant.

20         Okay.  Let's remember another thing, though, the

21   evidence that you have before you where plaintiffs complain

22   about the warrant doesn't have the contents, the details of

23   being substantiated and not substantiated.

24         Well, the detention report does, the jurisdictional

25   report does.  So here's the detention report:  It's A-41, not

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

111

Closing Argument - Defendants

1   written by Ms. Cobbs, but look, here's a summary of the service

2   logs.  This one says, "General neglect unfounded."  Unfounded,

3   evaluated out, inconclusive, right.  It has all the information

4   about past sexual abuse, kids having intercourse, who the --

5   if, in fact, it was a mandated reporter or not.

6          And a different judge, Judge Ameral, found it was

7   sufficient to order N     detained.  So you have to ask yourself

8   in terms of whether Judge Friedman, who signed the warrant,

9   would have issued the warrant, nonetheless, if he had this

10  additional information.  I think your answer has to be a

11  resounding yes.  Not only did this judge have this detention

12  report that had all this information, this detailed summary,

13  but here's the jurisdiction report, A-47 -- excuse me, A-47,

14  yes.  So if you remember, you'll see the stipulated facts --

15  I'll go back to the jurisdictional report in a second.

16          Right, stipulated facts, these are part of your jury

17  instructions, so you have the timeline.  So Number 8 talks

18  about July 19, where the application -- and the judge signed

19  the warrant on July 19.

20          Then the petition was filed and detention -- the

21  detention report, A-41 that I showed you, was filed.  And then

22  on July 29 issued the order of detention based on the

23  information in the detention report, that's got a lot more

24  detail.

25          Then later there's a jurisdictional report, and that's

112

Closing Argument - Defendants

1    that basis, on October 8, N     was adjudicated a ward of the

2    court, which means the Court said, I'm going to keep control

3    over what happens to this child until legally released, even

4    though he was physically released back to the parents with this

5    week-on-week visitation.

6          So the jurisdictional report has even more about the

7    service logs, but not just detailed summaries of the service

8    logs, but a portion of the service logs themselves.  Here they

9    are:  The Attachment B.

10          So you have to ask yourself if Judge Ameral, after

11    looking at all these service logs, the jurisdictional report,

12    the summaries and the actual service logs determined N

13    should be -- continue to be a ward of the Court, I think the

14    judge would have issued the warrant on the pages it was

15    drafted.

16          What you won't see in these jury instructions is

17    anything about a right to have an attorney at a TDM, you won't

18    see that.  So in the Fourteenth Amendment context, there is

19    this phrase "deliberate indifference."  Think about that

20    phrase, "deliberate."  Purposeful, something done on purpose.

21    And then "indifferent."  Meh, I don't care about that.  So you

22    have to prove that Ms. Cobbs looked at the warrant and said,

23    I'm not going to include that because I don't care about their

24    rights.  But you heard her testimony that at the TDM she said,

25    If you leave, we're going to decide this without you.  Granted,

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

113

1    there could have been some better communication prior to the

2    TDM, absolutely, but that doesn't make it deliberately

3    indifferent to their rights.  The fact that she got the warrant

4    means she was not deliberately indifferent, in my view.

5         All right.  So those are the Fourth Amendment, that

6    was the Fourteenth.

7         Now, I should talk to you about the state law claim.

8    It's a little bit different in terms of the analysis.

9    Plaintiffs have to prove that the custody law was invalid

10   because it contained perjured information, fabricated evidence

11   or failed to disclose known exculpatory evidence.

12        Well, let's assume for the moment, right, plaintiffs'

13   counsel convinces you, Well, you know, there wasn't information

14   about there where Ms. Perez talked to the children afterwards

15   and said don't do that.  That's not exculpatory, something that

16   proves that there wasn't a lack of supervision.  It may seem

17   that there was parts of supervision, but it doesn't prove a

18   complete lack.  And ultimately, if you look at all this other

19   stuff in the service logs, I would submit to you that it's not

20   really exculpatory.

21        But it's not enough to prove failure to disclose

22   exculpatory evidence.  For this case, for this claim, they have

23   to prove that Ms. Cobbs did so with malice.  Malice is intent

24   to cause injury or despicable conduct as carried on with the

25   willful and conscious disregard of the rights of others.

114

Closing Argument - Defendants

1        So, this is about obtaining the warrant.  There's no claim

2    about the manner in which the warrant was executed.  To be

3    fair, you could consider that for damages, if you get there.

4    But this is about obtaining the warrant with malice.  And that

5    N      was actually harmed.  So even if you, in your analysis,

6    think that, well, okay, maybe here, maybe here, but has there

7    been any evidence that N     was actually harmed?  I don't think

8    so.

9        I tend to think that plaintiffs' counsel even admitted,

10   Yeah, he cries a little bit here and there, every baby cries.

11   Yes, every baby cries.  But a nine-month-old, they're going to

12   cry for multiple reasons, not because they've been harmed from

13   the warrant.

14        All right.  The other thing with malice, it goes to

15   this:  What I said in the beginning about social workers having

16   a terrible job.  You heard them say they take this seriously,

17   that they understand the trauma that a parent and a child goes

18   through.  They recognize that this is serious business.  So

19   recognizing the emotional turmoil is contrary to somebody who

20   has malice or despicable conduct and recognize that and realize

21   I still have a job to do.  I need to protect N     , given all

22   these other things.

23        All right.  I mean, look, if N    had been damaged you

24   would have had an expert up here saying, Oh yeah, even as a

25   five-year old, he can't concentrate and he hits other kids, and

115

Closing Argument - Defendants

1    that's an indication that he's been through some trauma.  You

2    don't have any evidence of that, so would I submit to you that

3    N    has zero actual damages from the removal.

4         In terms of causation, this is where I was going to

5    get to, the causal connection is a substantial factor that you

6    see just in this -- goes to both your analysis of liability

7    and, in other words, did Defendant Cobbs cause damage, cause

8    the violation, cause damage, so there's two aspects, liability

9    and damages.

10        All right.  So turning to the Verdict Forms, right,

11   did Plaintiff N.P., N    , prove by a preponderance of the

12   evidence his Fourth Amendment unreasonable seizure rights based

13   on judicial deception against April Cobbs?  Right, that's the

14   ultimate question, did they prove the claim?

15        That all goes into the analysis that we just walked

16   through about fabricated evidence, omissions, was it

17   deliberate, was it intentional, all goes into this question.  I

18   think you could conclude no.

19        And then these, 3, 4 and 5, are the Fourteenth

20   Amendment claims, Familial Association.  Again, this is against

21   April Cobbs, which arises out of the warrant.  And in this one,

22   right, they have to prove not just a violation of the Fourth

23   Amendment, but that she was deliberately indifferent to their

24   rights under the Fourteenth.  I would submit to you they

25   haven't proven that.

116

Closing Argument - Defendants

1    False imprisonment claim, that's the state law claim

2    that we just talked about.  That requires malice, right, so in

3    your analysis of this question goes to that jury instruction

4    about proving the warrant where you had perjured or omitted

5    exculpatory evidence and that she did so with malice.  No, they

6    haven't proven that.  That's what I would submit to you.

7    So now comes the difficult part for me, because as a

8    defense attorney, I want to tell you no damages, zero damages,

9    don't put any damages at all.  And actually, I'm going to ask

10   you to do that, put zero damages.  But because plaintiff gets

11   another chance to speak to you and I don't, I have to consider

12   what if you disagree with my analysis?  What is reasonable

13   compensatory damages, compensatory for their loss?  How do you

14   measure that?  I think you can measure that.  So if you're

15   going to not put a zero, which I think you can and should,

16   particularly for N    -- 6 is about Hilda, 7 is about Shane, 8

17   is about N  .  Those are all damages questions.

18   So I have to assume for my job how do you measure

19   damages?  It's pretty easy to do in this case.  We have a

20   strict number of days in which the Court ultimately determined

21   there was proper amount to detain him on July 29, that's only

22   10 days after removal.  I think that's a good measure of

23   damages in terms of, well, here we have a court already saying

24   well, it's okay to detain him.  If you don't like that date, he

25   was returned physically by October 8.  So that's two months and

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

117

Closing Argument - Defendants

1    20 days, like I said at the beginning of this case.

2         MR. POWELL:  Objection, Your Honor.

3         THE COURT:  Overruled.  He can argue it.  It's just

4    argument.

5         MR. WHITEFLEET:  So I would submit to you, all right,

6    if you want to consider that as a separation period, well, we

7    can put a number on that.  Two months, 20 days, 80 days times a

8    thousand dollars a day, that's $80,000 split between the two,

9    40,000 apiece.

10        Then comes to the question of future noneconomic loss.

11   Shane is the only one where you heard testimony from an expert,

12   Dr. Ho, about future needs.  So when you're deciding whether

13   there should be damages for future losses, like he needs

14   therapy, I would first ask you -- Dr. Ho was paid over $10,000

15   to give her opinion.  In terms of adjudging credibility, what

16   kind of motivation and bias did she have to come up with that

17   conclusion?  Paid by plaintiffs' counsel to say yes, he has

18   PTSD.  Putting that aside, you heard her say she could not

19   quantify all his past stressors, suicide, work molestation, I'm

20   not going to go through all of it.  I could not quantify his

21   past stressors as opposed to this incident.  So if you can't

22   quantify it, how can you say -- how can you conclude that this

23   incident caused his PTSD as opposed to the 99 other things that

24   occurred in his past life?  She couldn't do it.  I would say

25   you can't do it either, and so I would say future economic loss

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

118

Closing Argument - Defendants

1   is zero.  But, I'm going to have to assume maybe you disagree
2   with me.  There's a number, she gave a number, 52 sessions at
3   $200 a session, that's $10,000.  That's the loss.  You can
4   actually calculate it.
5           All right.  I don't think you'll get to punitive
6   damages because you're going to, I think, say no, no, no on
7   each of them, you don't get the punitive damages, but I think
8   you should say no on punitive damages because this is the
9   standard:  Malicious, oppressive, or reckless disregard of
10  their rights.  Rights don't come from their interaction at the
11  TDM.  The rights come from the Fourth Amendment and the
12  Fourteenth Amendment.  So that's the rights we're talking
13  about.  The rights of were you able to present the warrant with
14  sufficient information that a judge would believe there's
15  probable cause.  I think that happened.
16          And this instruction about nominal damages only comes
17  into play -- only comes into play if you have said yes to
18  liability, zero on damages, that's the only scenario where you
19  say yes liability, but no damages, zero damages, then this is
20  what comes into play, that's it.  Failed to prove damages, and
21  this is only as to the 1983 claims, not the state law claim.
22          All right.  So thank you for listening to me.  I don't
23  get to have another say, plaintiffs' counsel will, but I would
24  ask that you return a verdict in favor of Ms. Cobbs.  Thank you
25  for your time.

119

Rebuttal Argument - Plaintiffs

1    THE COURT:  All right, Mr. Powell, rebuttal.

2         REBUTTAL ARGUMENT ON BEHALF OF PLAINTIFFS

3    MR. POWELL:  All right, ladies and gentlemen, I have a

4  very short 15 minutes, I'm not going to talk like the Fed-Ex

5  man.

6         This was interesting, what five-year old doesn't tell

7  their mother what happened when sexually abused?  Christ, I

8  don't know, but I sure know that a lot of people when they're

9  adults come out that they've been sexually abused.  I hope

10 Freddy, Jr. is not one of them, but I didn't understand that

11 point at all.

12        Mr. Whitefleet told you it's as if Freddy, Jr. was

13 being used, it's a custody battle, and then said, Ultimately

14 that's what the warrant was about.  Read the warrant.  It

15 didn't say anything about a custody battle.  No, it is a

16 full-on assault on Hilda Perez, and we have Shane and N

17 thrown in on the side.  There's nothing about a custody battle

18 in there.  I had some time to get the documents that I couldn't

19 get to you yesterday.

20        Now, this was troubling -- this was troubling, she's

21 doing her best to summarize, she says she didn't go line by

22 line, it was her impressions.  Wait a minute.  You think that's

23 what warrants are, your impressions?  No, they're supposed to

24 be facts, not your impressions, not your "appears," "it

25 seems" -- it just turns the constitution on its head.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

120

Rebuttal Argument - Plaintiffs

1    You know, remember the witch -- the Salem witch stuff?
2  I believe Hilda's a witch.  Burn her.  That's it.  You don't
3  need a warrant there.  But that's my impression, she's a witch,
4  she went in the water and she floated.
5    It's omission when you have omitted something that is
6  material.  Well, again, we've got the fact about Shane not
7  living there, and right in the warrant it tells you there's a
8  reasonable alternative, you know, no reasonable service.  Here,
9  I did it this way.  I thought of one -- I thought of one, and
10  I've never even been a social worker, okay -- Oh yeah.  Are you
11  with me?
12    MR. WHITEFLEET:  HDMI.
13    MR. POWELL:  HDMI, all right, that's something.
14    Now, I'm going to get to the warrant, but since it's
15  up here, this is one of the documents he was just telling you
16  about.  It says, "Alfredo knew the difference between the truth
17  and a lie, but he could not agree to tell the truth during this
18  interview."  This is something that Jones says in her
19  testimony.  She put it in there because she wanted people to
20  know the problem was with the kid.  In fact, it's kind of weird
21  that these masters in social work, looking through these
22  delivered service logs, didn't say, You know what, maybe we
23  have a problem with the kid, maybe we should get a little
24  mental health counseling for the kid.  No, and again, this was
25  just hammer Hilda Perez, hammer her.

Rebuttal Argument - Plaintiffs

1      This is interesting, too.  This is Alfredo, Sr.
2  speaking here on Exhibit 58.  I think it's the second page
3  in -- no, first page in.  See, it's highlighted, "Alfredo, Sr.
4  disclosed that the older children in the home have a history
5  with cutting."  That's Destiny when she was a teen, it happens.
6  "And could have taught Alfredo how to harm himself."  And this
7  is after the April event where he goes to the hospital because
8  he's got marks all over him.

9      Alfredo states, "I don't trust the children in the
10  home because they once touched my son inappropriately."

11      Wow, Alfredo, how did that one touch turn into like
12  five different referrals?  Two more.  Some of those are through
13  mandated reporters.  You know, and again, that's what those
14  people have to do.  It seems like maybe that's why, in their
15  own policy manual, it says, Tell us in the warrant about
16  whether there was mandated reporters, but Cobbs didn't do that
17  either.  Reckless disregard, like I said, that's just all over,
18  that's all over her.

19      All right, I digressed.

20      She left out the different homes, left out the safety
21  plan agreements.  That's where I was headed.

22      Seventy-two, the warrant again, but don't worry.  "The
23  child's physical environment poses an immediate threat to the
24  child's health or safety.  No reasonable services available to
25  this worker, which, if provided to the child's parent,

122

Rebuttal Argument - Plaintiffs

1  guardian, caretaker, or to the child, would eliminate the need
2  to remove the child from the custody of his or her parent,
3  guardian or caretaker."
4        Well, sure there is, there's a safety plan. You went
5  out on the 16th and you whipped out two of them. Okay. That
6  man knows how to read a safety plan. He knows how to
7  understand the threat to the right, and said, If you don't go
8  along with this, keep him away from Hilda, like these other two
9  men, or we might come and take your kid. The whole thing's an
10 utter fabrication. It really is.
11       Next, she's cooking when kids get hurt. She's got
12 five kids. I bet she is.
13       He talked about motive, in fact, those were the first
14 words out of my colleague's mouth about motive, you have to
15 look at motive. Well, again, it's not a claim against the
16 County, but you heard plenty of evidence about the take one
17 take all policy. Right. County's not a defendant now, but you
18 heard it, take one take them all, that's how we do it. They're
19 just kids with lives connected to their families, their
20 friends, their neighbors, their aunts, their uncles.
21       "Sleepy Sleepy," well, the evidence is in the records,
22 that came from Alfredo's house. I don't know. Again, I think
23 Freddy, Jr. probably needs something to look at, but my client
24 couldn't help him right now because when they took him he's
25 been gone ever since. He's been gone ever since.

123

Rebuttal Argument - Plaintiffs

1      Sufficient info for dad to be declared unprotected.

2  Well, there is, if you leave out the fact that he called and

3  said, Hey, I'll do anything.  I'll separate from my fiancee,

4  I'll do anything.  I don't know.  Actually, there's not really

5  sufficient evidence to declare him unprotected.  He said

6  something about, you know, You got to do more than talk to

7  them.  What exactly is that?  What do you think the parenting

8  counseling classes did for the parents here?  Did that help

9  them to catch the fact that two kids were in a blanket fort,

10  touched each other one time?

11      Page 3.  Look at this, Exhibit 60, DSL, from April 26,

12  2019.  "Alfredo denied allegations that his brother,

13  Christopher, touched him inappropriately in the genital area,

14  and he disclosed that he told his mom that his dad touched his

15  butt because he wanted her to make him an appointment."  See, I

16  don't tell you things that aren't actually in here, but I

17  couldn't pull them up the first time.  He's too young to

18  participate.

19      So that might be mom's error, you know, erroring [sic]

20  on the side of my kid said it happened and said it to other

21  people and taking him to the doctor.  That's not a basis to

22  take the child.

23      Now, I don't know why, counsel points out the

24  detention report that the kid stayed taken.  You heard from

25  Mr. Granados and my client, it's on a prima facie basis, that's

124

Rebuttal Argument - Plaintiffs

1   at first glance.  There's a case, literally, that they wrote,

2   Oh, you know, the family held ritual sacrifices in the living

3   room on Wednesday nights.  Well, guess what, that case got

4   passed detention, too, because it's prima facie.  You get to

5   put on the evidence to get to the jurisdictional report.

6        Both of them agreed on that, and he works there.

7        And there's nothing in those jury instructions that

8   talked about a ruling on the detention report, jurisdiction

9   report, addendum report or any of the other many reports that

10  they do.  That's not before you.  It's not an issue.  It's a

11  misdirection.  I don't know.  The statement that the fact that

12  she got the warrant means she was not deliberately indifferent.

13  I just submit to you that's non-sequiturs.

14        No -- he said something about no malice in the

15  execution of the warrant.  Well, let's remember, what they did

16  is after this man had called and said, Hey, I'll do anything,

17  you know, they called him and say, Hey, we're going to do a

18  house check.  Cool.  Good.  Kid's not going to foster care.

19  Even Hilda, Okay, cool.  That's fine.  Great.  My baby is not

20  going to foster care.

21        Instead, they show up with a little mini SWAT team and

22  come and take the kid.  Tell me that's not malicious.  How

23  about walking up to Shane back at the house, it's in the

24  recording, I don't think he testified about that because, yeah,

25  not everything is in there.  She's older.  You are aware she's

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

SER-0125

125

Rebuttal Argument - Plaintiffs

1   older.  Like, what the hell?  Does anyone know -- you can't

2   answer this out loud, but it's the term *parens patriae*.  That's

3   when somebody is acting like they're the father of you.  Okay.

4   That's what that is, but it's *parens patriae* on steroids, and

5   it's sick, and it wreaks throughout this entire case,

6   throughout this agency.  You think this is a one-off; you think

7   this is a one-off in Stanislaus County?

8          Sorry.  I'm not yelling at you.  I'm just yelling.

9          I have an expert.  Yeah, she wasn't cheap, and it

10  wasn't $10,000, it was $18,000, because she had to drive here,

11  because she couldn't appear by Zoom.  And you can only afford

12  so many 18 thousands of dollars.

13         Which brings me to the comments by Ms. Cobbs that

14  Ms. Perez in the house telling Shane, Oh, she's manipulating

15  you.  I thought to myself wow, Ms. Perez, you're not very

16  sharp.  You're manipulating a guy that works at Game Stop.

17  She's going to take him for half his salary?  What's she

18  manipulating for?  She lives in her own house.  He lives with

19  his grandparents.  Not a good manipulator.

20         Finally, punitive damages.  So, see this underlined

21  section, "Unnecessary Harshness or Severity," well, that's

22  telling dad, Hey, we're going to come check out the house so

23  the baby doesn't have to go to foster care and then showing up

24  with the police instead and taking the baby.  Can you imagine

25  the rollercoaster?  Wahoo, this is great!  Wham.  It's not even

126

Rebuttal Argument - Plaintiffs

1    a rollercoaster.  It's more like that ride, bam, like that.

2    And that's what he did, he went bam, like that, he fell on the

3    ground.  He couldn't support his own body weight.  That's a

4    pretty intense hit.  Two-and-a-half months.

5         He's going to be seeing these cars.  He's going to

6    worry about every knock on the door.  Certainly anybody who

7    shows up in any type of county attire or badge, I submit for

8    the rest of his life, but I told you how to figure the damages.

9    What would the reasonable person pay to not have that happen to

10   their kid?  And you know a lot of people, I bet these two as

11   well, they would say, I'll pay a bazillion dollars to not have

12   it happen to my kid, you know, but take me.  That's another

13   thing a good parent would say, just like Ms. Perez did when she

14   was sick, she was like, No, kids, stay with Horacio.  I'm not

15   in good shape.  Best thing for them to do.

16        Javier is a child with Down Syndrome, autism.

17        THE COURT:  You got one minute.

18        MR. POWELL:  Okay.

19        I can understand why she's like, Oh, my God, don't get

20   CPS involved.  And little did she know she would have darn good

21   reason to say it in the future.  The kid had Down Syndrome, he

22   had autism, too, I believe it was.  It's in the log.

23        Ladies and gentlemen, it's in your hands, pretty

24   much -- well, not "pretty much," completely.

25        I really do thank you again for your time, and I hope

127

Jury Instructions

1   we get the opportunity to speak with you after the matter, win,

2   lose or draw, and I guess that's about it.  Thank you.

3          THE COURT:  All right.  Thank you.

4          Stand up, take a stretch, we're going to hand out the

5   jury instructions to you.

6          You got them, right?

7          All right.  All jurors have their package of

8   instruction, the law does require me to read them to you, so we

9   will go over them on the record.

                    JURY INSTRUCTIONS

11         THE COURT:  All right.  Members of the jury, now that

12  you've heard all the evidence and the arguments of the

13  attorneys, it's my duty to instruct you on the law that applies

14  to the case.  A copy of these instructions will be available in

15  the jury room for you to consult.  You can take that copy with

16  you.

17         It is your duty to find the facts from all the

18  evidence in the case.  To those facts you will apply the law as

19  I give it to you.  You must follow the law as I give it to you,

20  whether you agree with it or not, and you must not be

21  influenced by any personal likes or dislikes, opinions,

22  prejudices or sympathy.  That means that you must decide the

23  case solely on the evidence before you.  You will recall that

24  you took an oath to do so.

25         Please do not read into these instructions or anything

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

128

## Jury Instructions

1   that I may say or do, or have said or done, that I have an

2   opinion regarding the evidence or what your verdict should be.

3        When a party has the burden of proving any claim by a

4   preponderance of the evidence, it means you must be persuaded

5   by the evidence that the claim is more probably true than not

6   true.  You should base your decision on all of the evidence

7   regardless of which party presented it.

8        You should decide the case as to each plaintiff

9   separately.  Unless otherwise stated, the instructions apply to

10  all parties.

11       To assist with deliberations I am providing you with

12  the following summary of the claims brought by plaintiffs

13  against Defendant April Cobbs.  You need not consider any other

14  claims against any other persons or the County of Stanislaus

15  that may have been mentioned by the parties in this case.

16       Plaintiff N.P., Defendant April Cobbs, the claim is

17  under 42 U.S.C. Section 1983, Fourth Amendment, Unreasonable

18  Seizure by Judicial Deception.

19       N.P., Hilda Perez, and Shane Beard are all plaintiffs

20  against Defendant April Cobbs.  The claim is under 42 U.S.C.

21  Section 1983, a Fourteenth Amendment claim, Substantive Due

22  Process Familial Association.

23       And Plaintiff N.P., has a claim against Defendant

24  April Cobbs, for False Imprisonment, a state claim.

25       The parties have agreed to the following facts that

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

129

Jury Instructions

1  you must treat as having been proved:  One, Plaintiff Hilda
2  Perez, is the natural mother of N.P., A.S., C.P., D.P. and VP.
3        Two, Shane Beard is the natural father of Plaintiff
4  N.P.
5        Three, Plaintiff N.P. was born in 2018.
6        Four, at all relevant convenient times, Plaintiffs
7  Hilda Perez and Shane Beard lived in different residences.
8        Five, on July 12, 2019, Defendants April Cobbs and
9  Shynelle Jones went to the home of Hilda Perez and spoke to her
10 in order to investigate a child abuse referral regarding Hilda
11 Perez's son, A.S.
12       Six, a team decision meeting, TDM, was held July 15,
13 2019.
14       Seven, following the TDM on July 15, 2019, a staff
15 meeting referred to as team assessment planning, TAP, was held
16 by the social workers.  Those who attended were defendants --
17 it should say just Eric Anderson, Mariela Gomez, Gloria
18 Solorio -- April Cobbs is the defendant, Shynelle Jones and
19 Stephanie Herrera.  The last two are not defendants.  Also
20 acting as facilitator was Stanislaus County employee Howard
21 Courney.
22       Eight, on July 19, 2019, Defendant April Cobbs, filed
23 an application, an affidavit in support of protective custody
24 order and order authorizing entry into home with the juvenile
25 court seeking judicial authorization to remove N.P. from the

MARYANN VALENOTI - U.S. DISTRICT COURT - (916)930-4275

130

Jury Instructions

1    custody of his parents, plaintiffs, Hilda Perez and Shane

2    Beard.

3            A judge signed the warrant on July 19, 2019, and N.P.

4    was removed on the warrant the same day.

5            A juvenile dependency petition signed by David

6    Granados and Mariela Gomez regarding N.P. was submitted in the

7    Stanislaus County Superior Court on July 23, 2019.  On July 29,

8    2019, the Stanislaus County juvenile court issued an order of

9    detention for N.P.

10            A first amended juvenile dependency petition signed by

11   David Granados and Mariela Gomez regarding N.P. was admitted --

12   was submitted in the Stanislaus County Superior Court on

13   August 16, 2019.

14            A jurisdiction report signed by David Granados and

15   Mariela Gomez regarding N.P. was submitted in the Stanislaus

16   County Superior Court on August 19, 2019.

17            Thirteen, a disposition report signed by David

18   Granados and Mariela Gomez regarding N.P. was submitted in the

19   Stanislaus County Superior Court on September 10, 2019.

20            An addendum report, signed by David Granados and

21   Mariela Gomez, regarding N.P. was submitted in the Stanislaus

22   County Superior Court on October 8, 2019.

23            On October 8, 2019, the Stanislaus County juvenile

24   court adjudicated N.P. a ward of the Court.

25            Again, David Granados and Mariela Gomez are not

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

131

Jury Instructions

1   defendants in this case.

2           Sixteen, on the same day Plaintiff N.P. was physically

3   returned to Plaintiff Shane Beard only pursuant to a

4   reunification plan.  Plaintiff Hilda Perez was placed on a

5   family maintenance plan.

6           Seventeen, a second amended juvenile dependency

7   petition signed by David Granados and Mariela Gomez regarding

8   N.P. was submitted in the Stanislaus County Superior Court on

9   October 11, 2019.

10          A status review report by social workers Rebecca

11  Blacksten and Kurt Van Houten regarding N.P. was submitted in

12  the Stanislaus County Superior Court on March 27, 2020.

13          An addendum report signed by social workers Rebecca

14  Blacksten and Kurt Van Houten regarding N.P. was submitted in

15  the Stanislaus County Superior Court on April 27, 2020.

16          And twenty, on April 27, 2020, the Stanislaus County

17  juvenile court terminated the dependency proceedings, returning

18  physical and legal custody to plaintiffs, Hilda Perez and Shane

19  Beard.

20          Again, you must treat these facts as having been

21  proven.

22          The evidence you are to consider in deciding what the

23  facts are consists of:  One, the sworn testimony of any

24  witness.

25          Two, the exhibits that have been admitted into

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

SER-0132

132

Jury Instructions

1    evidence.

2            Three, any facts to which the parties have agreed.

3            And four, any facts that I have instructed you to

4    accept as proved.

5            In reaching your verdict, you may consider only the

6    testimony and exhibits received into evidence.  Certain things

7    are not evidence and you may not consider them in deciding what

8    the facts are.  I will list them for you:  One, arguments and

9    statements by lawyers are not evidence.  The lawyers are not

10   witnesses.  What they have said in their opening statements,

11   closing arguments and at other times is intended to help you

12   interpret the evidence, but it is not evidence.  If the facts

13   as you remember them differ from the way the lawyers have

14   stated them, your memory of them controls.

15           Questions and objections by lawyers are not evidence.

16   Attorneys have a duty to their clients to object when they

17   believe a question is improper under the Rules of Evidence.

18   You should not be influenced by the objection or by the Court's

19   ruling on it.

20           Three, testimony that is excluded or stricken or that

21   you have been instructed to disregard is not evidence and must

22   not be considered.

23           In addition, some evidence was received only for a

24   limited purpose.  When I have instructed you to consider

25   certain evidence only for a limited purpose, you must do so and

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

133

Jury Instructions

1   you may not consider that evidence for any other purpose.

2          Four, anything you may have seen or heard when the

3   Court was not in session is not evidence.  You are to decide

4   the case solely on the evidence received at the trial.

5          Evidence may be direct or circumstantial.  Direct

6   evidence is direct proof of a fact such as testimony by a

7   witness about what that witness personally saw or heard or did.

8          Circumstantial evidence is proof of one or more facts

9   from which you could find another fact.

10          You should consider both kinds of evidence.  The law

11   makes no distinction between the weight to be given to either

12   direct or circumstantial evidence.  It is for you to decide how

13   much weight to give to any evidence.

14          In deciding the facts in this case you may have to

15   decide which testimony to believe, which testimony not to

16   believe.  You may believe everything the witness says or part

17   of it or none of it.  In considering the testimony of any

18   witness you may take into account, one, the opportunity and

19   ability of the witness to see or hear or know the things

20   testified to.

21          Two, the witness's memory.

22          Three, the witness's manner while testifying.

23          Four, the witness's interest in the outcome of the

24   case, if any.

25          Five, the witness's bias or prejudice, if any.

134

Jury Instructions

1      Six, whether other evidence contradicted the witness's
2 testimony.

3      Seven, the reasonableness of the witness's testimony
4 in light of all the evidence.

5      And eight, any other factors that bear on
6 believability.

7      Sometimes a witness may say something that is not
8 consistent with something else he or she said.  Sometimes
9 different witnesses will give different versions of what
10 happened.  People often forget things or make mistakes in what
11 they remember.  Also, two people may see the same event but
12 remember it differently.  You may consider these differences,
13 but do not decide the testimony is untrue just because it
14 differs from other testimony.

15      However, if you decide that a witness has deliberately
16 testified untruthfully about something important, you may
17 choose not to believe anything that witness said.  On the other
18 hand, if you think that the witness testified untruthfully
19 about some things, but told the truth about others, you may
20 accept the part you think is true and ignore the rest.

21      The weight of the evidence as to a fact does not
22 necessarily depend on the number of witnesses who testify, what
23 is important is how believable the witnesses were and how much
24 weight you think their testimony deserves.

25      You've heard testimony from an expert witness who

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

135

Jury Instructions

1   testified to opinions and the reasons for her opinions.  This

2   opinion testimony is allowed because of the education or

3   experience of this witness.  Such opinion testimony should be

4   judged like any other testimony.  You may accept it or reject

5   it and give it as much weight as you think it deserves

6   considering the witness's education and experience, the reasons

7   given for the opinion and all the other evidence in the case.

8           The evidence that a witness lied under oath on a prior

9   occasion may be considered along with all other evidence in

10  deciding whether or not to believe the witness and how much

11  weight to give to the testimony of the witness and for no other

12  purpose.

13          Plaintiffs Shane Beard, Hilda Perez and N.P. bring two

14  claims under the federal statute, 42 U.S.C. Section 1983, which

15  provides that, "Any person or persons who, under color of state

16  law, deprives another of any rights, privileges or immunities

17  secured by the constitution or laws of the United States, shall

18  be liable to the injured party.

19          "In a Section 1983 action the plaintiff must

20  demonstrate that the defendant's conduct was the actionable

21  cause of the claimed injury.  In order to establish causation

22  on Plaintiff N.P.'s Unreasonable Seizure by Judicial Deception

23  claim, plaintiffs must establish that Defendant April Cobbs'

24  actions, in violation of the Fourth Amendment, were a

25  substantial factor in causing harm to Plaintiff N.P.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Jury Instructions

1      "In order to establish causation on Plaintiffs' Hilda

2 Perez, Shane Beard and N.P.'s, interference with Familial

3 Association claim, plaintiffs must establish that Defendant

4 April Cobbs action in violation of the Fourteenth Amendment

5 were a substantial factor in causing harm to Plaintiffs Shane

6 Beard, Hilda Perez and/or N.P.

7      "A substantial factor is one that a reasonable person

8 would consider to have contributed to the harm.  Although the

9 conduct need not be the only cause of the harm, the conduct

10 must be more than a trivial or remote fact."

11      In order to prevail on their Section 1983 claims

12 against Defendant April Cobbs, the plaintiffs must prove each

13 of the following elements by a preponderance of the evidence:

14 One, Defendant April Cobbs acted under color of law.

15      Two, the act of Defendant April Cobbs, deprived

16 Plaintiffs Shane Beard, Hilda Perez and/or N.P. of their

17 particular rights under the United States Constitution, as

18 explained in later instruction.

19      And three, Defendant April Cobbs' conduct was an

20 actual cause of the claimed injuries.

21      A person acts under color of law when the person acts

22 or purports to act in the performance of official duties under

23 any state, county or municipal law, ordinance or regulation.

24 The parties stipulate that the Defendant April Cobbs was acting

25 under color of law.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

137

Jury Instructions

1    If you find plaintiffs have proved each of these
2  elements as to Defendant April Cobbs, and if you find that the
3  plaintiffs have proved all the elements they are required to
4  prove under the additional instructions provided, your verdict
5  should be for the plaintiffs.

6    If, on the other hand, the plaintiffs have failed to
7  prove any one or more of these elements, your verdict should be
8  for the defendant.

9    As previously explained, the plaintiffs have the
10  burden of proving that the acts of Defendant April Cobbs
11  deprived the plaintiffs of particular rights under the United
12  States Constitution.  In this case the minor, Plaintiff N.P.,
13  alleges Defendant April Cobbs, deprived him of his right --
14  rights under the Fourth Amendment to the constitution when the
15  Defendant Cobbs intentionally or in reckless disregard of the
16  truth, made one or more material misrepresentations or
17  omissions in a Protective Custody Warrant affidavit submitted
18  to a judge.

19    Under the Fourth Amendment a person has the right to
20  be free from an unreasonable seizure of his person.  A
21  Protective Custody Warrant is a written order signed by a judge
22  that permits social workers to place a child in protective
23  custody.  To obtain a Protective Custody Warrant, a social
24  worker must show probable cause that there exists substantial
25  danger to the safety or to the physical or emotional health of

138

Jury Instructions

1   the child, and there are no reasonable means to protect the

2   child's safety or physical health without removal.

3          In deciding whether to issue a Protective Custody

4   Warrant, a judge generally relies on the facts stated in a

5   warrant affidavit signed by a social worker.  To prove

6   Defendant April Cobbs deprived the Plaintiff N.P. of his Fourth

7   Amendment right, plaintiffs must prove the following additional

8   elements by a preponderance of the evidence:

9          One, Defendant April Cobbs, submitted to a judge a

10  warrant affidavit that contained one or more misrepresentations

11  or omissions material to the finding of probable cause.

12         And two, Defendant April Cobbs made those

13  misrepresentations or omissions either intentionally or with

14  reckless disregard for the truth.

15         To show materiality in the context of this claim,

16  plaintiff must demonstrate that the judge would not have issued

17  the warrant if the false information had been excluded or if

18  the omitted or missing information had been included.

19         In the context of this claim a reckless disregard for

20  the truth means highly unreasonable conduct that is an extreme

21  departure from ordinary care presenting a danger of misleading

22  a reasonable judge into concluding that probable cause has been

23  established when that danger is either known to the defendant

24  or is so obvious that the defendant must have been aware of it.

25         With respect to Plaintiffs Hilda Perez, Shane Beard,

139

Jury Instructions

1    and N.P.'s claim for loss of familial relationship, in general,

2    a parent has a constitutional right to a familial relationship

3    with his or her child.  In order for plaintiffs to prove that

4    Defendant April Cobbs, interfered with their familial

5    relationship, plaintiffs must prove by a preponderance of the

6    evidence that defendant's conduct shocks the conscience.

7         There are two tests used to decide whether a

8    defendant's "conduct shocks the conscience."  A defendant's

9    conduct may shock the conscience if, one, the official acted

10   with a purpose to harm the victim for reasons unrelated to the

11   legitimate enforcement objectives.

12        Or two, the official acted with "deliberate

13   indifference" to the victims.

14        Which test applies turns on the specific circumstances

15   of the underlying events in each case.  Here if you find that

16   the encounter at issue escalated so quickly that Defendant

17   April Cobbs had to make a snap judgment, the plaintiffs must

18   show defendant acted with a purpose to harm; however, if you

19   find the situation evolved within a timeframe that allowed

20   Defendant April Cobbs to reflect before acting, the plaintiffs

21   must show she acted with deliberate indifference.

22        Plaintiff N.P. says he was wrongfully removed by

23   Defendant April Cobbs under state law.  To establish this claim

24   against Defendant April Cobbs, Plaintiff N.P. must prove all of

25   the following:

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

140

Jury Instructions

1       One, that Defendant April Cobbs intentionally caused

2    N.P. to be removed.

3       Two, that the Protective Custody Warrant was invalid

4    because it contained perjured information, fabricated evidence,

5    or failed to disclose known exculpatory evidence.

6       Three, that Defendant April Cobbs did so with malice.

7    Malice is defined as conduct that is intended to cause injury

8    to the plaintiff or despicable conduct that is carried on in a

9    willful and conscious disregard of the rights or safety of

10   others.

11      Four, that N.P. was actually harmed.

12      And five, that Defendant April Cobbs' conduct was a

13   substantial factor in causing N.P.'s harm.

14      It is the duty of the Court to instruct you about the

15   measure of damages.  My instructing you on damages, the Court

16   does not mean to suggest for which party your verdict should be

17   rendered.

18      If you find for plaintiffs on any of plaintiffs'

19   claims, you must determine the plaintiffs' damages.  Plaintiffs

20   have the burden of proving damages by a preponderance of the

21   evidence.

22      "Damages" means the amount of money that will

23   reasonably and fairly compensate plaintiffs for any injury you

24   find was caused by the defendant.  You should consider the

25   following:

141

Jury Instructions

1    One, the nature and extent of the injuries.

2    Two, the mental or emotional pain and suffering

3    experienced and that with reasonable probability will be

4    experienced in the future.

5    It is for you to determine what damages, if any, have

6    been proved.  Your award must be based upon evidence and not

7    upon speculation, guesswork, or conjecture.

8    If you find for plaintiffs, you may, but are not

9    required to award punitive damages.  The purposes of punitive

10    damages are to punish defendant and to deter similar acts in

11    the future.  Punitive damages may not be awarded to compensate

12    plaintiffs.

13    Plaintiffs have the burden of proving by a

14    preponderance of the evidence that punitive damages should be

15    awarded for their unreasonable seizure, loss of familial

16    relationship or false imprisonment claims, and if so, the

17    amount of any such damages.

18    You may award punitive damages only if you find that

19    Defendant April Cobbs' conduct that harmed plaintiff was

20    malicious, oppressive, or in reckless disregard of the

21    plaintiffs' rights.

22    The conduct is malicious if it's accompanied by ill

23    will or spite or it is for the purpose of injuring a plaintiff.

24    Conduct is in reckless disregard of a plaintiff's

25    rights if under the circumstances it reflects complete

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

142

Jury Instructions

1   indifference to a plaintiff's safety or rights, or if the

2   defendant acts in the face of a perceived risk that its actions

3   will violate the plaintiffs' rights under federal or state law.

4           An act or omission is oppressive if the defendant

5   injures or damages or otherwise violates the rights of the

6   plaintiff without unnecessary harshness or severity such as by

7   misusing or abusing authority or power or by taking advantage

8   of some weakness or disability or misfortune of the plaintiff.

9           If you find that punitive damages are appropriate, you

10  must use reason in setting the amount.  Punitive damages, if

11  any, should be an amount sufficient to fulfill their purposes,

12  but should not reflect bias, prejudice, or sympathy for any

13  party.

14          In considering the amount of any punitive damages,

15  consider the degree of reprehensibility of defendant's conduct.

16  In addition, you may consider the relationship of any award

17  punitive damages to any actual harm inflicted on the

18  plaintiffs.

19          Punitive damages may be awarded even if you award

20  plaintiffs only nominal and not compensatory damages.

21          The law, as it applies to the case, authorizes an

22  award of nominal damages on the claims for unreasonable seizure

23  and loss of familial relationship.

24          If you find for the plaintiffs but you find that

25  plaintiffs have failed to prove damages, as defined in these

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

143

Jury Instructions

1    instructions, you must award nominal damages.  Nominal damages

2    may not exceed one dollar.

3           The arguments of the attorneys are not evidence of

4    damages.  Your award must be based on your reason judgment

5    applied to the testimony of the witnesses and the other

6    evidence that has been admitted during trial.

7           Before you begin your deliberations, elect one member

8    of the jury as your presiding juror.  The presiding juror will

9    preside over the deliberations and serve as a spokesperson for

10   the jury in court.

11          You shall diligently strive to reach agreement with

12   all of the other jurors if you can do so.  Your verdict must be

13   unanimous.  Each of you must decide the case for yourself, but

14   you should do so only after you've considered all of the

15   evidence, discussed it fully with all of the other jurors and

16   listened to their views.  It is important that you attempt to

17   reach a unanimous verdict, but, of course, only if each of you

18   can do so after having made your own conscientious decision.

19          Do not be unwilling to change your opinion if the

20   discussion persuades you that you should.  But do not come to a

21   decision simply because other jurors think it is right or

22   change an honest belief about the weight and effect of the

23   evidence simply to reach a verdict.

24          Because you must base your verdict only on the

25   evidence received in the case and on these instructions, I

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

144

Jury Instructions

1    remind you that you must not be exposed to any other

2    information about the case or to the issues it involves.

3    Except for discussing the case with your fellow jurors during

4    deliberation, do not communicate with anyone in any way, and do

5    not let anyone else communicate with you in any way about the

6    merits of the case or anything to do with it.

7         This includes discussing the case in person, in

8    writing, by phone or electronic means, via e-mail, via text

9    messaging or any Internet chat room, blog, website, or

10   application, including but not limited to, Facebook, YouTube,

11   Twitter, which is now X, Instagram, LinkedIn, Snapchat or any

12   other forms of social media.

13        This applies to communicating with your family

14   members, your employer, the media or press and the people

15   involved in the trial.

16        If you are asked or approached in any way about your

17   jury service or anything about this case, you must respond that

18   you've been ordered not to discuss the matter and report the

19   conduct to the Court.  Do not read, watch or listen to any news

20   or media accounts or commentary about the case or anything to

21   do with it, although I have no information that there will be

22   news reports about this case.

23        Do not do any research such as consulting

24   dictionaries, searching the Internet or using other reference

25   materials, and do not make any investigation or in any other

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

145

Jury Instructions

1   way try to learn about the case on your own.

2           Do not visit or view any place discussed in this case,

3   and do not use Internet programs or other devices to search for

4   or view any place discussed during the trial.

5           Also, do not do any research about this case, the law

6   or the people involved, including the parties, the witnesses or

7   the lawyers until you've been excused as jurors.  If you happen

8   to read or hear anything touching on this case in the media,

9   turn away and report it to me as soon as possible.

10          You should also protect each party's right to have

11  this case decided only on evidence that's been presented here

12  in court.  Witnesses here in court take an oath to tell the

13  truth, and the accuracy of the testimony is tested through the

14  trial process.  If you do any research or investigation outside

15  the courtroom or gain any information through improper

16  communications, then your verdict may be influenced by

17  inaccurate, incomplete, or misleading information that has not

18  been tested by the trial process.

19          Each of the parties is entitled to a fair trial by an

20  impartial jury, and if you decide the case based on information

21  not presented in court, you will have denied the parties a fair

22  trial.

23          Remember, you have taken an oath to follow the rules,

24  and it's very important that you follow these rules.  A juror

25  who violates these restrictions jeopardizes the fairness of

146

Jury Instructions

1    these proceedings and a mistrial could result that would

2    require the entire trial process to start over.

3           If any juror is exposed to any outside information,

4    please notify the Court immediately.

5           If it becomes necessary during your deliberations to

6    communicate with me, you may send a note through the courtroom

7    deputy signed by any one or more of you.  No member of the jury

8    should ever attempt to communicate with me except by a signed

9    writing.  I will not communicate with any member of the jury on

10   anything -- I'm sorry, I will not communicate with any member

11   of the jury on anything concerning the case except in writing

12   or here in open court.

13          If you send out a question, I will consult with the

14   lawyers before answering it which may take some time.  You may

15   continue your deliberations while waiting for the answer to any

16   question.

17          Remember that you are not to tell anyone, including

18   the Court, how the jury stands, whether in terms of vote count

19   or otherwise, until after you've reached a unanimous verdict or

20   have been discharged.

21          A Verdict Form has been prepared for you.  After

22   you've reached unanimous agreement on a verdict, your presiding

23   juror should complete the Verdict Form according to your

24   deliberations, sign and date it, and advise the courtroom

25   deputy that you are ready to return to the courtroom.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Jury Instructions

1      Okay.  Pull out Instruction Number 5.  I'll give you a
2 corrected version based on what I read to you.  It's on
3 Pages 5, 6 and 7, and we'll send it in to you so you'll have
4 it.

5      From this point forward you control your
6 deliberations.  You don't have to send me a note asking for
7 permission to take a break.  We'd like you to go until 4:30
8 today.  Again, that's up to you.  If you want to go past 4:30
9 for a little while, that's fine with me.  Usually I'm going to
10 kick you out of here by 5:00 anyway.  The building shuts down
11 pretty quickly after 5:00 o'clock, including a lot of times in
12 the summer they turn off the air conditioning and in the winter
13 they turn off the heat.  Again, up to you.

14      I'll leave it up to the foreperson to enforce rules
15 regarding cell phones, laptops, et cetera.  Please keep them
16 off during your deliberations.  I'm not going to take them from
17 you, you're all adults, and we'll leave it up to you to make
18 sure you follow those rules.

19      If you do take a break and you separate, remember, you
20 can't talk about the case at all.  The only time you can talk
21 about the case is when all eight of you are in that room.
22 We'll have you come back.  If you don't reach a verdict
23 tonight, I'll have you come back at 9:00, 9:15 tomorrow.
24 Ms. York will tell you where to report tomorrow.

25      We send in all the exhibits, all the written exhibits.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

SER-0148

148

Jury Instructions

1   The video and the audio that you saw during the trial doesn't
2   go into the jury room.  If you do want to see that again or
3   listen to that again, just send out a note and we have to do
4   that in open court.
5           The Verdict Form, you saw it during closing arguments,
6   just follow the instructions, it's self-explanatory.  One thing
7   the lawyers didn't point out is on Page 2 there are
8   instructions at the bottom.  If you do answer no on Questions 1
9   through 5, then you go right to the last page, and you date and
10   sign the verdict form.  If you answered yes to any question, 1
11   through 5, then you go to the damage questions.
12          So again, it's self-explanatory, and whoever the
13   foreperson is, just make sure that the Verdict Form matches the
14   verdict before you tell us that you reached a verdict.
15          Questions?
16          We will keep you together during lunch tomorrow, so
17   you won't separate at lunch.  And again, anytime you want to
18   take breaks, you don't need my permission, it's up to all of
19   you.
20          Let's swear in the courtroom security officer.
21          Court Security Officer, sworn.
22          THE COURT:  Okay.  Read Jury Instruction 5.  Grab your
23   notes, your other jury instructions, head on into your room.
24   Leave just Jury Instruction Number 5, Pages 5, 6 and 7.
25      (In open court outside the presence of the jury.)

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

149

Jury Instructions

1    THE COURT:  Okay.  Stay within five minutes of the

2  courtroom, please.  When they take a break, we'll notify you.

3  Make sure Ms. York has your cell phones, and she'll send in the

4  exhibits.  I know you all agreed, so she'll take them in.

5         All right.

6         (Jury deliberations begin 3:04 p.m.)

7         (Proceedings adjourned at 4:30 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

150

Jury Instructions

1                          C E R T I F I C A T E

2

3          I certify that the foregoing is a true and correct

4     transcript of proceedings in the above-entitled matter.

5

6

7     MARYANN VALENOTI, RMR, CRR              July 24, 2024
      Official Court Reporter                      DATE
8     CA CSR #11266

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275