Appeal Nos. 24-5782, 24-5779

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

SHANE BEARD, HILDA PEREZ and N.P., a minor, by and through Guardian ad Litem, Donnie R. Cox,

*Plaintiffs/Appellants/Cross-Appellees,*

vs.

COUNTY OF STANISLAUS et al.

*Defendants/Appellees/Cross-Appellants*

_____

On Appeal From a Decision of the United States District Court,
Eastern District of California, Case No. 1:21-cv-00841-JAM-CSK
_____

**APPELLEES'/CROSS-APPELLANTS'S
SUPPLEMENTAL EXCERPTS OF RECORD,
VOLUME 2 OF 3**
_____

PORTER SCOTT
A Professional Corporation
John R. Whitefleet, SBN 213301
2180 Harvard St. STE 500
Sacramento, CA 95815
Telephone: 916.929.1481
Facsimile: 916.927.3706
Attorneys for Defendant/Appellee
County of Stanislaus

```
 1                    UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF CALIFORNIA
                              --oOo--
 3
    SHANE BEARD, et al.,          ) Case No. 1:21-cv-00841-JAM
 4                                )
                  Plaintiffs,     ) Sacramento, California
 5                                ) May 24, 2024, 9:13 a.m.
           v.                     )
 6                                )
    COUNTY OF STANISLAUS, et al.,) Re: Trial Day 8
 7                                )
                  Defendants.     )
 8

 9                    TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE JOHN A. MENDEZ
10              SENIOR UNITED STATES DISTRICT JUDGE

11  APPEARANCES:
    For the Plaintiffs:       POWELL & ASSOCIATES by
12                            MR. ROBERT ROSS POWELL
                              925 West Hedding Street
13                            San Jose, California  95126

14   For the Defendants:      PORTER SCOTT by
                              MR. JOHN ROBERT WHITEFLEET
15                            2180 Harvard, Suite 500
                              Sacramento, California  95815
16
    Also Present:            Eric Anderson
17                           David Granados
                             Gloria Solorio
18
                      MARYANN VALENOTI, RMR, CRR
19                       Official Court Reporter
                        501 I Street, Suite 4-200
20                        Sacramento, CA 95814
                        mvalenotiRMRCRR@gmail.com
21                          (916)930-4275

22  Proceedings reported via mechanical steno - transcript produced
    via computer-aided transcription
23

24

25
```

2

I N D E X

WITNESSES                                                      PAGE

ERIC ANDERSON (Recalled)
     Direct Mr. Powell ......................... 16

ELIZABETH ANSHUTZ
     Voir Dire Mr. Powell ...................... 27
     Voir Dire Mr. Whitefleet .................. 37
     Direct Mr. Powell  ........................ 43
     Cross Mr. Whitefleet ...................... 50
     Redirect Mr. Powell ....................... 53

HORACIO GUADALUPE GARCIA PEREZ, JR.
     Direct Mr. Powell ......................... 60
     Cross Mr. Whitefleet ...................... 72
     Redirect Mr. Powell ....................... 73

DAVID GRANADOS
     Direct Mr. Whitefleet ..................... 104
     Cross Mr. Powell  ......................... 114
     Redirect Mr. Whitefleet ................... 124
     Recross Mr. Powell  ....................... 125

SHARI JOHNSON
     Direct Mr. Whitefleet ..................... 126
     Cross Mr. Powell  ......................... 133


DEFENDANTS' EXHIBITS
     No. A-31 .................................. 102
     No. A-32 .................................. 102
     No. A-40 .................................. 102
     No. A-41 .................................. 103
     No. A-45 .................................. 103
     No. A-47 .................................. 103
     No. A-49 .................................. 104
     No. A-42 .................................. 103

3

1                  SACRAMENTO, CALIFORNIA, THURSDAY, MAY 24, 2024

2                                 --o0o--

3       (In open court outside the presence of the jury.)

4            THE CLERK:  Please remain seated and come to order.

5 Court is now in session.  The Honorable John A. Mendez, Senior

6 United States District Judge, presiding.

7            Calling Civil Case Number 21-cv-841, Beard, et al.

8 versus Stanislaus County, et al.

9            THE COURT:  Good morning, outside the presence of the

10 jury.  The Court received the plaintiffs' brief regarding an

11 offer of proof and argument on prior deposition testimony.  The

12 memo concerns three potential witnesses:  Eric Anderson,

13 Elizabeth Anshutz and Juan Perez.

14            We don't have to spend any time with Mr. Anderson.

15 You can recall him and ask him questions about the practice

16 that you allege was in existence in 2019 when N    was removed.

17 So, clearly, under Rule 32 you can use that deposition

18 testimony for purposes of impeachment.

19            In terms of Ms. Anshutz and Mr. Perez, Mr. Whitefleet,

20 I'll give you an opportunity to make a record in terms of your

21 opposition to the motion, and then I'll have further

22 discussion.  Go ahead.

23            MR. WHITEFLEET:  Yeah, thank you, Your Honor.

24            So, like I indicated yesterday, Ms. Anshutz was a

25 Court Unit social worker.  She was not involved in removals.

1   And the *Westfall* case was a warrantless removal, so we don't
2   believe that the necessary foundation can be laid.

3          The *Westfall* case is not reasonably factually similar,
4   and simply because plaintiff wants to use testimony, it doesn't
5   become impeachment until and unless a foundation can be laid
6   that she had some awareness of some practice about removing, in
7   terms of warrants, other children.

8          I would submit to the Court that none of this is
9   relevant because only one child was removed in this case
10  pursuant to a warrant, and so I would submit that the *Monell*
11  claim fails in that because this is a one child removal.

12         THE COURT:  Save that for your motions, just focus on
13  whether these witnesses can testify or not.

14         MR. WHITEFLEET:  And like I said yesterday, Mr. Perez
15  was only employed between December 17 of 2018 -- excuse me,
16  December 2017 to December 2018, and his involvement was, again,
17  a warrantless removal of a single child after a death of an
18  infant.

19         I would also point out even though the Court is
20  allowing to recall Mr. Anderson, I would submit to the Court
21  that plaintiff has had essentially two shots at him already,
22  during his case-in-chief by calling him up on the stand and
23  then playing the video.

24         We would object to a third time, and particularly
25  because *Nunes* was not a removal at all.  That was a safety plan

1   issue only.

2       We would submit, too, that of all three, the proffered

3   impeachment is not actually impeachment because of its inherent

4   vagueness on all of them, because there's no timelines in the

5   question, they're convoluted, particularly on the question in

6   *Nunes* because it was about what happens -- how they handle

7   generally, and so the answer is pretty vague -- the question

8   was vague and the answer was vague.  So we would submit it's

9   not true impeachment.

10      THE COURT:  Okay.  Mr. Powell, do you want to respond

11  to that?

12      MR. POWELL:  Yes, Your Honor.  Obviously, the very

13  same legal issues are at play in these cases, and it makes

14  sense that defendants would want to take a scalpel to it, but

15  that is not really the, I don't know, intent according to

16  42 U.S.C. 1983 or the 4th or 14th Amendments not to find ways

17  to get around them.

18      We believe that the testimony is very clear,

19  Ms. Anshutz -- let me address the Court Unit worker part.  I

20  believe Your Honor worked in Sacramento County when actually a

21  juvenile bench officer himself, but in Stanislaus County what

22  "Court Unit" means, and it's in her full deposition, I have all

23  of these in sealed form here today.  I would like to submit all

24  of them to be decided which we'll open and which we'll not.

25      But anyway, a Court Unit officer there, as she

6

1    testifies in her thing, they deal with placements, they go to

2    the TDMs, which you know is a feature in this case, so they're

3    there for the decisions, and she had, at the time that the

4    child in her case was removed, had been a social worker for

5    four -- a supervisor, really, because she has a high degree,

6    like a psychology major or something -- four years, and then

7    we're talking to her on May 5, 2023, and asked her if the

8    practice is still in place, and she says yes.  So at that point

9    she's got nine years, if my math is right, yes.

10            THE COURT:  Did she do any removals?

11            MR. POWELL:  Herself?

12            THE COURT:  Yeah.

13            MR. POWELL:  No, I don't --

14            THE COURT:  Did she do any warrants for removal?

15            MR. POWELL:  No, she did not.

16            THE COURT:  Was she in the Emergency Removal Unit,

17    ever?

18            MR. POWELL:  No, she was not.

19            THE COURT:  Okay.  So where was she in June, July of

20    2019, what unit?

21            MR. POWELL:  Could I have a moment to look at her

22    depo?

23            Oh, yes, she was also in quality control and training,

24    Your Honor.  That was, I think, a very important aspect of her

25    work, but I'll take a second to get to her -- oh, I know, we

1  had a brief description at the top of the brief, Your Honor,

2  that was actually quite accurate.  Let me see.

3          THE COURT:  Okay.  She was transferred to the Court

4  Unit supervisor in 2017, transferred back to Extended Foster

5  Care in 2019, okay.

6          Did you ask her in that other deposition -- could you

7  just jump to the question, "Are you aware," leading, compound,

8  but setting aside the form of the question, in that deposition

9  did you get into how she was aware that there was this alleged

10  practice?

11          MR. POWELL:  No, I don't recall asking her, "How were

12  you aware," because she works -- I know the system in

13  Stanislaus County, I've also practiced in the --

14          THE COURT:  You're not testifying.  Let's focus on

15  her.

16          MR. POWELL:  I know, but I do want to give my full

17  answer.  I know the system.  Court Unit workers are -- that's

18  why they're at TDMs and all that because there's an issue of a

19  child may be taken.  They may not go out and perform the

20  removals themselves, but they're well aware of what happens

21  with the families because they're the ones who get them.

22          She also was, as it says in her brief --

23          THE COURT:  But the issue is was that the practice;

24  was that the practice of Stanislaus County at the time that

25  N    was removed?  You want her to say yes, that there was a

1    practice of if there were multiple kids in the family, that if

2    one child was going to be removed, all children were going to

3    be removed.  That's what you want, that was the practice.

4         MR. POWELL:  That's what she said.

5         THE COURT:  Okay.  And the question is, how does she

6    know that?  That's what I'm raising with you, the foundation

7    issue.  How does she know that?

8         MR. POWELL:  I've given my answer, which I feel and

9    I'm really confident is true, that she works with the families

10   when they're taken.  She has the delivered service logs, all

11   the same materials that people should be reading.  This

12   particular lady indicates she reads her employees' reports when

13   she was a supervisor.

14        THE COURT:  Do you see how you can argue, though, that

15   she's speculating?  That's not an expert, so she can't give an

16   opinion.  But as to what happened in the cases where all

17   children are removed from the families, she doesn't have

18   personal knowledge.  She wasn't there.  She wasn't involved.

19   She wasn't a supervisor.

20        Obviously Mr. Anderson was the supervisor of the unit

21   and was involved.  He's got personal knowledge of what goes on

22   in these cases.

23        So I think you're going to have to bring her in before

24   she testifies before the jury to see if I'm satisfied that you

25   can lay a foundation.  I'm not saying no completely to her, but

1    it's more foundational issues with me, and then, obviously,

2    Mr. Whitefleet is going to have an opportunity to question her

3    as well when she testifies.

4         In terms -- so that's having to do with her.

5         In terms of Mr. Perez, I'm sustaining the objection

6    over the plaintiffs' argument and request that I allow him to

7    testify for a number of reasons.  One, again, he left in

8    December 2018, so any testimony that he might give concerning a

9    policy that allegedly existed in 2019 would be pure

10   speculation.

11        Second, he's not an unavailable witness.  So, normally

12   the witness has to be unavailable just to simply read his

13   deposition testimony from another case.  Obviously Rule 32

14   (a)(8) -- (a)(1) and (8) does allow use of depositions taken in

15   an earlier action, which is the issue here.  The rule says

16   that, "A deposition lawfully taken, and if required, filed in

17   any federal court action may be used in a later action

18   involving the same subject matter between the same parties or

19   their representatives or successors in interest to the same

20   extent as they're taken in the later action."

21        We have the same party on the defense side.  We have

22   Stanislaus County in these other depositions.  We don't have

23   the same plaintiffs, obviously.  The cases are different

24   enough, substantially different, such that the Court does not

25   feel comfortable simply reading deposition testimony from

1   Mr. Perez's testimony in *Santor* to this jury.  The facts aren't

2   the same.  The plaintiffs aren't the same.  It's a much

3   different situation.  That's the case that involved, I believe,

4   the child had died, not this case, and as Mr. Whitefleet

5   argued, it was a warrantless removal.  It wasn't a removal with

6   a petition.  So, I am not going to permit Mr. Perez to testify,

7   and we will go forward in terms of the other witnesses.

8           MR. POWELL:  May I address the Perez?

9           THE COURT:  Well, you did in your brief.  Anything

10   further you want to add?

11           MR. POWELL:  Well, yeah.  Right now what

12   I'm understanding is the Court's saying, No, you can't just

13   read his deposition in, or something like that.

14           THE COURT:  Right, you can't.

15           MR. POWELL:  But in terms of foundation with this

16   gentleman, he testifies in his deposition that he had a -- he

17   supervised over seven, on average, people, meaning all

18   Emergency Response workers, nothing but Emergency Response from

19   his time period there.

20           THE COURT:  I'm not ruling against you on a

21   foundation, other than he doesn't have personal knowledge post

22   2018, so it's speculation.

23           If Mr. Whitefleet -- if you ask that question, and

24   he's sitting here, you know, Was there a policy of take one

25   take all, you'd get, Objection, time.

```
 1              You'd say, In July of 2019.
 2              Objection, speculation.
 3              Judge rules, Sustained.  He wasn't there.
 4         I know in your brief you're arguing that basically
 5    that can't be the law.  Well, you have to have personal
 6    knowledge, and you can't speculate, and you can't put witnesses
 7    up that speculate.  That's a pure form of speculation on his
 8    part.  That's why I'm not allowing it.
 9              MR. POWELL:  Mr. Anderson --
10              THE COURT:  You can disagree.
11              MR. POWELL:  No, I understand and --
12              THE COURT:  Mr. Anderson was there in 2019.  I mean,
13    you can put him back on.  You have had two shots at him, and
14    there were some questions when he was here, but I'm going to
15    allow you -- it's not going to take long.  I'm going to allow
16    you to put him back up and see if you can establish that there
17    was a policy.
18              Mr. Whitefleet is going to be able to ask him
19    questions, and he can explain his point of view.
20              MR. POWELL:  Would it make any difference if I also
21    pointed out that Mr. Anderson, he testifies in his depo
22    dated -- I'm sorry, Ms. Anshutz, 5/5/23, she testifies that the
23    practice is still alive today, meaning that day.
24              THE COURT:  Again, with her it's a question of how
25    does she know that or is she just speculating.
```

1    MR. POWELL:  Thank you for allowing the record, Your

2  Honor.

3    THE COURT:  Okay.

4    MR. WHITEFLEET:  What I'm thinking, Your Honor, I

5  believe that the plaintiff never disclosed this testimony as

6  part of their Rule 26 disclosures.  In other words, at no time

7  was the deposition testimony of Mr. Anderson in the *Nunes* case

8  disclosed as part of any Rule 26 disclosures, nor was the

9  deposition testimony in *Santor* of Mr. Perez disclosed as part

10  of the Rule 26 disclosures in this case.  And likewise,

11  Ms. Anshutz's deposition testimony in the *Westfall* case was not

12  part of any Rule 26 disclosure by plaintiff in this case at

13  all.

14    THE COURT:  Okay, the record's clear.

15    MR. POWELL:  No, I can't allow that record to be

16  clear.

17    THE COURT:  That's not true?

18    MR. POWELL:  That's not accurate.  I'm holding my

19  Rule 26.

20    THE COURT:  I'm sorry, go ahead.

21    MR. POWELL:  It's very clear.  May I present it to the

22  Court?

23    THE COURT:  No.  Just go ahead, read it into the

24  record.

25    MR. POWELL:  This is the same that it reads for

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

1    Mr. Perez, Ms. Anshutz and Mr. Anderson's prior, of course --

2           MR. WHITEFLEET:  Just a second.  Mr. Powell, I'm not

3    saying that you didn't disclose them as witnesses.  I'm saying

4    you never disclosed the documents, the testimony itself.  You

5    identify them as witnesses, I'm not disputing that.  It's the

6    disclosure of the testimony that was never provided.

7           MR. POWELL:  I never heard of such a thing, but may I

8    please read how they are described, Your Honor?

9           THE COURT:  Go ahead.  Yeah, for the record.

10          MR. POWELL:  Juan Perez, again, Anshutz and Perez in

11   this fifth one, Mr. Anderson, of course, he's in the very

12   beginning.

13          THE COURT:  Use the microphone.

14          MR. POWELL:  "Anticipated testimony includes:

15   Knowledge of unconstitutional practices and/or policies of

16   County re removing all children from a home when there are

17   allegations concerning one.  May also provide testimony

18   regarding the training they received while employed with County

19   of Stanislaus with third-party providers and other County of

20   Stanislaus social workers and supervisors."  That's identical.

21          THE COURT:  That's fine.  Just make your record,

22   that's fine.

23          So you're going to recall Mr. Anderson first?

24          MR. POWELL:  Yes.

25          THE COURT:  And then who's your next witness after

1  that?

2         MR. POWELL: Would we have the time for the voir dire?

3         THE COURT: You want to try to call Ms. Anshutz?

4         MR. POWELL: Yes.

5         THE COURT: Okay. So I'll bring her in and see if she

6  qualifies. Is there a third witness this morning?

7         MR. POWELL: Horacio Garcia, Jr., he's on his way, he

8  should be here in a little bit.

9         THE COURT: Let's proceed, then. Let's bring in the

10  jury.

11         MR. POWELL: Your Honor, we had a dismissal as well

12  worked out. You probably want to hear about that.

13         THE COURT: What's that?

14         MR. POWELL: I worked out a dismissal of Ms. Johnson,

15  Ms. Solario, Ms. Herrera and Mr. Granados with Mr. Whitefleet.

16         THE COURT: Okay. So Johnson, Solorio --

17         MR. POWELL: Gomez.

18         THE COURT: Johnson, Solorio, Mariela Gomez, you said?

19         MR. POWELL: And Granados. Did I say Herrera?

20  Granados and Herrera.

21         THE COURT: So five of them. So that only leaves

22  Anderson, Cobbs and Jones.

23         MR. POWELL: Anderson, Cobbs and Jones and the County

24  of Stanislaus.

25         THE COURT: County of Stanislaus, okay, thank you. I

```
 1    like those stipulations.
 2            I guess you can stay, but you're free to go if you
 3    want.
 4            MR. GRANADOS:  Thank you, Your Honor, I made it this
 5    far, I might as well watch Mr. Anderson.
 6            THE COURT:  All right, bring in the jury.
 7            Mr. Whitefleet, just so the record is clear, you've
 8    stipulated -- you agreed to the dismissal, correct?
 9            MR. WHITEFLEET:  We have no objection to the
10    dismissal, yes.
11            THE COURT:  Okay.
12            MR. POWELL:  Your Honor, one other quick --
13            THE COURT:  Wait, wait.  Go ahead.
14            MR. POWELL:  My paralegal, Kaycie Cody, is a law
15    school graduate, and she'll be sworn in in not too long, I was
16    wondering if she could join me at the table?
17            THE COURT:  Yes, absolutely.
18            MR. POWELL:  That's K-A-Y-C-I-E, Cody, C-O-D-Y.
19            THE COURT:  Did Mr. Park abandon you?
20            MR. POWELL:  Yeah, he did.  Yes, he did.  I just hope
21    nothing technological occurs.
22            THE COURT:  I hope not.  Okay, bring in the jury.
23         (In open court in the presence of the jury.)
24            THE COURT:  Good morning.  All jurors present, all
25    parties are present.  We've been working on issues to try to
```

Anderson - Direct Recalled by Powell

1    streamline this case for you.  I think -- I'm pretty sure that
2    the plaintiffs will complete their case today, so we will move
3    forward.

4         You want to recall Mr. Anderson, correct?

5         MR. POWELL:  Yes, but I realize that a brief sidebar
6    on the issue of foundation might save some time based on --

7         THE COURT:  You've laid a foundation.

8         MR. POWELL:  Thank you.

9         THE COURT:  You can jump right into it.  I don't have
10   a foundation issue.

11        You're still under oath, Mr. Anderson.

12        Go ahead, Mr. Powell.

13      ERIC ANDERSON, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

14             DIRECT EXAMINATION (RECALLED)

15   BY MR. POWELL:

16   Q    Good morning, Mr. Anderson.

17   A    Hello.

18   Q    Do you remember sitting for a deposition where I was
19   taking -- asking you questions back in 2018 regarding a family
20   known as the Nunes family?

21   A    I remember the family, and I remember the deposition on
22   some level, yes.

23   Q    Do you remember telling me at that --

24        MR. WHITEFLEET:  Object, Your Honor.  This is improper
25   impeachment.

Anderson - Direct Recalled by Powell

1      THE COURT:  Sustained.

2  BY MR. POWELL:

3  Q    Sir, were you aware up until 2023 of a practice that if

4  there was more than one -- if there was more than one child in

5  a -- going to be removed by some method, then any second child

6  would also be handled in that manner?

7      MR. WHITEFLEET:  Objection, overly broad as to time.

8  Vague as to "by some method."  Irrelevant.

9      THE COURT:  Time overruled, although we're focusing on

10  2019.  It's the "by some method" that's overbroad.  I think you

11  need to break it down by method.

12  BY MR. POWELL:

13  Q    Okay.  First of all, Mr. Anderson, I'm going to ask you to

14  consider the 2019 time frame up to 2023, okay, that's the time

15  frame I'm going to ask about; do you understand?

16  A    Yes.

17  Q    Were you aware of any practice whereby if a child in a

18  two-child family or more than one-child family is going to be

19  removed, then the other child or children would also be removed

20  as a matter of practice by Stanislaus County?

21      MR. WHITEFLEET:  Objection, overly broad, irrelevant,

22  vague.

23      THE COURT:  Sustained.  It's your use of the word

24  "removed."  There's different ways of removal, so you're making

25  it too broad.

Anderson - Direct Recalled by Powell

BY MR. POWELL:

Q    Let's break that down.  Mr. Anderson, there are different
ways in which children are separated from their parents in the
course of interactions with the Child and Family Services
Agency of Stanislaus County, correct?

A    Yes.

Q    And one of those is removal, they're literally taken from
their parents, they're removed, correct?

        MR. WHITEFLEET:  Objection, it's incomplete
hypothetical.

        THE COURT:  Sustained.

BY MR. POWELL:

Q    Were children removed from their parents in 2019?

A    One time; you mean ever?

Q    No, in 2019 -- were any children in Stanislaus County
removed by CFS in 2019?

        MR. WHITEFLEET:  Objection, I mean, it's overly broad.

        THE COURT:  Overruled.  You can answer that.

        THE WITNESS:  I'm assuming that at least one child was
removed in 2019.

BY MR. POWELL:

Q    Okay, by the way, do you have a definition for the term
"removed" that we can use here with you today?

A    I'm not sure I have -- when I think "removal," I think of
a warrant, so I think of that type of removal when people say

Anderson - Direct Recalled by Powell

1   "removal."

2   Q    Children are removed and separated from their parents

3   without warrants in Stanislaus County in 2019, correct?

4        MR. WHITEFLEET:  Objection, irrelevant, overly broad.

5        MR. POWELL:  I'm breaking it down, Your Honor.

6        THE COURT:  Overruled.

7        THE WITNESS:  I mean, I guess I'd have to guess; I

8   don't really want to guess about that.  I can give you my

9   experience.

10       THE COURT:  Go ahead.

11       THE WITNESS:  My experience is that warrants are

12  typically used for a removal.  It happens, I would assume, that

13  there are warrantless removals, but my experience has been

14  warrants, for the most part.

15  BY MR. POWELL:

16  Q    Are you familiar with safety plans?

17  A    Yes.

18  Q    Was the agency using safety plans in 2019?

19  A    All agencies use safety plans.

20  Q    So tell the jury, what's a safety plan?

21  A    A safety plan, in short, is an agreement between the

22  agency and a parent to do something that mitigates, typically,

23  risk or safety.

24  Q    And it's not required that both parents agree to the

25  safety plan, correct?

Anderson - Direct Recalled by Powell

1          MR. WHITEFLEET:  Objection, incomplete hypothetical.

2          THE COURT:  Overruled.

3          THE WITNESS:  It depends on, I guess, what the outcome

4    is or what the concern would be.  Sometimes, for example, we

5    might have a parent file for custody, and that would be an

6    agreement with that parent and in that regard a social worker

7    or the agency.

8    BY MR. POWELL:

9    Q    But, sir, my question was, it's true that it's not

10   necessary for all safety plans that both parents agree and sign

11   them, correct?

12         MR. WHITEFLEET:  Objection, incomplete hypothetical,

13   this witness is not designated as 30(b)(6), and he's not

14   designated as an expert.

15         THE COURT:  Overruled.  He can testify based on his

16   experience.

17         Go ahead.

18         THE WITNESS:  Sorry, one more time.

19         MR. POWELL:  Your Honor, may I ask for a read back?

20         THE COURT:  Is it true that, "it's not necessary for

21   all safety plans that both parents agree and sign them"?

22         THE WITNESS:  For all safety plans, I would say that's

23   accurate, but that depends on each case, and it depends on the

24   circumstances of the family, the nuclear family, whether

25   they're together or whether they're apart.

Anderson - Direct Recalled by Powell

1      MR. POWELL:  Move to strike beyond "accurate."

2      THE COURT:  Overruled.

3  BY MR. POWELL:

4  Q    Those kinds of safety plans were used in 2019, right, that

5  did not require both parents to agree, correct?

6      MR. WHITEFLEET:  Objection, it's an incomplete

7  hypothetical, misstates testimony.

8      THE COURT:  Overruled.

9      THE WITNESS:  I mean, I can think of circumstances

10  where that has happened, yes.

11  BY MR. POWELL:

12  Q    How about the *Nunes* case, that's what happened there,

13  isn't it?

14      MR. WHITEFLEET:  Objection, irrelevant.

15      THE COURT:  Sustained.

16  BY MR. POWELL:

17  Q    When a safety plan is exercised by one parent, is it not a

18  removal of the child from the other parent?

19      MR. WHITEFLEET:  Objection, calls for expert

20  testimony.

21      THE COURT:  Overruled.

22      THE WITNESS:  Sometimes, as I stated, we will have a

23  parent file for custody of a child, if that's what you're

24  referring to as a "removal."

25

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Anderson - Direct Recalled by Powell

1  BY MR. POWELL:

2  Q    That's what I'm asking you.  Doesn't it have the exact

3  same effect to the other parent as would a warrant, they don't

4  have their children -- their child?

5          MR. WHITEFLEET:  Objection, calls for speculation,

6  calls for expert testimony.

7          THE COURT:  Overruled.

8          MR. WHITEFLEET:  Incomplete hypothetical.

9          THE COURT:  Overruled.

10         THE WITNESS:  Sorry, one more time.

11         THE COURT:  Does it have the same effect to the other

12  parent as would a warrant?

13         THE WITNESS:  If, in fact, that is granted by the

14  family -- I mean, by the -- if, in fact, that's granted by the

15  family court, I guess, yes.

16  BY MR. POWELL:

17  Q    Okay.  Well, the warrants are submitted in your practice,

18  in your emergency response --

19  A    You were talking about safety plans, though.

20  Q    Well, for a minute there I was talking about -- okay,

21  thank you.

22  A    You're welcome.

23  Q    So now, again, returning to 2019, is it accurate that at

24  that time if there was -- strike that.

25         At that time, in 2019, was there a policy that specified

Anderson - Direct Recalled by Powell

1    if there are allegations of abuse --

2          THE COURT:  Did you say "practice"?

3          MR. POWELL:  Pardon me?

4          THE COURT:  Did you say --

5          MR. WHITEFLEET:  I have to get there, Your Honor.

6          THE COURT:  You can say "practice."

7    BY MR. POWELL:

8    Q    Is it accurate, sir, that in 2019 -- strike that.

9          Was there any practice in 2019 that specified that if

10   there are allegations of abuse or neglect regarding one child

11   and there's more than one child in the family, that however the

12   first child is handled, whether it's the removal, the safety

13   plan that we've talked about, then the second child must also

14   be handled in that manner?

15         MR. WHITEFLEET:  Objection, incomplete hypothetical,

16   vague as to "handled," overly broad, compound.

17         THE COURT:  Overruled.  You can answer that.

18         THE WITNESS:  I'm sorry, I'm getting confused.  Can

19   you repeat that?

20         THE COURT:  Do you want me to read it?

21         MR. POWELL:  Yeah.

22         THE WITNESS:  Somebody, sorry.

23         THE COURT:  "Was there any practice in 2019 that

24   specified that if there are allegations of abuse or neglect

25   regarding one child, and there's more than one child in the

Anderson - Direct Recalled by Powell

1    family, that however the first child is handled, whether it's

2    the removal, the safety plan that we talked about, then the

3    second child must also be handled in that manner"?

4           THE WITNESS:  No, it's all going to be based on the

5    social worker's assessment.

6           MR. POWELL:  Move to strike beyond "no," and ask to

7    read --

8           THE COURT:  After "no" I will strike the remainder of

9    that answer.

10          MR. POWELL:  May I approach with an original?

11          THE COURT:  You can just lodge it, yeah, with us.

12   Give me the deposition date.

13          MR. POWELL:  I'm going to do all that.  Ready, Your

14   Honor?

15          THE COURT:  Go ahead.

16   BY MR. POWELL:

17   Q    Reading from the deposition of Eric Anderson on June 27,

18   2018 at 9:04 a.m. in the matter of *Nunes*.

19          THE COURT:  Okay, sidebar.

20          (At sidebar off the record.)

21   BY MR. POWELL:

22   Q    Mr. Anderson.

23   A    Yes.

24   Q    The reason that you and the other social workers and

25   supervisors attending the TDM, and then the TAP staffing on

Anderson - Direct Recalled by Powell

1  July 15, decided that you were going to have the Garcia

2  children and the Sosa child safety planned and N    taken by a

3  warrant, was because you had in place at that time a practice

4  whereby if your agency takes one child, you take them all,

5  correct?

6  A    No.

7  Q    Never had a practice like that ever?

8         MR. WHITEFLEET:  Objection, that's argumentative,

9  overly broad as to time.

10        THE COURT:  Overruled.

11        THE WITNESS:  A practice in and of itself, no.  With a

12  social worker assessing --

13        MR. POWELL:  Objection, move to strike beyond "no."

14        THE COURT:  That's fine.

15        THE WITNESS:  If the social workers were assessing.

16        THE COURT:  Hang on, hang on, the answer was, No,

17  never had a practice like that.

18        MR. POWELL:  Ever.

19        With that, Your Honor, I would like to return to the

20  deposition of Eric Anderson in *Nunes*, June 27, 2018.

21        MR. WHITEFLEET:  Page, line?

22        MR. POWELL:  Fifty-eight, it was in the briefing.

23        THE COURT:  Any objection?

24        MR. WHITEFLEET:  Objection, irrelevant, it's not

25  proper impeachment.

Anderson - Direct Recalled by Powell

1          THE COURT:  Sustained.

2          MR. POWELL:  Nothing further, Your Honor.

3          THE COURT:  Anything further?

4          MR. WHITEFLEET:  No, Your Honor.

5          THE COURT:  Okay, you may step down.

6      (Witness is excused.)

7          THE COURT:  We have to take up another issue outside

8  your presence, so I'm going to ask you to step out.  All

9  admonitions still apply even during these short breaks, and

10  then we'll bring you back.

11      (In open court outside the presence of the jury.)

12          THE COURT:  So the record's clear, we did have a

13  sidebar with respect to Mr. Anderson's prior deposition

14  testimony.  As the Court noted, the deposition was taken back

15  in June, June 27, 2018, and, therefore, I sustained the

16  objection raised by Mr. Whitefleet just now.

17          To try and impeach Mr. Anderson with testimony from

18  2018 in this case would be bringing up issues that are not

19  relevant or not proper impeachment.  Again, the issue is what

20  was the practice in 2019, not what was the practice in 2018.

21  We discussed that at sidebar and that was my ruling.

22          MR. POWELL:  Your Honor, can I now, since we are out

23  of the presence of the jury, I'd like to bring up that last

24  question, because after he was asked "if ever" and he said

25  "no," well, then, it would be a credibility issue and then

1    perfectly impeachable, I would think, to go ahead and now refer

2    to that deposition testimony.  He is a party in the case, the

3    County is a party in the case, so I didn't understand that

4    ruling.

5            THE COURT:  "If ever" is not relevant.  Again, "if

6    ever" isn't relevant.

7            MR. POWELL:  Okay.  Credibility-wise, I think it's

8    always relevant, credibility.

9            THE COURT:  Okay.

10           MR. POWELL:  No?

11           THE COURT:  Understood.  I understand your point.

12           Let's bring in Ms. Anshutz.

13           THE CLERK:  State and spell your full name.

14           MS. ANSHUTZ:  Elizabeth Anshutz, it's spelled

15   E-L-I-Z-A-B-E-T-H, Anshutz, A-N-S-H-U-T-Z.

16           THE COURT:  Again, we're outside the presence of the

17   jury in a hearing to determine if a proper foundation can be

18   laid for this witness to testify in the trial.  Go ahead.

19           ELIZABETH ANSHUTZ, PLAINTIFFS' WITNESS, SWORN

20                   VOIR DIRE EXAMINATION

21   BY MR. POWELL:

22   Q    Ms. Anshutz, where are you employed?

23   A    Say it again, I'm sorry.

24   Q    Sorry, where are you employed?

25   A    It's working.  I apologize, I do have hearing impairments.

Anshutz - Voir Dire by Powell

1    So, I work for Stanislaus County, Child Welfare Services.

2    Q    And how long have you worked there?

3    A    Over nine years, since 2015.

4    Q    And I'm going to take you through, you know, where you

5    worked first, what unit, that kind of thing.

6           THE COURT:  You can lead so we can get to the

7    foundation issues.  Just confirm what's in your brief.

8    BY MR. POWELL:

9    Q    I'm going to ask you, Ms. Anshutz, it might be a long

10   sentence, but if it's right, you earned a Master of Arts in

11   clinical psychology in 2013, correct?

12   A    Yes.

13   Q    You started with the County, as you just said, in 2015,

14   correct?

15   A    Yes.

16   Q    And that was with the Extended Foster Care Program,

17   correct?

18   A    Yes.

19   Q    Then in 2017 you were transferred to Court Unit

20   supervisor?

21   A    Correct.

22   Q    And then went back to Extended Foster Care in 2019?

23   A    As a supervisor, yes.

24   Q    Yes, as a supervisor, thank you.

25           And then in 2021, you became another supervisor in the

Anshutz - Voir Dire by Powell

1  Staff Development and Training unit --

2  A    Yes.

3  Q    -- correct?

4       And then at some point in 2023 you had a promotion to a

5  manager over, quote, "Continuous Control and Improvement

6  Programs," correct?

7  A    Continuous Quality Improvement Programs, yes.

8  Q    So I want to drill down on your Court Unit experience.

9  A    Okay.

10 Q    What does a Court Unit supervisor do?

11 A    Court Unit supervisor is responsible for supervising the

12 court officers and placement specialists that receive cases

13 after an ER investigation was completed and a removal was

14 completed.  They would go through the court process.  We would

15 review the Detention Report, any subsequent juris dispo

16 reports, and then we would support the social workers through

17 that process until the recommendation was made at the end of

18 the JD hearing.

19 Q    Okay.  As part of that job, I believe you said you read

20 the detention reports, correct?

21 A    We would read the detention reports, yes.

22 Q    And it was not uncommon that you would have also already

23 participated in a Team Decision Meeting on a case that's given

24 to your unit, correct?

25 A    Yes.

Anshutz - Voir Dire by Powell

1        THE COURT:  So you did participate in Team Decision
2  Meetings?
3        THE WITNESS:  Yes.
4        THE COURT:  You, we're focusing on you.
5        THE WITNESS:  Yes, I participated in Team Decision
6  Meetings and TAP meetings, team assessment planning meetings;
7  they're two separate types of meetings.
8        THE COURT:  Yeah, we know, thanks.
9  BY MR. POWELL:
10  Q    We've all learned it while you've been away.
11       The TDMs, by mid 2019, can you give me a range of how many
12  you feel comfortable you had attended, you know, from the --
13  I'm absolutely sure it was more than this, but I don't think it
14  was more than that kind of a number?
15  A    Regarding TDMs?
16  Q    Yes.
17       THE COURT:  Best estimate in a year.
18       THE WITNESS:  I would say 10 to 20.  It would depend
19  on how many cases came through and we were on a rotation basis.
20       THE COURT:  Just so the record's clear, you weren't
21  involved in a TDM or a TAP meeting in this case, right?
22       THE WITNESS:  No.
23       THE COURT:  I'm sorry, that was a terrible question.
24  You weren't involved in either -- in a TAP meeting or a TDM in
25  this case?

Anshutz - Voir Dire by Powell

1      THE WITNESS:  No.

2      THE COURT:  Okay.

3  BY MR. POWELL:

4  Q   So let me ask, what did you say, 20 or so?

5  A   I said 10 to 20.

6  Q   Okay.  And then in the same time frame, in 2019, as a

7  supervisor, how many TAPs, TAP meetings did you attend?  And

8  we're just looking for an honest range, ma'am.

9  A   I'm trying to do some numbers in my head.  Maybe up to a

10 hundred.

11 Q   Okay.  Now, at those TAP meetings, it was not uncommon

12 that decisions were made on whether children were going to be

13 separated from parents, correct?

14 A   Correct.

15      MR. WHITEFLEET:  Objection, vague as to "separated."

16 Vague as to time.  And I would also note, Your Honor, because

17 there's been testimony of pre removal TDMs and post removal

18 TDMs, it's confusing as to which ones this witness is talking

19 about.

20      THE COURT:  Okay.  Clarify that.

21      MR. POWELL:  Well, right now I'm asking about a TAP.

22      THE COURT:  Okay.  Pre removal or post removal; were

23 there post removal TAPs that you're aware of?

24      THE WITNESS:  Not that I can recall.

25      THE COURT:  So all of them were pre removal?

Anshutz - Voir Dire by Powell

1          THE WITNESS:  Uh-huh.

2          THE COURT:  How about the TDMs?

3          THE WITNESS:  TDMs could be pre or post.

4          THE COURT:  You attended both?

5          THE WITNESS:  Yes.

6          THE COURT:  Okay, thanks.

7    BY MR. POWELL:

8    Q    I'll just try my question again.  Ma'am, is it true that

9    at TAP staffings decisions would be made that would include

10   some aspect of removing a child from one or more parents in

11   2019?

12   A    Yes.

13   Q    Okay.  And what are the ways that you understood, as a

14   supervisor of the Court Unit at that time, that children could

15   be separated from their parents, and by that I mean the

16   methods?

17   A    So during the staffing we would hear about the

18   investigation, the assessment, their formal tools.

19          THE COURT:  Not -- not what he asked.

20          THE WITNESS:  We would hear about the outcomes of

21   that.

22          THE COURT:  He just asked you what were the ways that

23   you understand -- as you understand it, that children could be

24   separated from their parents?

25          THE WITNESS:  PC warrants and exigency circumstances.

Anshutz - Voir Dire by Powell

1    I believe that's what you're asking.

2    BY MR. POWELL:

3    Q    I am.  How about the safety plans following that as a

4    method for separating children from one parent or the other?

5    A    I think I would have to be -- more clarification for

6    separating because a safety plan would be a temporary solution

7    before we make a decision on the outcome of where the children

8    are -- whether they're being removed from the families or not.

9    Q    Regardless of whether a temporary solution or not, is it

10   true that in TAP staffings, safety plans would be the

11   agreed-upon decision in some families?

12   A    Yes.

13   Q    And then that would on occasion -- certainly on some

14   safety plans it would require children to literally be

15   physically separated from a parent, correct?

16   A    Yes.

17   Q    Were you aware of any practice --

18        MR. POWELL:  Well, your Honor, I really kind of want

19   to go to the heart of it.

20        THE COURT:  We're not in front of the jury.  You can

21   ask her the heart of the question and then I need to find out

22   how.  Go ahead.

23   BY MR. POWELL:

24   Q    Were you aware in 2019 of a practice where if there's

25   allegations of abuse and neglect of one child in the home and

Anshutz - Voir Dire by Powell

1  that child is to be removed, then the other children will be

2  removed as well?

3          MR. WHITEFLEET:  I think that lacks foundation, but I

4  mean, I know we're trying to figure that out.

5          THE COURT:  Overruled.

6          Go ahead.

7          THE WITNESS:  No.

8          MR. WHITEFLEET:  This is where I would --

9          THE COURT:  Go ahead.  You can use -- do you want to

10  try to use the deposition?

11          MR. POWELL:  I want to lodge.

12          THE COURT:  Obviously, you need more free reign here,

13  Mr. Powell, so I can decide whether she can testify in front of

14  jury.  So go ahead.

15          MR. POWELL:  It's in the briefing, it's Page 69.

16          THE COURT:  It's a deposition that you gave of

17  Ms. Anshutz on May 5, 2023 in a case called *Westfall versus*

18  *County of Stanislaus*; do you remember that?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay, go ahead, Mr. Powell.

21  BY MR. POWELL:

22  Q    All right.  Reading from Line 1 of that.

23          THE COURT:  Microphone, microphone.

24  BY MR. POWELL:

25  Q    Reading from Line 1 of that page.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Anshutz - Voir Dire by Powell

1    THE COURT:  You're on Page 69?

2    MR. POWELL:  Yes, 69 -- I'm sorry, Line 10.

3    THE COURT:  Okay.  You were asked the following

4 questions and answers:  Listen to what he says.

5    THE WITNESS:  Okay.

6 BY MR. POWELL:

7 Q    "Question:  Are you aware of a policy whereby if one

8 child -- if there's allegations of abuse or neglect of one

9 child in the home and that child is to be removed, then the

10 other children will be removed as well?

11    "Answer:  Yes.

12    "Question:  Is that still in place to this day?

13    "Answer:  Yes.

14    "Question:  I used the word 'policy.'  Do you know if it's

15 written policy or it's just a practice?

16    "Answer:  To my knowledge, it's a practice."

17    MR. POWELL:  That's the end of that read, Your Honor.

18    THE COURT:  Okay.  Do you want to ask her a question

19 about that?

20    MR. POWELL:  Yeah.

21 BY MR. POWELL:

22 Q    Does that refresh your recollection that there was indeed

23 a practice that involved the removal of all children if there's

24 allegations against one?

25 A    Yes, but I would like to offer a clarification that --

Anshutz - Voir Dire by Powell

 1          MR. POWELL:  Objection, move to strike beyond "yes."

 2          THE COURT:  Okay.  Mr. Whitefleet is going to it, so I

 3   can get the answer now or I can get it from him, it's up to

 4   you.

 5          MR. POWELL:  Okay, go ahead, Your Honor.

 6          THE COURT:  Do you want to let her finish her answer?

 7          MR. POWELL:  No, I want to move to strike and let

 8   Mr. Whitefleet do whatever he's going to do.

 9          THE COURT:  Okay, I'll strike.  Mr. Whitefleet will be

10   able to ask you a question and you'll be able to explain your

11   answers.

12          Go ahead.

13   BY MR. POWELL:

14   Q   Another question is:  Was that practice in place, to your

15   mind, as of May 5, 2023, allegations against one child, we take

16   all the children?

17          MR. WHITEFLEET:  I don't know if that's relevant.

18          THE COURT:  That's not relevant.  Overruled -- I mean

19   sustained.  What happened in 2023 isn't relevant.  What

20   happened in 2019 is relevant to me.

21          MR. POWELL:  Understood.  The point was that -- is

22   trying to establish for Your Honor the longstanding nature of

23   this because that's the part --

24          THE COURT:  Well, it has to be longstanding before

25   2019.

Anshutz - Voir Dire by Whitefleet

1        MR. POWELL:  It would seem that evidence that if it's

2   longstanding thereafter would be probative of it having been

3   longstanding before.

4        THE COURT:  Not necessarily.

5        MR. POWELL:  I believe that's it, Your Honor, that's

6   all I have.

7        THE COURT:  Mr. Whitefleet.

8        MR. WHITEFLEET:  Yes.  Thank you, Your Honor.

9                    VOIR DIRE EXAMINATION

10  BY MR. WHITEFLEET:

11  Q    Ms. Anshutz, did you ever obtain a warrant to remove a

12  child?

13  A    No.

14  Q    Have you ever exigently removed a child?

15  A    No.

16  Q    So your only experience is what you may have gleaned from

17  pre removal TAP meetings?

18  A    Correct.

19  Q    Have you ever spoken to any policymaker about any claim

20  that there's a practice to remove all children from a home

21  regardless of allegations?

22       MR. POWELL:  Objection, Your Honor, calls for hearsay.

23       MR. WHITEFLEET:  It's "yes" or "no."

24       THE COURT:  Overruled.

25       THE WITNESS:  No.

Anshutz - Voir Dire by Whitefleet

BY MR. WHITEFLEET:

Q   When you said, "To my knowledge, it's a practice," what did you mean, in the *Westfall* case?

A   That I did not know of a policy that required us to remove children, all the children in the home, if there was an allegation against one child in the home.

        MR. POWELL:  Objection, Your Honor, that misstated her testimony, that misstated her testimony.  The only, "To my knowledge," was "it's a practice" versus a policy.

        THE COURT:  Overruled.

        Go ahead.  She's just explaining her answer.

BY MR. WHITEFLEET:

Q   When you said, "It's a practice," and you were stopped from explaining earlier, can you explain now what you meant?

A   So the clarification is that, to my knowledge, there is not a practice that you automatically remove all the children in the home when you remove one child.  You do assess the risk and safety of all the children in the home, and if there are continued concerns for the safety of the other children, then that would warrant a removal.

Q   So your understanding -- your experience in the TAP meetings is that the assessments are done about all the children?

        MR. POWELL:  Objection, Your Honor, now leading his own witness.

Anshutz - Voir Dire by Whitefleet

1      THE COURT:  You called her, so overruled.

2      MR. POWELL:  Well, there was one other objection, Your

3  Honor.

4      THE COURT:  Go ahead.

5      MR. POWELL:  He's not clarifying, is it pre-removal

6  TAP staffings or post removal?

7      MR. WHITEFLEET:  My understanding was all TAP

8  removals --

9      THE COURT:  All TAPs are post --

10     MR. WHITEFLEET:  Pre.

11     THE COURT:  I'm sorry, pre, yes.  She already

12  testified to that.

13     Do you want to try your question again?  We're really

14  confusing this witness.

15     MR. WHITEFLEET:  Sure.

16     THE COURT:  Sorry.  Go ahead.

17     MR. WHITEFLEET:  Now I can't remember the question.

18     THE COURT:  "So your understanding -- your experience

19  in the TAP meetings is that assessments are done about all the

20  children?"

21     THE WITNESS:  Yes, I believe so.

22  BY MR. WHITEFLEET:

23  Q    And in those instances do the assessments, in your

24  experience of all the TAP meetings you had, always conclude

25  that all the children must be removed either exigently or by a

Anshutz - Voir Dire by Whitefleet

1   warrant?

2   A    No.

3   Q    Thank you.

4            THE COURT:  Neither of you asked the question I want

5   answered.  In the deposition testimony you got asked the

6   question, "Are you aware of a policy where there's allegations

7   of abuse or neglect of one child and that child is to be

8   removed, then the other children will be removed as well?"

9            You answered "Yes."

10           I'm focusing on the awareness part.  How were you

11  aware of a policy?

12           THE WITNESS:  I wasn't aware of the policy, but the

13  practice.  He clarified the practice after that statement.

14           THE COURT:  How were you aware of the practice?  You

15  just said there isn't a practice, there wasn't a practice.

16           THE WITNESS:  I'm trying to offer my clarification.  I

17  can't --

18           THE COURT:  Yeah, please.

19           THE WITNESS:  I can't explain why I said "yes" to that

20  in that deposition.  All I know is that in my experience as a

21  supervisor in the TAP staffing, we would assess the risk and

22  safety of all the children, and if there was concerns of the

23  safety of the other children, they would also be removed.

24           It wasn't an automatic every single time, and there

25  may be other outcomes for those other children that may not

Anshutz - Voir Dire by Whitefleet

1   warrant a removal -- it may be a removal from this parent but
2   maybe not that parent.  So there were different outcomes for
3   all of the children.  I don't know if I was able to offer that
4   type of clarification in my previous deposition.
5               THE COURT:  Okay.  Thank you.
6               Do you still want to call her as a witness?
7               MR. POWELL:  Yes, and I would like to ask some
8   follow-up, if I may?
9               THE COURT:  If you want.
10              MR. POWELL:  Thank you.
11              THE COURT:  It's a question of whether you want to do
12  that in front of the jury or not?
13              MR. POWELL:  No.
14              THE COURT:  Do you still object to her testimony?
15              MR. WHITEFLEET:  Yes.
16              THE COURT:  I'm going to let her testify and you --
17  let the jury decide whether she's credible or not.
18              MR. POWELL:  Thank you.  There was just one or two I
19  would like to ask her here.
20              THE COURT:  No, do it in front of the jury, I'm
21  letting you call the witness.
22              MR. POWELL:  It won't make sense because they won't
23  have heard the question that was asked.
24              THE COURT:  They're going to hear everything all over
25  again.

Anshutz - Voir Dire by Whitefleet

1    MR. POWELL:  They're not going to hear what Mr.
2  Whitefleet -- they're not necessarily going to hear the one or
3  two things.

4    THE COURT:  Well, they will when he does his cross
5  examination, so --

6    MR. POWELL:  Trust me, Your Honor, I --

7    THE COURT:  I already ruled in your favor.

8    MR. POWELL:  I appreciate that.  I really just had the
9  one question.

10    THE COURT:  No.

11    MR. POWELL:  Okay.

12    THE COURT:  I want you to ask it in front of the jury.

13    MR. POWELL:  It's your courtroom, got it.

14    THE COURT:  Let's bring the jury back in, and then
15  we'll swear her back in in front of the jury again.  This won't
16  take long.

17    THE WITNESS:  No problem.

18      (In open court in the presence of the jury.)

19    THE COURT:  All jurors present, all parties are
20  present.

21    Just a heads up, this is going to be a strange day in
22  terms of sending you out and bringing you back.  There may be
23  large breaks.  We're working towards getting there, okay.  All
24  right, I appreciate your patience.

25    Let's swear in the witness.

Anshutz - Direct by Powell

1    ELIZABETH ANSHUTZ, PLAINTIFFS' WITNESS, RESWORN

2         THE COURT:  You may be seated.

3         THE CLERK:  Say and spell your whole name for the

4    record.

5         THE WITNESS:  Elizabeth Anshutz, E-L-I-Z-A-B-E-T-H,

6    Anshutz, A-N-S-H-U-T-Z.

7         THE COURT:  All right, Mr. Powell, go ahead.

8         MR. POWELL:  Still a few foundational questions, if

9    it's okay, Your Honor?

10         THE COURT:  Yes, start at the beginning.

11         MR. POWELL:  Thank you.

12                    DIRECT EXAMINATION

13   BY MR. POWELL:

14   Q    Good morning.

15   A    Good morning.

16   Q    Since we've spoken before, I'm going to take you through

17   some questions hopefully real quick.  Is it true that you, in

18   2013, obtained a master's of arts in clinical psychology?

19   A    Yes.

20   Q    And is it accurate you started with the County of

21   Stanislaus in the year of 2015?

22   A    Yes.

23   Q    And what was your first unit assignment?

24   A    Extended Foster Care as a social worker.

25   Q    And then was there any change in your position in 2017?

Anshutz - Direct by Powell

1    A    Yes, I was promoted to a court supervisor.

2    Q    Is it called a Court Unit supervisor?

3    A    It's a Court Unit.  The position title is Social Worker

4    Supervisor II.

5    Q    And how long, approximately, did you stay in that position

6    before you switched?

7    A    Two years.

8    Q    And what was your next assignment and when, if you know?

9    A    Approximately 2019, I was transferred to supervisor of

10   Extended Foster Care.

11   Q    In 2021, was there another change in your employment?

12   A    Yes, I was transferred to supervisor of Staff Development

13   and Training.

14   Q    And has there been any promotions since that position?

15   A    Yes.  In March of 2023 I was promoted to manager over

16   Continuous Quality Improvement Programs.

17   Q    Okay.  So, I'd like you to tell me about what your work

18   consisted of in the Court Unit when you were a supervisor from

19   2017 to 2019; what did that work look like?

20   A    As a supervisor we oversaw a unit of social workers that

21   included court officers and placement specialists, and they

22   would work on the cases for families that had just had children

23   removed from their care, and they would go through detentions

24   all the way through JD.

25        As a supervisor, I would be part of reviewing those

Anshutz - Direct by Powell

1  reports, and prior to detention I would also participate on TAP

2  staff meetings and sometimes TDMs as well.

3  Q    The jury's heard a little bit, but I want to ask you about

4  TDMs.  Is it true that TDMs can be held before removal and

5  after removal?

6  A    Yes.

7  Q    They can kind of be held anytime, correct?

8  A    Yes.

9  Q    All right.  Have you been to TDMs where the result is that

10  children are removed?

11  A    That they are removed?

12  Q    Yes.

13  A    Yes.

14  Q    In any of the TDMs that you've been to, have the parents

15  had an attorney?

16  A    Not that I can recall.

17  Q    And do you understand who has the final decision making

18  authority at a TDM during the times you were attending them?

19  A    Yes.

20  Q    And who is that?

21  A    The agency.

22  Q    Now -- and so you have been at TDMs where children have

23  been separated from their parents through various mechanisms?

24  A    Yes.

25  Q    Would that include an agreement that the agency is going

Anshutz - Direct by Powell

1    to get a warrant?

2    A    Yes.

3    Q    Would it include agreements that the agency is going to

4    safety plan the children with one parent or the other or even a

5    relative?

6    A    Yes.

7    Q    Okay.  Was there any of those where the agreement was,

8    We're going to go take the kids now?  It's so exigent, We're

9    going to remove the kids, no warrant?

10   A    I can't recall if I participated in those types of TDMs.

11   Q    Okay.  Now, TAP staffing, again, the jury's heard a little

12   bit about those, is TAP staffing something that happens always

13   before children are removed or separated from parents?

14   A    Yes.

15   Q    And, in fact, that's kind of the decision principle in the

16   process where the decisions are made about removal, correct?

17   A    Yes.  And if I can offer a clarification, TAP staffings

18   are usually held prior to the removal should there be a

19   possibility for staffing the case.  But if a social worker is

20   out in the field and there are exigent circumstances, they may

21   remove the child without a TAP staffing.

22   Q    Okay.  And they can't also call in from the field and

23   request a TAP staffing be set up, correct?

24   A    Yes.

25   Q    Now, isn't it true that while employed with Stanislaus

Anshutz - Direct by Powell

1    County, you were aware of a policy whereby if there's

2    allegations of abuse or neglect of one child in the home and

3    that child is to be removed, then the other children will be

4    removed as well?

5             MR. WHITEFLEET:  Objection, lacks foundation, vague as

6    to time.

7             THE COURT:  Overruled.

8             You said "policy," right?

9             MR. POWELL:  I'm trying to follow --

10            THE COURT:  That's fine.  Go ahead.

11            THE WITNESS:  I'm having a hard time answering that

12   question because the language is not what I answered in the

13   last statement that the -- there was a policy, but I meant a

14   practice.

15   BY MR. POWELL:

16   Q    Okay, so let me try it this way:  Would you agree if I had

17   said it this way:  You were aware, during your time as a Court

18   Unit supervisor, of a practice whereby if there's allegations

19   of abuse or neglect of one child in the home and that child is

20   to be removed, then the other children will be removed as well?

21   A    The practice would be that all the children would be

22   assessed for other safety concerns.  They weren't automatically

23   removed.

24            MR. POWELL:  I ask to read from the depo, Your Honor,

25   Page 69, Lines 10 through 20.

Anshutz - Direct by Powell

1        THE COURT:  Go ahead.  Deposition taken on?

2        MR. POWELL:  May 5, 2023.

3        THE COURT:  Okay.  Again, I gave you instructions

4    about deposition testimony.  This is deposition testimony

5    from -- that Ms. Anshutz gave on May 5, 2023 in a different

6    matter.

7        MR. WHITEFLEET:  Objection, lacks foundation, improper

8    impeachment.

9        THE COURT:  Overruled.  It was still under oath.

10       Go ahead.

11   BY MR. POWELL:

12   Q    Reading:

13       "Question:  Are you aware of a policy whereby if one

14   child -- if there's allegations of abuse or neglect of one

15   child in the home and that child is to be removed, then the

16   other children will be removed as well?

17       "Answer:  Yes.

18       "Is that still in place to this day?

19       "Answer:  Yes.

20       "Question:  I used the word 'policy,' do you know if it's

21   a written policy or it's just a practice?

22       "Answer:  To my knowledge, it's a practice."

23       That's the end of the reading.

24       Ms. Anshutz --

25   A    Yes.

Anshutz - Direct by Powell

1   Q     -- is your testimony different today about whether or not
2   there existed a practice right on up until May 5 of 2023,
3   whereby if one child has allegations, the agency will, if
4   they're going to remove that child, remove all the children?

5           MR. WHITEFLEET:  Objection, incomplete hypothetical,
6   calls for expert testimony.

7           THE COURT:  Overruled.  You can answer that.

8           THE WITNESS:  Verbatim, yes, it's different; however,
9   I do offer a clarification that should have been made at that
10  time.

11  BY MR. POWELL:

12  Q     Was there anything during that deposition, anybody
13  stopping you from saying anything?

14  A     No.

15          MR. WHITEFLEET:  Objection, irrelevant.

16          THE COURT:  Sustained.  Answer will be stricken.

17  BY MR. POWELL:

18  Q     How about this:  Ms. Anshutz, were you informed in that
19  deposition, in the beginning, that if you needed to change an
20  answer, you could feel free to do that right then and there
21  during the depo?

22          MR. WHITEFLEET:  Objection, irrelevant.

23          THE COURT:  Overruled.

24          Go ahead.

25

Anshutz - Cross by Whitefleet

1  BY MR. POWELL:

2  Q    Was the answer yes?

3  A    Yes.

4  Q    But you didn't do that with regards to this question, did

5  you?

6  A    No.

7  Q    And you were told that you would have an opportunity to

8  review the deposition in the fairly near future and you could

9  actually send in a sheet of paper that says, Hey, I need to

10 change that answer; you were told that as well, correct?

11 A    Yes.

12         MR. WHITEFLEET:  Objection, irrelevant, compound.

13         THE COURT:  Overruled.

14         Go ahead, you can answer.

15         THE WITNESS:  Yes.

16 BY MR. POWELL:

17 Q    You didn't do that either?

18 A    No.

19         MR. POWELL:  Nothing further, Your Honor.

20         THE COURT:  Mr. Whitefleet.

21         MR. WHITEFLEET:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23 BY MR. WHITEFLEET:

24 Q    Ms. Anshutz, did you ever work in ER?

25 A    No.

Anshutz - Cross by Whitefleet

1    Q    Have you ever applied for a warrant to remove a child?

2    A    No.

3    Q    Have you ever exigently removed a child?

4    A    No.

5    Q    Did you consider -- well, what is your definition of

6    "removal"?

7    A    It would be physically removing the children from the home

8    of their parents.

9    Q    And what legal process, in your mind, does that include?

10   A    We would --

11        MR. POWELL:  Objection, calls for improper expert

12   testimony.

13        THE COURT:  Overruled.

14        THE WITNESS:  We would place them in -- so I know that

15   we can remove them exigently or through a PC warrant.  So if we

16   remove them, my definition would be that they would be placed

17   into foster care while we go through the detention hearing.

18   BY MR. WHITEFLEET:

19   Q    So the method of -- when somebody says "removed," in your

20   mind you're meaning either a warrant or exigent circumstances?

21   A    Yes.

22        MR. POWELL:  Objection, Your Honor, leading.

23        THE COURT:  Overruled.  It's cross.  He can lead all

24   he wants.

25

Anshutz - Cross by Whitefleet

1  BY MR. WHITEFLEET:

2  Q    Do you consider a safety plan a removal?

3  A    No.

4  Q    Are you familiar with intake and assessment protective

5  custody policy of the agency?

6          MR. POWELL:  Objection, vague as to time.

7          THE COURT:  Time?

8  BY MR. WHITEFLEET:

9  Q    Sure.  Back in July of 2019, were you aware of the taking

10  children into protective custody written policy?

11  A    I wouldn't be able to cite it, no.

12  Q    Okay.  I'm going to grab the book.

13          THE COURT:  Sure.  Is it in evidence?

14          MR. WHITEFLEET:  It is.

15          THE COURT:  Which exhibit is it?

16          MR. WHITEFLEET:  B.

17          THE COURT:  Exhibit B.

18  BY MR. WHITEFLEET:

19  Q    Prior to July 2019, were you aware of this policy,

20  Exhibit B?

21  A    No, I've never read this policy before.

22  Q    How about Exhibit C, Protective Custody Search Warrants?

23  A    No.

24  Q    In terms of your experience at TAP meetings, have there

25  been discussions about other children in a home when the main

Anshutz - Redirect by Powell

1    concern is another child?

2           MR. POWELL:  Objection, Your Honor, calls for hearsay.

3           THE COURT:  Sustained.

4    BY MR. WHITEFLEET:

5    Q    You were asked about a practice and you were asked to

6    provide clarification, what was that clarification?

7    A    The clarification was that if there is an allegation of a

8    child in the home, and there are other children in the home, if

9    one child is removed, it doesn't automatically mean that the

10   rest of the children will be removed.  But there would be

11   assessment of risk and safety, and if there continues to be

12   risk and safety concerns for those children, then there would

13   be a conversation of removal.

14         It doesn't always mean removal from both parents or in the

15   same format as the first child.  It could be a safety plan

16   arrangement, it could be a different plan.

17   Q    So is -- your prior testimony, that's what you meant?

18   A    Yes.

19         MR. WHITEFLEET:  Thank you.  Nothing further.

20         THE COURT:  Anything further?

21         MR. POWELL:  Yes, Your Honor.

22         THE COURT:  Go ahead.

23                   REDIRECT EXAMINATION

24   BY MR. POWELL:

25   Q    Ms. Anshutz, following up on those questions there, the

Anshutz - Redirect by Powell

1   term "practice," you have an understanding of that term, right?

2   A    Yes.

3   Q    Would you agree that doesn't mean that it's done

4   100 percent of the time because something is done as a

5   practice; it means it is a practice, it was routinely followed,

6   you understood that when your deposition was taken, correct?

7           MR. WHITEFLEET:  Objection, form, compound, vague.

8           THE COURT:  Sustained in terms of form.

9   BY MR. POWELL:

10  Q    Did you understand that a "practice," when you were taking

11  your deposition, didn't mean 100 percent of the time?

12          MR. WHITEFLEET:  Objection, leading, vague.

13          THE COURT:  Overruled.

14          THE WITNESS:  Yes.

15          MR. POWELL:  Thank you.

16          THE COURT:  Anything else?

17          MR. POWELL:  No.

18          THE COURT:  Thank you.  You may step down.

19          THE WITNESS:  Thank you.

20       (Witness is excused.)

21          THE COURT:  Let's go, another witness.  You got

22  another witness?

23          MR. POWELL:  I guess I'll know shortly.

24          Your Honor, apparently there was an accident, but they

25  have parked their car, this might be a good time for a break.

1  They're apparently, like, approaching the building.

2           THE COURT:  Okay.  I think this will be our last

3  witness, that's why we want to get him in.  Let's take a break.

4  All admonitions apply.  Please report any violations of those

5  admonitions, and we'll get you in about 10 or 15 minutes.

6  We're getting close.

7           (Recess taken 10:26 a.m. to 10:47 a.m.)

8           (In open court outside the presence of the jury.)

9           THE CLERK:  Please remain seated and come to order.

10  Court is back in session.

11          THE COURT:  Okay, bring in the jury.

12          MR. POWELL:  Can we have two minutes?

13          THE COURT:  Go ahead.

14          MR. POWELL:  Two minutes.  I just wanted to clarify

15  one thing that was said in the record about I called him a

16  third time.  I submit that's not what happened.  He had been

17  up, documents weren't admitted, later admitted, and I still had

18  his video awaiting rulings on the objections to play.  And then

19  when his video ended we were done for the day.  I wasn't saying

20  I was done, that's all, I just wanted to state my position on

21  that.

22          THE COURT:  That's fine.

23          MR. POWELL:  The next thing was, Your Honor, and even

24  my clients caught this, and that is that we're supposed to show

25  or be able to show longstanding in order to show practice.  So,

1    Mr. Anderson's testimony, albeit before one year, I think
2    almost exactly one year before, that is support for the
3    longstanding practice part of the jury instruction.
4            THE COURT:  The other problem with the testimony you
5    want to try to impeach Mr. Anderson with is it's not proper
6    impeachment testimony.  In other words, the question -- and
7    don't take my comments in any way a personal attack, but it's a
8    convoluted question, a convoluted answer, and it doesn't
9    impeach his testimony here today.
10           He's thinking safety plans.  You're talking about any
11   type of removal.  So, it's not -- it's not proper impeachment.
12   It's the substance of the testimony that you want to try to use
13   that concerns the Court as well.
14           Again, I know you disagree, but it's not proper
15   impeachment testimony, and I would sustain the objection on
16   those grounds.
17           MR. POWELL:  But even Lines 13 through --
18           THE COURT:  You can't take it out of context.  I got
19   to read it as much as I can in its entirety, and even those
20   lines, because you have to read what came before.
21           MR. POWELL:  What I'm submitting to you, Your Honor,
22   is given his status as a party in this case and his prior
23   deposition under oath, whether it's a statement against
24   interest, a prior sworn testimony --
25           THE COURT:  I'm not excluding it on hearsay grounds.

1    I'm just saying it's not proper impeachment.  It's a different

2    question.

3         MR. POWELL:  I'm submitting it's direct evidence.  I

4    should be able to read it as direct evidence.  I want to be

5    clear, that's what I'm saying, because of the case law I

6    provided, Statute 32.  I should be able to read it as direct

7    evidence.  Any objections to its form we'd have to deal with

8    would have been at the time.

9         THE COURT:  Do you have a problem with him reading

10   that in?  It does fit under Rule 32.

11        MR. WHITEFLEET:  And it goes back to my other

12   argument, Your Honor, that it was never disclosed in the course

13   of this case in terms of the document itself and the testimony.

14        So defendants never had notice, either by way of

15   responses to written discovery or Rule 26 disclosures, and

16   there were five of them from plaintiffs.  The fifth one is what

17   identified those other defendants, Juan Perez and Anshutz, but

18   because Mr. Anderson was a defendant in this entire case, one

19   would have expected that if plaintiff wanted to use prior

20   deposition testimony in their case-in-chief, it would require

21   disclosures under Rule 26 and/or identification.

22        THE COURT:  Okay.  Other than that, any other

23   objection?

24        MR. POWELL:  Well --

25        THE COURT:  Hang on.

58

 1          MR. WHITEFLEET:  Yes, because it was not similarly

 2  situated.

 3          *Nunes* was a safety plan and not a removal, and it was

 4  based on a skull fracture of a child, so the other child was

 5  safety planned.

 6          THE COURT:  In order for him to use the deposition in

 7  the earlier action, it has to involve the same subject matter

 8  between the parties -- between the same parties; same subject

 9  matter between the same parties.  So there's that hurdle as

10  well, Mr. Powell.

11          The significant difference, factual difference between

12  *Nunes* and this case, different plaintiffs, different

13  circumstances would preclude you from simply just reading the

14  deposition under Rule 32.  Again, I know you disagree, but you

15  made your record.

16          MR. POWELL:  I do want to be clear, again,

17  Mr. Whitefleet is not correct.  In my plaintiffs' initial --

18          THE COURT:  I'm overruling his Rule 26 objection.

19          MR. POWELL:  Please note, it's in here, it reads just

20  like I read to you from Perez.

21          THE COURT:  If it's on the docket --

22          MR. POWELL:  The Rule 26 doesn't go into you all.

23          THE COURT:  Okay.  He's just saying there's no

24  disclosure of this deposition testimony.

25          MR. POWELL:  But one does not have to disclose

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

1   deposition testimony. It's not an exhibit. It's never an

2   exhibit, so that's not a thing, legally.

3        I don't even understand that argument, that's why I

4   haven't addressed that.

5        THE COURT: I ruled in your favor.

6        MR. POWELL: Just now?

7        THE COURT: Yeah, I overruled his objection on the

8   Rule 26. You can't read the testimony, though, for the other

9   reasons I just gave you.

10       MR. POWELL: Understood, thank you.

11       THE COURT: It's not the same case.

12       MR. POWELL: I appreciate, Your Honor, that you allow

13   the record.

14       THE COURT: Absolutely, you got to make a record.

15       All right, bring in the jury, bring in the witness.

16       Where's the witness?

17       MR. POWELL: Yeah, I'll go get him.

18       THE COURT: Please.

19     (In open court in the presence of the jury.)

20       MR. POWELL: Apologies, Your Honor, nature doesn't

21   care about the schedule. He'll be back very shortly, one

22   minute maybe.

23       THE COURT: Fine. While we wait, let me see both of

24   you at sidebar.

25     (At sidebar off the record.)

Perez, Jr. - Direct by Powell

1   HORACIO GUADALUPE GARCIA PEREZ, JR., PLAINTIFFS' WITNESS, SWORN

2          THE CLERK:  Say your whole name and spell it for the

3   record.

4          THE WITNESS:  Horacio Guadalupe Garcia Perez, Jr.

5          THE COURT:  Spell your first name.

6          THE WITNESS:  H-O-R-A-C-I-O.

7          THE COURT:  And your last name.

8          THE WITNESS:  Garcia, G-A-R-C-I-A.

9          THE COURT:  Thank you.

10         MR. WHITEFLEET:  Your Honor, he probably doesn't need

11   that big binder.

12         THE COURT:  That's fine, let's go.

13                     DIRECT EXAMINATION

14   BY MR. POWELL:

15   Q    Mr. Garcia, how are you?

16   A    Good, good.

17   Q    Do you know that lady back here in the flannel plaid

18   jacket?

19   A    My mom?

20   Q    Do you wear glasses?

21   A    Yeah.

22   Q    But you're not wearing them now?

23   A    No.

24   Q    Okay.  And were you -- I'm going to go real quick, sir.

25   Do you recall being present on July 12, 2019, at your mother's

Perez, Jr. - Direct by Powell

1    house when some social workers came to the home?

2    A    Yes.

3    Q    Okay.  At that time where were you living primarily?

4    A    At her house.

5    Q    Okay.  How long had that been the case?

6    A    When she won custody of us back in like -- I don't

7    remember the year exactly, but it's somewhere in like the 2015,

8    2014 range.

9    Q    Okay.  And so was that true of all your siblings, that

10   Ms. Perez, your mother, shared with your father, all living

11   there?

12   A    Yeah.

13   Q    Now, when the social workers were in the home, did you, at

14   anytime, leave Alfredo, Jr., Freddy, Jr., alone in a room with

15   Christopher?

16   A    No.

17   Q    How do you -- why do you remember that?

18   A    Me and my sister were coming in and out of the room, like

19   a -- and we weren't leaving him alone because it was -- my mom

20   told us beforehand that, like, uh, we can't leave those two

21   alone no more.  She didn't tell us why, she just told us we

22   can't leave them alone.

23   Q    And did she -- can you fix in time using months or weeks

24   or when it was she told you before that day of July 12?

25   A    Not off the top of my head, but it was before they came to

Perez, Jr. - Direct by Powell

1   visit that they couldn't be alone no more.

2   Q    Was it at least months?

3   A    Yeah.

4   Q    But you don't know how many months?

5   A    Huh-huh.  That was like almost 10 years ago.

6   Q    Okay.  How is it that you know that those two were not in

7   the room -- I mean, Christopher and Freddy, Jr. were not in the

8   room alone, other than a practice that your mother instilled in

9   you?

10  A    Me and my sister were by -- walking up to the door and,

11  like, eavesdropping, and one of us would stay in the room at

12  all times.

13  Q    And so you were eavesdropping on the social workers

14  talking to whoever they were talking to?

15  A    Yeah.

16  Q    All right.  Did you at any point see the social workers

17  separate and individually speak to kids, or was it all in one

18  room, one place?

19       MR. WHITEFLEET:  Objection, lacks foundation,

20  compound.

21       THE COURT:  Sustained.

22  BY MR. POWELL:

23  Q    Could you see the social workers when kids would come from

24  the family in to talk to them?

25  A    It's not like a big house.  From the door to where they

Perez, Jr. - Direct by Powell

1  were talking, it's like from me to her.  So...

2          MR. POWELL:  Your Honor, may I make an estimate of 11

3  to 12 feet?

4          THE COURT:  Okay.

5          MR. POWELL:  For the record.

6  BY MR. POWELL:

7  Q    Okay.  So when you said, Me and my sister were

8  eavesdropping -- let me start, where were you leaving from when

9  you decided to go on an eavesdropping trip?

10 A    When they were talking to them, we weren't allowed to be

11 out there, like, they took them alone into the living room.

12 But, like, the living room has no hallways, it's just two doors

13 to my mom's room and the kids' room, and we were just, like,

14 standing by the door with, like, our ears to it.

15         MR. POWELL:  Okay.  Let the record reflect he's

16 putting both hands up to his ear in kind of a funnel shape

17 typical of eavesdropping.

18         THE COURT:  The record will so reflect.

19 BY MR. POWELL:

20 Q    Okay.  But, sir, I'm just trying to understand, what room

21 were you in where you and Destiny were switching taking turns

22 eavesdropping?

23 A    We were in the kids' room.

24 Q    Okay.  So could you see when any other child would go in

25 to speak to the social workers?

Perez, Jr. - Direct by Powell

1 A    I couldn't see them, but they were like right there,
2 like...

3          THE COURT:  That's okay, you answered.

4          MR. POWELL:  Yeah, thank you.

5 BY MR. POWELL:

6 Q    Did the social -- did you ever get in a place where you
7 were able to speak with the social workers?  Even if you
8 didn't, I just want to find out did you get close enough where
9 you could have talked?

10 A    There was a point where like they had -- they were sitting
11 down with my parents, and I was trying to talk to them, but
12 they didn't want to talk to me because I wasn't a minor.  I was
13 trying to tell them stuff, like my dad had made -- well, not
14 just my dad, me and my dad and my sister made like a bunch of
15 fake reports on my mom for --

16          MR. WHITEFLEET:  I'm going to object and move to
17 strike as nonresponsive.

18          THE COURT:  Sustained.

19          MR. WHITEFLEET:  And move to strike the testimony.

20          THE COURT:  The last part of the answer will be
21 stricken.

22 BY MR. POWELL:

23 Q    I believe you've already testified they declined to speak
24 to you because you were not a minor; is that right?

25 A    Yes.

Perez, Jr. - Direct by Powell

1  Q     But did you ask them, again, to please talk to you?

2  A     When I had asked them, like, Are you guys going to

3  interview me, too, they were saying no, because they don't need

4  to talk to me because I'm not a minor.

5  Q     Okay.  So did either of the social workers speak to you

6  about anything at all?

7  A     Not really.  They were just talking to my mom and my

8  stepdad.  I don't know if it matters --

9         THE COURT:  Wait for a question.

10  BY MR. POWELL:

11  Q     What were you about to say?

12        MR. WHITEFLEET:  No, there's no question pending.

13        THE COURT:  That's not a proper question.

14        THE WITNESS:  It was one of the social workers --

15        THE COURT:  Stop, stop.

16        Ask a proper question.

17  BY MR. POWELL:

18  Q     Is there anything else that you said to the social workers

19  other than, Aren't you going to interview me?

20  A     I had told -- I think her name is Shari, she was like

21  the -- she works for the CPS, on one of the meetings when we

22  went over there after they took N     , I had told --

23        THE COURT:  We're not there yet.  We're still on the

24  July 12, 2019.

25

MARYANN VALENOTI - U.S. DISTRICT COURT - (916)930-4275

Perez, Jr. - Direct by Powell

1  BY MR. POWELL:

2  Q    Right.  Until we leave that -- and maybe there's no more

3  that you can tell me, sir, so I'm going to try and then move

4  on.

5        Is there anything else that you remember the social

6  workers saying while were you in the home?  And it doesn't

7  matter if they said it to you or they said it to your mom and

8  dad and you heard it while you were eavesdropping.

9  A    When they were talking to my mom, oh my God, what's her

10 name, April Cobbs said that the reason that they needed to

11 have -- like, to go talk to everyone was because Christopher

12 had tickled Freddy on the belt, and to her that was like

13 perping on a little kid, and that's grounds to take everyone

14 away, just that he tickled him on the belt.

15 Q    And "perping," what did you understand that meant?

16 A    Yeah, she was -- she was very -- she was creative, you

17 know, like she --

18        MR. WHITEFLEET:  I'll object and move to strike

19 everything after yes.

20        THE COURT:  Sustained.

21        He asked if you know what "perping" meant.

22        THE WITNESS:  Yeah, she meant if -- like he was -- I

23 don't know a lot of synonyms, I'm sorry, like he was trying to

24 touch the little kid.

25        THE COURT:  Okay.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Perez, Jr. - Direct by Powell

1   BY MR. POWELL:

2   Q    Anything else that you heard Ms. April Cobbs say?

3   A    When she was asking, like, questions, she would ask

4   questions like -- she wasn't asking, like, generic questions,

5   she was asking, like, Were you ever alone with this kid?

6        I remember she was getting me mad while I was

7   eavesdropping because she was asking, like, Did you ever -- oh

8   my God, because I don't remember word for word, but it felt

9   like she was leading him into saying "yes" to stuff.

10            MR. WHITEFLEET:  Move to strike as nonresponsive.

11            MR. POWELL:  It's responsive.

12            THE COURT:  Sustained.  The answer will be stricken,

13   the jury will disregard.

14   BY MR. POWELL:

15   Q    Who was April Cobbs talking to with regards to what you

16   were just referring to?

17            MR. WHITEFLEET:  You can't refer to prior testimony

18   that's been stricken, that's vague.

19            THE COURT:  Sustained.

20   BY MR. POWELL:

21   Q    Please name each child, starting with the youngest, that

22   you heard April Cobbs speaking to.

23            MR. WHITEFLEET:  Objection, lacks foundation.

24            THE COURT:  Overruled.

25            THE WITNESS:  I heard them talk to Victoria and to

Perez, Jr. - Direct by Powell

1   Christopher and to -- those are the only ones I heard because,
2   like --
3           THE COURT:  Okay, okay.
4   BY MR. POWELL:
5   Q   Victoria and Christopher, correct?
6   A   Uh-huh.
7   Q   Because were you taking turns, correct?
8   A   Yes.
9   Q   So Christopher, can you tell me what you remember, as best
10  you can, don't guess, what you heard Mrs. Cobbs say to
11  Christopher in the living room?
12  A   She was telling him, like, Where did you tickle him?  And
13  like, If you ever touched him -- like she's the one that said,
14  Do you touch his -- did you touch, like, his waistline, his
15  belt or anything.  And I remember Christopher -- he say, Yeah,
16  but like that was like the end of their thing.  Like after
17  that, it was, Oh, yeah, and then to the next kid.
18  Q   Okay.  Were you also -- do you remember anything
19  specifically from Victoria?  And if you have to guess, you can
20  tell me you'd have to guess.
21  A   I'd have to guess.
22  Q   Were you also present on July 19 at a home where the
23  social workers showed up at and you ended up leaving with them,
24  sort of?
25  A   The 1220 Courtney Way?

69

Perez, Jr. - Direct by Powell

1   Q    No, July 19, 2019, were you at Hilda's mother's home?

2   A    Yeah, that's 1220 Courtney Way.

3        MR. POWELL:  What did he say?

4        THE COURT:  He's giving an address.

5   BY MR. POWELL:

6   Q    Oh, okay, thank you.  My bad, not yours.

7        Can you tell me if you saw the same two social workers on

8   that day?

9   A    Yes.

10  Q    When was the first -- how did you first encounter them?

11  A    They came to the door and they wanted to talk to -- I

12  opened the door, and they wanted to talk to, like, an adult,

13  and I told them that, "I am an adult."

14       They told me, Well, can we talk to another adult?

15       And I told them that, Oh, my grandma is here.  I could get

16  her, but she's cooking right now, so you got to wait a little

17  bit.

18       And I remember -- I forget his name, but it's like Shane's

19  dad, he came in, like, at the same time that they were there.

20  And I don't know why, but I think that got April mad because

21  she ended up, like, telling Shynelle that they don't have time

22  for this.  That they could just come with the cops, and they

23  could get the kids like that, and --

24       MR. WHITEFLEET:  I think we're in a narrative here.

25       THE COURT:  Yeah, ask a question.

Perez, Jr. - Direct by Powell

1  BY MR. POWELL:

2  Q    To clarify, though, Ms. Cobbs, where you left off there,

3  she said something about calling the cops?

4  A    Yeah, she said that -- I think her words exactly is like,

5  "We don't have time for this.  We could just come with the

6  cops."  I'm almost certain that's like word-for-word.

7  Q    Okay.  Next thing -- you have to break it up a little bit.

8  Next thing you recall Mrs. Cobbs saying?

9  A    Her and her little group, it was herself, Shynelle and

10  Cobbs, they, like, went to the driveway, and they were just

11  standing there, and I walked outside with them.  I was curious

12  what were they going to say outside of the door, if they were

13  going to come with the cops or not.

14        THE COURT:  Try to answer the question, Horacio.  What

15  did they say?  We're trying to focus on what they said and what

16  you said.

17        THE WITNESS:  That's what I'm getting at, sir.

18        THE COURT:  Get to the answer, not, I followed them

19  down.  Tell us what you remember they said.

20        THE WITNESS:  I had asked them after I followed them

21  that --

22        THE COURT:  Get close to that mic, too, so we can hear

23  you.

24        THE WITNESS:  I had followed them to ask them, like,

25  So what happens now, like -- and they were telling me that

Perez, Jr. - Direct by Powell

1   they're going to take the kids and stuff to -- that they were

2   going to come in and take the kids, and they were going to

3   explain to my grandma and stuff, like, how it was going to

4   happen and stuff.

5   BY MR. POWELL:

6   Q    Did they say anything about where the kids were going to

7   be taken?

8   A    Not right then and there, but, like, once they go inside

9   and talk to my grandma, they tell us that they had found my

10  dad, and they were going to go take them to my dad.

11       But before they had said that, at the other house, when

12  she said that Christopher's perping on Freddy, that that was

13  grounds to take them all the way to foster care, so I was under

14  the idea that they were all going to foster care.

15            MR. WHITEFLEET:  Move to strike the last part as

16  nonresponsive.

17            THE COURT:  Overruled.

18  BY MR. POWELL:

19  Q    This is kind of the final question:  Is there anything

20  else that you heard them say July 19 -- not July 12 -- July 19,

21  at the home, your mother's home?

22            MR. WHITEFLEET:  Objection, vague.

23            THE COURT:  Overruled.

24            I thought he was at his grandmother's home.

25            On July 19 you were at your grandmother's home?

Perez, Jr. - Cross by Whitefleet

1    THE WITNESS:  Yeah.

2  BY MR. POWELL:

3  Q    Yeah.  Is there anything else you can tell us about what

4  you remember Ms. Cobbs saying or Ms. Jones that you haven't

5  told us already?

6  A    There is a lot, like they were telling my grandma that she

7  can't record and stuff like that because -- that they don't

8  have consent -- her consent to record them.  And that if they

9  continue recording, that, like, they could leave and come with

10  the cops and stuff.  And they could do it, like, the nice way

11  or they could do it with the cops, and that they didn't want to

12  make a big scene in front of all the neighbors and stuff like

13  that.

14  Q    And then anything else?  You got to break it up a little.

15  A    Not really.  Once they said that they were going to my

16  dad's, that was, like, a big relief for me, and I went to go

17  tell them, Hey, you guys are going to go with dad right now,

18  and then I'll go meet you and go over there right now.

19    MR. POWELL:  Nothing further, Your Honor.

20    THE COURT:  Cross?

21    MR. WHITEFLEET:  Yeah, just briefly Your Honor.

22    CROSS-EXAMINATION

23  BY MR. WHITEFLEET:

24  Q    Horacio, you said you were living with your mother in

25  July 2019 in the home.  Did Shane Beard ever spend the night?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Perez, Jr. - Redirect by Powell

1    A    Yeah.

2    Q    What were the sleeping arrangements while you were there?

3    A    I slept on the couch and the other -- the kids had their

4    own beds.

5    Q    So --

6    A    Freddy slept with my mom.

7    Q    So who slept in the same room of the children, of your

8    siblings?

9    A    Destiny, Christopher, Damien and Victoria.

10          MR. WHITEFLEET:  Okay.  Thank you.  Nothing further.

11          THE COURT:  Okay.  Anything further?

12          MR. POWELL:  Yes, very little, Your Honor.

13                    REDIRECT EXAMINATION

14   BY MR. POWELL:

15   Q    You said something in there, "Freddy slept with my mom."

16   A    Yes.

17   Q    Now, if I understood your testimony, maybe in a four or

18   more year period that you're living with mom, was that

19   happening the whole time or --

20   A    Yeah, Freddy always slept with my mom.  He was like a

21   mommy's boy.

22   Q    Okay.  He was five-years old.

23          MR. POWELL:  Nothing further, Your Honor.

24          THE COURT:  Thank you, you can step down.

25          THE WITNESS:  Okay.

1    (Witness is excused.)

2         THE COURT:  Okay, any further witnesses?

3         MR. POWELL:  No, Your Honor.

4         THE COURT:  Plaintiff rests?

5         MR. POWELL:  Well, you already made a ruling on one

6    other, so yes, I guess the plaintiff rests.

7         THE COURT:  So, ladies and gentlemen, I'm going to

8    excuse you again.  This may take a little while longer.  If

9    it's going last longer than 15 or 20 minutes, we'll let you

10   know, but take a break.

11        During the break please don't discuss the case with

12   anyone, don't discuss the case among yourselves, don't do any

13   independent investigation or research.  Report any violations

14   of those admonitions to the Court.  I'll come get you as soon

15   as I can.

16      (In open court outside the presence of the jury.)

17        THE COURT:  Outside the presence of the jury.

18        Mr. Whitefleet, do you have any motion?

19        MR. WHITEFLEET:  I do, Your Honor.  I would like to

20   make a motion under Rule 50(a) for judgment.

21        THE COURT:  Okay.  For the record, there's three

22   defendants remaining:  Mr. Anderson, Ms. Cobbs and Ms. Jones.

23        First claim for relief brought only by N    for

24   unreasonable seizure by judicial deception.

25        The second claim has two parts:  The first part, which

1    I'll call 2(a) is brought by all plaintiffs against

2    Mr. Anderson, Ms. Cobbs, and Ms. Jones, so all defendants.

3          Then the second part of the second claim for relief --

4    first part is a 1983 claim, Fourteenth Amendment, substantive

5    due process familial association, and then the second part of

6    the second claim, which I'll call 2(b), it's also a 1983 claim

7    brought under the Fourteenth Amendment, a substantive due

8    process claim for a deliberate fabrication.

9          There's a third claim for relief brought under

10   Section 42 U.S.C. 1983 under the Fourteenth Amendment,

11   procedural due process familial association.  All plaintiffs

12   have brought that claim against all defendants.

13         The fourth claim for relief is brought under 42 U.S.C.

14   Section 1983, Fourteenth Amendment, it's entitled "Minimal

15   Care."  It's brought only by plaintiff, N    , only against

16   Cobbs and Jones.  Mr. Anderson is not named as a defendant.

17         Fifth claim is brought against the County, that's the

18   *Monell* claim for municipal liability under Section 1983.

19         Sixth claim was dismissed.

20         Seventh claim is for false imprisonment brought only

21   by N    against Mr. Anderson, Ms. Cobbs, and Ms. Jones.

22         And the eighth claim is a claim under the Bane Act,

23   brought only by N    against Anderson, Cobbs and Jones.

24         I do have a question, Mr. Whitefleet, before you get

25   into your argument for Mr. Powell, and that is -- I didn't see

1   a jury instruction for your fourth claim for relief, so was

2   that just an oversight?  And second, I honestly have never seen

3   a 1983 claim, and I know titles don't matter, I'm just not sure

4   what you're arguing for minimal care.

5          MR. POWELL:  That's kind of like based on the *Thomas*

6   case.  In our case it was just the withholding of the breast

7   milk, which we intended, certainly Mr. Park and I in

8   discussion, to go ahead and drop that separately as a claim,

9   just didn't think it was needed.

10         THE COURT:  So --

11         MR. POWELL:  Certainly don't think it was proven here,

12   per se.

13         THE COURT:  So you're dismissing the fourth claim?

14         MR. POWELL:  To the extent it's about the failure to

15   deliver the breast milk to the child.

16         THE COURT:  Okay.  But you think you can maintain it

17   for the evidence that they failed to ensure that he was safe in

18   foster placement resulting in physical injuries?

19         MR. POWELL:  We can let it go.  It was stuff that

20   happens.

21         THE COURT:  I didn't understand that answer.

22         MR. POWELL:  The injuries that the child had were, you

23   know, just not the care that he had with his parents.  I don't

24   think it rises to the level of *Thomas*.  It is dropped, Your

25   Honor.  It is dismissed.

```
 1              THE COURT:  I assume there's no objection?
 2              MR. WHITEFLEET:  No objection.  My understanding,
 3    fourth claim for relief is being dismissed in its entirety?
 4              THE COURT:  Yes.
 5              MR. POWELL:  Fourth, right?
 6              MR. WHITEFLEET:  Yes.
 7              THE COURT:  Okay.  All right.  Mr. Whitefleet, go
 8    ahead.
 9              MR. WHITEFLEET:  Thank you, Your Honor.  Would you
10    prefer per defendant or per claim in terms of argument?
11              THE COURT:  I'd like to go with the state claims, the
12    Bane Act and the false imprisonment brought where only N     is
13    the plaintiff.
14              MR. WHITEFLEET:  Okay.  So turning to the false
15    imprisonment claim, Your Honor, state law claims require
16    plaintiff to prove nonconsensual, intentional confinement
17    without lawful privilege for an appreciable time.  And because
18    of the state immunities under Government Code Section 820.2,
19    Discretionary Immunity, and 820.21, which gives immunity for
20    perjury, fabrication of evidence, failure to disclose, known
21    exculpatory evidence or obtaining testimony by duress, fraud or
22    undue influence, but plaintiff can overcome that immunity only
23    if committed with malice.
24              We would submit, particularly as to Ms. Jones and
25    Mr. Anderson, neither were involved in drafting the warrant,
```

1   and we believe that the evidence, even in plaintiffs -- in

2   light of -- excuse me, in the light most favorable to

3   plaintiff, that no jury would reasonably believe that

4   Mr. Anderson or Ms. Jones committed anything with malice in

5   terms of overcoming immunities in the warrant.

6           As to Ms. Cobbs, we would also submit that the

7   evidence was insufficient to show malice, that being defined as

8   "despicable conduct with a willful and conscious disregard for

9   the right and safety of others."

10          THE COURT:  I was looking for your jury instruction on

11  that.  Do you remember which one it was?

12          MR. WHITEFLEET:  It was the defendant's disputed jury

13  instruction --

14          THE COURT:  Eight?

15          MR. WHITEFLEET:  Eight.

16          THE COURT:  Okay.

17          MR. WHITEFLEET:  And then on the Bane Act, we don't

18  believe there's been any evidence of sufficient threats,

19  intimidation, coercion or violence with the specific intent to

20  violate Nc  's constitutional rights such that no reasonable

21  jury would find a violation of the Bane Act for any of the

22  remaining defendants.

23          THE COURT:  Okay.  Mr. Powell, my other question with

24  respect to the state law claims is, what evidence is there that

25  Nc  was damaged?

1          MR. POWELL:  Your Honor, false imprisonment is the

2    kind of tort that has almost a presumed damage, and by the way,

3    false imprisonment, there is no immunity under California

4    immunities, any of them.  That's literally a Google search

5    away.  It's not -- it's not subject to any of the immunities.

6    There's no need to invoke 820.21, but 820.21 could still fall

7    in favor of plaintiffs.

8          So, the false imprisonment, Your Honor, I think that

9    the jury is allowed to infer the damage -- that there is a

10   presumption of damage when your liberty is curtailed in that

11   manner.

12         THE COURT:  Infer what damage, though?

13         MR. POWELL:  The violation of the right is the damage.

14   That was something we talked about earlier in this case.  The

15   violation of the right is a damage.

16         THE COURT:  But you're asking them to assign a dollar

17   number, a dollar figure to N̶    .

18         MR. POWELL:  We did general verdict forms, Your Honor.

19         THE COURT:  I don't know how a jury can come up with a

20   number for a -- at the time he was a nine-month old kid; how is

21   that nine-month old child damaged?  Where's the evidence that

22   there are any damages that he suffered for being falsely

23   imprisoned?

24         MR. POWELL:  Your Honor, I don't know.  I can only

25   tell you that I think that every juror in that box and every

1  juror in every box can infer from the fact of the separation of

2  the child from his or her parents and everything familiar, that

3  the child had damage.

4  Mr. Beard talked about the crying when separating.

5  The term for it is "hypervigilance," if you didn't know it, but

6  that's the term; very common -- very common result.  So the

7  jury heard that.  They can infer damage from that.  It's a jury

8  question.

9  There's no matter-of-law ruling, I believe, that would

10  be correct in the way that Mr. Whitefleet is asking, even on

11  the Court's point of how do you prove a nine-month old was

12  damaged.

13  THE COURT:  Not how do you, did you prove.  It's not

14  how do you.  It's is there evidence in this case upon which a

15  jury could return a damage award to N   ?  And I don't --

16  there's no evidence that he was damaged.

17  Mr. Beard's testimony was not admissible.  He's not an

18  expert, so there's no testimony -- obviously, you know, we

19  talked about this, obviously N   can't testify.  I don't know

20  of any case where a jury has awarded a dollar amount damages to

21  a child.

22  Now, on the federal claims a jury obviously can award

23  nominal damages.  So they can give him a dollar even if they

24  don't believe there is any proof of damages.  You can't do that

25  on the state claims.  So that's why I'm still asking you what

 1    evidence did you put in in your case-in-chief that would allow

 2    this jury to award damages to N    on these two claims?

 3            MR. POWELL:  Your Honor, it's what I've already said.

 4    You said my client's testimony is not admissible because he's

 5    not an expert.  Again, I'm not sure I would agree that the

 6    percipient witness who sees his kid everyday until the kid is

 7    removed and then gets him back doesn't have the foundation to

 8    testify about damage to his child, the changes in his behavior.

 9            I understand the Court's argument.  I trust the Court

10    understands mine even if it disagrees with it.  I don't see

11    this as a JMOL-able issue.

12            THE COURT:  What about the argument with respect to

13    Ms. Jones and Mr. Anderson on the false imprisonment claim

14    itself?  They weren't involved in the imprisonment itself.  You

15    argued that 820.21 doesn't apply in that case; is that right?

16            MR. POWELL:  Well, I'm saying that's typically --

17    820.21 is brought up by plaintiffs' counsel such as myself.

18    It's not needed because there is no immunity for false

19    imprisonment, that's the only point I made on that.  That's the

20    only point I made on that.

21            THE COURT:  Mr. Whitefleet, do you believe there is

22    immunity for a false imprisonment claim?

23            MR. WHITEFLEET:  Yeah, I believe that, yes, Your

24    Honor, because here it's based on --

25            THE COURT:  820.2 says, "Except as otherwise provided

1     by statute, a public employee is not liable for an injury
2     resulting from his act or omission where the act or omission
3     was a result of the exercise of the discretion vested in him,
4     whether or not such discretion be abused."  So why doesn't
5     820.2 apply to the state claims?

6             MR. POWELL:  I'm going have to Google it, Your Honor.
7     I understood this to be widely known, but may I please?  I'll
8     ask the opportunity to brief it.

9             THE COURT:  We don't have an opportunity to brief it.

10            MR. POWELL:  Here we go, here we go.  Is this all
11    going to be oral?

12            THE COURT:  It has to be because I have to decide what
13    the jury's going to decide in this case.

14            MR. POWELL:  820.4.

15            THE COURT:  I'm at 820.2.

16            MR. POWELL:  There's more, a lot of hits on it.  One
17    second, Your Honor.  *Sullivan versus County of Los Angeles*,
18    12 Cal.3d at 711.

19            THE COURT:  Again, get in front of that microphone.

20            MR. POWELL:  Again, I'm doing this just on a Google
21    search.  I could go Westlaw, if the Court will allow me,
22    because it is clear that false imprisonment is not something
23    that there is an immunity for.  So there's *Sullivan versus Los*
24    *Angeles*, that's Justia Law.

25            MR. WHITEFLEET:  I'm sorry, I don't understand what

1    you're saying.

2           MR. POWELL:  I'm saying that false imprisonment is

3    not -- it is not immunized by any of the California immunity

4    statutes.  And if I'm given time to go to Westlaw and look for

5    it, I will find it as well, but right now I was just trying to

6    do it off of Google search, and here we go.

7           MR. WHITEFLEET:  And I apologize, I don't mean to

8    direct my question directly to counsel, but I didn't hear the

9    case that was cited.

10          MR. POWELL:  **Oh**, *Sullivan versus* --

11          MR. WHITEFLEET:  I still don't hear you.

12          THE COURT:  *Sullivan versus* what?

13          MR. POWELL:  *County of Los Angeles.*

14          THE COURT:  And you believe that case holds that false

15   imprisonment is not protected -- a social worker or a

16   government employee, a public employee who is sued for false

17   imprisonment can't invoke the 820.2?

18          MR. POWELL:  Correct, Your Honor.  In fact, maybe I'll

19   try and get the annotate 820.2, because I believe it's in the

20   annotations below there as well.  It's been around a

21   significant period of time.

22          THE COURT:  And then you also don't believe that you

23   have to prove that they acted with malice as set forth in

24   820.21 because that, also, you believe doesn't apply to false

25   imprisonment?

84

1          MR. POWELL:  Right.  If they don't have any

2     immunities, so then I wouldn't have to show the elements of

3     820.21.  They'd have to show that they either didn't do it or

4     convince the jury it was justified.

5          MR. WHITEFLEET:  Based on my brief review of *Sullivan*

6     *versus County of Los Angeles*, we would argue that it's

7     distinguishable, it was based on whether an individual who was

8     confined in a county jail was beyond his proper jail term could

9     maintain an action for false imprisonment; therefore, it does

10    not apply in this case.

11         We would note, Your Honor, in defendants' trial brief,

12    Page 13, we cited numerous cases that apply 821.6, 820.2 and

13    820.21 to social workers, although, to be fair, I'm not sure if

14    *Gabriel A. versus County of Orange* is a social worker case.

15         THE COURT:  Okay.  Let's go to the *Monell* claim.

16         MR. WHITEFLEET:  Your Honor, my understanding of the

17    *Monell* claim, two aspects of it that plaintiffs are claiming

18    that there's a practice of submitting warrants with falsities

19    and/or omissions.

20         We would submit that there's been no evidence of prior

21    cases of warrants being submitted that had been found to be --

22    contained falsities or material omissions, and, therefore,

23    plaintiff has failed to prove any practice with respect to that

24    *Monell* claim regardless of the underlying claim in this case,

25    whether plaintiff can prove an underlying violation of the

1    warrant in this case.

2           I would also submit that because there are written

3    policies, two of them, that require specifically and in writing

4    that the warrants contain specific information, not contain

5    false information, not contain omissions, that any claim that's

6    based on the warrant here in this case that contains false

7    omissions and/or omissions was not -- must mean that Ms. Cobbs

8    was not acting under any particular policy or practice in doing

9    so.  In other words, because there are written policies that

10   expressly tell her to include such information, then there was

11   no causation in terms of *Monell* on that claim.

12          We'd also submit the other *Monell* claim we understand

13   is based on alleged failure to train.  We believe that the

14   testimony has been abundant that these defendants in this case

15   were trained on how to prepare a warrant.  And so if, for

16   whatever reason, they failed to do so in compliance with that

17   training, again, it's not the moving force in terms of a

18   practice or policy.  Otherwise, we would submit there's been no

19   evidence of a sufficient practice of longstanding that

20   employees of the County were not trained in connection with

21   writing warrants and creating warrants that allegedly included

22   fabrications or omissions.

23          THE COURT:  And what about the take one take all,

24   that's another allegation in the *Monell* claim.

25          MR. WHITEFLEET:  Okay.  Well, I would submit, Your

1    Honor, that -- and I don't read the complaint as actually

2    stating as much, I would submit that, Number 1, it's not

3    sufficiently alleged in the complaint.  Number 2, it's not

4    applicable in this case because only one child was removed.

5    And Number 3, there's been insufficient evidence of such a

6    practice or procedure, that would be the moving force in this

7    case.

8            THE COURT:  Mr. Powell?

9            MR. POWELL:  Okay, whenever the Court's ready, I'm

10   ready to address the false imprisonment, I don't want to miss

11   that.  It turns out it's in *Wallis versus Spencer.*

12           THE COURT:  Go ahead, if you want to go back to false

13   imprisonment.

14           MR. POWELL:  Well, *Wallis versus Spencer*, and this is

15   in the annotations under 820.2, and it does involve social

16   workers.

17           THE COURT:  Do you have a cite?

18           MR. POWELL:  Yeah, 202 F.3d 1126, and I don't have the

19   pincite, but --

20           THE COURT:  Ninth Circuit?

21           MR. POWELL:  Yes, Ninth Circuit, kind of the

22   grandfather of child welfare litigation.

23           THE COURT:  What does it say?

24           MR. POWELL:  I'm reading from the annotated note, and

25   I'm going to try and cut it -- well, "Under California law,

1    county social workers statutory immunity from liability
2    resulting from their discretionary acts provides complete
3    protection for the decision to investigate, to make in-person
4    response, and for actions necessary to make a meaningful
5    investigation.  It does not extend, however, to
6    nondiscretionary acts or to at least some intentional torts
7    committed in the course of making the investigation such as
8    battery and false imprisonment."
9            And there's abundance of other cases, *Swartwood versus*
10   *County of San Diego*, *Reynolds versus County of San Diego*.
11           THE COURT:  Okay.  Let's go back to *Monell*.
12           MR. WHITEFLEET:  If I could just briefly respond to
13   that.
14           THE COURT:  Go ahead.
15           MR. WHITEFLEET:  Our understanding -- so *Wallis* only
16   addressed 820.2 and not the other immunities.  I would submit
17   that I think the courts have generally limited 820.2 in terms
18   of discretionary immunity to supervisors in policy-like
19   decisions, and so I would submit that in terms of Mr. Anderson,
20   it would apply to him.
21           THE COURT:  Okay.  All right.  *Monell*.
22           MR. POWELL:  Onto the *Monell* issues, Your Honor, the
23   take one take all, I think that's established clearly.  That
24   was a clear, candid statement by the social worker in the home,
25   unadulterated, if you will, no influence of any counsel or

1   anyone else.

2        The failure to train, we believe there is enough

3   evidence to conclude that there is a failure to train when

4   Mrs. Cobbs, who wrote this warrant, said she'd been to two, and

5   then, I was going to save this for closing argument, but she

6   claimed that she'd been to two at a time when she said it was

7   all by Zoom, and the problem is the time that she gave, it's in

8   our notes, was actually before COVID.  So she wasn't -- there

9   wasn't something truthful about that.  I realize that's

10  case-specific and the Court might disagree with me.

11       We may not have made -- crossed the threshold on the

12  practice of lying; however, I was told in no uncertain terms

13  that my other witnesses wouldn't have foundation, that would be

14  Ms. Olivaras in *Santor*.  We had at least three on our list, so

15  we took them off.  If we don't cross the threshold here, I'll

16  be sure to bulk up for the next run.

17       THE COURT:  So that's sort of the first part.  Let's

18  assume that I thought there was enough evidence on the take one

19  take all.  The second part, as set forth on the jury

20  instructions on *Monell* claim, says that the official policy, or

21  in this case, "The widespread or longstanding practice or

22  custom caused the deprivation of the plaintiffs' rights by the

23  defendants, that is that the County's official policy or

24  widespread or longstanding practice or custom is so closely

25  related to the deprivation of the plaintiffs' rights as to be

1    the moving force that caused the ultimate injury."

2          It's the causation issue, I think, that you failed to

3    present evidence.  The take one take all evidence also isn't

4    strong at all.  I'm concerned that as a matter of law there

5    hasn't been any -- or enough evidence of causation to submit it

6    to the jury.  So I want you to address that.

7          MR. POWELL:  Well, Your Honor, I believe there was.

8    It was a longstanding practice, I think we established that.

9    It was still in practice to the day of Ms. Anshutz's depo,

10   May 5, 2023.  It's the reality, and I believe we did present

11   the evidence sufficient, not to mention the woman telling my

12   client that in her home.  So, you know, it is rather hard to

13   come by, and we've already made our record on our difference on

14   the significance of the Perez testimony, so I won't go there.

15         THE COURT:  Again, the question is what's the evidence

16   that it was the moving force behind the removal, the alleged

17   constitutional violation?

18         MR. POWELL:  Because when it's a practice, I submit

19   it's *ipso facto* a moving force.  In this case all children were

20   taken from my client, from Ms. Perez, and one from Mr. Beard as

21   well.  It's a culture.  It's a culture.

22         THE COURT:  So, you're saying N   wouldn't have been

23   removed but for this practice; is that what you are saying?

24   That's what you have to argue, that it was the cause of N

25   being removed?

 1          MR. POWELL:  I believe it is the cause.

 2          THE COURT:  I know you believe a lot of things; how

 3   about giving me the evidence?  Give me the evidence.

 4          MR. POWELL:  Because there was no other basis to

 5   remove N    , Your Honor.  The facts leave nothing but for the

 6   we have to remove them all.  N    was removed after a house had

 7   been emptied of all other children leaving him only to be

 8   touched by his parents, which is a common occurrence.

 9          THE COURT:  So the only reason N    was removed is

10   because of a take-one-take-all policy or practice of the

11   County, that's your argument?

12          MR. POWELL:  No, that would be my argument in the

13   alternative.  The other will be the contemptive social worker

14   theory is what us plaintiffs' counsel call it, contemptive

15   social worker, Your Honor.

16          THE COURT:  What's that?

17          MR. POWELL:  Well, it's all the failure-to-cooperate

18   language, you see.  They didn't cooperate in the TDM, so we

19   took their child.  They failed to cooperate.

20          THE COURT:  Wait, how's that --

21          MR. POWELL:  That's the common phrase.

22          THE COURT:  How's that come under your *Monell* claim?

23          MR. POWELL:  No, you're saying I would be forced -- if

24   I'm understanding you correctly, I would be forced in order to

25   prevail on a *Monell* claim to argue to the jury this is the

 1 but-for cause.

 2          THE COURT:  Right.

 3          MR. POWELL:  And I'm saying certainly I don't have to

 4 do that in the context of a JMOL right now, but the question is

 5 whether we produced sufficient enough evidence that it should

 6 not be determined as a matter of law --

 7          THE COURT:  Right.

 8          MR. POWELL:  -- that we did not show causation by

 9 that, because of that practice.

10          THE COURT:  A reasonable jury would not have a legally

11 sufficient evidentiary basis to find for the party.  So I'm

12 trying to figure out, in the instructions I'm going to give the

13 jury, how there would be a legally sufficient basis for them to

14 find causation here, that the practice that you say of take one

15 take all was the -- was the cause, was the moving force, as the

16 instructions say, was the moving force that led to No    s

17 removal.

18          MR. POWELL:  I mean, we've set the evidence out, Your

19 Honor.

20          THE COURT:  Tell me again.

21          MR. POWELL:  We have Ms. Jones at the house saying it.

22 We now have Ms. Anshutz saying it.  What we have from

23 Mr. Anderson's testimony, I think it's sufficient, a reasonable

24 jury could indeed find it's the moving force.  And I also don't

25 believe -- the Court is expressing it as a "but-for," and I

1    believe the law has loosened up.  It's not a "but-for" anymore.
2    I don't believe that's accurate, but the Court indicated a lot
3    of experience with *Monell*.
4            THE COURT:  Okay.  That leaves the 1983 claims.
5            Mr. Whitefleet.
6            MR. WHITEFLEET:  Yes, Your Honor.  I would -- just one
7    thing more on *Monell* in terms of the moving force.  I don't
8    think there's been any evidence that Ms. Cobbs sought the TDM
9    and to staff this case with other people because she thought
10   all the children needed to be removed.  There's no evidence
11   that she was motivated by some sort of practice.  And I think
12   there's been plenty of testimony from Mr. Anderson and others
13   that the assessment of each individual child -- and, of course,
14   this child was only -- there was only one removed here in this
15   case by warrant.
16           On the 1983 matter --
17           THE COURT:  Hang on.  Off the record.
18       (Discussion is held off the record.)
19           THE COURT:  Back on the record.
20           MR. POWELL:  I wanted to respond to that comment by
21   Mr. Whitefleet.  Ms. Anshutz also discussed that safety plans
22   are a removal.  I mean, there seems to be a lot of dancing
23   around the term "removal," and this jury could easily infer
24   that removal is children separated from parents.  And I don't
25   care how you do it, that's a removal.

1          THE COURT:  You keep using "parents."  In this case it

2    was "parent."  They were removed from the mom, but they were

3    given to the dads.

4          MR. POWELL:  No, on those kids over there, yeah.  And

5    my client here --

6          THE COURT:  Right, there was a removal of N(  .  No

7    one's disputing that.  That was done by warrant.

8          MR. POWELL:  But is there a legitimate dispute that

9    the other kids were removed from mom, and that as a result all

10   of them were removed?

11         THE COURT:  You keep using the word "parents," though.

12   The kids weren't removed from their "parents," plural.  It's

13   just the word you're using.  They were definitely removed from

14   the mom, right.  No one's disputing that.

15         MR. POWELL:  I saw what I felt was hairsplitting not

16   from Your Honor but counsel on the word "removal."

17         THE COURT:  Okay.  Mr. Whitefleet, the 1983 claims.

18         MR. WHITEFLEET:  Yes.  Thank you, Your Honor.

19         So addressing the judicial deception claim under the

20   Fourth and Fourteenth Amendment, we would submit that plaintiff

21   has failed to prove that, particularly as to Mr. Anderson and

22   Ms. Jones, who did not draft the warrant, that they

23   misrepresented anything in the warrant, since they didn't draft

24   it, or made material omissions.

25         THE COURT:  Stop there for a second.

1          Mr. Powell, I had the same question just with respect

2     to Ms. Jones.  What is the evidence as to Ms. Jones with

3     respect to your judicial deception and deliberate fabrication

4     claims?

5          MR. POWELL:  Your Honor, we have a participatory

6     instruction in there.

7          THE COURT:  Just Ms. Jones, yeah.  What's the

8     evidence?

9          MR. POWELL:  She participated in the investigation

10    from start to finish other than signing the warrant.  She was

11    at the TDM --

12         THE COURT:  Okay.

13         MR. POWELL:  -- and the following TAP.  That's in the

14    records.

15         THE COURT:  Okay, but this is unreasonable seizure by

16    judicial deception.

17         MR. POWELL:  Understood.

18         THE COURT:  The argument that the social workers

19    deceived the judge, there's only one social worker that wrote

20    the warrant, and I know Mr. Anderson testified that he has to

21    look at the warrant.

22         I'm focused only on Ms. Jones.  What is the evidence

23    against Ms. Jones that she should -- the jury should decide

24    whether she's liable for judicial deception or deliberate

25    fabrication?

95

1          MR. POWELL:  Because of her participation in it, kind

2    of like the *Boyd v. Benton* theory of participation.  We have an

3    instruction in there.  The Court made the determination there's

4    enough to hold that participation, where the actor doesn't have

5    to have actually committed the constitutional violations

6    themselves.

7          THE COURT:  Well, she didn't, right?

8          MR. POWELL:  Yeah, but they participated in it, and

9    she is in it all but for -- using "but-for" again -- the

10    signature on the warrant application.

11          THE COURT:  She had nothing to do with the warrant,

12    right?

13          MR. POWELL:  No, she did, because the facts that are

14    in the warrant come -- if you look at the delivered service

15    logs, they come, and those that are avoided as well, come from

16    Ms. Jones or --

17          THE COURT:  But the deception is in the warrant

18    itself.

19          MR. POWELL:  I understand the argument, Your Honor.

20          THE COURT:  So how can you hold Ms. Cobbs [sic] liable

21    for something she had nothing to do with?

22          MR. POWELL:  Well, that's the thing, it's the "nothing

23    to do with" I don't agree with.

24          THE COURT:  She didn't draft it.  She didn't present

25    it to the Court.  She didn't do any of that.

1          MR. POWELL:  Right, I understand the Court takes the

2   view she didn't draft it, didn't present it.

3          THE COURT:  I'm not taking a "view," we're talking

4   about evidence.

5          MR. POWELL:  The evidence, understood.

6          THE COURT:  Okay.  Is there legally sufficient

7   evidence that the jury could find for the plaintiffs with

8   respect to Ms. Jones on those two claims?

9          MR. POWELL:  I'm not sure there is, Your Honor.  I'll

10  let you decide.

11         THE COURT:  Well, if that's your argument, okay.

12         MR. POWELL:  That's my argument.

13         THE COURT:  All right.

14         MR. WHITEFLEET:  And I didn't get to the deliberate

15  fabrication issue, Your Honor, but I would also submit that

16  plaintiffs have waived that.  There's no jury verdict form, no

17  jury instruction on deliberate fabrication as to any defendant.

18         THE COURT:  So why don't I have a jury instruction on

19  that?

20         MR. POWELL:  That I don't know because Mr. Park put

21  those together.  I believed we had one.  I would ask for the

22  opportunity to submit it.

23         THE COURT:  That doesn't help me at this stage.  It

24  may be redundant.  How is deliberate fabrication not subsumed

25  in your judicial deception claim?

1        MR. POWELL:  I have to agree, I think it is subsumed

2    in judicial deception.  Judicial deception, in fact, is

3    broader.

4        THE COURT:  Okay.  I definitely agree.  The second

5    claim is already confusing enough.  So I'm going to find that

6    the second part of this second claim for relief, which I call

7    2(b), is subsumed in the first claim for relief, incorporated

8    into the first claim for relief.  So whatever jury instructions

9    we have for the first claim, I'll take that in mind.  But the

10   second claim, second part is subsumed in the first claim, and

11   that's how it would appear on the verdict form.

12        So let's focus, then, on -- I think, Mr. Whitefleet,

13   there's been enough evidence with respect to Ms. Cobbs and

14   Mr. Anderson on the first claim.  Anderson only in his role as

15   a supervisor, and there will be a supervisor instruction.

16        MR. WHITEFLEET:  May I be heard on that?

17        THE COURT:  Yeah, I want you to be heard, but I think

18   there's enough that the first claim can go to the jury.  Go

19   ahead.

20        MR. WHITEFLEET:  So, with regard to Mr. Anderson, the

21   testimony has been that he reviewed the warrant and approved it

22   prior to it being submitted.  I would submit to Your Honor that

23   that's not a Fourth Amendment violation.  That's not a judicial

24   deception claim merely because a supervisor says "this warrant

25   appears to be fine," not without any evidence that Mr. Anderson

1    was aware of some facts that should have been in there and were

2    not, or that there were some express misrepresentations.

3    There's been no evidence of that.

4         Regardless, I think qualified immunity would apply to

5    a supervisor who merely just approves of a warrant and because

6    there was an absence of this evidence of deliberately or with

7    reckless disregard for the truth of the contents of the

8    warrant.

9         THE COURT: Okay. What about the second claim for

10   relief, the familial association?

11        MR. WHITEFLEET: So, we would submit, Your Honor, that

12   as to -- particularly as to Mr. Anderson and Ms. Jones, this

13   requires the shock-the-conscience standard. There's simply

14   no -- there's insufficient evidence to submit this to a jury

15   that these defendants shocked the conscience in determining to

16   obtain a warrant.

17        I would submit in terms of Ms. Cobbs, the plaintiff

18   would have to prove the underlying judicial deception first in

19   order to prove the substantive process. But I don't think

20   there's been -- I don't think there's sufficient evidence to go

21   to a jury in terms of shocking the conscience because she, in

22   fact, used that process.

23        Otherwise, I would submit qualified immunity would

24   apply to this particular claim.

25        THE COURT: Okay. Third claim is procedural due

1 | process.

2 | MR. WHITEFLEET:  So our position with this, Your

3 | Honor, is because, as a matter of law, the state court process

4 | exists under the cases cited in the defendant's trial brief on

5 | Page 6, Lines 11 through 22, that that procedural due process

6 | has been afforded.  And I believe the testimony here at trial

7 | supports that, that these parents, plaintiffs, and the child

8 | were afforded due process via the state process.

9 | Otherwise, I would note that there's no jury

10 | instruction submitted by plaintiff for it, no verdict form.

11 | THE COURT:  Okay, and then the fourth claim has been

12 | dismissed.  That covers the remaining claims.

13 | Mr. Powell, do you want to respond primarily to the --

14 | let's start with the procedural due process claim.

15 | MR. POWELL:  Yes, Your Honor.  I don't think we can

16 | make a procedural due process claim.  The process was followed.

17 | THE COURT:  Okay.  So the third claim for relief is

18 | dismissed.

19 | MR. POWELL:  I apologize, Your Honor, I know I spoke

20 | with my law school graduate paralegal, and I think we had

21 | talked about dropping the PDP a long time ago, so I apologize.

22 | THE COURT:  Okay.  So on the first claim and the

23 | second claim, tell me why those should go forward.

24 | MR. POWELL:  They should go forward because it's not a

25 | shocks-the-conscience standard when you have time to

1   deliberate.  It's basically a deliberate indifference standard;

2   it's not a shocks the conscience.  That's a critical element

3   difference between the *Lewis v. Sacramento.*  I believe that

4   started this whole argument where it shocks the conscience, the

5   leaning out of a police officer vehicle and shooting at a

6   fleeing suspect.  This is just not that setting; it's the

7   lesser standard of deliberate indifference.

8        I think we've given very sufficient evidence on

9   judicial deception as a violation of these parties' Fourth and

10   Fourteenth Amendment rights.

11        THE COURT:  And it was done with deliberate

12   indifference?

13        MR. POWELL:  Yeah, they had time.  They had time to do

14   something other than run out of the TDM and start dropping the

15   nuclear bomb.  I think that's what the evidence shows, just to

16   keep it in context.

17        THE COURT:  Mr. Whitefleet, anything further on any of

18   the claims?

19        MR. WHITEFLEET:  Just a comment on that.

20        The standard is shocks the conscience.  I recognize

21   that in the way the Courts have analyzed "shocks the

22   conscience."  They recognize that there can be deliberate

23   indifference that meets that standard, but it's, nonetheless,

24   still under that rubric of "shocks the conscience."

25        THE COURT:  Okay.  Here's what I'm going to do:  We

1   all need a short break.  I'm going to take the motion under

2   submission.

3        I want you to put on your witnesses, Mr. Whitefleet,

4   so we can finish your case.

5        Then we'll come back -- dismiss the jury, and we'll

6   come back on the motion, assuming you all renew it at the time

7   of the close of your case, and I'll take it up then in terms of

8   the Court's ruling.

9        Let the jury know we'll bring them back in about

10  12:15, and then I anticipate we won't finish with witnesses

11  today.  Everybody okay with that?

12        MR. POWELL:  Yes.

13        THE COURT:  All right.  See you in about 15.

14     (Recess taken 12:01 p.m. to 12:24 p.m.)

15        THE CLERK:  Please come to order.  Court is back in

16  session.

17        THE COURT:  Bring in the jury.

18     (In open court in the presence of the jury.)

19        THE COURT:  All jurors present, all parties present.

20        Mr. Whitefleet, you may call your first witness.

21        MR. WHITEFLEET:  Thank you, Your Honor.  Some

22  housekeeping issues first.  I'd like to move into evidence

23  based on judicial notice, Exhibits A-30 -- excuse me, sorry,

24  A-31.

25        THE COURT:  Hang on.  B and C are in, right?

1          THE CLERK:  Yes.

2          MR. WHITEFLEET:  Yes.

3          THE COURT:  So A, what now?

4          MR. WHITEFLEET:  A-31 and A-32.

5          THE COURT:  A-31 and A-32 are Superior Court records

6    on judicial notice.

7          A-31 and A-32 are admitted.

8       (Defendants' Exhibit A-31 admitted in evidence.)

9       (Defendants' Exhibit A-32 admitted in evidence.)

10         MR. WHITEFLEET:  A-40.

11         THE COURT:  I thought that was in already.

12         MR. WHITEFLEET:  So this is the signed, court-stamped

13   version.

14         THE COURT:  Was there one -- did we admit that in

15   another exhibit?

16         MR. WHITEFLEET:  I don't believe the court-stamped

17   version was.

18         MR. POWELL:  That was the issue, you recall, Your

19   Honor, no stamp and no signature.

20         THE COURT:  A-40.

21         MR. POWELL:  Even though we got them from the same

22   source.

23         THE COURT:  A-40 is admitted.

24      (Defendants' Exhibit A-40 admitted in evidence.)

25         THE COURT:  What were the other two?

1          MR. WHITEFLEET:  A-31 and A-32.

2          THE COURT:  Okay.

3          MR. WHITEFLEET:  Now A-41.

4          MR. POWELL:  Your Honor, can I request a sidebar when

5     this is done?

6          THE COURT:  Yes.

7          MR. POWELL:  Thank you.

8          THE COURT:  A-41, that's the Detention Report, that's

9     admitted.

10         (Defendants' Exhibit A-41 admitted in evidence.)

11         MR. WHITEFLEET:  A-42, Order of Detention.

12         THE COURT:  That's Exhibit A-42, that's admitted.

13         (Defendants' Exhibit A-42 admitted in evidence.)

14         MR. WHITEFLEET:  A-45, Findings and Orders on the

15     warrant.

16         THE COURT:  Okay.  Exhibit A-45 is admitted.

17         (Defendants' Exhibit A-45 admitted in evidence.)

18         MR. WHITEFLEET:  A-47, the Jurisdiction Report, and

19     yes, there may be -- I think there was a version that was

20     submitted earlier, but this is the signed version that has all

21     the attachments that were filed with the Court.

22         THE COURT:  A-47 is admitted.

23         (Defendants' Exhibit A-47 admitted in evidence.)

24         MR. WHITEFLEET:  And A-49, Disposition Report.

25         THE COURT:  A-49 is admitted.

1           (Defendants' Exhibit A-49 admitted in evidence.)

2               THE COURT:  Sidebar -- are there others?

3               MR. WHITEFLEET:  That's it, Your Honor.

4               THE COURT:  All right.  Sidebar.

5           (At sidebar off the record.)

6               MR. WHITEFLEET:  Defense calls David Granados.

7               THE COURT:  Mr. Granados.

8               DAVID GRANADOS, DEFENDANTS' WITNESS, SWORN

9               THE CLERK:  You may be seated.  Please say and spell

10  your whole name for the record.

11              THE WITNESS:  David Granados, D-A-V-I-D,

12  G-R-A-N-A-D-O-S.

13              THE CLERK:  Thank you.

14              THE COURT:  All right.  Go ahead.

15                          DIRECT EXAMINATION

16  BY MR. WHITEFLEET:

17  Q    Okay.  Mr. Granados, how old are you?

18  A    I am 45.

19  Q    And starting with your undergraduate degree, please tell

20  the jury what your education is.

21  A    I have a bachelor's in general studies specializing in

22  sociology and Spanish.  I also have a master's in social work.

23  Q    When did you obtain that master's in social work?

24  A    2012.

25  Q    When were you hired by the County of Stanislaus?

Granados - Direct by Whitefleet

1   A    I started December 2016.

2   Q    And what was your position that you were hired into?

3   A    As a court officer in the Court Unit.

4   Q    Did you have any prior employment that you believed helped

5   you in your position as a court officer with the County of

6   Stanislaus?

7   A    Social worker related, I worked for the Washoe tribe in

8   Nevada and California prior, and I also served in the Peace

9   Corps for two years.

10  Q    What did you do for the Washoe tribe?

11  A    Last position I had was a site manager for their native --

12  Temporary Assistance for Needy Families Program.

13  Q    So tell the jury what you -- strike that.

14       In July 2019 through October 2019, were you still a court

15  officer?

16  A    Yes.

17  Q    And did you have a particular position in that as a court

18  officer?

19  A    In the Court Unit I was a court officer.  We work in

20  teams.  My counterpart was the placement specialist.

21  Q    And who was that?

22  A    Shari Johnson.

23  Q    And so what did you do as a court officer?

24  A    I would write the court reports, primarily, and then also

25  work with the parents.

Granados - Direct by Whitefleet

1  Q   Are you involved in the pre-removal process?

2  A   No.

3  Q   All your job is in connection with post-removal court

4  process?

5  A   Correct.

6  Q   All right.  Generally, what is that court process that

7  you're aware of?

8  A   As I understand it, after removal I'm given a TAP form,

9  and I have to draft that petition, the Detention Report, to

10 file with the court.

11 Q   What is a Detention Report?

12 A   A Detention Report, it has a summary of the ER

13 investigation.  It has the parties involved.  It has like

14 contact info for the social workers.  It has the agencies'

15 efforts in finding a placement home and few other things.

16 Q   What is the purpose of a Detention Report?

17 A   It's to inform the court and I guess all parties involved,

18 kind of the summary of why we're -- why there was a removal.

19 Q   I think you may have skipped a process.  Before you get to

20 the Detention Report, is there something that you file with the

21 court?

22 A   Initially, the Petition Report is filed first.  That kind

23 of triggers the court process.

24 Q   That's called what?

25 A   A Petition Report.

107

Granados - Direct by Whitefleet

1    Q    Take a look at A-40 for me.  Is that a Petition Report?

2    A    Yes.

3    Q    Is that what you filed in this case?

4    A    Yes.

5    Q    What do you base the Petition Report off of?

6    A    It's based off the initial investigations, our log notes

7    and delivery service logs.

8    Q    And what is the first hearing that occurs after the

9    petition is filed?

10   A    The detention hearing.

11   Q    Okay.  And you prepare that Detention Report in advance of

12   the detention hearing?

13   A    Correct.

14   Q    How do you go about preparing the Detention Report?

15   A    The Detention Report is also information from the delivery

16   service logs from the ER investigation.

17        THE COURT:  Mr. Whitefleet, given the stipulations in

18   this case, I'm not sure we need to go in any great detail with

19   respect to his involvement or the preparation of these reports.

20        MR. WHITEFLEET:  I don't plan to.

21        THE COURT:  Okay.

22        MR. POWELL:  Your Honor, I also need to object based

23   on the sidebar, that we need a ruling on --

24        THE COURT:  Well, I'm overruling the objection, I'll

25   put it on the record as to why.

Granados - Direct by Whitefleet

1    MR. POWELL:  Okay.

2  BY MR. WHITEFLEET:

3  Q    Take a look at A-41.  Is that your Detention Report you

4  filed in this case?

5  A    Yes, it is.

6  Q    So when you said you looked at the logs, generally, just

7  tell me what the process is that you're doing that goes into

8  this Detention Report.

9  A    I looked at the logs, I also look at the child welfare

10  history, so the history referrals, so that's included in the

11  Detention Report also.

12  Q    So are you lifting the log information or are you

13  summarizing them?

14  A    It's summarizing.

15  Q    Okay.  When you do that, do you do your own investigation?

16  A    No.

17  Q    So what -- are you relying on just what's in the logs?

18  A    Just what's in the logs.

19  Q    Do you interview any other social workers?

20  A    No.

21  Q    So what is the -- what was the outcome of this detention

22  hearing, if you know?

23  A    As I recall, the initial hearing I wasn't present for.  It

24  was continued, and I attended the second detention -- the trial

25  detention hearing.

Granados - Direct by Whitefleet

1  Q    And what happened then?

2         MR. POWELL:  Objection, vague, overbroad.

3         THE COURT:  It happened on August 2; is that what

4  you're asking?

5  BY MR. WHITEFLEET:

6  Q    What happened at the continued detention hearing?

7         THE COURT:  Overruled.  Go ahead.

8         THE WITNESS:  The Court, I don't know the legal term,

9  but the Court agreed with the reports, recommendations and a

10  Jurisdiction Report was set in the future.

11  BY MR. WHITEFLEET:

12  Q    Take a look at A-42.  Is that the -- did you receive a

13  copy of that order at some point?

14  A    The Order of Detention, yes.

15  Q    Okay.

16         THE COURT:  I misspoke, it's July 29.

17         Go ahead.

18  BY MR. WHITEFLEET:

19  Q    Did you draft this order?

20  A    No.

21  Q    That came from the court, as far as you know?

22  A    As far as I know, I think our EC submits it and then a

23  court will sign it or stamp it.

24  Q    Who was the judge that you were appearing for for this

25  detention hearing?

Granados - Direct by Whitefleet

1   A    Judge Ameral was the judge.

2   Q    So what's the next step in the process after the detention

3   hearing?

4   A    As far as court reports?

5   Q    Yes, for what you do.

6   A    So, in this case a jurisdictional report -- usually in our

7   county we combine jurisdiction disposition hearings and

8   reports.  In this case they split it up as a jurisdiction-only

9   report and then a disposition-only report.

10  Q    Is there anything that you do in between the detention

11  hearing and submitting the jurisdictional report?

12  A    Evaluating and assessing the family, the parents.

13  Q    So did you do that in this case?

14  A    Yes.

15  Q    What happened?

16  A    Parents got -- we gave them like -- well, we call them

17  "referrals" in the Court Unit, but they're just like service

18  providers to help the family if there's any issues.  I know

19  they do have drug and alcohol tests through this agency also.

20  Q    At this point is it court ordered?

21  A    It's voluntary.

22  Q    So you arranged for both Shane and Hilda to voluntarily

23  start services?

24  A    Yes.

25  Q    What services were they?

Granados - Direct by Whitefleet

1    A    Parenting, counseling.

2    Q    So then what do you do to prepare a jurisdictional report?

3    A    As I understand, the Jurisdiction Report is -- we have to

4    present the allegations and present the kind of proof of the

5    allegations, so in this case I think we attached service logs,

6    et cetera.

7    Q    So what's your process in terms of preparing the

8    jurisdictional report?

9    A    Once again, kind of review the current situation, but

10   also, you have to sustain the initial allegations in the

11   petition.

12   Q    So for this particular Jurisdiction Report -- you can turn

13   to A-47.  Does this report contain more or less detail than

14   what you had summarized from the logs in the Detention Report?

15        MR. POWELL:  Objection, Your Honor, document speaks

16   for itself.

17        THE COURT:  Sustained.

18   BY MR. WHITEFLEET:

19   Q    What's your purpose on the Jurisdiction Report?

20   A    To sustain the allegations petition and ask for a

21   disposition hearing.

22   Q    So in preparing your report, when you summarize each

23   service for the service logs, how much detail are you putting

24   in there?

25        MR. POWELL:  Objection, vague and ambiguous.

Granados - Direct by Whitefleet

1      THE COURT:  Sustained.  Also not -- I don't see the
2  relevance.
3  BY MR. WHITEFLEET:
4  Q    Okay.  In this case you had said that the jurisdictional
5  hearing and dispositional hearing was combined.  What is a
6  dispositional hearing?
7  A    That's where the agency has the recommendations for the
8  family and for the court.  Also, the report itself has kind of
9  a summary of the parents' progress and services and our
10 assessment.
11 Q    Okay.  And you prepared that as well?
12 A    Yes.
13 Q    Turn to 49.  Is that your disposition report?
14 A    Yes.
15 Q    So what goes in -- and you also, you're summarizing the
16 service logs?
17      MR. POWELL:  Objection, Your Honor, leading.
18      THE COURT:  Document speaks for itself, too.
19 BY MR. WHITEFLEET:
20 Q    Okay.  What are the attachments, generally, in the
21 dispositional hearing report?
22 A    Additional service logs -- just like in general or this
23 case specifically?
24      Well, for this case I don't recall specifically, but
25 generally, just service logs, any outcomes from the

Granados - Direct by Whitefleet

1   assessments, anything that a counselor may have provided, like

2   a summary or an update.

3   Q    Do you remember when that jurisdictional/disposition

4   hearing occurred in this case?

5   A    Sometime in October.

6   Q    Take a look at A-31 and 32.

7        THE COURT:  What's "RFA" stand for?

8        THE WITNESS:  Resource Family Approval.

9        THE COURT:  Okay.  Thank you.

10  BY MR. WHITEFLEET:

11  Q    Do you see those Minute Orders dated October 8, and it

12  says you are the social worker there?

13  A    Yes.

14  Q    Does that help refresh your memory that it was October 8?

15  A    Yes.

16  Q    What is your recollection of what happened on that -- what

17  was the result of that hearing, if you recall?

18  A    I think all parties agreed on Court FM for the family.

19  Q    What was the decision of the Court?

20  A    The Court agreed on that recommendation and gave

21  Stanislaus County jurisdiction over the minor while the family

22  had Court approved FM.

23       THE COURT:  The court approved what?

24       THE WITNESS:  Family Maintenance service.

25

Granados - Cross by Powell

1   BY MR. WHITEFLEET:

2   Q    The Court also adjudicated N    a ward of the Court?

3   A    Yes.

4        MR. WHITEFLEET:  That's all I have, Your Honor.

5        THE COURT:  Cross.

6        MR. POWELL:  Thank you, Your Honor.

7                         CROSS-EXAMINATION

8   BY MR. POWELL:

9   Q    Hello, Mr. Granados.

10  A    Good afternoon.

11  Q    If I understood your testimony, the purpose of the

12  Jurisdiction Report that you write is to sustain the

13  allegations, right?

14  A    As I understand, yes.

15  Q    What was that, that's your understanding?

16  A    Yes.

17  Q    Do you know what the term "cherrypicking" means,

18  generally?

19       MR. WHITEFLEET:  Objection, vague.

20       THE COURT:  He's just asking if he understands.

21       THE WITNESS:  I think so.

22  BY MR. POWELL:

23  Q    How would you describe it when it comes to in the context

24  of looking through delivered service logs and then transferring

25  information from there into reports?

Granados - Cross by Powell

1          MR. WHITEFLEET:  Objection, lacks foundation.

2          MR. POWELL:  Just following up on the definition, Your
3     Honor.

4          THE COURT:  Overruled.

5          Go ahead, you can answer it if you understand it.

6          THE WITNESS:  Legal, I don't know.  But, like,
7     cherrypicking kind of in general is like you just pick only the
8     best things and leave the other stuff behind.

9     BY MR. POWELL:

10    Q    The things that support your position, and by that, sir, I
11    don't mean David Granados necessarily, but the agency, correct?

12    A    Is that a question for me?

13    Q    Let me try it again.  I think we're clear on
14    cherrypicking.  I'm asking you what that means in the context
15    of what you're doing, preparing petitions and Detention
16    Reports.  If you're cherrypicking, that would mean you're
17    picking things that are favorable to the agency's position of
18    making the cases stick, correct?

19         MR. WHITEFLEET:  Objection, argumentative, lacks
20    foundation, assumes facts, compound.

21         THE COURT:  Overruled.

22         Is that correct?

23         THE WITNESS:  That is not correct.

24    BY MR. POWELL:

25    Q    Okay.  So, are you under any kind of a requirement, that

116

Granados - Cross by Powell

1  you're aware of, to put in things that are contrary to the

2  proposition that a case should be maintained against the

3  parents?

4  A    Can you repeat that?

5  Q    Yeah.  Are you trained that you are required, at that time

6  in 2019, to include information that you glean from the

7  delivered service logs that would be contrary to the

8  proposition that your agency needs to be involved with the

9  family?

10 A    No.

11 Q    Now, you were asked about starting services with parents,

12 and in this case these parents, right?

13 A    Yes.

14 Q    Okay.  Now, that's your mandate, right, your mandate is to

15 start services with parents, to the extent you can, as soon as

16 they -- as soon as you make contact with them, correct?

17        MR. WHITEFLEET:  Objection, vague as to "mandate," to

18 the extent it calls for legal conclusion.

19        THE COURT:  Sustained.

20        Rephrase.

21 BY MR. POWELL:

22 Q    Based on your training, is it your understanding you're

23 required to attempt to start services for parents once they've

24 come into the system?

25        MR. WHITEFLEET:  I'll object as "required" is vague,

Granados - Cross by Powell

1    calls for a legal conclusion.

2              THE COURT:  Overruled.

3              THE WITNESS:  Answer that?

4              THE COURT:  Yes, go ahead.

5              THE WITNESS:  From my position, every detention

6    hearing, that's when parents would receive their referrals of

7    service.

8    BY MR. POWELL:

9    Q    That's what you tend to do in your position?

10   A    Yes.

11   Q    That's regardless of whether the parents say they want

12   them or not, you're supposed to offer them to them, correct?

13   A    Correct.

14   Q    Now, I believe you said something in your testimony

15   earlier, there's really no proof of the allegations provided in

16   any of the reports to the Court until the Jurisdiction Report,

17   which in this case is Exhibit A-47; did I hear you right?

18             MR. WHITEFLEET:  Objection, misstates testimony.

19             THE COURT:  Is that right?

20             THE WITNESS:  Well, the detention hearing, that

21   Detention Report has no service logs attached, not until

22   jurisdiction or dispo.

23   BY MR. POWELL:

24   Q    Does the detention hearing have the warrant application in

25   2019 attached?

Granados - Cross by Powell

1   A    I don't think so, no.

2   Q    I didn't see it in the Jurisdiction Report either.  Is

3   there a reason the warrant application is not included in the

4   Jurisdiction Report?

5   A    I believe it's already given to the Court.  I've never

6   filed a warrant or a copy of the warrant.

7   Q    Meaning you've never attached it to any of the reports

8   that you write; that's what you meant?

9   A    Right, correct.

10  Q    Mr. Whitefleet used the term "lifting," and I think he

11  might have been referring to cutting and pasting.  Do you ever

12  cut and paste from delivered service logs into the reports that

13  you write?

14  A    Yes, I have, and summarize it.  I clean it up if there's a

15  spelling and names that shouldn't be there, like, you know,

16  that are not part of the party, et cetera.

17  Q    And you're not required, based on your training, to verify

18  a single fact that you cut and paste into your reports, and by

19  that I mean all of them:  Detention, Jurisdiction, Disposition;

20  is that correct?

21          MR. WHITEFLEET:  Objection, compound, overly broad,

22  vague.

23          THE COURT:  Overruled.

24          Go ahead.  You can answer.

25          THE WITNESS:  I assume it's accurate information in

Granados - Cross by Powell

1   the logs.

2   BY MR. POWELL:

3   Q    That wasn't my question.

4        You're not required in any way, shape or form, based on

5   your training, to confirm anything that you have taken from

6   delivered service logs and put into any of the subsequent

7   reports, right?

8            MR. WHITEFLEET:  Same objections.

9            THE COURT:  Overruled.

10           THE WITNESS:  No.

11  BY MR. POWELL:

12  Q    Meaning correct?

13  A    Well, not that I recall.  Like maybe training

14  specifically.

15  Q    Okay.  And that's true of the petition, right, you're not

16  required to verify anything that you're getting from these

17  delivered service logs in order to put it in the petition,

18  correct?

19  A    Correct.

20  Q    And yet you signed that under oath, right?

21  A    Yes.

22  Q    Now, at the disposition hearing -- strike that.  My bad.

23       At the jurisdiction hearing -- actually, let me ask you

24  sir:  Do you recall what the name is of the hearing where the

25  child was returned, literally, physically to Mr. Beard?

Granados - Cross by Powell

1   A    I think they combined it to the jurisdiction disposition
2   hearing.
3   Q    And you called that October 8 in terms of when that
4   occurred?
5   A    I believe so, yes.
6   Q    Do you recall if anybody took the stand during that
7   proceeding?
8   A    I only recall from this current trial that someone took
9   the stand.
10  Q    It reminded you?
11  A    Yes.
12  Q    And that was Mr. Beard, right?
13  A    From what I learned from this trial, yeah.
14  Q    So then I'm going to ask you, generally, and then specific
15  to this case, in the course of -- strike that.
16       Negotiations break out from time to time during juvenile
17  dependency matters between all the sides, correct?
18           MR. WHITEFLEET:  Objection, incomplete hypothetical,
19  irrelevant, vague.
20           THE COURT:  Overruled.
21           THE WITNESS:  I know parties talk as far as lawyers --
22  the lawyers, et cetera.
23  BY MR. POWELL:
24  Q    So I just want to find out, are you generally part of
25  that?

Granados - Cross by Powell

1   A    I can't recall -- I mean, in general, yes.  The social
2   worker is part of that.

3   Q    So then the next question is about this case.  Do you
4   recall being part of any negotiation after Mr. Beard stopped
5   testifying?

6   A    I don't remember.

7   Q    I think I have a couple more, sir.

8        Can you estimate for me, and, sir, just, like, a range is
9   good, how many times you've been in a juvenile dependency
10  proceeding where the juvenile court is going to make a decision
11  on some recommendation that's included in one of your reports;
12  ballpark, lowest to highest?

13  A    Like the JD reports or the detention --

14  Q    Every time when you're in court there's a report that
15  you've written, and the Court's going to make a decision about
16  a recommendation that you've written even if it came from
17  others above you?

18            MR. WHITEFLEET:  It's overly broad.

19            THE COURT:  Sustained.

20  BY MR. POWELL:

21  Q    How many times have you been in court on a Jurisdiction
22  Report -- strike that.

23       Jurisdiction Reports, they always have some type of
24  recommendation, what they want the Court to rule, correct?

25  A    Yes.

Granados - Cross by Powell

1    Q    Okay.  So let's just focus on that first.

2         How many times, by the time October of 2019 comes around,

3    had you been in a court hearing on a Jurisdiction Report and

4    there's a recommendation that the agency has made, best

5    estimate?

6    A    You know, I don't know because usually we have combined.

7    So if it's jurisdiction only, maybe five or six a year.

8    Q    Okay.  So combined is the course it normally goes?

9    A    Yes.

10   Q    Let's focus on that, then.  How many times in the 2019

11   time frame on average in a year would you be at a juris dispo

12   hearing where there's recommendations before the Court?

13   A    I would say at least a dozen.  Minimum, like once a month,

14   maybe more.

15   Q    Okay.  And isn't it true that the -- in that case you were

16   in front of Judge Ameral, correct?

17   A    Yes.

18   Q    Do you know who signed the warrant application in this

19   case?

20   A    No.

21        MR. POWELL:  I'd like to give him the binder, Your

22   Honor, if I may.

23        THE COURT:  He doesn't know, so why give him the

24   binder if it's not going to help him?

25

Granados - Cross by Powell

1   BY MR. POWELL:

2   Q    Are you familiar with Judge Freeland?

3   A    No.

4   Q    All right.  So let me ask you, on these jurisdiction

5   disposition hearings that you've been to, is it accurate to say

6   that the Court agrees with the recommendation of CFS

7   approximately 10 percent of the time -- I'm sorry, disagrees

8   with the recommendations in your reports approximately

9   10 percent of the time?

10          MR. WHITEFLEET:  Objection, relevance.

11          THE COURT:  Sustained.

12  BY MR. POWELL:

13  Q    Would you say whatever the agency recommends, it generally

14  rules the day?

15          MR. WHITEFLEET:  Objection, overly broad, incomplete

16  hypothetical.

17          THE COURT:  Sustained.

18          MR. WHITEFLEET:  Calls for speculation, relevance.

19          THE COURT:  Sustained.

20          MR. POWELL:  I have nothing further, Your Honor.

21          THE COURT:  Anything further?

22          MR. POWELL:  Forgive me, Your Honor, I do have one.

23          THE COURT:  Go ahead.

24  BY MR. POWELL:

25  Q    Sir, do you know, from your time in that Court Unit, what

Granados - Redirect by Whitefleet

1   the legal standard is that the juvenile court is applying when

2   it's reviewing the petition allegations and making a decision

3   about whether to further detain the children?

4   A    Do I know the legal term?

5   Q    Yes.

6   A    I always hear them say -- I don't know if I'm going to say

7   this right -- prima facia, "facia."

8   Q    Close.  Were you trained on what that means?

9   A    No.

10           MR. POWELL:  Nothing further.

11           THE COURT:  Mr. Whitefleet.

12           MR. WHITEFLEET:  Thank you, Your Honor.

13                     REDIRECT EXAMINATION

14   BY MR. WHITEFLEET:

15   Q    The delivered service logs that you're summarizing in both

16   the Jurisdictional Report and the Detention Report, those are

17   actually provided to counsel for the parents of the child at

18   some point during the process, yes?

19   A    Counsel receives discovery at detention.

20   Q    What does discovery consist of?

21   A    Initial referral and copy of the service logs.

22   Q    The entire service logs?

23   A    The same logs I'm using.

24           MR. WHITEFLEET:  Thank you.

25           THE COURT:  All right.  You may step down.

Granados - Recross by Powell

1          MR. POWELL:  Wait, Your Honor.  I have one follow-up

2     on that.

3          THE COURT:  Go ahead.

4                    RECROSS-EXAMINATION

5     BY MR. POWELL:

6     Q    Did you just say they were provided to counsel?

7     A    Yes.

8     Q    Isn't it true the majority of the counsel in the juvenile

9     dependency system in Stanislaus County, they're court-appointed

10    attorneys, correct?

11         MR. WHITEFLEET:  Objection, relevance, vague.

12         THE COURT:  Sustained.

13         MR. POWELL:  Pardon me, Your Honor?

14         THE COURT:  Sustained.  It doesn't matter if they're

15    court appointed.

16    BY MR. POWELL:

17    Q    Are you aware of any provision whereby the delivered

18    service logs are provided to the parents at the detention

19    hearing?

20    A    No.

21         MR. POWELL:  Thank you.

22         THE COURT:  Okay, now you can step down.

23         Next witness.

24         MR. WHITEFLEET:  Defense calls Shari Johnson.

25       (Witness is excused.)

Johnson - Direct by Whitefleet

1    THE CLERK:  Thank you, you may be seated.  Please say

2    and spell your whole name for the record.

3    THE WITNESS:  Shari Johnson, S-H-A-R-I, Johnson,

4    J-O-H-N-SO-N.

5    THE CLERK:  Thank you.

6    SHARI JOHNSON, DEFENDANTS' WITNESS, SWORN

7    DIRECT EXAMINATION

8    BY MR. WHITEFLEET:

9    Q    Ms. Johnson, how old are you?

10   A    Fifty-eight.

11   Q    And do you have any kids?

12   A    Yes, four.

13   Q    What are their ages?

14   A    Thirty-two, 30, 25 and 22.

15   Q    When did you start with Stanislaus County?

16   A    In 2015.

17   Q    Prior to that, where did you get your undergraduate

18   degree?

19   A    I actually got my AA in JC, I got my bachelor's at CSU

20   Stan and my master's at Stan State as well in 2015.

21   Q    What was your position when you started at the County in

22   2015?

23   A    Family Reunification Specialist Social Worker.

24   Q    What does that entail?

25   A    Basically, I work with the kids and the parents.  It was

Johnson - Direct by Whitefleet

1    all one unit.  There's only one social worker assigned to each

2    family, making sure the parents are getting to their services,

3    engaging, attending their visits; working with service

4    providers, make sure they're doing what they need to do,

5    removing any barriers, if they have any, so they can be

6    successful.

7        And for the children, making sure they're attending

8    school, going to doctor's appointments, dentists, mental health

9    services, if needed.  Basically, just encases the whole family.

10   Q    Prior to your employment with the County as a social

11   worker, do you have personal experiences in raising your own

12   children with CPS that you believe helped your ability to do

13   your job?

14   A    Yes.

15   Q    What were those experiences?

16   A    My children chose -- my child chose to do something

17   inappropriate, and I had a social worker come to my door.  My

18   daughter had to have a CAIRE interview.  It was very traumatic.

19   After 15 years it's still a little traumatic for her.

20       I had an amazing social worker that walked my journey with

21   me, attended appointments.  I had recently got a divorce.  She

22   helped me with custody to make sure the kids were safe because

23   my ex felt it wasn't any of his fault.

24       All of that interaction led me to want to pay back to my

25   clients what I received when I was a client.

Johnson - Direct by Whitefleet

1    Q    In July of 2019, what was your position with the County?

2    A    I was a placement specialist in the court unit.  I was

3    David's partner.

4    Q    What is a placement specialist?

5    A    I do the kids, making sure they're getting enrolled in

6    school, they're getting to go to their school of origin, that

7    they're getting set up for mental health assessments, that

8    they're having visits with their parents.

9         I also work with the parents to make sure if there's IEPs,

10   they're attending their meetings.  If the parents are having

11   issues in parenting during their visits, I go in and give them

12   tips and advice to see what we can do to help them be more

13   successful in their parenting classes -- I mean, in their

14   visitation, bringing in things from their parenting classes;

15   off-site visits, if the parents are eligible for that.  I've

16   observed birthday parties so parents could be there, number of

17   things, just to help kids maintain a normal-as-possible life as

18   they had before.

19   Q    Do you have a recollection of what you did in this

20   specific case?

21   A    Yes.

22        MR. POWELL:  Objection, vague, overbroad, calls for a

23   narrative.

24        THE COURT:  Sustained.  Little more specific.

25        MR. WHITEFLEET:  Sure.

Johnson - Direct by Whitefleet

1   BY MR. WHITEFLEET:

2   Q    In terms of a placement specialist, what did you do in

3   this case?

4   A    So in this case --

5           MR. POWELL:  Same objections, Your Honor.

6           THE COURT:  Sustained.

7           What did you do first?

8   BY MR. WHITEFLEET:

9   Q    Sure.  Do you have a memory of what your first task was as

10  a placement specialist in this case?

11          THE COURT:  There we go.

12          THE WITNESS:  Typically provide clothing allowance for

13  the kids so the foster parents can buy them clothes, medical

14  insurance, attend the detention.

15  BY MR. WHITEFLEET:

16  Q    The detention hearing?

17  A    Yeah, the detention hearing.

18  Q    After the detention hearing, did the judge request that

19  you do something?

20  A    I was out on the day of detention.  It was my youngest

21  birthday, so when I came back to work the following day, I read

22  the notes from the social worker that did attend.  I had been

23  Court ordered to do an assessment on dad's house.  So I

24  contacted dad and went to his home to do an assessment.

25  Q    Okay.  And what happened during that assessment?

Johnson - Direct by Whitefleet

1   A    Well, when I went to the house -- in the log notes, you
2   know, it states all this, but I knocked on the door, dad met me
3   at the door.
4           THE COURT:  You're talking about Mr. Beard, right?
5           THE WITNESS:  Mr. Beard, yes.
6           THE COURT:  Okay, go ahead.
7           THE WITNESS:  Typically, we go over things.  For him,
8   we did a walk through of the house.  When we went to the
9   bedroom, he knocked and said, Let me make sure she's decent.
10  She's pumping.  And I was a little confused that someone was
11  there because in the log notes I had read the day before, dad's
12  attorney had announced that they were separated and they were
13  no longer together.  So I was assuming that I was assessing his
14  home and just him because they were apart.
15  BY MR. WHITEFLEET:
16  Q    So did you interview both Hilda and Shane on that day?
17  A    I attempted to interview Shane.
18  Q    What happened during that interview?
19  A    Hilda took over most of the interview, giving responses
20  for Shane.  I have to assess whether this child is going to be
21  safe in dad's care, what his plan is going to be for daycare.
22  In this case it was getting breast milk to the baby, how is he
23  going to do that, because at that time it's still in the Court
24  Unit and we have to make sure that he keeps the child protected
25  and safe from mom.

Johnson - Direct by Whitefleet

1     And his plan was mom would bring the breast milk by. When

2     I asked who would watch N    for him while he went to work, he

3     said mom would watch the baby. I had to explain to dad that

4     that's not an option.

5     Dad explained that N    had never spent the night with him

6     alone. That he had only seen him in the evening. He didn't

7     have a lot of parenting time at that point.

8     Q     So Shane did ask a portion -- answer a portion of the

9     questions?

10    A     He did.

11    Q     You had mentioned breast milk, did you have any role in

12    making arrangements for N    to get breast milk?

13    A     Yes, the Judge had ordered it, and typically, if there's

14    breast milk, it's important to me that I get it to the kids.

15    That day mom provided me with everything she had at dad's

16    house, and then I followed her to her home and picked up the

17    breast milk, put it in my car, and turned my air conditioner on

18    high, froze myself all the way to Los Banos to deliver it.

19    When I got to the home of the caregivers, I immediately walked

20    it in and observed the caregivers putting it in their freezer.

21    Q     Were you involved in the delivery of breast milk after

22    that?

23    A     No. Typically, I arrange, and I did in this case as well,

24    I'll have the parents bring the breast milk to their visit, and

25    they bring a cooler or an ice chest and then we have a freezer

Johnson - Direct by Whitefleet

1    there we'll place it in, and then when the caregivers take the
2    baby back after the visit, they take the breast milk the parent
3    has provided.  So we have a system set up.
4    Q    What are the remedies if the parent didn't feel like the
5    caregiver was providing the breast milk?
6    A    They can always have their attorney go back to court and
7    have it addressed if it's not being followed.
8    Q    Okay.  What was your recommendation about whether Shane
9    could have N    in his grandparents' home?
10   A    Initially it was concerning because he didn't know the
11   answer to any questions.  Hilda was taking over.
12           THE COURT:  What was your recommendation?
13           THE WITNESS:  Oh, no placement with dad.  Stay in the
14   CAIRE.
15   BY MR. WHITEFLEET:
16   Q    Did the Court follow your recommendation?
17   A    Yes.
18   Q    After the jurisdictional/dispositional hearing, did you
19   have any role with the family?
20   A    Yes.  I had a role all throughout, but at the end I helped
21   dad and mom figure out what visitation was going to look like
22   and then the discussion of holidays came up, all of that,
23   parenting time, who was going to parent when.
24   Q    What was your role in terms of the visitation after the
25   jurisdictional hearing?

Johnson - Cross by Powell

1   A    We set it up that it would be every other week, so it was

2   making sure that they followed the rules, that when dad had the

3   baby it was his time and when mom had the baby it was her time.

4   Q    When did that arrangement start?

5   A    On October 8, both parents were given custody of the

6   child.

7   Q    Just every other week?

8   A    Yes.

9   Q    How long did that role last?

10  A    Until they got him back -- well, not long after that I

11  went off on a medical leave, so I'm not sure how long that

12  lasted.

13          MR. WHITEFLEET:  All right, no further questions.

14                      CROSS-EXAMINATION

15  BY MR. POWELL:

16  Q    Ms. Johnson, a moment ago you indicated at the end you

17  helped them with parenting time, correct?

18  A    Yes.

19  Q    I'm going to ask you specifically about your help.  Isn't

20  it true that you went into a room with Mr. Beard and you told

21  him that Ms. Perez, she wanted all of the holidays and, you

22  know, extended weekends for herself with the child?

23  A    It wasn't in a room.  It was in the court lobby, and yes,

24  because I had to help set up the holidays.  It was October.  It

25  was near No   's birthday, Thanksgiving, Christmas, and mom had

Johnson - Cross by Powell

1    stated -- I asked them to please list what holidays they

2    wanted, and mom listed she wanted all the holidays.  So yes,

3    that is correct, but just not a room.

4    Q    Well, I mean, you were inside, right, of a building?

5    A    Yes.

6    Q    And then you went and spoke to mom on the same topic,

7    correct?

8    A    Yes.

9    Q    And you told her the exact same thing, that Mr. Beard, he

10    wants all the holidays and the extended weekends, correct?

11    A    No, you are not correct.

12    Q    Now, you, at some point a little bit ago, said, Staying

13    with mom is not an option, when Mr. Beard mentioned, Well, I

14    would have mom watch him when I get him back.  Why wasn't it an

15    option?

16    A    Because he had been removed by a warrant from mom and dad.

17    Q    The Court gave you discretion to -- strike that, not you

18    in particular.

19        The Court gave discretion to the agency to adjust

20    visitation and time spent with the parents like they do in

21    virtually every case, correct?

22    A    No.

23    Q    They give you no discretion?

24    A    No, visitation in the beginning in the court from

25    detention to juris dispo occurs at our agency because a child

Johnson - Cross by Powell

1   is only detained, they are not a dependent yet, and we keep a

2   close eye on our families to make sure everyone is safe,

3   including the parents.

4   Q   What do you mean when you say "including the parents"?

5   A   Sir, I work from newborns to 18-year olds.  I work with

6   very difficult kids.  It's to protect the parents from if their

7   child does something that the children get -- that the parent

8   might get in trouble for.  We help with parenting.

9   Q   You said in your initial testimony you set up mental

10  health assessments for children, correct?

11  A   Yes.

12  Q   Is that required for every child that comes into the

13  juvenile dependency?

14          MR. WHITEFLEET:  Objection, relevance.

15          THE COURT:  Sustained.

16  BY MR. POWELL:

17  Q   Did you set up mental health assessments for No  ?

18  A   Under KDA, it's required for all youth.

19          THE COURT:  That didn't answer the question.

20          THE WITNESS:  Yes.

21  BY MR. POWELL:

22  Q   KDA, what's that a reference to?  The jury wouldn't know

23  probably.

24  A   It's a mandate that all minors have mental health

25  assessments to ensure that their mental health needs are being

Johnson - Cross by Powell

1    met.

2    Q    Do you understand that that was a result of the removals

3    from their parents that caused that litigation to result in

4    that requirement?

5            MR. WHITEFLEET:  Objection, compound, argumentative.

6            THE COURT:  Sustained.

7    BY MR. POWELL:

8    Q    Now, you said you were a little confused when you came in

9    the house and Hilda was in the other room allegedly pumping

10   breast milk.

11   A    Yes.

12   Q    And you say you were confused because some attorney had

13   said they separated?

14   A    Father's attorney.

15   Q    Well, were you aware of any Court order that said that

16   they couldn't be together in the same space?

17   A    The Court order was made because dad's attorney had

18   announced --

19           THE COURT:  That's not the question.  It was, were you

20   aware of an order?

21           THE WITNESS:  No.

22   BY MR. POWELL:

23   Q    You later -- you're aware that you reported that they were

24   in the same house and it ended up in a court report, correct?

25           MR. WHITEFLEET:  Objection.

Johnson - Cross by Powell

1    THE WITNESS:  Yes.

2    MR. WHITEFLEET:  Assumes facts not in evidence.

3    THE COURT:  Overruled.  She said yes.

4  BY MR. POWELL:

5  Q   Now, when you said mom was not an option, did you

6  understand the case, if you will, against mother when you were

7  assigned to the matter, what the complaint was?

8  A   When I was assigned?

9  Q   Yeah, when you took over your role in that case did you

10  understand what the allegations were against the mom?

11  A   I was informed of it on the TAP sheet.  Did I understand,

12  no, that came further with investigation.

13  Q   Okay.  So what is your best understanding, by the time the

14  case is closed, of what the allegations were against mom; what

15  did she do such that she wasn't an option when the child was

16  staying with father?

17  A   She was using her son to get custody of her other children

18  through the system.

19  Q   Did you read any of the delivered service logs in the case

20  prior to the case closing?

21  A   Which delivered service logs?

22  Q   What are they?

23  A   No, which?  You said, did I read any?  The ones that I had

24  written, that myself and David had written?

25  Q   No, others, that others had written.

Johnson - Cross by Powell

1   A   On this case?

2   Q   On this case, before it was closed and the parents have

3   the child fully returned to them.

4   A   The ER reports?

5   Q   Ma'am, delivered service logs.

6   A   I write the delivered service logs.

7   Q   Understood, I believe you read those.  Did you read any of

8   the others, that others had written before your involvement?

9   A   That would be the ER workers?

10  Q   Ma'am, it could have been other workers, but the question

11  is whether you read any delivered service logs before you

12  yourself started entering delivered service logs?

13  A   I do read the delivered service logs.  My partner gives me

14  the report and I read it before we go into the detention, so I

15  had read it.  I did not attend the initial detention, but yes,

16  I read them, but that would be from the ER workers.

17  Q   Right.  Did you have a conversation with Mr. Beard's

18  mother about him reminding you of your son?

19  A   I could have.  He's similar age.

20  Q   Did you also during that conversation apologize --

21  apologize in any way?  Let's leave it at that.

22  A   I don't recall.

23  Q   Do you recall having reason to maybe apologize for

24  something?

25  A   If I do something wrong, I apologize for my wrong action.

Johnson - Cross by Powell

1   I don't recall doing anything wrong, but I'm human.

2   Q    Do you recall saying anything about having relied entirely

3   on the notes of April Cobbs when you received the case?

4   A    No.

5           MR. POWELL:  Nothing further.

6           THE COURT:  Anything further?

7           MR. WHITEFLEET:  Nothing further.

8           THE COURT:  You can step down.

9       (Witness is excused.)

10          THE COURT:  Any other witnesses?

11          MR. WHITEFLEET:  Defense rests.

12          THE COURT:  Okay.  We will come back on Tuesday.  I'm

13  going to have you come in around 10:00 because we're going to

14  have to go over jury instructions and verdict forms.  We will

15  start with closing arguments on Tuesday.  You will get

16  instructed and then you will begin deliberations on Tuesday.

17          Once you begin deliberations, you won't leave at 1:30.

18  You'll go as long as you can go, which usually is around 4:00

19  or 4:30.  So you will get a lunch break.  So don't worry about

20  not eating.  We'll make sure you get food.

21          It's really important, especially over the long

22  weekend, to please sort of set the case aside.  Don't talk to

23  anybody about the case, don't let anybody talk to you, no

24  independent investigation or research.  You're going to have an

25  opportunity very soon to discuss the case amongst yourselves on

1   Tuesday.  So you have a good rest this weekend, good night's

2   sleep on Monday, and I'll see all of you on Tuesday.  Come in

3   around 10:00, okay.

4           All right, thanks.

5       (In open court outside the presence of the jury.)

6           THE COURT:  Take a break and come back in 15.

7           MR. POWELL:  Thank you.

8       (Recess taken 1:19 p.m. to 2:06 p.m.)

9           THE CLERK:  Please come to order.  Court is back in

10  session.

11          THE COURT:  Back on the record.  Outside the presence

12  of the jury.

13          Mr. Powell, you can make your record with respect to

14  Defense Exhibit A-40, A-31, A-32, A-41, A-42, A-45, A-47 and

15  A-49.

16          We had a sidebar in which Mr. Powell objected.

17          The Court has overruled the objection, but I want to

18  make sure the record is clear, the basis for his objection,

19  which also involves the Welfare and Institutions Code Section

20  827 process.

21          Go ahead.

22          MR. POWELL:  I'm comparing myself, Your Honor.  Could

23  I have a moment?

24          Our Exhibit 74 is a juris report.  And, counsel's --

25  defendants' -- do you have a juris report?  John, I don't know

1    which -- I don't suppose you know off the top of your head
2    which one you used?
3         THE COURT:  Can't hear you at all.  Make a record as
4    to why you objected.
5         MR. POWELL:  I'm trying to find the exact record, Your
6    Honor, but my objection is clear.  The other day we had
7    shown -- it's on the record -- one of the petitions that we
8    had.
9         Here we go.  I found the Jurisdiction Report.  I found
10   the Jurisdiction Report.  Defense has it as Exhibit 47.
11   Plaintiffs have it as 74, yeah.
12        So, if the Court's familiar with the 827 process, you
13   file it, you notify all those who should be notified, lengthy
14   service list, and what I've got here are two different
15   documents:  74 in the plaintiffs.  It's not the same document
16   as the one that the defendants have, and I did not -- I can
17   double check this, but I didn't receive any notice that there
18   was some subsequent 827.
19        I literally had a case on this issue in the Ninth
20   Circuit.  They're not giving -- counsel for the agency is
21   getting everything and people like me are not.  So this right
22   there tells you on the front page that I don't have the same
23   document, and I can bet if I go through every one of them, it's
24   going to be the exact same thing.
25        The petition he showed was either 31 or 32.

142

```
 1              THE COURT:  Okay.  I'm not disputing that the
 2    defendants' exhibits are more complete, contain more documents
 3    than your exhibits that you moved into evidence.
 4              You had defense exhibits before trial, correct?
 5              MR. POWELL:  Yes.
 6              THE COURT:  So you could have used the defense
 7    exhibits during your case.  There's nothing that prevents you
 8    from using defense exhibits.  In fact, my pretrial order says
 9    exactly that.
10              So, in effect, I have the same exhibit, one is more
11    complete than the other.  The question is why do you believe
12    that would preclude the defense from introducing the more
13    complete document?
14              MR. POWELL:  It's because I'm supposed to have the
15    same document.  If the Court's only --
16              THE COURT:  You did, though, before trial.  You had
17    it.
18              MR. POWELL:  If the Court's only point is I had it
19    before trial, if the Court is implying that I should go through
20    every single exhibit that they gave me to compare it to every
21    exhibit that I have, I could only say that's unworkable.  That
22    shouldn't be required.  That should not be a basis for denying
23    the fact that it is apparent.
24              I'm telling you as an officer of the court we did not
25    get notice of this.
```

1    They have obtained my clients' confidential juvenile

2    case file without giving notice to us. This is

3    behind-the-scenes kind of stuff. It happens all the time, and

4    it's got to stop. One good way to stop it would be to have

5    this stuff stricken because it should not have been presented

6    to the jury. It's completely different. Mine aren't even

7    signed.

8    THE COURT: But you introduced the same exhibit. You

9    want it in your case-in-chief.

10    MR. POWELL: I wanted it in my case-in-chief when I

11    thought it was the only one we had. Why would I think for a

12    minute that opposing counsel would have a completely different

13    document?

14    Again, let the record be clear, as far as I know,

15    Mr. Whitefleet wasn't involved, at least when our 827 went

16    down. Now, if he did one later, then that might be a problem,

17    but this is highly improper, Your Honor. These documents are

18    not even supposed to be in their possession unless they're in

19    mine.

20    THE COURT: Okay, I understand, but they were in your

21    possession before trial. You did have them.

22    MR. POWELL: I understand the Court's point. The

23    Court will do as it sees fit, I understand. I think it's

24    highly improper. And if the thought was I was supposed to go

25    through every one of his -- which, by the way, he's got A, and

1    it is the entire juvenile dependency file.  So I objected to

2    that in its entirety in the beginning when we were supposed to,

3    and I did.  But the idea that I should have gone through this

4    and checked them all -- I mean, maybe some of them are the same

5    as mine.  Delivered service logs are not filed, so I suspect

6    those are the same as mine, but this is not something you would

7    see at a glance.

8             THE COURT:  Okay.  I understand your objection.  It's

9    on the record.  I overruled it.

10            MR. POWELL:  If that's the case, then still without

11   waiving my objection, I ask the Court to admit 39.

12            THE COURT:  What's 39?

13            MR. POWELL:  It's another Minute Order from the

14   original detention hearing, and let's use defendants because

15   it's going to be different than mine.

16            THE COURT:  A-39, you mean?

17            MR. POWELL:  Yes, it would be, Your Honor.

18            THE COURT:  A-39 is 7/23/19 from the Superior Court.

19   What is it, a Minute Order?

20            MR. POWELL:  Minute Order.

21            THE COURT:  Mr. Whitefleet, do you want to stipulate

22   to the admission of that exhibit?

23            MR. WHITEFLEET:  No, Your Honor.  Plaintiffs case is

24   closed.  My case is closed.  It's too late.  Plus, I don't

25   think this particular one, now that the evidence is in, is

1  relevant.

2          THE COURT:  What would be the relevance?

3          MR. POWELL:  It's relevant to my closing argument

4  points, Your Honor.

5          THE COURT:  Well, you want to be more specific?

6          MR. POWELL:  I don't want to.

7          THE COURT:  Well, then, how can I rule if you don't

8  tell me the relevance?

9          MR. POWELL:  It was taken before the documents were

10  taken on -- filed in the Superior Court, so I would ask the

11  Court to do it based on that.

12          THE COURT:  So this minute order was issued before

13  which document?

14          MR. POWELL:  The very first minute order in the case

15  in the juvenile matter.

16          THE COURT:  Thirty-nine is?

17          MR. POWELL:  Yes.

18          THE COURT:  Okay.  Other than this is the very first

19  minute order, what's the relevance?  It says, "Matter trailed

20  for Agency to conduct further assessment and investigation.

21  Agency to ensure for the minor to receive mom's breast milk.

22  Mom allowed to breastfeed minor during her visits at the

23  agency."  All that's in evidence already.  So you don't need a

24  document to prove that.

25          MR. POWELL:  Not the relevance of it being a temporary

1   order trailed to the 29th.  If relevance is the grounds, then I

2   would submit that any minute orders that defense submitted

3   should not be submitted, and I did object to all of them

4   because of the way it was presented.

5           THE COURT:  Mr. Whitefleet?

6           MR. WHITEFLEET:  I stand on my objections.

7           THE COURT:  Objection sustained.

8           Let's go through the -- you're renewing your Rule 50

9   motion.  The Court took the previous motion under submission.

10          MR. WHITEFLEET:  Yes, Your Honor.  I'd also like to

11   add, I believe the false imprisonment claim is also likely

12   barred by the *Rooker-Feldman* doctrine, and I would ask the

13   Court issue an order to the extent that any portion goes to the

14   jury, that a jury may not award damages after the Court -- the

15   juvenile court either ordered the detention of N   and/or

16   ordered N   a ward of the Court.

17           THE COURT:  No damages after October 8.

18          MR. WHITEFLEET:  Under *Watson versus City of San Jose*,

19   800 F.3d 1135, 9th Circuit (2015).

20          THE COURT:  *Rooker-Feldman* applies to false

21   imprisonment because why?

22          MR. WHITEFLEET:  To the extent that the juvenile court

23   made detention orders, it would be tantamount to relitigating

24   those matters and/or this Court would be essentially

25   overturning -- allowing the jury to overturn what the juvenile

1   court had already ordered.

2           THE COURT:  Mr. Powell, do you want to respond for the

3   record?

4           MR. POWELL:  Yeah.  *Rooker-Feldman* does not apply at

5   all.  There is not any claim for relief in the entire complaint

6   that says, Give me my kids back.  There is no *Rooker-Feldman*

7   that applies in these cases.  It's abundantly clear.

8           THE COURT:  That argument doesn't help me.  Why

9   doesn't it appear?

10          MR. POWELL:  Because it is --

11          THE COURT:  Why is it abundantly clear?

12          MR. POWELL:  The case law makes it abundantly clear,

13  and I'm sorry I say that, but we just completed like a 19-page

14  brief on it the other day just so that we could track all the

15  cases that defense counsel tried to use for that purpose.

16          It is an appeal of another Court's order, correct, and

17  there's nothing in the relief that's requested that says

18  reverse that order, nothing at all.

19          Judicial deception is a separate animal.

20          There is no *Rooker-Feldman*, that's the definition of

21  *Rooker-Feldman*, a de facto appeal of a lower court ruling or

22  another court ruling.

23          I can brief it, Your Honor, if you'd like.

24          THE COURT:  And what about the argument no damages

25  after October 8, 2019?

1        MR. POWELL:  The artifice of the judicial proceeding
2   does not stop emotional distress damage, it does not.  You
3   can't say --
4        THE COURT:  The case that supports that is?
5        MR. POWELL:  Your Honor, it would be nice to have had
6   notice if this was an argument by counsel, so I'm sorry that I
7   don't have it, but I would like --
8        THE COURT:  I think it was in your trial brief; wasn't
9   it?
10       MR. WHITEFLEET:  It was, Your Honor.
11       MR. POWELL:  I would like to quote Judge White, Ronald
12  White, "If a police officer breaks your arm and arrests you,
13  and you're arrested and you're detained, and you stayed
14  detained when you go into jail, the broken arm and the healing
15  callus in the bone, that continues."
16       So, I'm not sure what damages, if the claim is
17  emotional distress damages, should be cut off because there was
18  a court proceeding, I submit that's not accurate, that can't
19  apply.  And, in fact, in the case he decided, which was mine,
20  *Watson*, that's exactly what Judge White did, that's literally
21  part of his jury instruction, I believe -- yeah, jury
22  instruction.
23       THE COURT:  What's the case again?
24       MR. POWELL:  It's *Watson versus* it's either *City of*
25  *San Jose* or *County of Santa Clara*, long time ago.

1          MR. WHITEFLEET:  *City of San Jose*, 800 F.3d 1135, 9th
2     Circuit (2015).
3          THE COURT:  800 F.3d 11, what?
4          MR. WHITEFLEET:  800 F.3d 1135.
5          THE COURT:  Okay.  Mr. Powell, there's a case you're
6     intimately familiar with decided last month, *O'Neel versus City*
7     *of Folsom*.
8          MR. POWELL:  Yes.
9          THE COURT:  Judge Shubb's opinion granting summary
10    judgment for the defendants.  Similar facts, similar issues,
11    similar arguments raised by you on behalf of your clients.  Why
12    doesn't *O'Neel* control here?
13         MR. POWELL:  What aspect of the case?
14         THE COURT:  I know it was a summary judgment motion
15    particularly on the qualified immunity issue on the 1983
16    claims.  Wouldn't Cobbs, Anderson and Jones be entitled to
17    qualified immunity?
18         MR. POWELL:  Because there is no qualified immunity
19    for judicial deception.  And the context here at trial is far
20    different than it is in the motion for summary judgment
21    context.
22         THE COURT:  Do you agree that whether something is
23    material or not is an issue that I have to decide before it
24    goes to the jury?
25         MR. POWELL:  No, we talked about that.

1          THE COURT:  Because that's what Judge Shubb says.

2          MR. POWELL:  That's true in the context of a motion

3    for summary judgment.  I don't think -- I have other case law

4    about that is not the case when it goes to the jury.

5          THE COURT:  He writes, "In the context of the judicial

6    deception claim, materiality is a question which must be

7    determined by the reviewing court in each instance on a

8    case-by-case basis," citing *Chism* 661 F.3d at 389.

9          In the *O'Neel* case he writes here, "This Court has

10   determined that none of the alleged misrepresentations or

11   omissions considered individually or collectively were material

12   because it did not influence the juvenile court judge in his

13   decision.

14          "And suppose this Court had held otherwise and

15   determined that one or more of the alleged misrepresentations

16   were made with knowledge that they were false and were

17   material, would that conclusion have been clear to any officer

18   in the position of Starks, who was the social worker?

19          "The Court concludes it would not, and that a

20   reasonable officer in Starks, the social worker's position,

21   could well have believed that the juvenile court judge would

22   still have issued the detention order even if the allegedly

23   false statements were omitted and the omitted facts were

24   included in the petition.

25          "It must not be forgotten that juvenile dependency

1    petitions and applications for protective custody warrants are
2    typically drafted under exigent circumstances and often
3    considered and granted by a judge the same day they are
4    submitted.

5          "CPS officials cannot be expected to include every
6    fact that may or may not be potentially exculpatory in a
7    protective custody warrant application.  They are not required
8    to provide a comprehensive recitation of every detail of the
9    investigation up to that point.

10          "The warrant application need only include sufficient
11   information to ensure that the facts presented are not so
12   wrenched from their context that the judicial officer will not
13   comprehend how they fit into the larger puzzle," citing *Scanlon*
14   92 F.4th at 799.

15          "Officials need only provide an adequately complete
16   representation of the total story so as to not be materially
17   misleading.

18          "Plaintiffs have been unable to point to any case,
19   either at the Supreme Court or circuit level, which would have
20   placed the social worker on notice that she could not rely upon
21   the information provided to her by other social workers or law
22   enforcement officers in drafting her application to the Court.

23          "Much to the contrary, prevailing case law suggests
24   they may do so," citing *Motley*, 432 F.3d at 1081.  "Nor have
25   plaintiffs been able to identify any case law to even suggest

1    to Starks, the social worker, that she had a constitutional

2    obligation to conduct a further investigation under the

3    circumstances," citing *Ewing* 588 F.3d at 1224.

4           "As the Supreme Court has taught us, qualified

5    immunity protects 'all but the plainly incompetent or those who

6    knowingly violate the law,'" citing *Malley versus Briggs*, 1986

7    Supreme Court case.

8           "There is nothing in the record to permit an inference

9    that defendants here were either plainly incompetent or

10   knowingly violated the law.  Accordingly, even if the Court

11   were to conclude that defendants' conduct violated the

12   Fourteenth Amendment, at the very least they would be entitled

13   to qualified immunity."

14           Why doesn't that apply here?

15           MR. POWELL:  It doesn't apply here, Your Honor, under

16   *Hardwick* Ninth Circuit authority, and I'm trying to find the

17   operative language there because, first of all, the facts are

18   different in the two cases.  And this isn't a case about did

19   Ms. Cobbs rely on others.  She did an investigation.  She

20   claimed to have read things.  The way Judge Shubb writes

21   that -- it's going to be appealed, that's happening now.

22           THE COURT:  I know.

23           MR. POWELL:  We did appeal.  The way that Judge Shubb

24   writes that, it's a case all about you have to show that they

25   intentionally did it and that has not been the standard ever,

1    has never been.  Reckless disregard for the truth has been the

2    standard.  And we have here some stark examples of she knew the

3    truth and left it out on purpose.  It was an interesting

4    hearing with Judge Shubb that day.  I would only say it does

5    not control.  I think *Hardwick* does.

6         THE COURT:  So, that is -- I want you to brief the

7    qualified immunity issue because it obviously covers the 1983

8    claims.  I do want briefs on that, and you got try to get them

9    to me as soon as possible so I have a chance to digest them, no

10   later than Monday morning in terms of the qualified immunity

11   issue.

12        The other holding by Judge Shubb in this case involves

13   the supervisor in Judge Shubb's case, a guy named Smith.  In

14   our case Mr. Anderson.

15        Judge Shubb writes in *O'Neel*, "The parties have not

16   identified any evidence in the record that suggests Smith, the

17   supervisor, had reason to doubt the accuracy of the

18   representations made by Starks, the social worker, in the

19   warrant application.

20        "Moreover, plaintiffs have not identified and the

21   Court is unaware of any authority holding that a supervisor

22   must review the underlying evidence or documentation for a

23   warrant application prepared by her subordinate, 'Omissions or

24   misstatements resulting from negligence or good faith mistakes

25   will not invalidate an affidavit which on its face establishes

1    probable cause,' and 'a claim of judicial deception may not be
2    based on an officer's erroneous assumptions about the evidence
3    he has received,'" citing *Ewing*, *Motley versus Parks*, and then
4    in parenthesis, "(Law enforcement officers are generally
5    entitled to rely on information obtained from fellow law
6    enforcement officers)."

7         "Smith's reliance on Stark's representations thus
8    cannot form the basis for a judicial deception claim.  The
9    Court grants summary judgment in favor of Smith."

10         Why doesn't that apply to Mr. Anderson, what's
11   different?

12        MR. POWELL:  There's no difference if Judge Shubb's
13   ruling is deemed correct and accurate.

14        THE COURT:  Right now it is.

15        MR. POWELL:  District Court level.  This Court will
16   have an opinion on it, and I understand it's reviewing that.
17   You said it was a controlling case here.  I'm not sure what
18   that meant in this context, District Court to District Court,
19   but there is supervisor liability for not properly supervising
20   one's employees, and the very idea that supervisor approves
21   things that he has done absolutely no checking on, is not
22   required to do any checking on, which we were going to bring up
23   as part of that *Monell* in terms of the pattern and practice of
24   deception.

25        You recall everyone testified that, I think, to a man

155

 1   and a woman, that they're not required to read anything.  They

 2   get it -- it came up from Cobbs, it went to Granados, it went

 3   through the process in the juvenile court, and it pretty much

 4   stayed the same.  Nobody reviews anything.  So, I mean, that

 5   does add to *Monell*.  In the context of what you're asking me

 6   now, is there a difference with Smith?

 7          THE COURT:  And Anderson, a difference between Smith

 8   and Anderson.

 9          MR. POWELL:  Not in terms of their position, but

10   Mr. Anderson did testify that he does review, and he does, you

11   know, approve it, and I don't know that we had that with Smith.

12   If you're approving things simply because somebody wrote them

13   and that's their job, then you're not supervising.

14          THE COURT:  But the case law, at least that Judge

15   Shubb cites, says that there's no court that says a supervisor

16   must review the underlying evidence of documentation for a

17   warrant application prepared by the subordinate.

18          MR. POWELL:  Well, I have to check it, Your Honor, but

19   I've got appellate counsel for that matter.

20          THE COURT:  Here's the Court's ruling on the Rule 50

21   motion --

22          MR. POWELL:  Your Honor, when I brief it, though,

23   before you finish, I'm sorry.

24          THE COURT:  Go ahead.

25          MR. POWELL:  I can -- obviously, I can address this

```
 1    issue of now you are saying that the judge will decide the
 2    materiality, because earlier and when we started even, the
 3    Court indicated that, yeah, those are only summary judgment
 4    cases and materiality is now an issue for the jury, which
 5    causation always is and materiality is simply the same --
 6              THE COURT:  You may have misheard me.  I didn't say
 7    that a judge has to decide materiality before it goes to the
 8    jury.  All I was doing was quoting Judge Shubb saying that the
 9    judge -- he believes the judge must decide materiality, that's
10    a legal question, not a question for the jury.  But that, in
11    the context of summary judgment motion, makes sense to me.
12              It's the same thing with qualified immunity.
13    Qualified immunity is a legal issue.  The jury doesn't decide
14    qualified immunity.  The judge has to decide it.  So I'm
15    allowing you and Mr. Whitefleet -- he's already briefed the
16    issue that he believes that I should require you to list all
17    the material facts or material omissions that you're relying
18    on, and then have me decide whether, as Judge Shubb wrote,
19    those are, in fact, material or not.
20              Your argument is we're past that stage.  Really,
21    that's a question for the jury; were they material or not?  I
22    want briefing on that because it may come back.  Even if the
23    case goes to the jury and the jury returns a verdict,
24    and assume that there's a verdict in favor of the plaintiffs,
25    Mr. Whitefleet might then ask me, You need to overturn this
```

1    verdict, you didn't do your job.  Your job was to determine

2    materiality before that issue got to the jury.  I'm letting

3    both sides further brief that issue in a jury trial in the

4    stage that we're in, whether that is, again, something I have

5    to decide or not.

6             MR. POWELL:  All right.

7             THE COURT:  So I haven't made up my mind on that.

8    That would create a lot of extra work for you in terms of

9    listing what you believe the material omissions were or

10   material misrepresentations.  There's been a lot of evidence of

11   that.

12            Okay.  The parties have already stipulated to and the

13   Court has granted the stipulation and enters an order with

14   respect to the following:  Defendants Mariela Gomez, David

15   Granados, Stephanie Herrera, Shari Johnson and Gloria Solorio,

16   that all those defendants and any and all claims against those

17   defendants are dismissed, and no claims will be submitted to

18   the jury with respect to those defendants.

19            That leaves -- let me start with No   s, N.P.'s,

20   claims under the Bane Act and the false imprisonment, the two

21   state law claims brought against -- let me make sure I'm

22   accurate here, the Bane Act claim is brought against Anderson,

23   Cobbs and Jones.

24            The Court is granting the Rule 50 motion with respect

25   to the Bane Act.  There is not sufficient evidence that was

1    presented in this case such that the jury could return a
2    verdict in N    's favor under the Bane Act.

3           The allegations in the complaint focus on the
4    Defendants Anderson, Cobbs and Jones berating Shane and Hilda,
5    and Cobbs and Jones speaking aggressively to Shane and his
6    relatives during the July 19, 2019 removal.  There's no
7    evidence in this case, or even sufficient evidence, of any
8    threats, intimidation or coercion towards N    .

9           Again, there's been no evidence presented at this case
10   with respect to any alleged damages that N    suffered as a
11   result of an alleged Bane Act violation.

12          Absent that evidence, the jury has no basis for
13   finding in favor of N    under the Bane Act.  All the alleged
14   coercive and intimidating and threatening conduct was directed
15   towards Hilda and Shane; Ms. Perez and Mr. Beard.

16          Bane Act is out.

17          The false imprisonment claim is a more difficult issue
18   because of this immunity issue.

19          In reviewing the cases, Ninth Circuit, and Judge Shubb
20   included as a district court judge you are all over the place
21   in terms of 820.2, immunity, *Wallis v. Spencer* does contain
22   language that supports the argument that there is no such
23   immunity from false imprisonment.  *Wallis v. Spencer* did not
24   take up 820.2 with respect to the social workers in that case.

25          There are several other Ninth Circuit cases which make

1    it clear that 820.2 immunity can apply to false imprisonment to

2    claims.

3         Again, this is only a claim brought by N    .  Parents

4    are not involved as plaintiffs.  It's based on an allegation --

5    I want to look at the jury instruction, but it's based on the

6    false warrant -- that the false imprisonment resulted from the

7    false warrant application.

8         Ms. Jones, again, had nothing to do with that

9    application.  She was present when N    was taken into custody,

10   but she was not involved in the underlying warrant that led to

11   the alleged false imprisonment.  I, again, don't see any legal

12   basis for a jury to find liability against Ms. Jones on a false

13   imprisonment claim.

14        As to Mr. Anderson, again, following the instructive

15   decision of Judge Shubb that we've been discussing, he also

16   wasn't the primary reason -- if you take the evidence in the

17   light most favorable to the plaintiffs, he wasn't the primary

18   reason that N    was falsely imprisoned.  He simply was in his

19   role as a supervisor.

20        And since the claim is based on the false affidavit

21   and his role in that was limited, there's no legal reason --

22   there's no legal basis as to why he was required to review it

23   in detail as supervisor.  He didn't help write the warrant.  I

24   don't see, again, any basis for a false imprisonment claim

25   against him.

160

1          I think both Ms. Jones and Mr. Anderson would also be

2     entitled under these facts to immunity under 820.2,

3     particularly Ms. Jones since she was not involved in any way in

4     the alleged judicial deception or fabrication of evidence.

5          820.2 provides that, "Acceptance otherwise provided by

6     statute, a public employee is not liable for an injury

7     resulting from his act or omission where the act or omission

8     was the result of the exercise of the discretion vested in him

9     whether or not such discretion be abused."

10          The question on false imprisonment with respect to

11     Ms. Cobbs is admittedly a closer question.  In order to

12     establish the false imprisonment claim against Ms. Cobbs, the

13     plaintiff is required to prove by preponderance of the evidence

14     that the defendant intentionally caused N    to be removed,

15     that the protective custody warrant was invalid because it

16     contained perjured information, fabricated evidence or failed

17     to disclose non-exculpatory evidence and that Cobbs did so with

18     malice.

19          So, when you look at the evidence against Ms. Cobbs,

20     820.21 comes into play, and 820.21 makes clear that immunity

21     would not apply to Ms. Cobbs if she committed with malice

22     fabrication of evidence or perjury or failure to disclose

23     non-exculpatory evidence.

24          It's clear the evidence in the light most favorable to

25     the plaintiff that was introduced against Ms. Cobbs and during

1　the Rule 50 hearing that we held earlier, the Court raised the

2　question whether there is enough evidence here to show malice.

3　　　　Malice is defined as, "Conduct that is intended to

4　cause injury to the plaintiff or despicable conduct that's

5　carried on with a willful and conscious disregard of the rights

6　and safety of others." This issue of whether N.P. was actually

7　harmed and then the defendant's conduct was a substantial

8　factor in causing N.P.'s harm.

9　　　　It's a close question, and I am going deny the Rule 50

10　motion as to Ms. Cobbs. I think there is at least enough

11　evidence to allow the jury to decide that claim as to

12　Ms. Cobbs, but as to Ms. Jones and Mr. Anderson, the Court will

13　grant the Rule 50 motion.

14　　　　On the *Monell* claim against the County of Stanislaus,

15　the Court is granting the Rule 50 motion. I don't believe

16　there is any policy or practice that was clearly established.

17　　　　The take-one-take-all evidence, I think, is less than

18　sufficient to allow the jury to make a finding that there was a

19　practice. But even if I assume that there was a

20　take-one-take-all practice used by Stanislaus County, *Monell*

21　requires, again, that that practice be the moving force behind

22　the alleged constitutional violation.

23　　　　There clearly is insufficient evidence that this

24　practice was the moving force. There were so many other

25　reasons that were given as to why N.P. was removed and why, as

1    plaintiffs allege, their constitutional rights were violated.

2           The primary moving force being the incomplete,

3    inaccurate warrant and the, as the social workers put it, the

4    "lack of cooperation" from Mr. Beard.  That's an issue that the

5    jury has to decide -- I'm sorry, the jury will decide on the

6    other claims, but in terms of holding the County liable for

7    these constitutional violations, it wasn't the County that --

8    County's policies or practices that caused the alleged

9    constitutional violations.

10          Given the lack of causation evidence, the claim cannot

11   be submitted to the jury, and the Court grants Rule 50 motion

12   in favor of the defendant on the *Monell* claim.

13          In terms of the third claim in the complaint for

14   procedural due process, that has been dismissed by stipulation,

15   by agreement, and so the Court need not grant Rule 50 motion

16   given that it has been dismissed by plaintiff.

17          The fourth claim for relief has also been dismissed by

18   plaintiff, and those two claims will not be submitted to the

19   jury.

20          The second part of the second claim for relief under

21   Section 1983, the substantive due process deliberate

22   fabrication, will not be submitted to the jury as a separate

23   claim.  It will be incorporated into the first claim for relief

24   in the instructions and in the verdict form and will be decided

25   by the jury as one inclusive claim.

1        So that leaves the first claim under 1983 for

2   unreasonable seizure by judicial deception or deliberate

3   fabrication, and the second claim for relief for familial

4   association of substantive due process claim.  Just, really,

5   those two claims are the guts, the center of these claims.

6        The Court denies the Rule 50 motion on both of those

7   claims finding that there is sufficient evidence for the jury

8   to decide whether those claims have been satisfied.

9        The first claim is only brought by N    , and there,

10  again, is an issue of damages.  I'm going to let that go to the

11  jury because for 1983 claims, the jury's also going to receive

12  an instruction that says, If you don't find there's any

13  damages, you can still award nominal damages.  So that claim

14  will go forward.

15       In terms of whether Ms. Jones is going to remain as a

16  defendant on the first claim for relief, again, I am granting

17  the Rule 50 motion with respect to Ms. Jones on the first claim

18  because of her lack of involvement in the alleged judicial

19  deception or deliberate fabrication.  There is no evidence that

20  Ms. Jones deliberately fabricated or judicially deceived

21  anyone.

22       She was involved in April of 2019.  There was no

23  allegation that any of her entries were false, omitted material

24  facts.  She did participate in a -- what do they call it --

25  Team Decision Meeting, in which the plaintiff has argued that

1     she should have spoken up about her -- the results of her

2     investigation, but that's the limit of the evidence in terms of

3     anything done deliberately or any involvement in judicial

4     deception.

5          So, again, I don't believe there's sufficient evidence

6     as to Ms. Jones on the first claim for relief, and I will

7     grant the Rule 50 motion with respect to Ms. Jones on the first

8     claim for relief.

9          The issue of whether Mr. Anderson should also remain

10     as a defendant on the first claim for relief, applying Judge

11     Shubb's argument and finding and holding in *O'Neel*, I don't see

12     that the law would permit me to allow the jury to return a

13     verdict given that the evidence was exactly the same as what

14     the evidence was in *O'Neel*, that the supervisor's role was to

15     rely on the application that was prepared by the social worker,

16     that the supervisor, Mr. Anderson, was not responsible for the

17     preparation of the warrant that led to No   's removal as in

18     *O'Neel*, Mr. Anderson did not review the underlying evidence or

19     documentation that went into the warrant, and, again, as Judge

20     Shubb writes, "The Court is unaware of any authority holding

21     that a supervisor must review the underlying evidence or

22     documentation for a warrant application prepared by the

23     subordinate."

24          As Judge Shubb found, "The supervisor's reliance on

25     the social worker's representations cannot form the basis for a

1  judicial deception claim." I'm going to grant the Rule 50

2  motion on the first claim as to Mr. Anderson, too.

3          So, further briefing on qualified immunity, further

4  briefing on the damage issue raised by Mr. Whitefleet should be

5  submitted to the Court. I'm going to ask that you get it to me

6  by Sunday.

7          I'm going to prepare jury instructions. I'm going to

8  try to e-mail them to you on Monday. Even though it's a

9  holiday, I know you will be working because you'll be doing

10 closing argument preparation, and we'll go over them before

11 your closing arguments. That's why I'm having the jury come in

12 at 10:00.

13         We'll meet at 9:00, and go over the verdict forms and

14 the jury instructions, and hopefully I will have sent you a

15 draft of those by then. If not, they'll be on your tables when

16 you come in on Tuesday, and we'll go over them at that time.

17         Any questions?

18         MR. WHITEFLEET: Point of clarification, Your Honor, a

19 couple of them, on the ruling, we raised also on the *Monell*

20 claims, the alleged policy of lack of training and the claim

21 about alleged practice of warrants being false.

22         THE COURT: I didn't find any evidence or even rising

23 to the level of sufficient evidence that those were in any way

24 proven or there was evidence to allow that to be submitted to

25 the jury.

1      MR. WHITEFLEET:  And is the Court saying on the second
2  claim, the familial association, that's going to the jury as to
3  all defendants, Cobbs, Anderson and Jones?
4      THE COURT:  Yes.  I can't remember if you made an
5  argument as to why Jones shouldn't be in that one.
6      MR. WHITEFLEET:  I did.
7      THE COURT:  And your argument was?
8      MR. WHITEFLEET:  This is the -- the familial
9  association claims arise essentially that plaintiffs have to
10  prove the underlying issue for the familial association, which
11  in this case is the warrant.  So my argument is, is because
12  Jones wasn't involved in the warrant, she also cannot be held
13  to a familial association violation, in addition to the fact
14  that it requires the shocks of conscience and deliberate
15  indifference, and there was no evidence of that.
16      THE COURT:  You are both right in terms of shocks the
17  conscience, the instruction does mention that, but then it also
18  explains shocks the conscience, and Mr. Powell is correct that
19  it has to be, in this case, under these facts a deliberate
20  indifference.  So you're both correct in that and the jury
21  instruction reflects that.
22      You think it's inconsistent if I grant the Rule 50 on
23  the first count, but not on the second count as to Ms. Jones?
24      MR. WHITEFLEET:  Yes, Your Honor.
25      THE COURT:  It certainly sounds inconsistent since

1    they're both based on the false warrant, correct?

2         MR. WHITEFLEET:  Yes.

3         THE COURT:  Mr. Powell?

4         MR. POWELL:  Well, yes, if you've already made the

5    conclusions that you have, I think it follows that that would

6    be the case.

7         THE COURT:  Yeah, I think it would be inconsistent.

8    So, yes, Ms. Jones is dismissed on the second count.  So there

9    aren't any counts remaining against Ms. Jones, correct?

10        MR. WHITEFLEET:  Correct.

11        THE COURT:  So the Court grants the Rule 50 motion on

12   all claims as to Ms. Jones, Shynelle -- she goes by "Shynelle

13   Smith" now, but Shynelle Jones, and she'll be dismissed.  She

14   is dismissed as a defendant.

15        The case will go forward against Mr. Anderson and

16   Ms. Cobbs.  Ms. Cobbs on Counts 1 and 2, and Mr. Anderson only

17   on Count 2.

18        Okay.  We'll take up the qualified immunity issue on

19   Tuesday as well.

20        Anything else?

21        MR. POWELL:  No, Your Honor.

22        THE COURT:  Okay.  Mr. Whitefleet, if you want to

23   prepare a motion -- an order that reflects the Rule 50, we'll

24   have it in the minute order on the docket, obviously, but for

25   purposes of completeness and for purposes of the record, if you

168

1   want to prepare an order, do it, run it by Mr. Powell for

2   approval as to form, and we'll put it on the docket if I think

3   it accurately reflects the Court's rulings, okay?

4          MR. WHITEFLEET:  Understood, Your Honor.

5          THE COURT:  Thank you.  See everybody on Tuesday.

6   Have a good weekend.

7       (Proceedings adjourned at 2:59 p.m.)

8

9                    C E R T I F I C A T E

10

11      I certify that the foregoing is a true and correct

12   transcript of the proceedings in the above-entitled matter.

13

14

15   MARYANN VALENOTI, RMR, CRR          December 3, 2024
     Official Court Reporter                  DATE
16   CA CSR #11266

17

18

19

20

21

22

23

24

25

        MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

1           UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA
                      --oOo--
3
SHANE BEARD, et al.,          ) Case No. 1:21-cv-00841-JAM
4                             )
              Plaintiffs,     ) Sacramento, California
5                             ) May 20, 2024, 9:21 a.m.
         v.                   )
6                             )
COUNTY OF STANISLAUS, et al.,) Re: Trial Day 6
7                             )
              Defendants.     )
8

9               TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JOHN A. MENDEZ
10         SENIOR UNITED STATES DISTRICT JUDGE

11  APPEARANCES:
    For the Plaintiffs:      POWELL & ASSOCIATES by
12                           MR. ROBERT ROSS POWELL
                             925 West Hedding Street
13                           San Jose, California  95126

14                           LAW OFFICE OF SAMUEL H. PARK, APC
                             MR. SAMUEL PARK
15                           374d Bergin Drive, Suite 2
                             Monterey, California  93940
16
    For the Defendants:      PORTER SCOTT by
17                           MR. JOHN ROBERT WHITEFLEET
                             2180 Harvard, Suite 500
18                           Sacramento, California   95815

19  Also Present:            Eric Anderson
                             David Granados
20                           Gloria Solorio

21              MARYANN VALENOTI, RMR, CRR
                   Official Court Reporter
22                 501 I Street, Suite 4-200
                     Sacramento, CA 95814
23              mvalenotiRMRCRR@gmail.com
                      (916)930-4275
24
    Proceedings reported via mechanical steno - transcript produced
25  via computer-aided transcription

1                            I N D E X

2    WITNESSES                                    PAGE

3    APRIL COBBS-MAGEE
          Direct Mr. Whitefleet ....................... 5
4         Cross Mr. Powell .......................... 53
          Redirect Mr. Whitefleet ................... 77
5         Recross Mr. Powell ........................ 83

6    HOWARD COURNEY
          Direct Mr. Powell  ........................ 84
7
     SHANE BEARD
8         Direct (Resumed) .......................... 94
          Cross Mr. Whitefleet ..................... 134
9
     PLAINTIFFS' EXHIBITS
10        No. 97    ................................. 91
          No. 76    ................................ 104
11        No. 77    ................................ 111
          No. 78    ................................ 112
12        No. 79    ................................ 113
          No. 80    ................................ 115
13        No. 81    ................................ 115

14   DEFENDANTS' EXHIBITS
          No. B     ................................. 14
15        No. C     ................................. 15

16

17

18

19

20

21

22

23

24

25

3

```
 1              SACRAMENTO, CALIFORNIA, MONDAY, MAY 20, 2024
 2                            --oOo--
 3          (In open court outside the presence of the jury.)
 4              THE CLERK:  Please remain seated and come to order.
 5     The Honorable John A. Mendez, Senior United States District
 6     Court Judge, presiding.
 7              Calling civil case 21-cv-841, Beard, et al. versus
 8     Stanislaus County, et al.
 9              THE COURT:  Okay.  All the depos have gone through.
10     You have the portions you can play.
11              You must be Ms. Cobbs.
12              MS. COBBS:  Yes.
13              THE COURT:  Welcome.
14              MS. COBBS:  Thank you.
15              THE COURT:  We're going to put her on, so bring in the
16     jury and let's get going.
17              MR. POWELL:  Your Honor, couple little things.
18              THE COURT:  Microphone.
19              MR. POWELL:  Couple things.  I have here, you know, we
20     had to shorten 93 and 94, the recordings, and so this is the
21     one that actually got played to the jury on the stick.  So I
22     wondered if the Court -- I'll give them to Ms. York or swap
23     them in.  We put one of these kind of things in our binder
24     that's got these kinds of things.
25              THE COURT:  Yeah, give them to Ms. York.
```

4

1                MR. POWELL:  And I think Mr. Whitefleet and I have --

2                THE COURT:  Are those all three of the exhibits?

3                MR. POWELL:  No, because one of them didn't get

4  shortened.

5                THE COURT:  That's right.  Okay.  So that's just 93

6  and 94?

7                MR. POWELL:  Yes.

8                THE COURT:  Okay, you hang onto them.

9                MR. POWELL:  And then we have a witness, Howard

10  Courney, who -- you know, Mr. Whitefleet and I agreed, I think,

11  you can correct me if I'm wrong, after he does -- whatever we

12  do with Ms. Cobbs live today, we would hop over to him.  His

13  testimony is not going to be very long, then we'll send him on

14  his way and then proceed in our case, I guess back to my

15  case-in-chief.  I would use the video -- depo video.

16                THE COURT:  Were you going to call Courney?

17                MR. POWELL:  Yes.

18                THE COURT:  Okay.  That's fine.

19                All right.  Bring in the jury, please.

20                MR. POWELL:  Oh, I'm supposed to mention -- never

21  mind, we'll do it on the break.

22     (In open court in the presence of the jury.)

23                THE COURT:  Mr. Whitefleet, you're going to start the

24  questioning?

25                MR. WHITEFLEET:  Yes.

SER-0324

Cobbs-Magee - Direct by Whitefleet

1    THE COURT:  Okay.  Good morning.  All jurors present,

2    all parties present.  We're going to take a witness out of

3    order.

4    Ms. Cobbs, if you would take the stand.  April Cobbs

5    will testify this morning and then we'll go back.  We'll call

6    actually two witnesses out of order and then we'll go back to

7    where we were last Friday.

8    APRIL COBBS-MAGEE, DEFENDANTS' WITNESS, SWORN

9    DIRECT EXAMINATION

10   THE CLERK:  Please say and spell your whole name for

11   the record.

12   THE WITNESS:  My name is April Magee.  That's

13   A-P-R-I-L M-A-G-E-E.

14   THE CLERK:  Thank you.

15   BY MR. WHITEFLEET:

16   Q    Good morning, Ms. Cobbs.

17   A    Good morning.

18   Q    Tell the jury how old you are.

19   A    I am 42.

20   Q    Are you married?

21   A    I am happily for 11 years.

22   Q    Do you have any children?

23   A    I do, I have three children.  I have a 17-year old

24   daughter, a 10-year old daughter and a five-year old son.

25   Q    And where did you grow up?

6

Cobbs-Magee - Direct by Whitefleet

1   A    I grew up in -- on the south side of Stockton, California.

2           THE COURT:  Stay close to that microphone so we can

3   hear you.

4           THE WITNESS:  I'm sorry.

5           THE COURT:  That's okay.

6   BY MR. WHITEFLEET:

7   Q    And you went to college?

8   A    I did.

9   Q    Tell the jury where you went to college.

10  A    I attended Utah State University for my undergrad in

11  communicative disorders in deaf education, and then I got my

12  master's from Touro University Worldwide in marriage and family

13  therapy.

14  Q    Where are you currently living?

15  A    I currently reside in a suburb outside of Dallas, Texas.

16  Q    What are you doing for -- you got a job?

17  A    I do.

18  Q    What are you doing?

19  A    I work for an independent school district as a special

20  education teacher.

21  Q    So why couldn't you be here for the first week of trial?

22          MR. POWELL:  Objection, Your Honor, relevance.

23          THE COURT:  Sustained, it doesn't matter.

24  BY MR. WHITEFLEET:

25  Q    When were you first hired by Stanislaus County?

Cobbs-Magee - Direct by Whitefleet

1    A    I was hired in or around December of 2017, but I didn't

2    physically start in my role until January of 2018.

3    Q    What was the position were you hired for?

4    A    As a social worker trainee and then once my master's

5    posted, I was then moved to a Social Worker IV.

6    Q    And did you know the area that you would be working in as

7    a social worker?

8    A    I did.

9    Q    And what was that?

10   A    I was hired to work within the Emergency Response

11   Department.  That entailed that we responded to -- immediate

12   responses that were called in through our intake department or

13   ten-day referrals that needed some investigation within our

14   department.

15   Q    Okay.  And what was your job immediately before working

16   for the County?

17   A    Prior to me working for the County, I was an early

18   interventionist.  I worked with children ages birth to five who

19   were developmentally delayed.  And then while I worked on my

20   practicum hours, I was actually hired as a mental health

21   therapist working with foster children and families.

22   Q    So once you were on the job and your master's came in, did

23   you do any training on the job for the social worker position?

24   A    Yes.  Throughout my course of the training, we received

25   on-the-job training, naturally, but we also attended academy,

Cobbs-Magee - Direct by Whitefleet

1    social worker academy.

2    Q    What did that generally consist of?

3    A    That entailed we would go through trainings of how to

4    investigate reports of child abuse and neglect appropriately.

5    That included documentation, umm, umm, just things within our

6    investigation and how to go about, umm, executing that.

7    Q    And you said "documentation," what did that mean?

8    A    Umm, it meant that, umm, while we are in the midst of,

9    umm, investigating our referrals, umm, that entailed us

10   ensuring that we were making, umm, informed decisions, in

11   addition to writing, umm, the documentation to the best of our

12   knowledge with the information that we had been provided.

13   Q    Where were you making that documentation, like, they tell

14   you where you're supposed to put that documentation?

15   A    Within our CMS database.

16   Q    Are they also called "delivered service logs"?

17   A    Yes, sir.

18   Q    And what did you understand, when you're making entries

19   into those logs, what you're supposed to do?

20   A    Umm, while making -- well, implementing our documentation

21   within service logs, you would, you know, discuss the current

22   situation, umm, and, umm, you would document your engagement

23   with the family, umm, and, umm, be specific.  Umm, and, umm,

24   just address the current issues to mitigate whatever the risk,

25   umm, that was reported to our agency.

9

Cobbs-Magee - Direct by Whitefleet

1  Q    Was there any training about being truthful in
2  documentation?
3  A    Yes.
4  Q    And what did you understand the reason for that?
5  A    Umm, it was because our information can be used at a later
6  date, umm, whether it be like as we're here for a trial or,
7  umm, documentation, for instance, if you move to a higher level
8  of intervention with -- you know, within the court system.
9  Q    And was there any training about, umm, the completeness of
10 the entries; whether that you could go back and do them
11 piecemeal or are they supposed to be in some other form?
12         MR. POWELL:  Objection, compound.
13         THE COURT:  Overruled.  Go ahead.
14         THE WITNESS:  Could you repeat that, please?
15 BY MR. WHITEFLEET:
16 Q    Sure.  In terms of making the entries, was there any
17 training about whether you should be complete in making those
18 entries?
19         MR. POWELL:  Objection, Your Honor, leading.
20         THE COURT:  Sustained.  Rephrase.
21 BY MR. WHITEFLEET:
22 Q    Does the training include, umm, how to make the entries
23 complete?
24 A    Yes.
25 Q    And what did you understand to be that?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Cobbs-Magee - Direct by Whitefleet

1  A    Umm, to make the information complete it was -- you would

2  be specific.  You would not, umm, be bias.  You would just use

3  the facts that you, umm, concluded through your investigation.

4  Q    Was there any training about who might access the

5  delivered service logs?

6  A    Yes.

7  Q    Who was that?

8  A    Who provided the training?

9  Q    No, who -- what was your understanding of who might access

10  the service logs?

11  A    My understanding was that could be accessed by, you know,

12  umm, the courts or the family may have -- can subpoena to have

13  access to that information at a later date.

14  Q    All right.  And in terms of that training, did you gain an

15  understanding of the purpose of your job as a ER social worker?

16  A    Yes.

17  Q    What was that?

18  A    The purpose of my job as an ER worker was to, umm, conduct

19  my investigations in the best interests of the children in the

20  family that we served in the community.

21  Q    What did that mean to you?

22  A    That meant, to me, umm, me treating the clients that I

23  work with the same level of respect and integrity that I would

24  want somebody to treat me with.

25  Q    Did you have -- once you were a social worker, did you

Cobbs-Magee - Direct by Whitefleet

1   have training on protective custody warrants?

2   A    Yes.

3   Q    How many trainings did you have on that?

4   A    Approximately two.

5   Q    And, umm, what was the form of the training?

6   A    Umm, as far as like in person or?

7   Q    Yes.

8   A    I believe they were virtual, because we were in the midst

9   of COVID at some point in time.

10  Q    And do you recall who put the training on?

11  A    I do.

12  Q    And who was that?

13  A    Our County counsel.

14  Q    And what kind of information do you recall learning in

15  that training about what goes in a warrant?

16  A    I recall being trained to be, again, specific, to state

17  the facts, umm, to state, umm, the current issue that's going

18  on within the family as a whole, umm, to state, umm, any

19  mitigating factors, whether we, umm -- you know, the family's

20  ability to be cooperative and maybe participate in whether it

21  be parenting or counseling or, umm, therapeutic services to

22  address mental health.  And what that entailed, whether they

23  were open to it or not.

24       And, umm -- I'm sorry, I just went blank.  Umm, basically

25  all of that in addition to their overall history with the

Cobbs-Magee - Direct by Whitefleet

1   contact with the agency, umm, and we just, umm -- that's all I

2   could think of right now.

3   Q    Do you remember how long that training was?

4   A    I don't recall the time.

5   Q    Umm, after you attended the training, did you have any

6   understanding in terms of, umm, whether the warrant should

7   include false or misleading information?

8   A    Yes.  Warrants should not -- you should be, again,

9   specific.  You should not omit information and falsify

10  information to fluff it up of some sort.  It should just be the

11  straight direct facts and what were the safety risks.

12  Q    Do you have any understanding in terms of when you signed

13  the warrant, what that meant?

14  A    Yes.

15  Q    What does that mean?

16  A    It means that everything that we placed into that warrant

17  was true and factual to the best of our knowledge.

18  Q    Okay.  Were you also trained, once you got to the job with

19  the County, on the County's policies?

20  A    Yes.

21  Q    Turn to Exhibit B.

22  A    Okay.

23  Q    It should be there.

24  A    Yes.

25       MR. POWELL:  Give us a moment, John.

Cobbs-Magee - Direct by Whitefleet

1   BY MR. WHITEFLEET:

2   Q    Do you recognize that document?

3   A    I do.

4   Q    What is it?

5   A    This is, umm, the "Intake and Assessment Protective

6   Custody Guidelines."

7   Q    And were you trained on this policy when you got to the

8   County?

9   A    Yes.

10  Q    Did you have an understanding as to what the purpose of

11  that policy was?

12  A    Yes.

13  Q    What was it?

14  A    The purpose of this, umm, policy was to ensure that the

15  children who were at substantial risk of being harmed, whether

16  it be physically or emotionally, and our agency feels that

17  there is no reasonable way of mitigating and ensuring that the

18  child is safe from physical harm or emotional abuse without

19  being removed.

20  Q    And did you have an understanding that you were supposed

21  to follow this policy in your job?

22  A    Yes, sir.

23  Q    And -- okay.

24           MR. WHITEFLEET:  I would move Exhibit B into evidence.

25           THE COURT:  Any objection?

14

                    Cobbs-Magee - Direct by Whitefleet

1           MR. POWELL:  No objection.

2           THE COURT:  It's admitted.

3        (Defendants' Exhibit B admitted in evidence.)

4   BY MR. WHITEFLEET:

5   Q    Turn to Exhibit C for me, please.  Do you recognize that

6   document?

7   A    Yes.

8   Q    What is it?

9   A    This is the "Protective Custody" or "Search Warrant," the

10  guidelines.

11  Q    And were you trained on this policy?

12  A    Yes.

13  Q    And what did you understand this policy to be?

14  A    This policy is -- it is a document that allows us to enter

15  for -- to take custody of the child.

16  Q    Specific under warrants?

17  A    Yes.

18          MR. POWELL:  Objection, Your Honor, move to strike,

19  that was not a question, and the response.

20          THE COURT:  Overruled.

21          Go ahead.

22  BY MR. WHITEFLEET:

23  Q    Did you understand that you were to follow this policy in

24  doing your job?

25  A    Yes.

                    Cobbs-Magee - Direct by Whitefleet

1        MR. POWELL:  Objection, Your Honor, leading as well.

2        THE COURT:  Overruled.

3        THE WITNESS:  Yes, sir.

4        MR. WHITEFLEET:  Move Exhibit C into evidence?

5        THE COURT:  Any objection?

6        MR. POWELL:  Objection, Your Honor.

7        THE COURT:  What?

8        MR. POWELL:  Objection.

9        THE COURT:  Grounds.

10       MR. POWELL:  Lacks foundation as to this witness.

11       THE COURT:  Overruled.  Exhibit C is admitted.

12     (Defendants' Exhibit C admitted in evidence.)

13   BY MR. WHITEFLEET:

14   Q    All right.  So after all this training on warrants and the

15   policies that you became familiar with, what was your

16   understanding of what was supposed to go into a warrant when

17   you're drafting it?

18   A    The information that was to go into the warrant was the

19   current issue that led us to having contact with the family, in

20   addition to any of the information -- or their history that may

21   be benefit -- or not benefit, that may be of -- how do I say

22   this?  Any history that may be of importance to strengthen our

23   concerns for a lack of supervision or safety within the home.

24       The current issue with the family should be in the

25   warrant.  Again, any ways we've attempted to mitigate this

Cobbs-Magee - Direct by Whitefleet

1   moving from further intervention and what that looked like, and
2   whether the family was willing to -- willing to -- how do I say
3   this?  Whether the family was in -- were -- I'm sorry -- had
4   any knowledge or were willing to alleviate the concerns.
5        That's pretty much the overview.
6   Q    Have you heard the term "probable cause"?
7   A    Yes.
8   Q    What is your understanding of that?
9   A    Probable cause --
10            THE COURT:  Is there an objection?
11            MR. POWELL:  Yes.
12            THE COURT:  You got to get into the microphone so I
13   can hear you.  Go ahead.
14            MR. POWELL:  Objection, lacks foundation, this
15   witness.
16            THE COURT:  Overruled.  He's just asking her her
17   understanding.
18            Go ahead.
19            THE WITNESS:  My understanding of probable cause is
20   there is a concern or that a crime or that an offense has been
21   committed that possibly would need further court intervention.
22   BY MR. WHITEFLEET:
23   Q    You were deposed in this case; do you remember that?
24   A    I do.
25   Q    And since that time, have you become familiar with what

Cobbs-Magee - Direct by Whitefleet

1    the term "material"; means?

2    A    Yes.

3          MR. POWELL:  Objection, Your Honor, relevance as to

4    time.

5          THE COURT:  Overruled.

6          Go ahead.

7    BY MR. WHITEFLEET:

8    Q    What's your understanding of that term?

9    A    I'm sorry, I can't recall what the -- but I do recall that

10   term you're talking about, I just can't verbalize what that

11   looked like.

12   Q    What about Welfare and Institutions Code 300, are you

13   familiar with that section?

14   A    I am.

15   Q    What is your understanding of that section?

16   A    That section is, umm -- our overall guideline within

17   California is that there is a substantial concern that the risk

18   within -- or excuse me, that children are at risk of -- whether

19   it be emotional or physical abuse.  And there -- again, there

20   has to be no reasonable, umm -- they have not attempted to

21   mitigate the child from being at risk of being harmed, so that

22   entailed is that there was no other recourse but to remove the

23   child to ensure that they're safe.

24   Q    So after all this training on policies and all that, did

25   you ever gain an awareness of what consequences there might be

Cobbs-Magee - Direct by Whitefleet

1  to a family as a result of any actions you might take on a

2  removal?

3  A    Of course, yes.

4  Q    What were those?

5  A    Umm, it was that, umm, removing a child from their family,

6  or dismantling a family, it is very traumatic in itself.  So

7  throughout my course of my career within the agency, I would

8  attempt to use any other resources and work with families to

9  mitigate the children being removed because I understand the

10  long-term emotional, mental effects that it takes being

11  removed.  It's very traumatic.

12  Q    So prior to July 19, 2019, which is the date of the

13  execution of the warrant in this case, how long had you been on

14  the job?

15  A    Over a year, year and a half.

16  Q    How many warrants in that time had you drafted?

17  A    I would say less than five.

18  Q    Had you ever had a judge reject a warrant that you had

19  written?

20  A    No, sir.

21  Q    Had you ever had any criticism by any judge after a

22  removal occurred about the basis for the removal, that you're

23  aware of?

24         MR. POWELL:  Objection, Your Honor, hearsay.

25         THE COURT:  Sustained.  Also not relevant.

Cobbs-Magee - Direct by Whitefleet

1      Go ahead.  Next question.

2   BY MR. WHITEFLEET:

3   Q    Once a removal occurs, are you typically involved?

4   A    No.

5   Q    Do you have an understanding of what happens after the

6   removal?

7   A    I do.

8   Q    In terms of what happens in the juvenile court?

9   A    Yes.

10  Q    And what's that, generally?

11       MR. POWELL:  Objection, Your Honor, calls -- lacks

12  foundation as to this witness and seems to call for improper

13  opinion from this witness.

14       THE COURT:  Overruled on foundation.

15       Why do you need her to testify as to what happens?  If

16  you want to take judicial notice, I'll take judicial notice.

17  She wasn't involved, right?

18       MR. WHITEFLEET:  Yeah, I'd ask the Court to take

19  judicial notice of the process --

20       THE COURT:  That's fine.

21       MR. WHITEFLEET:  -- in terms of the fact that there is

22  a detention hearing and a jurisdictional dispositional hearing.

23       THE COURT:  I'll take judicial notice.

24       MR. POWELL:  Your Honor, may I ask the Court to take

25  judicial notice of Welfare and Institution Code Section 300

20

                    Cobbs-Magee - Direct by Whitefleet

1    that's been testified about as well?

2            THE COURT:  Sure, I'll take judicial notice that it

3    exists.

4            MR. POWELL:  Thank you.

5    BY MR. WHITEFLEET:

6    Q    Have you ever received criticism from anyone after the

7    removal for the basis of the removal pursuant to a warrant that

8    you obtained?

9            MR. POWELL:  Objection, Your Honor, it's again

10   hearsay.

11           THE COURT:  Sustained.

12           THE WITNESS:  Am I to answer that?

13           THE COURT:  No, no.

14           THE WITNESS:  I'm sorry.

15   BY MR. WHITEFLEET:

16   Q    So in this case how were you first assigned?

17   A    Calls that are routed through our agency, whether it be a

18   reporting party or a mandated reporting party, is called in to

19   our intake team.  And once the call is reported to our intake

20   team, they use a structured decision making tool to assess the

21   level of severity, whether it would be the referral, it's just

22   for historical purposes, that someone has reported this

23   concern, or if it needed an immediate response, which means we

24   have a two-hour timeframe to respond, or it required some

25   further follow-up, which would be a ten-day report.

Cobbs-Magee - Direct by Whitefleet

1  Q   Are you involved in that decision-making process?

2  A   No.

3  Q   Is there somebody, like a position within ER that does

4  that?

5  A   Yes.

6  Q   Do you know what that's called?

7  A   It is our intake social workers.

8  Q   Have you ever heard the term "screener"?

9  A   Yes.

10 Q   Is that the same thing, intake versus screener?

11 A   Yes, sir.

12 Q   So when you were assigned to this case, did you ask for

13 it?

14 A   No, sir.

15 Q   Did you have any choice?

16 A   No.

17 Q   So what were the specific allegations in this case when

18 you were first assigned to that you were responding to?

19 A   I believe there was a concern about the siblings within

20 the home, and there was a concern with lack of supervision

21 between one of the older siblings and a younger sibling.

22 Q   I'm showing Exhibit 70.  Is that the allegation you were

23 responding to?

24 A   Yes, sir.

25 Q   So what was the specific allegation?

Cobbs-Magee - Direct by Whitefleet

1   A    That Alfredo, at the age -- at that time was five,

2   reported that William was touching him inappropriately during

3   showering.

4   Q    So what was your process when you get a referral like

5   this; what did you generally do?

6   A    Generally, we would, of course, review the aforementioned

7   document, and then if time permitted, look at whether there's

8   any previous concerns.

9   Q    All right.  So then at some point did you do that, look at

10  the service logs to see if there were previous concerns?

11          MR. POWELL:  Objection, vague as to time, relevance.

12          THE COURT:  Overruled.

13          THE WITNESS:  I believe I did skim over so I can get a

14  picture.

15  BY MR. WHITEFLEET:

16  Q    I mean, ultimately, before you wrote the warrant, you just

17  reviewed the service logs?

18          MR. POWELL:  Objection, Your Honor, leading.

19          THE COURT:  Sustained.

20  BY MR. WHITEFLEET:

21  Q    Before you wrote the warrant, was part of your process to

22  review the service logs?

23  A    Oh, yes.

24  Q    So before you wrote the warrant, what are some of the

25  things in the service logs that caused you concern?

23

Cobbs-Magee - Direct by Whitefleet

1   A    There was a reoccurring concern, safety concern with

2   supervision within the house.  It was a concern with regards to

3   inappropriate touching among other family members with

4   Ms. Perez's children.  There was a concern of lack of

5   supervision.  I believe, if my memory serves me correctly,

6   Alfredo broke a bone or something, and there was a concern with

7   the older children having to supervise the younger children.

8   It just was a multitude of things.  In addition to, I believe,

9   substance abuse while breastfeeding as well.

10  Q    Was there any aspect of the service logs that you reviewed

11  that caused you concern about Ms. Beard's [sic] mental health?

12  A    Yes.

13          THE COURT:  Perez.

14  BY MR. WHITEFLEET:

15  Q    Sorry, Ms. Perez's mental health?

16  A    Yes, sir.  There was a couple of instances where she

17  threatened or had suicidal ideations and expressed that to her

18  older daughter.

19  Q    Showing you Exhibit 2 there.  Do you recall reading that

20  entry before you wrote the warrant?

21  A    Yes.

22  Q    Was this part of the mental health concerns that you had?

23  A    Yes, sir.

24  Q    Why?

25  A    Because her family had threatened to have her admitted to

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Cobbs-Magee - Direct by Whitefleet

1   a psychiatric ward, and it just -- it just was a concern, in
2   addition to her making previous suicidal ideations to a minor
3   child and threatening to harm herself in the presence of the
4   minor child.
5   Q   And did you review Exhibit 3 about this incident between
6   cousins of an allegation that Horacio, Jr. was molested by a
7   male cousin?
8   A   I do recall revisiting -- or viewing that, I do.
9   Q   Did you have any concerns because of that prior history
10  log?
11  A   I did.
12  Q   What was the concern?
13  A   Well, there was no CPS reports about that or her making an
14  attempt to make our agency aware, nor were there any police
15  reports to corroborate law enforcement being notified, and the
16  level or lack of supervision, you know, the children having
17  access to each other still.
18  Q   All right.  And then turning to Exhibit 22, pardon me
19  while I get there.  Did you read this one?
20  A   Yes.
21  Q   And what's your understanding of this report?
22  A   One of the children were sexually -- or touched
23  inappropriately.  There was some inappropriate boundaries
24  between cousins; I believe, paternal cousins.  There was a
25  concern with --

Cobbs-Magee - Direct by Whitefleet

1    THE COURT:  The report speaks for itself.

2    What's your question?

3    MR. WHITEFLEET:  Okay.

4  BY MR. WHITEFLEET:

5  Q    In terms of what was it about this particular report that

6  caused you concern, if any?

7  A    The way that Ms. Perez handled the situation, her bribing

8  the children with toys so they wouldn't say anything, that was

9  a huge red flag for me.

10 Q    And did you see anywhere where the police were called as a

11 result of this incident?

12    MR. POWELL:  Objection, document speaks for itself,

13 Your Honor.

14    MR. WHITEFLEET:  I'm not asking for her to review the

15 document.

16 BY MR. WHITEFLEET:

17 Q    In general, in the service logs, did you ever see anywhere

18 where the police had been called on this incident?

19 A    Yes -- well, this specific incident or others?

20 Q    That specific incident.

21 A    Yes, law enforcement was called out.

22 Q    All right.  And in reviewing the logs, do you recall

23 reading a log about -- in 2017 where Freddy, Jr. fell and broke

24 his arm?

25 A    I do recall that.

Cobbs-Magee - Direct by Whitefleet

1  Q    Was there any concern that you had as a result of that
2  incident?
3  A    Yes.
4          THE COURT:  She just testified that she did.
5          MR. WHITEFLEET:  Okay.  Thank you, Your Honor, I might
6  have missed it.
7  BY MR. WHITEFLEET:
8  Q    All right.  So what did you do for your investigation of
9  the allegations?
10 A    For the specific --
11         MR. POWELL:  Objection, Your Honor, overbroad.
12         THE COURT:  Overruled.
13         Do you want to put a time on it, be a little more
14 specific?
15         MR. WHITEFLEET:  Sure.
16 BY MR. WHITEFLEET:
17 Q    What did you do in terms of, generally, your process for
18 investigating the allegation?
19 A    Okay.  My process for investigating the allegation was,
20 you know, to, again, skim over their history to get a big
21 picture as to what's going on within the family unit.
22     Once I made contact with the family, we addressed the
23 concerns reported to our agency.
24 Q    And so does any of that process involve doing interviews?
25 A    Yes, sir.

Cobbs-Magee - Direct by Whitefleet

1   Q    So what was your process for that?

2   A    My process was I met with the family and we had a dialogue

3   about the current safety concerns that was brought to the

4   attention of our agency.

5   Q    And after that -- strike that.

6        What did you do for those interviews?

7   A    On that particular day?

8   Q    Yes.

9   A    Okay.  I recall speaking with Ms. Perez in her home

10  regarding, again, the safety concerns brought to our agency, in

11  addition to speaking to the children within the home who agreed

12  to speak to me as well.

13  Q    Why was Ms. Jones there?

14  A    My memory serves me correctly, Ms. Jones also had a

15  referral.  I don't know the timeline of where that referral

16  came, but she had some safety concerns that she needed to

17  address as well on a different referral.

18  Q    And did you ever gain an understanding of what that

19  referral was about?

20  A    Off the top of my head right now, I don't recall what it

21  was about.

22  Q    Prior to interviewing the family at the home, did you and

23  Ms. Jones coordinate in terms of how that would go?

24  A    With regards to how we conducted our investigations you're

25  talking about?

Cobbs-Magee - Direct by Whitefleet

1    Q    Yes.

2    A    No, because she needed to address her concerns and I

3    needed to address mine as well.

4    Q    Was there any agreement about who would conduct the

5    investigation first, like who would do any interviews first

6    when you arrived at the house?

7    A    I don't recall there being a conversation about who would

8    go first, no.

9    Q    And then did you document the interview in the service

10   logs?

11   A    Yes, sir.

12   Q    All right.  Showing you Exhibit 72, as soon as I get

13   there, are these your entries that you made after you conducted

14   the interviews?

15   A    Yes, sir.

16          MR. POWELL:  John, you said 72?

17          MR. WHITEFLEET:  Yes -- oh, that's 71, okay.  Sorry,

18   you're right, 72 is the warrant, I'm sorry.

19   BY MR. WHITEFLEET:

20   Q    I'm sorry, showing you 71.

21          MR. WHITEFLEET:  Correction, for the record.

22          Thank you.

23   BY MR. WHITEFLEET:

24   Q    So this is 71, this is what you documented for your

25   interviews?

Cobbs-Magee - Direct by Whitefleet

1  A    Correct.

2  Q    So what was your -- what were your conclusions after

3  interviewing Ms. Perez about this "sleepy, sleepy" incident

4  with the children?

5  A    During my investigation I --

6  Q    Closer to the microphone, please.

7  A    I'm sorry, during my investigation it was concluded that

8  there continued to be a safety concern within the home where

9  the kids are inappropriately touching each other and boundaries

10 were being crossed and a lack of supervision.

11 Q    Did it matter to you that Ms. Perez had said to the

12 children, Don't do that anymore?

13 A    I'm sorry, could you repeat that?

14 Q    Sure.  Did you have any understanding that Ms. Perez at

15 some point had said, I told the children, you know, to cut that

16 out, words to that effect, that it was inappropriate?

17 A    I don't think there was ever any -- I don't recall there

18 ever being a dialogue about that being inappropriate, I don't

19 recall that.

20 Q    Did you have an understanding of the sleepy, sleepy game

21 in terms of how long it had been going on?

22 A    I was not aware of how long it had been going on.  I just

23 was made aware that it happened on her watch.

24 Q    Okay.  And what about the distinctions that Ms. Perez says

25 about -- that Christopher touched Alfredo on the belt as

Cobbs-Magee - Direct by Whitefleet

1   opposed to the privates; what were your thoughts on that?

2   A    To me there was no distinction between the belt.  It was

3   just the fact that they were touching each other

4   inappropriately, and there was a lack of supervision in the

5   home.

6        MR. POWELL:  Objection, Your Honor, non-responsive,

7   move to strike.

8        THE COURT:  Overruled.

9   BY MR. WHITEFLEET:

10  Q    What about the historical service logs on the recitation

11  of that incident, did you have any understanding that there

12  were different versions of what that game entailed?

13       MR. POWELL:  Objection, Your Honor, that's leading.

14       THE COURT:  Sustained.

15  BY MR. WHITEFLEET:

16  Q    Were there other things in the service logs about that

17  sleepy, sleepy game about where the children were touching each

18  other that caused you concern?

19       MR. POWELL:  Objection, Your Honor, compound and

20  leading.

21       THE COURT:  Sustained.

22  BY MR. WHITEFLEET:

23  Q    Was there anything in the service logs that caused you

24  concern about where the children allegedly touched each other

25  in that game?

Cobbs-Magee - Direct by Whitefleet

1   A    Are you talking about within the home where it occurred
2   or -- I'm sorry.
3   Q    No, where on the body?
4   A    Oh, where on the body.  It was in the private parts.
5   Q    Anywhere else?
6   A    I believe the testicles.
7   Q    Was there anything else in the service logs that caused
8   you concern about that game?
9   A    The age difference.  I know they're siblings, but being
10  that there had been a history of inappropriate boundaries, that
11  they still were being unsupervised and allowed to be alone with
12  each other.
13  Q    Was there also an allegation that you were -- that you, at
14  least, looked into as part of your investigation about
15  showering together?
16  A    Yes.
17  Q    And what did you conclude about that?
18  A    That Ms. Perez was allowing her -- they referred to her,
19  correct me if I'm wrong, Victoria, to bathe with -- Victoria
20  who was -- is transgender, male to female, bathing with the
21  younger sibling.
22  Q    Was there anything that you raised with Ms. Perez about
23  doctors' appointments that were part of your concerns?
24  A    Yes.  It appeared that Ms. Perez had taken Alfredo to
25  several doctors' appointments expressing concerns of sexual

Cobbs-Magee - Direct by Whitefleet

1   abuse by Alfredo's biological father, and what that entailed is

2   him being examined because there were concerns of sexual abuse.

3   Q    Who expressed the concerns of sexual abuse?

4   A    Ms. Perez.

5   Q    And what was your understanding of the result of those

6   doctors' exams?

7          MR. POWELL:  Objection, Your Honor, compound,

8   overbroad, multiple, it sounds like.

9          THE COURT:  Overruled.

10         You can answer.

11         THE WITNESS:  I'm sorry.  The results of that, there

12  were no concerns of sexual abuse.

13  BY MR. WHITEFLEET:

14  Q    As part of your investigation, did you seek medical

15  records?

16  A    Yes.

17  Q    And in any of those records, did that cause you any

18  concern about any sustained allegation by a doctor of sexual

19  abuse?

20  A    No, sir.

21  Q    Did you ever use the term "doctor shopping" with

22  Ms. Perez?

23  A    I don't recall using that term, no.

24  Q    And then what about the CAIRE reports -- excuse me, the

25  CAIRE interviews, what's your understanding of CAIRE

33

Cobbs-Magee - Direct by Whitefleet

1   interviews, C-A-I-R-E?

2   A    I don't recall the exact acronym, but it is a forensic

3   interview where these people are trained, they're

4   professionals, to conduct sexual abuse interviews, yes.

5   Q    Do you have any role in that?

6   A    No, sir.

7   Q    Can you schedule one?

8   A    No.

9   Q    Can you cancel one?

10  A    No.

11  Q    All right.  What were your concerns about the CAIRE

12  interviews?

13  A    Well, Alfredo had participated in I don't know how many,

14  but he had participated in a couple, and there were no sexual

15  abuse substantiations and he made no disclosures.

16  Q    So why was that important to you for your investigation?

17  A    Because of -- I'm sorry.  Because, again, there she was

18  reporting concerns of sexual abuse; however, through medical

19  records, forensic exams, and the forensic interview there were

20  no substantiations of sexual abuse, nor there was no medical

21  proof in addition to that, or disclosures.

22  Q    So why did that cause you concern?

23  A    It caused me a huge concern because those sexual -- those

24  examinations are very, very invasive, and being that he is

25  young, you know, and vulnerable, those -- it's extensive, and

Cobbs-Magee - Direct by Whitefleet

1    it was a concern that he was being exposed to or made to go

2    through those examinations when he had -- you know, there were

3    no concerns being substantiated.  In addition to participating

4    in CAIRE interviews, those things are very detailed, they

5    probably cause children stress, and, again, he made no

6    disclosures of sexual abuse.

7    Q    How long were you at the house doing the interviews for

8    this allegation?

9    A    I'm sorry, I can't give you a time frame, but we were

10   there for some time.

11   Q    Do you have an estimate?

12   A    More than an hour.  I don't --

13   Q    How long in that time frame involved interviews with the

14   children?

15   A    A small portion of it.

16   Q    Were there any children where you refused to interview?

17   A    Yes.

18   Q    Why?

19   A    Why was I refused?

20   Q    No, no, no.  That you refused to interview.

21   A    No, sir.

22   Q    But some children refused to interview with you?

23   A    Correct.

24   Q    And why was that, if you know?

25            MR. POWELL:  Objection, calls for speculation or

Cobbs-Magee - Direct by Whitefleet

1    hearsay.

2         THE COURT:  Sustained.

3    BY MR. WHITEFLEET:

4    Q    Did you have an understanding as to which child refused to

5    interview with you during that interview?

6         MR. POWELL:  Objection, Your Honor, it's now leading,

7    still lacks foundation.

8         THE COURT:  What do you mean did she have an

9    understanding?  Is your question --

10   BY MR. WHITEFLEET:

11   Q    All right.  So in terms of your process --

12        THE COURT:  That's a vague question.

13        MR. WHITEFLEET:  Sure.  I'll withdraw and restate.

14   BY MR. WHITEFLEET:

15   Q    Which children did you interview during the process?

16   A    I want to say Christopher.

17   Q    Would it help to review your notes?

18   A    Yes.

19        MR. WHITEFLEET:  Actually, may I approach, Your Honor?

20   I'm going to give her paper copies so it's easier.

21        THE COURT:  Yes.  If it's in the notes, I'll let you

22   lead a little, so you can just -- the notes speak for

23   themselves.  We know from the notes who she interviewed.  Just

24   do that, Mr. Whitefleet.  I'm starting to expedite this.  Notes

25   are in evidence, it says who she interviewed.

Cobbs-Magee - Direct by Whitefleet

BY MR. WHITEFLEET:

Q    Let me ask you this way since -- to be more expedient with
this:  What was your impression of Ms. Perez after the
interview of terms of her willingness to mitigate your
concerns?

          MR. POWELL:  Objection, relevance.

          THE COURT:  Overruled.

          THE WITNESS:  My impression was that she just
genuinely -- and again, this is my impression, that she was not
aware of the safety concerns within her home.

BY MR. WHITEFLEET:

Q    And why was that -- why did that cause you concern?

A    That caused me concern because that -- I had to assess her
ability to be protected and to ensure her children were safe.

Q    Did it matter to you that the children indicated that they
did not feel unsafe?

A    Yes and no.

Q    Please explain.

A    Because throughout my course of conducting investigations,
a lot of children genuinely don't know what "feels safe" looks
like to them.

Q    And so when a child says yes, they feel safe, how does
that factor into your analysis?

A    Well, that allows me -- could you repeat that, please?

Q    Sure.  When a child says yes, they feel safe, how does

Cobbs-Magee - Direct by Whitefleet

1    that factor into your analysis?

2    A    It factors in my analysis, in that it means that overall,

3    as far as like they may feel some level of security with

4    whomever is their care provider, but with regards to them being

5    actually mentally and emotionally safe, they may not.

6    Q    When you were doing the interviews, did you raise a

7    concern with Ms. Perez about her questioning her children using

8    leading questions?

9            MR. POWELL:  Objection, Your Honor, leading question

10    there.

11            THE COURT:  Sustained.  Yeah.

12    BY MR. WHITEFLEET:

13    Q    When you were speaking with Ms. Perez, how did you address

14    concerns about the way she questioned her children?

15            MR. POWELL:  Objection, Your Honor, assumes facts not

16    in evidence that she had a concern.

17            THE COURT:  Sustained, the way it's phrased.

18    BY MR. WHITEFLEET:

19    Q    Did you have any concerns about the way Ms. Perez may have

20    been questioning her children?

21    A    Yes, because throughout my career, leading questions, you

22    are probing or prompting the child to answer in the manner that

23    you want them to.

24    Q    What does that mean?

25    A    So if I ask a child -- it's getting the desired answer you

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

38

Cobbs-Magee - Direct by Whitefleet

1   want.

2   Q    So what was your concern with Ms. Perez on that?

3   A    Because I felt the leading questions were getting her the

4   desired answer that she wanted in that manner.

5   Q    And what about the doctors' appointments, was the number

6   of doctor appointments a concern for you?

7   A    The number of doctor appointments was a concern to me.  In

8   addition to, it appeared there was a pattern that the doctor

9   appointments were scheduled after Alfredo's visits with his

10  biological father.

11  Q    All right.  So at the interview had you already scheduled

12  a TDM?

13  A    At that time, no.

14  Q    Okay.  Was a TDM to be scheduled?

15  A    Yes, sir.

16  Q    And when was that scheduled for?

17  A    I don't remember the -- it was for -- I believe that was

18  on a Friday.  Correct me if I'm wrong, I can't recall, but it

19  was for that following business day.

20  Q    Okay.  And what does TDM stand for?

21  A    Team Decision Meeting.

22  Q    What is the purpose of that?

23  A    It is where we sit down with the family, the agency sits

24  down with the family, and we discuss the current issue, just so

25  we could assess and provide or alleviate some of the safety

Cobbs-Magee - Direct by Whitefleet

1  concerns -- or not some of, the safety concerns within the

2  family unit without -- can I talk about what my goal was for

3  that?

4  Q    Yes, please do.

5  A    My goal -- and I want to -- is this appropriate to say?  I

6  never thought Hilda was a bad mom or Shane was a bad father.  I

7  can tell she genuinely loves her children, she does.  I just

8  felt there needed to be some -- there needed to be some areas

9  where she could probably strengthen her parenting skills.

10       So going into the TDM --

11           MR. POWELL:  Objection, Your Honor, it's a narrative

12  now on a non-question.

13           THE COURT:  Ask another question.

14  BY MR. WHITEFLEET:

15  Q    So what were your goals, then, at the TDM?

16  A    To mitigate any of the safety concerns brought to our

17  agency and to provide the family with the resources they need.

18  Q    Did you have conversations with Shynelle Jones about

19  ensuring Shane was there?

20  A    I do recall having a conversation with Ms. Jones about

21  that, yes.

22  Q    Did you ask her to make a call about that?

23  A    I don't recall if I asked her to call, but he was called.

24  Q    Were you aware that Shynelle said that his attendance was

25  not mandatory?

Cobbs-Magee - Direct by Whitefleet

1      MR. POWELL:  Objection, Your Honor, leading.  It's

2   also vague as to time.

3      THE COURT:  Sustained.

4   BY MR. WHITEFLEET:

5   Q   Did you direct -- let me put it this way:  Did you tell

6   Shynelle Jones to tell Mr. Beard that his attendance was not

7   mandatory?

8   A   No, I did not.

9   Q   Were you aware, prior to the TDM, as to whether Ms. Jones

10  said that Shane Beard did not have to be there?

11  A   No, I was not.

12  Q   Did you have any role in ensuring that the other fathers

13  were present?

14  A   Yes, but there was a barrier.  I believe she had a

15  protective order against one, if my memory serves me correctly,

16  so he couldn't physically be there.  And at that time I did not

17  have a way to get ahold of the other one.  So...

18  Q   Okay.  Who was -- let me strike that.

19      The TDM that occurred, how long did it take place?

20  A   Give or take 10 or 15 minutes, tops.

21  Q   Did anyone raise any voices during it?

22  A   No, sir.

23  Q   Anybody slam a folder or anything on the table?

24  A   No, sir.

25  Q   So what happened?

Cobbs-Magee - Direct by Whitefleet

1    MR. POWELL:  Objection, calls for a narrative.

2    THE COURT:  Sustained.

3  BY MR. WHITEFLEET:

4  Q    What is the first thing you recall happening at the TDM?

5  A    Hilda, along with Shane, and at the time I didn't know who

6  the other lady was, came in, sit down, we probably even got

7  through introductions of who we were, and then she immediately

8  asked for discovery or something like that, along those lines.

9  Q    Had that ever happened to you before?

10  A    No, sir.

11  Q    Had you ever had any training about whether a person had a

12  right to an attorney at a TDM?

13  A    No, sir.

14  Q    And have you heard of a family demanding an attorney at a

15  TDM?

16  A    No, sir.

17  Q    So what happened when Ms. Perez asked for an attorney or

18  discovery?

19  A    I believe Mr. Anderson told her that at that moment -- or

20  we did not have -- we don't have that, or something along those

21  lines.  I don't even know what a discovery is to this day, but

22  that was not something that we provided.  So...

23  Q    So what happened after that?

24  A    She continued to ask for it, and then I believe we

25  assessed whether she wanted to continue with the meeting, and

Cobbs-Magee - Direct by Whitefleet

1   she did not.

2   Q    All right.  Were you angry that they left?

3   A    I wasn't angry, no.

4   Q    Did you hold any animosity towards either Ms. Perez or

5   Mr. Beard that they left?

6   A    No.

7   Q    And when they were leaving, did you give them any

8   advice -- did you say, Hey, you need to stay, you should stay,

9   or something like that?

10  A    No, but we did advise them that we would be conducting a

11  further meeting.

12  Q    So was there any discussion at all about why you were

13  there, did it ever get that far?

14  A    We never even got that far.

15  Q    So once they left, what was the discussion about?

16  A    We discussed scheduling a TAP staffing, at what time I

17  don't recall.  And what that is is where all of the

18  departments --

19       MR. POWELL:  Objection, move to strike beyond

20  scheduling of the staffing.

21       THE COURT:  Next question.

22  BY MR. WHITEFLEET:

23  Q    What is a TAP?

24  A    A TAP is where we sit down as a agency and you have

25  someone from court, you have supervisors, we all sit down at

Cobbs-Magee - Direct by Whitefleet

1   the table -- I believe every agency, family maintenance, we sit

2   down, we discuss the mitigating -- I mean, the current issue,

3   ways we've attempted to mitigate and alleviate the children

4   being at risk, and discuss what that looked like; were they

5   willing to participate in services, would it be voluntarily or

6   resources or -- you know, needed to mitigate the kids being at

7   risk.  And if we could not, we made a determining factor

8   whether to move forward with further intervention or not.

9   Q   Was that TAP meeting -- did that TDM morph into a TAP

10  immediately or was it separately scheduled?

11          MR. POWELL:  Objection, Your Honor, leading.

12          THE COURT:  Overruled.  Just trying to move this

13  along.

14          Go ahead.  I'll allow a little leading.  Go ahead.

15          THE WITNESS:  Sorry.  I believe it was -- I don't

16  recall it being like right after, but it was not long after it

17  ended.

18  BY MR. WHITEFLEET:

19  Q   The same day?

20  A   Yes.

21  Q   So what was the decision that was made?

22  A   The decision was made to safety plan the other children

23  with their fathers and remove N   with the warrant, because

24  Shane, in turn, instead of trying to hear us out or to see what

25  we want to talk about, by him leaving the TDM that made -- we

Cobbs-Magee - Direct by Whitefleet

1    had to assess his ability to be protective as well.  So...

2    Q    Do you consider a safety plan a removal?

3    A    It's not a removal per se, but it is a document where we

4    are setting -- we're addressing the concern, and we're making a

5    plan to ensure that the children are safe through certain steps

6    that the agency has provided, and the family agrees to do so.

7    Q    Were you ever aware of a phone call purportedly by

8    Shynelle Jones with Shane after the TDM?

9    A    No, I don't recall.

10   Q    Did you ever become aware of any expression by Mr. Beard

11   after the TDM and before the warrant was executed, where he

12   expressed that he would be willing to separate from Hilda or do

13   anything for his son?

14   A    I do not recall that.

15   Q    Did you ever have any conversations with Shane prior to

16   removal, whether he should or should not be romantically

17   involved with Hilda after that?

18   A    I do not recall having that conversation.

19   Q    So then you drafted a warrant?

20   A    Yes.

21   Q    Did anyone help you draft it?

22   A    No.

23   Q    All right.  Showing you Exhibit 72, once I get there.

24   This is the warrant?

25   A    Yes, sir.

Cobbs-Magee - Direct by Whitefleet

1   Q    Let's look at the substance of it here.  So when -- so

2   this first paragraph, what are you trying to do?

3   A    Trying to set up a history of our involvement in the

4   Perez -- with our contact or involvement with Ms. Perez.

5   Q    This language where you say "52 referrals and/or reports,"

6   what significance does that have?

7   A    That has a huge significance, because that lets us know

8   whether those referrals were investigated or not.  Fifty-two

9   times someone has contacted our agency to express some concerns

10  with the family.

11  Q    And what's the difference between a referral and a report?

12  A    A referral is something that we actually go out and we

13  investigate, whether it be unfounded, inconclusive or

14  substantiated, is that we actually go through a whole

15  investigation progress.  A refer -- I'm sorry, what was the

16  other term?

17  Q    A report.

18  A    A report is that it was just a report made to our agency

19  where there has been some concerns of the safety or the kids

20  being at risk.

21  Q    Why was -- was that unusual?

22  A    In my career, in my short time, I have never seen that

23  many reports or referrals with a family.

24  Q    There's been discussions about mandated reporters versus

25  other citizens making reports.  For all these referrals or

Cobbs-Magee - Direct by Whitefleet

1    reports, for your purposes, did you have any -- did you place

2    any significance on whether it was a mandated reporter or

3    somebody else?

4            MR. POWELL:  Objection, vague.

5            THE COURT:  Overruled.

6            THE WITNESS:  No, there was no significance.  It was

7    just the fact that someone or somebody or some agency, whether

8    it be a mandated reporter, has called to express, again,

9    concerns regarding the safety of these children.

10   BY MR. WHITEFLEET:

11   Q    So why did it matter, then, whether it was some citizen

12   versus a mandated reporter for your purposes?

13   A    Again, it didn't matter because there were concerns that

14   there was a lack of supervision.  There were concerns of a lack

15   of safety within the Perez' household.

16   Q    Okay.  So you obviously didn't write all those prior

17   contact logs?

18   A    No.

19   Q    And the search warrant, is that a summary of those things?

20           MR. POWELL:  Objection, Your Honor, leading.

21           THE COURT:  Sustained.

22   BY MR. WHITEFLEET:

23   Q    What were you trying to do when you drafted the warrant?

24           MR. POWELL:  Objection, vague, that's overbroad, Your

25   Honor.

Cobbs-Magee - Direct by Whitefleet

1    THE COURT:  Overruled.

2    What are you trying to do?  Go ahead.

3    THE WITNESS:  When I drafted the warrant I was just

4    trying to create a picture of the overall history and the

5    repeated safety concern within the Perez' family dating back

6    from 2011, and there was a lack of supervision and there was a

7    safety concern that had yet to be mitigated.

8    BY MR. WHITEFLEET:

9    Q    And are you relying on your fellow social workers in terms

10   of the context and the content of the prior service logs?

11   A    Yes, I'm relying on the information provided in the

12   contact logs that it is -- it is to be factual.

13   Q    What did you mean here by the sentence that says, "All of

14   these reports or referrals have not been confirmed," that

15   phrase right there?

16   A    That's with regards to the six sexual abuse allegations

17   pertaining specifically Alfredo being perpetrated on by his

18   father.

19   All the reports, the referrals, the CPS investigations,

20   the medical findings, again, did not substantiate those

21   concerns, and they were all unfounded.

22   Q    You mentioned that the two CAIRE interviews in here, in

23   mentioning those, did it matter that one of them wasn't

24   generated by Ms. Perez?

25   MR. POWELL:  Objection, Your Honor, did not establish

MARYANN VALENOTI - U.S. DISTRICT COURT - (916)930-4275

Cobbs-Magee - Direct by Whitefleet

1    foundation with this witness.

2            THE COURT:  Did it matter to her.  Overruled.

3            Did it matter to you?

4            THE WITNESS:  No, sir, it did not matter.

5    BY MR. WHITEFLEET:

6    Q    Why not?

7    A    It was the fact that he participated in those.  Those are

8    specifically for sexual abuse victims.  These people go through

9    a high level of training to get children to make disclosure and

10   to feel comfortable in that setting to get the information to

11   corroborate the concerns of sexual abuse.  And he participated

12   in not one but two, and again, there were no disclosures and

13   everything was unfounded.

14   Q    Did it matter to you in terms -- you have this one

15   section -- strike that.

16        You have this one section on Page 1124 that, "It appears

17   that Ms. Perez does not provide adequate supervision for her

18   children as evidenced by her not knowing what her children were

19   doing in this fort, which allowed Christopher and Alfredo to

20   have inappropriate boundaries."

21        Did it matter to you as to whether she, after the fact,

22   had said, Hey, kids, don't do that?

23   A    Would it have mattered to me?

24   Q    Did it matter to you at all whether she said that?

25   A    Yes, it mattered.

Cobbs-Magee - Direct by Whitefleet

1   Q    Okay.

2   A    Uh-huh.

3   Q    Were you trying to intentionally omit anything in this

4   warrant?

5   A    No, sir.

6   Q    Did you go line-by-line in the service logs?

7   A    With the amount of referral history -- I mean, I couldn't

8   go through everything with a fine tooth comb, no, but the

9   pieces I felt that were highly of importance to help me create

10  a picture of what's going on, I did input that.

11  Q    In going through the service logs, you decide what facts

12  to not include?

13  A    Not purposely to omit information, no.  I just -- again, I

14  just used the information I felt was vital.

15  Q    What was the significance to you about Mr. Beard's being

16  aware of the concerns but made no new plans to remedy the

17  issue; what did that mean?

18  A    Because he was aware of the inappropriate boundaries in

19  the home, and he appeared to minimize it as well.  They both

20  minimized the inappropriate boundaries within the home.

21  Q    Now, did you feel that when you said that Christopher or

22  Alfredo were touching one another or -- and I don't want to

23  misstate the document, let me start over again.

24       When you said that there was inappropriate touching by the

25  children, what were you referencing?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Cobbs-Magee - Direct by Whitefleet

1  A    Christopher -- something along the lines of Alfredo asked
2  Christopher to touch his ding-a-ling and he did.
3  Q    Did you feel it was relevant as to whether the touching
4  was on the belt or in the private area, testicles or anything
5  like that?
6  A    I did.
7  Q    And was that all encompassed under the term
8  "inappropriate"?
9       MR. POWELL:  Objection, Your Honor, leading.
10      THE COURT:  Sustained.
11  BY MR. WHITEFLEET:
12  Q    All right.  How did you -- explain your answer.
13  A    Again, there were concerns with a lack of supervision
14  where these children are not being supervised and put in
15  situations where they are touching each other inappropriately.
16  Q    All right.  So in drafting a warrant, do you feel like you
17  were truthful?
18  A    Yes.
19  Q    Did you intentionally include any false information?
20  A    No.
21  Q    Do you feel like you intentionally omitted what you
22  thought was significant, relevant information?
23  A    No.
24  Q    Let's talk about the execution of the warrant.
25      THE COURT:  Let's take a break.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Cobbs-Magee - Direct by Whitefleet

1      MR. WHITEFLEET:  All right.

2      THE COURT:  During the break all admonitions apply.

3  Please report any violation of those admonitions to the Court.

4  We'll come back around 11:00.

5      (Recess taken 10:42 a.m. to 11:04 a.m.)

6      THE CLERK:  Please come to order, Court is back in

7  session.

8      THE COURT:  All jurors present, all parties are

9  present.

10      You may continue.

11      MR. WHITEFLEET:  Thank you, Your Honor.

12  BY MR. WHITEFLEET:

13  Q   Okay.  We were -- before the break we were talking about

14  the execution of the warrant.  Why were the police there?

15  A   The police were there to ensure our safety and the safety

16  of the family as well.

17  Q   Was that your discretion?

18  A   Yes.

19  Q   Do you understand whether there's a policy that requires

20  you to have police there or not?

21  A   I don't recall, but typically, to ensure our safety, we do

22  contact law enforcement.

23  Q   Okay.  Before the removal, did you ever say you were going

24  to do a house visit?

25  A   No.

Cobbs-Magee - Direct by Whitefleet

1  Q   You don't understand that term?

2  A   I do.

3  Q   Do you have any role in that, house visits?

4  A   Not in our department, no.

5  Q   What social worker has that role, if you know?

6  A   The long-term, case-carrying social workers.

7  Q   Did you ever say to anyone prior to the execution of a

8  warrant that you wanted to do a house visit?

9  A   No.

10 Q   And during the execution, did you ever tell Shane, "You

11 did this to yourself"?

12 A   No.

13 Q   Did you have any involvement after the removal?

14 A   No.

15 Q   Were you ever contacted by David Granados for input for

16 post-detention hearings?

17 A   I don't recall, no.

18 Q   How about Gloria Solorio, were you ever contacted by her

19 for any input on those documents?

20 A   No.

21 Q   How about Shari Johnson, were you contacted by her for any

22 input on any post-removal documents?

23 A   No.

24 Q   Were you subpoenaed in a custody trial for the Garcia

25 children?

Cobbs - Cross by Mr. Powell

1    A    Yes.

2    Q    And what happened during that?

3    A    Mr. Powell subpoenaed me for a case regarding -- is it

4    Horacio Garcia -- as they were contesting the child custody and

5    not participating in that hearing.

6    Q    Do you know what the result of that was?

7             MR. POWELL:  Objection, calls for hearsay.

8             THE COURT:  Sustained.

9             MR. WHITEFLEET:  No more questions.

10            THE COURT:  Thank you.

11            Cross-examination.

12                         CROSS-EXAMINATION

13   BY MR. POWELL:

14   Q    Good morning, Ms. Cobbs.

15   A    Good morning.

16   Q    I'm going to jump around a little.  We have some other

17   evidence later.  I apologize, but I have to.

18        You said from your testimony that you couldn't reach

19   Horacio after the initial decision to safety plan with him,

20   correct, today in your testimony?

21            MR. WHITEFLEET:  Misstates testimony.

22            THE COURT:  It does.  She said she couldn't reach him

23   for the TDM.

24   BY MR. POWELL:

25   Q    Oh, okay.  Couldn't reach him for the TDM?

Cobbs - Cross by Mr. Powell

1   A    Correct.

2   Q    All right.  And then you ended up executing a safety plan

3   with him, correct?

4   A    Correct.

5   Q    Under the terms of that safety plan, if he didn't abide by

6   keeping the children away from my client Hilda, and did not go

7   to the court and seek custody of the children?

8            THE COURT:  It's compound, break it up.

9            MR. WHITEFLEET:  It's also irrelevant.

10           THE COURT:  Go ahead and ask your question.

11  BY MR. POWELL:

12  Q    Under the terms of that safety plan, if he did not keep

13  the children away from Hilda, then that might cause further CPS

14  intervention and/or removal of the children from him, correct?

15           MR. WHITEFLEET:  Objection, compound, based on

16  hearsay, relevance.

17           THE COURT:  It's not compound.  Overruled.

18           Go ahead.  Is that your understanding?

19           THE WITNESS:  Yes.

20  BY MR. POWELL:

21  Q    And also, if he didn't go to the court and seek the

22  custody of the children, then the result of that would also be

23  further CPS interventions and/or removal of the children,

24  correct?

25           MR. WHITEFLEET:  Objection, compound, based on

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Cobbs - Cross by Mr. Powell

1   hearsay, irrelevant.

2           THE COURT: I'll allow it.  Is that correct?

3           THE WITNESS:  Correct.

4   BY MR. POWELL:

5   Q   And that's a common feature of a safety plan in Stanislaus

6   County, isn't it?

7           MR. WHITEFLEET:  Objection, lacks foundation.

8           THE COURT:  Sustained.

9   BY MR. POWELL:

10  Q   Well, how many safety plans had you executed when you

11  worked in Stanislaus county?  Best estimate, that's all we can

12  ask.

13          MR. WHITEFLEET:  Objection, relevance.

14          THE COURT:  Sustained.

15  BY MR. POWELL:

16  Q   Now, isn't it true, Ms. Cobbs, that after the TDM and

17  before the delivery of the children to Horacio Garcia, Sr.,

18  that you went to his house?

19          MR. WHITEFLEET:  Objection, relevance.

20          THE COURT:  Overruled.

21          THE WITNESS:  Am I to answer?

22          THE COURT:  Yes, you can answer.

23          THE WITNESS:  I'm sorry.  Yes.

24  BY MR. POWELL:

25  Q   And while there you told him he needed to clean up an

Cobbs - Cross by Mr. Powell

1   exterior shed on the property where the four children, that

2   were at that time residing with him, had been sleeping?

3           MR. WHITEFLEET:  Objection, relevance, compound.

4           THE COURT:  Overruled.

5           THE WITNESS:  No.

6   BY MR. POWELL:

7   Q    Did you say anything to him about cleaning up anything at

8   all on the property he lived on?

9   A    Yes.

10  Q    What did you tell him to clean up on the property?

11          MR. WHITEFLEET:  Objection, relevance.

12          THE COURT:  Overruled.

13          THE WITNESS:  It was a room that they were utilizing

14  as a storage area.

15  BY MR. POWELL:

16  Q    Okay.  Are you saying there were no children sleeping in

17  the room?

18  A    Huh-huh.

19          THE COURT:  Is that a no?

20          THE WITNESS:  No.

21          THE COURT:  Okay.

22  BY MR. POWELL:

23  Q    So why did he have to clean up a storage area?

24  A    It was a room within the home that they were utilizing as

25  an area to keep items.

Cobbs - Cross by Mr. Powell

1   Q    And those items did not include any of the four children

2   living in the home with he and his girlfriend?

3          MR. WHITEFLEET:  Objection, compound, relevance.

4          THE COURT:  Sustained, also very confusing.

5   BY MR. POWELL:

6   Q    Ma'am, there were four children living in the home before

7   you brought the five Garcia there; correct?

8   A    I don't recall how many children were there, but there

9   were children there, yes.

10  Q    Do these names sound familiar as the children:  Lily?

11         MR. WHITEFLEET:  Objection, relevance.

12         THE COURT:  Sustained.  She doesn't recall how many

13  were there.

14  BY MR. POWELL:

15  Q    How did you get ahold of Mr. Garcia; how did you get over

16  to his house before the kids were actually delivered to him?

17         MR. WHITEFLEET:  Objection, relevance.

18         THE COURT:  Sustained.

19  BY MR. POWELL:

20  Q    Did you contact him before you went to the house before

21  the children were delivered to him?

22  A    I don't believe we got him on the phone.  I think our

23  first point of contact was meeting him at the house.

24  Q    Did you, at any point in time, prior to preparing the

25  warrant to have my client's child, N    , taken, make any

Cobbs - Cross by Mr. Powell

1    attempt to ascertain the cause of the initial CAIRE interview?

2    A    I'm not understanding.

3    Q    Okay.  You know what a CAIRE interview is, right?

4    A    Yes.

5    Q    And I believe you testified that there was two of them,

6    right?

7    A    Correct.

8    Q    Now I'm asking you, did you do anything to ascertain what

9    caused the first CAIRE interview, what referral?

10   A    Specifically, no.  I just know there was two CAIRE

11   interviews that he participated in, but what referral lead to

12   that specifically, no, I don't.

13   Q    Ms. Cobbs, you attributed these two CAIRE interviews, in

14   the warrant application and today in your testimony, to my

15   client, Hilda Perez, correct?

16   A    Correct.

17   Q    How could you do that if you didn't know what brought the

18   first CAIRE interview to fruition, what caused it to occur?

19   A    Well, in the documentation for the CAIRE interview it

20   explains why they are presenting -- or participating in a CAIRE

21   interview.

22   Q    In whatever documentation you're referring to, did it say

23   they're participating in a CAIRE interview because of Hilda

24   Perez?

25            MR. WHITEFLEET:  Objection, vague.

Cobbs - Cross by Mr. Powell

1    THE COURT: Overruled.

2    Do you understand the question?

3    THE WITNESS: I do not recall it saying -- no.

4  BY MR. POWELL:

5  Q    As you sit here today, is it your testimony that you still

6  believe both CAIRE interviews were prompted because of some

7  allegations that Hilda made of abuse of Alfredo?

8    MR. WHITEFLEET: Objection, misstates testimony.

9    THE COURT: Overruled.

10    THE WITNESS: Could you repeat it, please?

11  BY MR. POWELL:

12  Q    As you sit here today, are you of the belief that the two

13  CAIRE interviews were caused by allegations made by Hilda Perez

14  about abuse of Freddy, Jr. by Freddy, Sr.?

15    MR. WHITEFLEET: Objection, misstates testimony.

16    THE COURT: Overruled.

17    THE WITNESS: Am I to answer that?

18    THE COURT: Yes.

19    THE WITNESS: Oh, okay. I'm sorry, this is -- it was

20  my belief that the concerns were surrounding Alfredo being

21  sexually abused, yes.

22    MR. POWELL: I would move to strike that as

23  nonresponsive.

24    THE COURT: Sustained. It will be stricken.

25    MR. POWELL: Can I ask Madam Reporter to read back,

Cobbs - Cross by Mr. Powell

1    Your Honor?

2              THE COURT:  Madam Reporter doesn't read back

3    questions.  I'll read it back.

4              As you sit here today, are you of the belief that the

5    two CAIRE interviews were caused by allegations made by Hilda

6    Perez about abuse of Freddy, Jr. by Freddy, Sr.; is that your

7    belief?

8              THE WITNESS:  I would say yes.

9    BY MR. POWELL:

10   Q    Ma'am, in your reviewing these referrals, did you ever

11   notice that Alfredo, Sr. had been making allegations against

12   Hilda?

13   A    There were some reports, yes.

14   Q    Did you ever speak to Mr. Sosa about making allegations

15   against Hilda that your agency deemed to be unfounded?

16   A    Are you talking about when I drafted the warrant?  I'm

17   confused.

18   Q    Ma'am, at this point, at anytime in history, did you ask

19   if Mr. Sosa had made any of the allegations against Hilda?

20   A    Why would I have to ask him when there's documentation to

21   corroborate that?

22   Q    So did you corroborate that Mr. Sosa had been making

23   allegations against Hilda at any time?

24   A    I was able to speak with him, yes, and address some

25   concerns that he expressed, yes.

Cobbs - Cross by Mr. Powell

1  Q   Ma'am, in looking at the CWS, CMS referrals that you had

2  access to, did you ever go see if Alfredo Sosa, Sr. had made

3  allegations of abuse by Hilda or in her household?

4  A   I don't know, I'm sorry, I can't answer that.

5  Q   At the removal event on July 19, isn't it true you were

6  saying to Shane, while he was laying on the ground, that he

7  wouldn't listen at the meeting; do you have any recollection of

8  that?

9  A   No.

10 Q   Are you saying you definitely did not say it?

11 A   You asked me if I had any recollection of it, I said no.

12 Q   Right.  Now my question is, are you saying you definitely

13 did not say it?

14 A   I do not recall saying that.

15 Q   Fair enough.  Thank you.

16      MR. POWELL:  We are going to publish Exhibit C, Your

17 Honor.

18      THE COURT:  It's in evidence.

19 BY MR. POWELL:

20 Q   Now, you indicated this Exhibit C is a policy you're

21 familiar with, correct, Ms. Cobbs?

22 A   Correct.

23      MR. POWELL:  Can you go to Page 17, Mr. Park.

24 BY MR. POWELL:

25 Q   I've taken you to Subsection E.  Do you see it there on

Cobbs - Cross by Mr. Powell

1   your screen?

2   A    Yes.

3   Q    And it talks about, under Sub 1, that information in the

4   application for support should be "as detailed as possible"; do

5   you see that?

6   A    Yes.

7   Q    All right.  I want to take you to an example.  There's an

8   example right there; do you see that, (e)(1)(A)?

9   A    Yes.

10  Q    Now I'd like to take you to another, it's on Page 19.  And

11  do you see where the author, whoever this put this together, is

12  laying out kind of that distinction between being conclusionary

13  and being specific; do you see that there on (2)(A)?

14          MR. WHITEFLEET:  Objection, it misstates document,

15  it's conclusory, argumentative.

16          THE COURT:  That's what it says, it says "conclusory."

17  What's your objection?

18          MR. WHITEFLEET:  He's characterizing the document.

19          THE COURT:  No, he's not.  Overruled.

20          Go ahead, ask your question again.

21  BY MR. POWELL:

22  Q    Do you see that example there?

23  A    Yes.

24          MR. POWELL:  And if you could scroll down a little

25  bit, Mr. Park, and show her how long it is.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Cobbs - Cross by Mr. Powell

1  BY MR. POWELL:

2  Q   Do you see how it goes to the bottom of the page?

3  A   Yes.

4  Q   Let me ask you, when you wrote that warrant right there,

5  do you think you followed the conclusionary approach or the

6  specific approach?

7       MR. WHITEFLEET:  Objection, calls for improper

8  opinion, speculation.

9       THE COURT:  Overruled.

10      THE WITNESS:  Could you ask that again?

11 BY MR. POWELL:

12 Q   Pardon me, ma'am?

13 A   May you ask that question again, please, sir.

14 Q   Yeah.  In preparing your warrant application, do you

15 believe that you followed the conclusionary method or the

16 specific method?

17 A   I can't answer that, I don't know.

18 Q   Have you ever actually been licensed as a licensed

19 marriage family therapist?

20 A   I had my intern, but no, I was not licensed.

21 Q   When asked about probable cause, ma'am, you responded that

22 it includes, quote, "Possibly," close quote, "need further

23 court intervention into a family."  Do you recall that

24 testimony a bit ago?

25 A   Yes.

Cobbs - Cross by Mr. Powell

1  Q    That's your understanding, if it's possible, then that's

2  probable cause.

3          MR. WHITEFLEET:  Objection, argumentative.

4          THE COURT:  Sustained.

5          MR. POWELL:  Your Honor, I'm in cross.

6          THE COURT:  I understand.

7  BY MR. POWELL:

8  Q    Ma'am, based on your training with Stanislaus, can you

9  name any constitutional amendments that are implicated in the

10  work that Emergency Response workers do?

11         MR. WHITEFLEET:  Objection, irrelevant, calls for

12  improper opinion.

13         THE COURT:  Sustained.

14         MR. POWELL:  Mr. Park, if you would please put

15  Exhibit 70 on the screen.

16  BY MR. POWELL:

17  Q    While we're doing that, ma'am, you recall in your warrant

18  application you said there was 52 referrals or reports?

19  A    Correct, yes.

20  Q    This July 12, 2019 referral, which your counsel indicated

21  and you agreed was the one that you went out on and

22  investigated, this one talks about 34 referrals; do you see

23  that?

24  A    I do.

25  Q    And then it says, "This will be the ninth referral for

Cobbs - Cross by Mr. Powell

1  sexual abuse in the past year"; do you see that?

2  A    Yes.  I'm sorry.

3  Q    So did you go and at least specifically look at what's

4  described as "nine referrals for sexual abuse in the past

5  year"?

6  A    Are you talking about prior to my investigation?

7  Q    Prior to applying and submitting that warrant to the

8  court.

9  A    Oh yes, prior to submitting the warrant, yes.

10 Q    You used the term "skim over" when asked about looking at

11 past referrals, correct?

12 A    Correct.

13 Q    So by that you mean you're not really looking at the

14 details of the referrals, correct?

15 A    I am viewing -- reviewing the details, yes, but in

16 detail -- I mean, like going line-by-line, as I stated earlier,

17 there was a total of 52 some-odd referrals, that's lot of

18 information to review.

19 Q    Early in your testimony didn't you tell us that you

20 understood the significance of the impact, the potential trauma

21 to children and parents when you remove a child?

22 A    I did, I do.

23 Q    Isn't that a basis to actually read the referrals?

24 A    It is.

25 Q    So why didn't you read the referrals line-by-line, as you

Cobbs - Cross by Mr. Powell

1 said?

2 A    Well, sir, for the sake of time, again, as I stated

3 earlier, she had a total of 52 referrals.  That would be me

4 reading a thesis, a dissertation.

5 Q    Do you have any idea how many of them were evaluated out?

6 A    I do not, off the top of my head, no.

7 Q    And back then, when you applied for the warrant, did you

8 know how many had been evaluated out?

9 A    I probably had knowledge of that -- well, not probably, I

10 did have knowledge of it, but right now I don't know off the

11 top of my head how many were evaluated out, no.

12 Q    When you prepared the warrant, did you have any idea of

13 how many of those were unfounded?

14 A    At the time of my drafting the warrant, yes.

15 Q    And you also talked about 52 in the sense of it being a

16 shear number, a significant number, agreed?

17 A    Yes.

18 Q    All right.  You did understand there's, in a sense, three

19 families at play, Hilda and Horacio, Sr., Hilda and

20 Alfredo, Sr. and Hilda and Shane, correct?

21 A    Correct.

22 Q    By the time you wrote that warrant, how many referrals did

23 you have that had anything to do at all with No    , allegations

24 about No   ?

25 A    At that time, none.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Cobbs - Cross by Mr. Powell

1   Q    Okay.  When you spoke to Ms. Perez at the home on July 12,
2   did you bring up the issue at all about, you know, what you
3   described as multiple doctor appointments?
4   A    Yes, we discussed that, yes.
5   Q    Did she have any response for you?
6   A    I don't recall what her response was, sir.  I can't --
7   that was -- like, I don't recall what her response was but that
8   was addressed.
9   Q    You're aware, as a mother of three and as a social worker
10  I'm sure, that -- I mean, you take a child to a doctor, if it's
11  at a clinic, you don't have top notch medical care, you might
12  be seen by any number of doctors in the clinic on that day; you
13  know that, right?
14          MR. WHITEFLEET:  Objection, calls for speculation,
15  incomplete hypothetical, overly broad as to time, assumes
16  facts.
17          THE COURT:  Sustained on all grounds.
18  BY MR. POWELL:
19  Q    Didn't Ms. Perez tell you that she went to a clinic and
20  that you would see whatever doctor was there when you went?
21  A    I don't recall having that conversation.
22  Q    You were asked about whether you reviewed medical records,
23  and forgive me, I didn't hear an answer, so did you actually
24  obtain any medical records before you filled out that warrant
25  regarding any of Ms. Garcia's children?

Cobbs - Cross by Mr. Powell

1   A    Yes, the medical records were requested, yes.

2   Q    I understand the word "requested," ma'am.  That doesn't

3   mean you reviewed them, agreed?

4   A    Well, for the sake of time, with regards to drafting a

5   warrant, you have -- medical records don't come in one hour.

6   There's a process.  Within our agency only, I believe it is our

7   nurse who requests those documents, but yes, they were

8   requested, and yes, they were reviewed.

9   Q    The question, ma'am, is whether you reviewed any medical

10  records before you sat down and wrote your warrant for the

11  court.

12  A    No.

13  Q    Okay.  You could have asked Ms. Perez for a release when

14  you were there on July 12, correct?

15  A    I could have, yes.

16  Q    And you've used those in the past, correct?

17  A    You mean out in the field?

18  Q    Yes.  A release, in the field?

19  A    I don't recall having to do that, no.

20  Q    You also could have taken a release to Mr. Sosa, Sr.,

21  correct?

22  A    Correct.

23  Q    You could have taken a release to Horacio, Sr., correct?

24  A    Correct.

25  Q    You didn't do that, though?

Cobbs - Cross by Mr. Powell

1    A    No, I did not.

2    Q    Now, I understood some testimony about a concern of yours

3    that my client, when talking to her son Alfredo, was asking

4    leading questions; did I hear that correct?

5    A    Yes.

6    Q    Did you ever once listen to my client ask her son,

7    Alfredo, Jr., a single question about anything?

8    A    The specifics I can't recall, but yes, she was -- yes.

9    Q    Forgive me, ma'am, specifically, you're telling me you, at

10   some point prior to filing this warrant, you heard Hilda Perez

11   asking Alfredo, Jr. questions about like being abused?

12   A    Sir, I don't remember the specific conversation, but yes,

13   she was asking him leading questions, that is the only reason

14   why that was brought up.

15   Q    So where were you when this happened?

16   A    In the home.

17   Q    Okay.  But you agree it's not abnormal for a parent to ask

18   questions if their child had said something concerning for

19   physical or sexual abuse; do you agree?

20   A    Agree.

21   Q    Now, you also said something about doctor visits appeared,

22   you used the word "appeared," to occur after visits with the

23   bio father, right?

24   A    Yes, it was a coincidence.

25   Q    But Ms. Cobbs, wouldn't it be true that whenever a parent,

Cobbs - Cross by Mr. Powell

1  in which there's changes of custody, is injuring a child, you

2  would expect that the protective parent would take the child to

3  a doctor if the child comes home with, you know, marks, cuts,

4  bruises; isn't that what you would expect?

5  A    I would expect that, yes.

6  Q    That's what a protective parent would do, correct?

7  A    Yes and no.

8  Q    I understand the "yes."  Could you explain the "no"?

9  A    Well, the "no" is if you're trying to -- and I'm not

10 saying this is what she was doing, hypothetically, we've had

11 cases where people are trying to build, how do I say, a history

12 or a -- I don't know the term I'm trying to use, but if they're

13 trying to use those visits in their favor to get whatever --

14 whether it be custody or -- that's not uncommon.

15 Q    Give me a minute, ma'am, I'm going to pull up another

16 document real quick.

17      So it is a concern if the parent is, like, using the

18 medical system to gain an advantage?

19 A    Yes.

20 Q    Or using the law enforcement system, correct?

21 A    Correct.

22 Q    Or using the CPS system, correct?

23 A    Correct.

24 Q    I'm having Mr. Park put up Exhibit 53.  Do you see this

25 Exhibit 53, ma'am?

Cobbs - Cross by Mr. Powell

1    A    Yes.

2    Q    Do you see that it's dated December 5, 2018?

3    A    Uh-huh.

4    Q    By the way, do you recall that the CAIRE interview, the

5    first one, that was in January; do you recall that?

6    A    I don't recall the date, no.

7    Q    Did you look at this referral?

8    A    I'm sure I did, yes.

9    Q    You notice it's the father who's reporting, right?

10   A    Yes.

11   Q    And it has to do with sex abuse, right, touching of

12   private parts?

13   A    Yes.

14   Q    And he's filed a police report, too, right?

15   A    Yes.

16   Q    Next, 54 -- and that last referral on 53, that was

17   12/5/2018 at 12:47 p.m.  Now it's 2:16 p.m.; do you see this?

18   A    Yes.

19   Q    And this is another story told by Alfredo, Sr. to some

20   reporting party, correct?

21   A    Correct.

22   Q    And this one now is a little more intense, it talks about

23   touching of the privates, having his "nana" grabbed, which is

24   apparently his penis; do you see that?

25   A    Yes.

Cobbs - Cross by Mr. Powell

1  Q    Let's go to 55 -- it's 56, I misspoke.  It's going to be

2  56.

3       Now, this referral, Exhibit 56, it's dated February 21,

4  2019, correct?

5  A    Yes.

6  Q    Are you familiar with this referral?

7  A    I'm sure I reviewed it, yes.

8  Q    Do you understand this also generated from Alfredo

9  Sosa, Sr.?

10  A    I can't tell who generated it, but yes, it's a referral

11  from a reporting party, but who it doesn't say.

12  Q    It doesn't, but if you go down to the bottom third, it

13  says, "Reported that the father has been appropriate and made a

14  report with law enforcement and CPS about the concerns.  He has

15  filed to amend custody to ensure more supervision during

16  visits.  Also has the child in counseling"; do you see all of

17  that?

18  A    Can you point to it?

19       MR. POWELL:  Can I point to it?  I think I can.  If I

20  point on there, will it do it?

21       MR. PARK:  Here's the mouse.

22  BY MR. POWELL:

23  Q    All I can give you is this wiggling little cursor.

24  A    That's fine.

25       MR. PARK:  No, it's highlighter.

Cobbs - Cross by Mr. Powell

1        THE WITNESS:  Can I also point out something?

2    BY MR. POWELL:

3    Q    Just a second, ma'am.  I first want to make sure that you

4    understand that this appears to be a report by a father through

5    a mandated reporter?

6    A    It does.

7    Q    It is, right?

8    A    Uh-huh.

9    Q    This one, it's taken a new step, it goes into

10   masturbation.  You see up there where it says, "Brother

11   masturbated the child."  Does that cause you any concern with

12   Mr. Sosa, Sr. in what he's engaging in?

13       MR. WHITEFLEET:  Objection, misstates the document.

14       THE COURT:  Sustained.  It doesn't say Mr. Sosa did

15   anything.

16       MR. POWELL:  I just got the witness to agree that it

17   appears to be a report by father through a mandated reporter,

18   Your Honor .

19       THE COURT:  Right, but you just said Mr. Sosa did

20   something.

21       MR. POWELL:  I'll try again.

22       THE COURT:  Mr. Sosa is reporting it, that his two

23   children are --

24       MR. POWELL:  I see where you're at.

25

Cobbs - Cross by Mr. Powell

1  BY MR. POWELL:

2  Q    Any concern with this report by Mr. Sosa?

3  A    No.

4  Q    So did you ever question him about any of these reports,

5  the two in December or this one here in February?

6  A    No, because it appears he's being appropriate.  He asked

7  the child, based on this document in front of your face, he's

8  being appropriate.  He is trying to assist the child, but he's

9  linking him to Sierra Vista, and he made a report to law

10  enforcement, so no, I don't.  It appears he's being protective.

11  Q    My client, Ms. Perez, if she makes a call to law

12  enforcement, is she being protective?

13         MR. WHITEFLEET:  Objection, calls for improper

14  opinion, incomplete hypothetical, vague as to time.

15         THE COURT:  Overruled.

16         THE WITNESS:  Yes.

17  BY MR. POWELL:

18  Q    So did you not see in the referrals that my client had

19  contacted law enforcement in the past?

20  A    There is a report, yes, that law enforcement was

21  contacted, yes, but again, throughout her -- the course of her

22  history with our agency, there has been a repeated concern of

23  lack of supervision with Hilda.

24  Q    All right.  We've got a shower incident and a sleepy

25  tent -- sleepy, sleepy and a blanket tent incident.

Cobbs - Cross by Mr. Powell

1   A    Uh-huh.  And also her nephew perped on her child as well.
2   So there's been, yes.
3   Q    I'm familiar with the referral, ma'am.  I'm trying to
4   figure out why you say that was a lack of supervision on her
5   part?
6   A    Sir, throughout the course of her involvement with our
7   agency, there have been re-occurring concerns, whether it's an
8   MRP or RP of concerns with Ms. Hilda Perez and her lack of
9   supervision in ensuring the safety of her children.
10  Q    Okay.  So you told me about the cousin.  You did
11  understand the cousin was autistic, right?
12  A    I'm aware.
13  Q    Down Syndrome?
14  A    Okay, but that doesn't take away the fact that they
15  weren't being supervised in a situation where that was
16  prevented.  Just because he has -- he has special needs, that
17  doesn't make it okay.  There was still lack of supervision
18  where they're allowed to engage in that behavior.
19  Q    Allowed to?
20  A    Not allowed, but they engaged in that behavior with no
21  adult supervision.
22  Q    There is a distinction between being allowed to and not
23  being stopped before it happens, correct?
24  A    Well, yes and no.
25  Q    A parent can't keep their eyes on a kid 24/7, correct?

Cobbs - Cross by Mr. Powell

1   A   No, you can't.

2   Q   And it makes it even a little more difficult if you have

3   two, three, four of them, correct?

4   A   I'm a mother with three kids, yes, it does.

5   Q   You said something about a broken arm?

6   A   Uh-huh.

7   Q   Do you believe that's caused by mother's lack of

8   supervision?

9   A   Well, if my memory serves me correctly, no one could even

10  explain how he obtained that injury while in her custody.

11  Q   Well, did you read the delivered service logs about the

12  broken arm incident?

13  A   I don't recall in detail, no, this is five years ago.

14  Q   Thank you.  Now, just a couple more, I think, ma'am.

15      Did you ask any of the children if, in fact, they were

16  ever spoken to by their mother or Mr. Beard while he was part

17  of the family about things like inappropriate touching,

18  boundaries; did you ask any of them?

19  A   I only spoke to one or two children.

20  Q   Did you ask any of them what I just asked you about, Hey,

21  did mom or Shane talk to you about inappropriate boundaries --

22  or, I'm sorry, appropriate boundaries and inappropriate

23  touching?

24  A   I'm sure there was a discussion, yes, that is part of our

25  protocol of asking questions.

77

Cobbs - Redirect by Mr. Whitefleet

1    Q    You're sure there was, then that would be something you

2    would write in your delivered service logs, correct?

3    A    Well, not specifically that, but yes.

4    Q    Maybe you'd cover it by saying they were safe; right?

5    They said they were safe?

6    A    Yes and -- no.

7    Q    Back to my other question, ma'am.  If that's something

8    that is so important to ask and you get the answer, are you

9    saying that's not important to put in the delivered service

10    log?

11    A    It is of importance, yes, but specifically saying that

12    verbatim, I don't recall putting that verbatim.

13    Q    Yes, did you put anything conceptually on the issue of

14    whether the children indicated they had had some prior

15    discussion with adults about boundaries and touching?

16    A    You would have to pull it up.  I can't off the top of my

17    head.  So...

18    Q    I'm trying to save some time, just a moment.

19          MR. POWELL:  I think that's enough for now.

20          Thank you, Your Honor.

21          THE COURT:  Anything else?

22          MR. WHITEFLEET:  Yes.  Thank you, Your Honor.

23                REDIRECT EXAMINATION

24    BY MR. WHITEFLEET:

25    Q    You were asked some questions about reviewing medical

Cobbs - Redirect by Mr. Whitefleet

1    records, and you said you didn't review them.  You knew the
2    results of the medical exams, right?
3    A    Yes.
4    Q    And what were the results?
5    A    There was no concerns of sexual abuse.
6    Q    When a child is of special needs, like autistic, would a
7    normal amount of supervision be expected?
8    A    Yes.
9    Q    How about a heightened sense?
10   A    A heightened, hypervigilant.
11   Q    You would expect a mother who has children of special
12   needs to increase the amount of supervision?
13   A    Yes.
14         MR. POWELL:  Objection, leading, Your Honor.
15         THE COURT:  It is.  Sustained.  Answer will be
16   stricken.
17   BY MR. WHITEFLEET:
18   Q    In this case were your expectations of Ms. Perez in terms
19   of mitigation and supervision of her children with special
20   needs higher than ordinary supervision?
21   A    Yes.
22   Q    And what do you mean?
23   A    As far as her own children?
24   Q    Yes.
25   A    Oh, with that, it would look like I would expect for her

Cobbs - Redirect by Mr. Whitefleet

1    to be even more, have a higher level of supervision because

2    those, you know, children with special needs, they lack the

3    ability to -- to be aware of -- you know, they are

4    developmentally delayed with regards to socially, so they're

5    not knowledgeable, or you have to teach them about social

6    boundaries and what's appropriate, what's not appropriate.

7        So I would expect that, you know, someone would be even

8    more hypervigilant with having supervision for children with

9    special needs, because they lack the ability to know, you

10   know -- or not all of them, but some lack the ability to know

11   what, you know, what's safe, what's appropriate.

12   Q    You were asked about leading questions, and in the

13   delivered service logs, Exhibit 58 on Page 900, do you recall

14   reviewing this where during an interview with Ms. Beard --

15   excuse me, Ms. Perez, Shynelle Jones indicated that Ms. Perez

16   interfered with asking her questions by asking leading

17   questions?

18   A    Yes.

19   Q    Was this, in part, the source of your information about

20   she was asking leading questions?

21             MR. POWELL:  Objection, leading.

22             THE COURT:  Sustained.

23   BY MR. WHITEFLEET:

24   Q    Was this delivered service log a source of your concern?

25             MR. POWELL:  Objection, leading.

Cobbs - Redirect by Mr. Whitefleet

1      THE COURT:  Sustained.  Don't answer that.

2  BY MR. WHITEFLEET:

3  Q    What were the sources of your concern for Ms. Perez asking

4  leading questions?

5  A    I observed her do it.

6  Q    And was this also one of them?

7      MR. POWELL:  Objection, leading.

8      THE COURT:  Sustained.

9  BY MR. WHITEFLEET:

10  Q    Did you ever have a conversation with Ms. Jones about this

11  delivered service log?

12  A    Specifically about this one?

13  Q    Generally, about her prior --

14      THE COURT:  Get close to the mic, please.

15      THE WITNESS:  I'm sorry, specifically about this one?

16      THE COURT:  That was his question.

17      THE WITNESS:  Could you ask it again?  I'm sorry.

18  BY MR. WHITEFLEET:

19  Q    Let me ask it a different way.  Did you have any

20  conversation with Ms. Jones about any concerns about Ms. Perez

21  asking leading questions?

22  A    After my interview with Hilda, yes.

23      And then --

24      THE COURT:  Nope, nope, there's no question pending.

25

Cobbs - Redirect by Mr. Whitefleet

1  BY MR. WHITEFLEET:

2  Q    Turning to Exhibit 62, Page 967, do you recall reading

3  this in the delivered service logs before writing the warrant,

4  this line that's highlighted, "Patterson detective reported

5  that it appears to be a custody issue between the mother in

6  terms of his investigation," perhaps her, "her investigation of

7  the report"?

8          MR. POWELL:  Objection, leading, Your Honor.

9          THE COURT:  Sustained.

10          MR. WHITEFLEET:  Just asking if she reviewed this one.

11          THE COURT:  Did you review this?

12          THE WITNESS:  Yes.

13          THE COURT:  Okay.

14  BY MR. WHITEFLEET:

15  Q    So did you understand -- when you were asked questions

16  about using the system to gain advantage, did you have any

17  understanding about a parent being in a custody battle as part

18  of that attempt to use the system to gain advantage?

19  A    Yes.

20  Q    All right.  In your experience, is a parent merely

21  speaking with a child about boundaries after sexual abuse

22  enough for purposes of supervision?

23          MR. POWELL:  Objection, Your Honor, calls for expert

24  testimony, lacks foundation as to this witness.

25          THE COURT:  Overruled.  He's asking about her

82

Cobbs - Redirect by Mr. Whitefleet

1  experience only.

2          THE WITNESS:  In my experience, my professional

3  experience, I don't feel that a parent having a conversation

4  with a child about boundaries is enough, no.

5  BY MR. WHITEFLEET:

6  Q    Why not?

7  A    Just because you're having a verbal conversation, but what

8  are the physical actions you are taking, what measures are you

9  taking to ensure that these activities or these actions aren't

10 happening?  What protective measures are you taking to ensure

11 that they're not having that kind of access to each other,

12 whether it be sleeping in separate, you know, rooms, not

13 allowing others to be in the restroom while you're -- you know,

14 that's private time.  So that would be my assessment.

15        Just having a verbal conversation, to me that's not

16 enough.  You need to follow through with action.

17 Q    In the warrant, when you talked about the CAIRE

18 interviews, you don't say that Ms. Perez caused the CAIRE

19 interviews.

20        THE COURT:  It speaks for itself, whether it says it

21 or not, you can't ask her.

22 BY MR. WHITEFLEET:

23 Q    Why didn't you put in the warrant who caused the CAIRE

24 interviews?

25 A    I didn't think it mattered who caused the CAIRE

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Cobbs - Recross by Mr. Powell

1    interviews.  I felt that it was of importance that this child

2    has participated in two CAIRE interviews.

3         MR. WHITEFLEET:  Thank you, that's all I have.

4         THE COURT:  Anything further?

5                    RECROSS-EXAMINATION

6    BY MR. POWELL:

7    Q    I want to understand all that mattered is that the child

8    had been the subject of two CAIRE interviews; right?

9    A    Yes.

10   Q    So then why did the hammer only fall on Hilda Perez?

11        MR. WHITEFLEET:  Objection, argumentative.

12        THE COURT:  Overruled.  Overruled.

13        THE WITNESS:  Am I to answer that?

14   BY MR. POWELL:

15   Q    Yes.

16        THE COURT:  Yes.

17        THE WITNESS:  Again, as I stated earlier, because

18   there had been re-occurring issues with boundaries, with sexual

19   inappropriate touching within Ms. Perez's care, and there was a

20   lack of supervision and concerns with regards to Ms. Hilda,

21   that's why.

22   BY MR. POWELL:

23   Q    Did Mrs. Jones ever share with you that she had, in fact,

24   reviewed medical records and spoken to a doctor who had

25   concluded that the child had injuries that were not normal?

Courney - Direct by Mr. Powell

1    THE COURT:  So much hearsay in that.

2    MR. POWELL:  From Shynelle Jones, Your Honor.

3    THE COURT:  But then you also mentioned the doctor.

4    You're now hearsay on hearsay.  Rephrase.

5    BY MR. POWELL:

6    Q    All right.  Did Mrs. Jones say anything to you about

7    actual abuse that she had learned about confirmed by a doctor?

8    A    No.

9    MR. POWELL:  All right.  I don't think I have anything

10   else, Your Honor.

11   THE COURT:  You may step down.  If you need to catch a

12   plane, you may catch a plane.  Thank you.

13       (Witness is excused.)

14   THE COURT:  The other witness you want to call out of

15   order here?

16   MR. POWELL:  Mr. Courney.

17   THE COURT:  Yes, let's start him.

18   MR. WHITEFLEET:  I'll go get him.

19       HOWARD COURNEY, PLAINTIFFS' WITNESS, SWORN

20   THE CLERK:  Please state and spell your whole name for

21   the record.

22   THE WITNESS:  Yes, my name is Howard Steven Courney,

23   H-O-W-A-R-D, S-T-E-V-E-N, C-O-U-R-N-E-Y.

24                      DIRECT EXAMINATION

25

Courney - Direct by Mr. Powell

1  BY MR. POWELL:

2  Q    Hello, Mr. Courney, how are you?

3  A    Good, thank you.

4  Q    Do you remember me?

5  A    Yes.

6  Q    All right.  Do you recall having your deposition taken --

7  sorry, I multi-tasked -- having your deposition taken in the

8  matter of Taylor Webb versus the County of Stanislaus on or

9  around November 2 of 2021?

10  A    Yes.

11  Q    So just a few background questions, sir.  First, you've

12  now twice been employed by Stanislaus County's CFS division,

13  correct?

14  A    Yes.

15  Q    First period was from 1990 to 2003, correct?

16  A    Yes.

17  Q    And then you received some orders to serve as a military

18  social worker in the Middle East from 2003 until about 2015,

19  correct?

20  A    Correct.

21  Q    See, I'm making this easy for you.  And then in 2015 you

22  fully retired from the military and you came back to work for

23  Stanislaus County?

24  A    Correct.

25  Q    Then in 2017 you became a TDM facilitator for the CFS,

Courney - Direct by Mr. Powell

1    correct?

2    A    Correct.

3    Q    Are you still doing that job?

4    A    Yes.

5    Q    Okay.  Would you say that you've presided as a facilitator

6    over as many as 350 to 400 TDMs since your return to CFS?

7    A    Yes, that sounds about right.

8    Q    Out of all those TDMs, has there ever been, to your

9    knowledge, an attorney in attendance for the parent or parents?

10   A    Yes.

11   Q    How many times?

12   A    I'll say three.

13             THE COURT:  Three, you said?

14             THE WITNESS:  Three.

15             THE COURT:  Okay.  These are all Stanislaus County

16   you're talking about?

17             THE WITNESS:  Yes.

18             THE COURT:  Okay.

19   BY MR. POWELL:

20   Q    There's another person who does the role that you do at

21   Stanislaus County, right?

22   A    Yes, my supervisor.

23   Q    Okay.  And how long has she -- I happen to know -- she

24   been doing what you do?

25   A    There's only one other person, his name's Philip, and he's

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Courney - Direct by Mr. Powell

1    probably been doing it about a year.

2    Q    Okay.  The other person you called your supervisor, let me

3    get a name.

4    A    Mariela Gomez.

5    Q    Is it true that you and Mariela do roughly the same amount

6    of TDMs, you kind of split the work?

7    A    Yes.

8    Q    So she might have three -- over 350 or 400 TDMs well?

9            MR. WHITEFLEET:  Objection, calls for speculation.

10           THE COURT:  Sustained.

11   BY MR. POWELL:

12   Q    Of those 350 to 400 TDMs, have you ever had the parents

13   mention that they would like an attorney present?

14   A    Yes.

15   Q    What happens, generally first, when that occurs?

16   A    From me, all I can control is what I say.

17   Q    Okay, but what do the supervisors say?

18           MR. WHITEFLEET:  Objection, calls for speculation.

19           THE COURT:  Sustained.  It's overbroad, too.

20   BY MR. POWELL:

21   Q    Mr. Courney, isn't it true that the first thing that

22   happens when a parent asks for an attorney present is that the

23   supervisor will say, quote, "No, no, no, no, no, we don't want

24   an attorney, you don't need one" --

25           MR. WHITEFLEET:  Objection.

Courney - Direct by Mr. Powell

1  BY MR. POWELL:

2  Q   -- end quote?

3       MR. WHITEFLEET:  Calls for speculation, incomplete

4  hypothetical.

5       THE COURT:  Sustained.

6  BY MR. POWELL:

7  Q   Have you heard supervisors reject the idea of an attorney

8  at anytime when a parent has requested one at a TDM?

9       MR. WHITEFLEET:  Objection, hearsay, overly broad.

10      THE COURT:  Sustained.

11 BY MR. POWELL:

12 Q   Mr. Courney, didn't you testify previously that a

13 supervisor will say, "No, no, no, no, we don't need an

14 attorney.  You don't need one"?

15      THE COURT:  It's an improper question.  Whether he

16 previously said something doesn't matter.

17      MR. POWELL:  Under oath, Your Honor?

18      THE COURT:  No, because he hasn't said anything here

19 that either would impeach him or refresh his recollection.

20 BY MR. POWELL:

21 Q   Well, I want to refresh your recollection, sir.

22      MR. POWELL:  May I approach?  I have to give this to

23 counsel as well.

24      THE COURT:  Well, he hasn't said he needs his

25 recollection refreshed.

Courney - Direct by Mr. Powell

1  BY MR. POWELL:

2  Q   Do you have any idea, sir, how you would describe, however

3  few times it's happened, that a parent has asked for an

4  attorney present, what the response is from supervisors?

5        MR. WHITEFLEET:  Objection, overly broad, vague,

6  hearsay, compound.

7        THE COURT:  Sustained.  It's also not relevant what

8  other supervisors have said at other meetings.  Let's focus on

9  this case.

10  BY MR. POWELL:

11  Q   Did you attend a TDM involving Shane Beard, Hilda Perez?

12  A   Yes, I did.

13  Q   Do you remember that, as you sit here today?

14  A   No, I don't.  I remember it as I read my notes.

15  Q   Okay.  Now, did you do more than one -- facilitate more

16  than one?

17  A   No, just one.

18  Q   The one that you facilitated, is there anything in your

19  notes about how many people were in attendance?

20  A   Yes, in attendance, 10.

21  Q   That would be other than -- do you remember that at that

22  one Mr. Beard's mother showed up as well?

23  A   No, I don't recall.

24  Q   Okay.  Do you have notes that you looked at today?

25  A   I have my notes from that TDM, but I don't have them

Courney - Direct by Mr. Powell

1    memorized, I have to look at them.

2    Q    Understood, it's been a while.  Do you recall that that

3    TDM was about one child, Freddy Sosa, Jr.?

4         MR. WHITEFLEET:  Objection, misstates testimony.

5         THE COURT:  Well, he hasn't testified.  He's asking

6    him.  Do you recall?

7         THE WITNESS:  I don't recall.

8    BY MR. POWELL:

9    Q    What would be your best recollection about the subject of

10   that TDM, if you have one?

11   A    That we're there to figure out services and placement,

12   those two things.

13   Q    Can you tell me the first, of anything, that you do

14   remember about that TDM, the first of anything?

15   A    Yes.  There were a lot of people in the lobby supporting

16   this family, I remember that, that's the first thing I

17   remember.

18   Q    Did you review your notes before coming today?

19   A    I did.

20   Q    Did you see a TDM that was set on July 15?

21   A    I don't have a record for that, a TDM that took place on

22   the 15th.

23   Q    So is it accurate that the one that you were looking at

24   was like July 25?

25   A    It was later, yes.

Courney - Direct by Mr. Powell

1    Q    All right.  What were the -- can you summarize what you

2    recall from that TDM as being the outcome or resolution?

3             THE COURT:  You're talking about now July 25, 2019?

4             MR. POWELL:  2019, Your Honor.

5             THE COURT:  Okay.

6             THE WITNESS:  Yes, we didn't come to a lot of

7    conclusion on where a child would be placed.  I remember that.

8    We couldn't conclude in this meeting anything safe, anything

9    that we could agree upon.  I remember that.

10   BY MR. POWELL:

11   Q    I want to take you through a policy, it's Exhibit 97.

12            MR. WHITEFLEET:  I don't know if this has been

13   admitted yet, Your Honor.

14            MR. POWELL:  It's not been admitted.

15            THE COURT:  Do you have an objection to 97?

16            MR. WHITEFLEET:  No.

17            THE COURT:  No, okay.  It's admitted.

18            Now you can use it.

19            MR. POWELL:  Thank you.

20       (Plaintiffs' Exhibit 97 admitted in evidence.)

21   BY MR. POWELL:

22   Q    Now, this is -- do you recognize this document, sir?

23   A    Yes.

24   Q    And, in fact, you don't just handle TDMs, you handle these

25   TAP staffings and FEM, Family Engagement Meetings, as well,

Courney - Direct by Mr. Powell

1    correct?

2    A    No.

3    Q    Which ones do you not do?

4    A    I do not do the TAP, I don't do FEM, I just do Team

5    Decision Making meetings only.

6    Q    Now, if you'll go to --

7         THE COURT:  He can't use this, there's no foundation.

8         MR. POWELL:  He said he's familiar with the document.

9         THE COURT:  He doesn't do TAPs, though.

10         MR. POWELL:  But this includes TAPs, TDMs and

11    everything else.

12         THE COURT:  If you want to focus on TDMs, that's fine.

13    BY MR. POWELL:

14    Q    Do you see what's on the screen now, sir, about, "Team

15    Decision Meetings are a multidisciplinary team meeting"?

16    A    Yes.

17    Q    That doesn't include attorneys for parents, does it?

18    A    If the parents invite the attorneys, the attorneys come.

19    Q    You're telling me it's only happened in your career three

20    times?

21    A    Only three times.

22    Q    Okay.

23         MR. POWELL:  My apologies, Your Honor, I had it

24    highlighted but now it's gone.  We'll find it.  This won't be

25    the last of it.

Courney - Direct by Mr. Powell

1  BY MR. POWELL:

2  Q   Sir, are you aware of the fact that at a TDM it is the

3  agency that has the final decision making authority, correct?

4  A   Yes.

5          MR. POWELL:  Nothing further, sir.  If you don't

6  remember anything else about the first TDM with this family,

7  you don't.

8          THE WITNESS:  Nope.

9          THE COURT:  Mr. Whitefleet?

10          MR. WHITEFLEET:  No questions.

11          THE COURT:  Thank you for being here.  You may step

12  down.

13          (Witness is excused.)

14          THE COURT:  So we're going to go back to Mr. Beard

15  now?

16          MR. POWELL:  I guess so.

17          THE COURT:  Let's take a break.  All admonitions

18  apply.  Please report any violation of those admonitions.  No

19  discussion, no independent research.

20          We'll come back about 12:20 or so.

21      (In open court outside the presence of the jury.)

22      (Recess taken 12:05 p.m. to 12:25 p.m.)

23          THE CLERK:  Please come to order.  Court is back in

24  session.

25          THE COURT:  Mr. Beard.

                    Beard - Direct (Resumed) by Powell

1           MR. POWELL:  Can I have a word or two with

2    Mr. Whitefleet real quick?

3           THE COURT:  Go ahead.

4           MR. POWELL:  It's personal.

5        (At sidebar off the record.)

6        (In open court in the presence of the jury.)

7           THE COURT:  All jurors present, all parties present.

8           Mr. Beard is back on the stand.  We'll continue his

9    examination from last week.  We may go past 1:30 today.  If

10   your stomachs start acting up, let me know, but hopefully you

11   can hang in there for a little bit.

12          Go ahead, Mr. Powell.

13          MR. POWELL:  Thank you, Your Honor.

14       SHANE BEARD, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

15                  DIRECT EXAMINATION (Resumed)

16   BY MR. POWELL:

17   Q    Mr. Beard, we pretty much left off where we were about

18   ready to get into July 19, 2019.

19   A    I believe that's correct, yes.

20   Q    You had already told us about being told they were going

21   to come do a home inspection.

22   A    Yes.  I was called by Ms. Cobbs, and she stated that she

23   wanted to do a home check and wanted to know if I was home to

24   be able to do that.

25   Q    She just testified that -- a little while ago, that she

Beard - Direct (Resumed) by Powell

1    doesn't have anything to do with that; are you sure it was
2    Ms. Cobbs who called you?
3    A    I'm a hundred percent positive, I could recognize the
4    voice.  And it was five years ago, maybe she doesn't recollect,
5    but I definitely do.
6    Q    What arrangements did you make for this home inspection,
7    if any?
8    A    I mean, I didn't really have to make too many
9    arrangements.  My home was already, in my opinion, deemed safe.
10   I just gave N   a quick bath and put him in some cute
11   clothing, what I considered cute, at least.
12        And then my mom was there, I asked her if she could stay
13   and -- because she was visiting my grandparents at the time.
14   I'm sorry.
15        Yeah, really no other arrangements really had to be made.
16   I mean, I had running water, I had a cabinet full of food.  My
17   room was safe.  I mean, I hadn't had a crib at the time because
18   he didn't really stay the night at my house, but --
19            THE COURT:  We're into a narrative, next question.
20            THE WITNESS:  Sorry.
21   BY MR. POWELL:
22   Q    Did there seem to be a number of people there at the
23   house?  If this event of a home inspection wasn't going to
24   occur, would that have been a normal amount of people at the
25   house?

Beard - Direct (Resumed) by Powell

1        MR. WHITEFLEET:  Objection, lacks foundation.

2        THE COURT:  Overruled.

3        MR. WHITEFLEET:  Relevance.

4        THE COURT:  Overruled.

5        Go ahead.

6        THE WITNESS:  Yes, I mean, my grandparents are kind of

7   like the rock of the family, and so my mom was going over there

8   to visit with two of my sisters and my brother, my cousin.  One

9   of them actually lives there, his name is Hayden.  And then my

10  cousin Jake, he always came over just because we had food.

11  BY MR. POWELL:

12  Q    So are you saying you didn't, like, notify the family,

13  Hey, there's going to be a home inspection, come on down?

14  A    No, they were already at my grandparents' house.

15       THE COURT:  Okay, next question.

16  BY MR. POWELL:

17  Q    What was your first sign that anything was going to be

18  different that day?

19  A    I saw law enforcement around the area, the surrounding

20  area.  It wasn't too peculiar considering one of the neighbors

21  wasn't the most -- unkempt and not very kind.

22       THE COURT:  Answer the question, Mr. Beard.  What did

23  you see that was --

24       THE WITNESS:  Well, the law enforcement, and then when

25  the white van showed up around law enforcement, that definitely

Beard - Direct (Resumed) by Powell

1  raised a concern to me.

2  BY MR. POWELL:

3  Q    What was your first interactions with either Ms. Cobbs or

4  Ms. Jones, and please specify who it was with?

5  A    My first interaction, I believe, was with Ms. Cobbs.  I

6  asked her, "What's going on?"

7       She indicated to me that they are taking N    .

8  Q    Basically the first things out of her mouth?

9  A    Pretty much, yeah.

10 Q    What did you say in response, if anything?

11 A    I asked why, and then Shynelle Jones shouted that I didn't

12 cooperate in the TDM.  And I yelled back saying I had nothing

13 to do with that, that that wasn't about me, that wasn't about

14 N   , that was just about Freddy.

15 Q    Any response from either of them after that comment?

16 A    Ms. Cobbs yelled at me and stated that I did this to

17 myself.  Stated that -- sorry.  Stated that I'm being

18 manipulated by Ms. Perez, and that N    is going to be taken.

19 And I was talking to a law enforcement officer around that same

20 time telling them I want the warrant.  I want the warrant.  He

21 wouldn't provide one, neither would they.

22 Q    Okay.  Did you ever see a warrant that day?

23 A    No, I saw a paper later on that said "Notice of Hearing,"

24 with a hearing date for what I later found out to be was a

25 detention hearing.

Beard - Direct (Resumed) by Powell

1    Q    At the time that you were just describing, "This is your
2    own fault," were you already on the ground?
3    A    No, I was -- well, when they were saying, "This is your
4    own fault," I was already on the ground, yes.
5    Q    So can you describe what that felt like in your body,
6    whatever it was, when it came to the point where you collapsed?
7    A    I felt -- I felt like I had -- like everything in my body
8    just left.  Like I had no strength.  I had no energy.  I felt
9    helpless.  I felt hopeless.  My body just felt like all the
10   blood rushed to my head and left my legs.
11   Q    We could hear the officer saying "breathe" on the video.
12   Do you know what was prompting that?
13   A    I do have asthma, and my breathing was -- I was just
14   having trouble breathing.  I was in such shock and panic that I
15   was having a hard time catching my breath because I was
16   exasperating [sic] because I was crying so hard that I just --
17   I was having a hard time catching my breath.
18   Q    Did you ever come close to losing consciousness?
19   A    It felt like I did for a split second.  My eyes were
20   starting to get blurry.  It wasn't a total lack of
21   consciousness, but it was just like a blur for a second.  My --
22   hearing-wise, I could hear everything, but vision-wise, I was
23   just having a little trouble seeing.
24   Q    Anything else that you remember being said during this
25   time you just described with, "It's your fault, it's your own

Beard - Direct (Resumed) by Powell

1  fault"?

2          MR. WHITEFLEET:  Objection, hearsay.

3          THE COURT:  You have to be more specific.

4  BY MR. POWELL:

5  Q    Yes, anything being said by Mrs. Cobbs or Ms. Jones at

6  this same time when you're hearing, "It's your own fault"?

7  A    I kept hearing the words, "You did this to yourself, you

8  brought this upon yourself, you didn't cooperate."

9          I did -- I remember yelling, yelling very specifically,

10  "I'm going to sue you," and here we are.  I remember something

11  about my grandfather.  I remember yelling something to the

12  social workers, I don't recall which one, but I do remember

13  saying, "I had nothing to do with that TDM.  What do you mean

14  lack of cooperation?  I cooperated with everything you asked me

15  to cooperate with."

16          I remember telling Shynelle specifically, Shynelle Jones,

17  that she had asked me to separate my relationship with Hilda

18  and I was willing to do that, and, "Why is this happening,"

19  and, "Why is my son being taken from me?"

20  Q    I take it no answers to your questions were given right

21  then and there?

22  A    No, just my lack of cooperation apparently during the TDM.

23  Q    Anything else that you remember from that event -- strike

24  that.

25          At some point did Mrs. Cobbs and/or Mrs. Jones step away

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Beard - Direct (Resumed) by Powell

1  from you in your immediate area?

2  A    They only stepped away from me when the paramedics

3  instructed them to, and then Ms. Cobbs actually came back into

4  the area and the paramedics informed her if she did not step

5  away, that they will have her detained, and that's when she

6  stepped away after badgering me consistently.

7  Q    What did the badgering consist of?

8  A    Just still constant yelling, still with the same words, to

9  that effect.

10  Q    That you did this to yourself?

11  A    Correct.

12  Q    Anything else?

13  A    No, not to my recollection from them.  It was the

14  paramedics from then on just trying to make sure I didn't go

15  into a stress-induced seizure.

16  Q    Were you taken away by ambulance from this scene?

17  A    No, I was still left at my grandparents' home.

18  Q    How was your sleep that night?

19  A    I don't remember actually sleeping that night.

20  Q    What's the next thing you did that had anything to do with

21  the fact that your firstborn son had just been taken?

22  A    The next step, I went with Hilda and my stepfather to seek

23  out an attorney, which was Robert Chase.  Hilda obtained him, I

24  did not.

25  Q    Was there a financial reason for that?

Beard - Direct (Resumed) by Powell

1   A    Financial, and he said he couldn't represent us both.

2   Q    All right.  So did you get yourself an attorney before you

3   went to court?

4   A    No, I did not.

5   Q    Were you given any papers before you actually went to

6   court, like the day before you went to court, were you given

7   any papers, you know, claiming what the allegations were

8   against you?

9   A    I did not.

10  Q    When is the first time you saw any paperwork?

11  A    It was at the detention hearing.

12  Q    And do you remember that date?

13  A    I do.

14  Q    And what date was that?

15  A    I want to say it was July 23.

16  Q    I'm going to put up -- actually, a few questions first.

17       THE COURT:  This was the detention hearing in

18  dependency court, correct?

19       MR. POWELL:  Yes, Your Honor.

20       THE COURT:  Again, remember, there's two different

21  courts.  This is a dependency court hearing?

22       MR. POWELL:  Yes, and, Your Honor, we're not going

23  to -- I don't think -- we have no family court stuff to talk

24  about.

25       THE COURT:  Okay.

Beard - Direct (Resumed) by Powell

1  BY MR. POWELL:

2  Q    Did anyone call you from CFS prior to that hearing to

3  discuss anything?

4  A    No.

5  Q    Okay.  And when was the first time after they took N    on

6  July 19 that you saw him again?

7  A    I want to say it was -- I want to say it was July 29, it

8  was 10 days later, so July 29.

9  Q    Did you see him alone?

10  A    No, I saw him with Hilda.

11  Q    Did you two arrive there together?

12  A    We did.  We were granted a two-hour visitation by the

13  Court together because we had apparently missed the visitation

14  that we were supposed to receive within the three days that he

15  was removed.

16  Q    And is it because you didn't receive it?

17  A    No one informed us that we were to have a visitation with

18  him.

19  Q    No one came to talk to you about something other than

20  hanging on to N   ?

21  A    I'm not sure what you're asking.

22  Q    I didn't mean physically come to you, but make contact

23  with you about something other than N    being in foster care?

24  A    No.

25  Q    Did you hire an attorney for N   ?

Beard - Direct (Resumed) by Powell

1  A    No.  One was appointed to him by the Court.

2  Q    And did you have an attorney by the time you got to court?

3  A    Not by the time I got to court.  I had to request a

4  court-appointed one.

5  Q    And how many attorneys did you have during your time in

6  the juvenile dependency process?

7  A    With No   's appointed one, it would be three.

8  Q    No, I'm not going to include No   s, he wasn't yours.  I'm

9  talking about your own attorneys, while you went through the

10 juvenile process, how many attorneys, different attorneys did

11 you have assigned to you?

12 A    Actually, yeah, it was three.

13 Q    All right.  I'm going to put up on the -- actually, I'm

14 going to ask you to turn to 76.

15 A    Okay.  I'm here.

16 Q    All right.  If you could go to the third page in, 116 --

17 it ends in 67.

18 A    I got it.

19 Q    Can you tell me if there's anything in that paragraph that

20 reads -- first of all, do you recognize this document?

21 A    Yes, I do.

22 Q    Did you understand at the time this was the listing of

23 allegations why your son was taken from you?

24 A    Yes.

25          THE COURT:  Is this in evidence?

Beard - Direct (Resumed) by Powell

1  BY MR. POWELL:

2  Q    By the way --

3         THE COURT:  Is this in evidence?

4         MR. POWELL:  It's not.

5         THE COURT:  Okay.

6         MR. WHITEFLEET:  I'll move to strike, lacks

7  foundation.

8         THE COURT:  You'll move to strike?  This is a juvenile

9  dependency petition.  I could take judicial notice of it.

10         MR. WHITEFLEET:  Sorry, I wasn't quite there.

11         THE COURT:  Do you want to object to it?

12         MR. WHITEFLEET:  Nope.

13         THE COURT:  Do you want to move it in?

14         MR. POWELL:  Yes, and I was laying foundation, is what

15  I was trying to do.

16         THE COURT:  It's admitted.  See how quickly that

17  happened.

18      (Plaintiffs' Exhibit 76 admitted in evidence.)

19         MR. POWELL:  And then, your Honor, if we could --

20         MR. WHITEFLEET:  I hadn't caught up.

21         MR. PARK:  Can I show him?

22         MR. POWELL:  Yes, you can.

23         THE COURT:  What page are you showing him?

24         MR. POWELL:  Exhibit 76 is a petition dated July 23,

25  2019, and I've taken him to the third page where there is a

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Beard - Direct (Resumed) by Powell

1  series of letters, numbered paragraphs, and we're first looking

2  at B-1.

3        THE COURT:  Got it.

4  BY MR. POWELL:

5  Q   If you could read that to yourself, Mr. Beard, no need to

6  read it out loud, and tell us if there's anything in there that

7  you feel is false, and that would include misrepresented.

8        MR. WHITEFLEET:  I'm going to object as overly broad,

9  lacks foundation.

10        THE COURT:  Just Paragraph B-1, right?

11        MR. POWELL:  Yes, B-1.

12        THE COURT:  Okay, overruled.

13        THE WITNESS:  Yes.

14        THE COURT:  Is there anything in there that you think

15  is false?

16        THE WITNESS:  Yes, sir.

17        THE COURT:  Go ahead.

18        THE WITNESS:  "The reporting party reported that the

19  minor, Alfredo, Jr., age five, reported that mother's house,

20  Hilda Perez, Victoria, age eight, showers with Alfredo, Jr.,

21  touched his penis."

22        From my recollection, that was not the case.

23        MR. WHITEFLEET:  I'm going to object as lacks

24  foundation.

25        THE COURT:  Sustained.

106

Beard - Direct (Resumed) by Powell

1   BY MR. POWELL:

2   Q   Well, Mr. Beard were you living in the home -- strike

3   that.

4       You weren't living in the home with Ms. Perez at anytime

5   for when Victoria was six and Alfredo was three, were you?

6   A   No.

7   Q   Were you aware of an incident where the two had showered

8   years prior to Ms. Cobbs and Jones coming to the house on

9   July 12?

10  A   No.

11          MR. WHITEFLEET:  Objection, based on hearsay.

12          THE COURT:  Sustained, answer will be stricken.  Jury

13  will disregard.

14  BY MR. POWELL:

15  Q   Let's go about things that were said about you, sir.  It

16  says, "Additionally, Shane Beard, father of N    Perez, was

17  aware of the allegations between Alfredo, Jr. and Christopher

18  but failed to notify this agency of the incident"; is that

19  true?

20  A   Not exactly, no.

21  Q   Okay.  What do you mean when you say "not exactly"?

22  A   Well, I informed them when they were at the house.  I only

23  knew a day before.

24  Q   So, I mean, you only learned a day before.  What could you

25  do to, I don't know, show protective capacity?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Beard - Direct (Resumed) by Powell

1    MR. WHITEFLEET: Objection --

2    THE COURT: The way it's phrased, yeah, sustained.

3    BY MR. POWELL:

4    Q    Did you ever, when you learned about it the day before,

5    think about any protective capacity moves you needed to make?

6    MR. WHITEFLEET: Objection, vague, may call for

7    improper opinion.

8    THE COURT: Sustained.

9    BY MR. POWELL:

10   Q    When you were informed of it, were you informed that

11   mother had already spoken to the children about boundaries?

12   A    Yes.

13   Q    Okay. When Mrs. Cobbs and Ms. Jones were there providing

14   their services -- suggestions for services, did either of them

15   recommend to you what more could be done by you?

16   A    No, I wasn't even living at the house.

17   Q    Okay. All right, go to B-2. Do you know if anything in

18   that is false? And, sir, you may not know for some of these.

19   A    I don't know.

20   Q    Well, after you had been in the case -- while you were in

21   the case, sir, did you receive materials like these delivered

22   service logs that we're seeing in these referrals and things

23   like that?

24   A    Way down the road, yes.

25   Q    And did you look them over?

Beard - Direct (Resumed) by Powell

1    A    I did.

2    Q    Did you find that there were 34 of them that were against

3    Ms. Perez?

4              MR. WHITEFLEET:  Objection, lacks foundation.

5              THE COURT:  Sustained.

6    BY MR. POWELL:

7    Q    Let's try it again.

8              THE COURT:  The documents are in evidence.  So whether

9    he reviewed them and what he saw isn't relevant, the document

10   itself is in evidence.

11             MR. POWELL:  Okay.

12   BY MR. POWELL:

13   Q    At the time you received this petition, did you have

14   reason to believe that it was false, the statement that mother

15   has had 34 referrals since 2014?

16             MR. WHITEFLEET:  Objection, calls for speculation.

17             THE COURT:  Sustained.  Best evidence.

18   BY MR. POWELL:

19   Q    We'll go to B-3.  Okay.  I'm going to, in the interest of

20   time, take you to -- it flows down to the next page, 405, but

21   it's actually B-6.

22             THE COURT:  It starts at the bottom, right?

23             MR. POWELL:  Yeah, it starts at the bottom of Page 3,

24   but then it goes on to Page 4.

25             THE COURT:  Right.

Beard - Direct (Resumed) by Powell

1   BY MR. POWELL:

2   Q    But, Mr. Beard, I'm just going to direct you to something

3   about you.  The last sentence, can you read that to yourself,

4   starts with, "N    Perez was to be," and then I have a couple

5   questions.

6   A    I got it.

7   Q    It indicates "a lack of cooperation during the Team

8   Decision Meeting"; correct?

9   A    Correct.

10  Q    Did you fail to cooperate during the Team Decision Meeting

11  in any way?

12  A    No, I did not.

13  Q    And then it says, "Inability to demonstrate a protective

14  capacity regarding the agency's concerns"; do you see that?

15  A    I do.

16  Q    First of all, by the time Cobbs and Jones left your house,

17  did you have some understanding of what the agency's concerns

18  were?

19  A    Hilda's house or my house on the 19th?

20  Q    On the 12th when they left your house, did you have some

21  understanding of what their concerns were?

22  A    I did.

23  Q    How would you phrase it?

24  A    Their concerns were inappropriate behavior between Freddy

25  and Christopher, but they were completely disregarding the

Beard - Direct (Resumed) by Powell

1   inappropriate behavior between Freddy and his father Alfredo.

2          MR. WHITEFLEET:  I want to move to strike that last

3   part.

4          THE COURT:  The last part will be stricken about his

5   father, the rest of the answer will remain.  Jury will

6   disregard the last part.

7   BY MR. POWELL:

8   Q   Well, what would be your response to the concept of you

9   having an inability to demonstrate a protective capacity at

10  that time when you received this document?

11  A   I'm honestly not sure what else they wanted me to do.

12         MR. WHITEFLEET:  Objection, lacks foundation, calls

13  for improper opinion, calls for speculation.

14         THE COURT:  Overruled.

15         You can answer it.

16         THE WITNESS:  I'm honestly not sure what else they

17  wanted me to do.  I mean, they were already talked to by the

18  mother, so what more could I have done?  I'm not even their

19  father, for one, and I don't live at the home, nor did I

20  witness the event happen.  So I'm not really sure what the

21  agency wanted me to do in that aspect.

22  BY MR. POWELL:

23  Q   Okay.  Had they, at any time between the TDM and the

24  removal, called you to discuss ideas to be protective?

25  A   They just wanted me to separate my romantic relationship

Beard - Direct (Resumed) by Powell

1   with Hilda.  And then -- I think I testified to this already,

2   that Ms. Cobbs called me for my Social, for a background check,

3   and the home placement with N    and myself.

4          MR. POWELL:  Your Honor, I'm going to be putting up

5   77 -- or, I guess, having my client flip to 77, which is the

6   Detention Report.  I don't know if the Court's willing to take

7   judicial notice of that document in another court.  I would

8   move to admit it.

9          THE COURT:  Any objection?

10          MR. WHITEFLEET:  Seventy-seven?

11          THE COURT:  It's the Detention Report.

12          MR. WHITEFLEET:  No.

13          THE COURT:  Okay, 77's admitted.

14      (Plaintiffs' Exhibit 77 admitted in evidence.)

15          MR. POWELL:  Thank you.  Now, Your Honor, this has

16   just been admitted, but my client hasn't looked at it, so I'm

17   going to have him look at some parts.

18   BY MR. POWELL:

19   Q    Are you familiar with this document, Mr. Beard?

20   A    Unfortunately, yeah, I am.

21   Q    And did you receive it when you showed up for court the

22   very first day?

23   A    Yes.

24   Q    And maybe if you look through it, you can tell us some of

25   the things, if any, that struck you as false.

112

Beard - Direct (Resumed) by Powell

1   A    On this first page?

2   Q    Yeah, it really doesn't get into the meat of it until the

3   bottom of the second page, "Reason For Hearing," you could

4   start there.

5        And, sir, you're not limited to pointing out something

6   that you believe is false just because it is related to

7   Ms. Perez, if you know otherwise.

8   A    Okay.

9            THE COURT:  Mr. Powell, your question is overbroad.

10  Is there a specific portion of this?  This is a lengthy

11  document.

12           MR. POWELL:  Your Honor, now that it's admitted, maybe

13  we could get the rest of the petitions and reports admitted,

14  and then, literally, I could wrap up with my client in not too

15  much time.

16           THE COURT:  What other exhibits do you want to move

17  in?  Exhibit 78 is an Addendum Report from the court; do you

18  want that in?

19           MR. POWELL:  Yes, Your Honor.

20           THE COURT:  Any objection?

21           MR. WHITEFLEET:  No, Your Honor.

22           THE COURT:  Seventy-eight is admitted.

23      (Plaintiffs' Exhibit 78 admitted in evidence.)

24           MR. POWELL:  Seventy-nine.

25           THE COURT:  Seventy-nine is a Status Review Report

Beard - Direct (Resumed) by Powell

1    from the court for a hearing date 3/27/20.

2            Any objection, Mr. Whitefleet?

3            MR. WHITEFLEET:  No, Your Honor.

4            THE COURT:  Seventy-nine is admitted.

5        (Plaintiffs' Exhibit 79 admitted in evidence.)

6            MR. POWELL:  There are two more petitions that I need

7    to ask to be in, one is 75.

8            THE COURT:  Seventy-five.

9            MR. POWELL:  The other is 82.

10           THE COURT:  Hang on.

11           MR. POWELL:  Okay.

12           THE COURT:  Seventy-five is a petition.

13           MR. POWELL:  That would be an August 16, 2019

14   petition.

15           THE COURT:  There it is, the date's on the second

16   page.  Okay, prepared by Mr. Granados and Ms. Gomez, right?

17           MR. POWELL:  Correct.

18           THE COURT:  Any objection to that, 75?

19           MR. WHITEFLEET:  Your Honor, I can't tell if this was

20   the version of the document that was submitted to the court.

21           THE COURT:  Because it's not stamped.

22           MR. WHITEFLEET:  Right.

23           THE COURT:  Yeah, without that, I can't admit it.  You

24   have to authenticate it.

25           Then what's the other one, exhibit what?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Beard - Direct (Resumed) by Powell

1    MR. POWELL:  The other, in terms of petitions, is 82.

2    THE COURT:  Eighty-two, is that one stamped?

3    MR. WHITEFLEET:  No.

4    MR. POWELL:  No, but I believe both 82 and 75 are

5    signed with the statement -- nope.  This is how they were

6    received through the Stanislaus county court system.

7    THE COURT:  They didn't give you a stamped version,

8    though, right?

9    MR. POWELL:  No.

10   THE COURT:  Okay, 82 is a petition with a date of

11   October 11, 2019.  You object to this one, too, Mr. Whitefleet?

12   MR. WHITEFLEET:  Yeah, I just can't tell if this is

13   the one that was submitted to the court without the stamp, and

14   there's no signatures on them.

15   THE COURT:  Your client has prepared them, right?

16   Your client has prepared the petitions, correct?

17   MR. WHITEFLEET:  Yes, Your Honor, but since I wasn't

18   the attorney of record at the time of disclosures, I don't know

19   how these were disclosed, produced or in what part.

20   THE COURT:  I think we may have to wait until

21   Mr. Granados testifies, then you can come back and move those

22   into admission.

23   We'll reserve 75 and 82.

24   Go ahead.

25   MR. POWELL:  And then further down you have the next

Beard - Direct (Resumed) by Powell

1   report, and then in the way that you were headed, Your Honor,

2   was the disposition, I believe.

3          THE COURT:  I wasn't headed anywhere, but use the

4   microphone.

5          Go ahead.

6          MR. POWELL:  I'm going down the list.  You had the

7   status, the next one is Number 80 -- Exhibit 80, a Disposition

8   Report of September 10, 2019.

9          THE COURT:  Any objection to Exhibit 80, it's from the

10  court?

11         MR. WHITEFLEET:  No, not to that one.

12         THE COURT:  Exhibit 80 will be admitted.

13     (Plaintiffs' Exhibit 80 admitted in evidence.)

14         MR. POWELL:  And --

15         THE COURT:  That's a Disposition Report from the court

16  for a hearing from September 10, 2019.

17         Go ahead.

18         MR. POWELL:  Next would be Exhibit 81, an Addendum

19  Report of October 8, 2019.

20         THE COURT:  Okay.  Exhibit 81, that's an Addendum

21  Report prepared by the court for a hearing date of October 8,

22  2019.  Eighty and 81 will be admitted.

23     (Plaintiffs' Exhibit 81 admitted in evidence.)

24         MR. POWELL:  And then finally the -- that's it.

25         THE COURT:  Any other questions?

Beard - Direct (Resumed) by Powell

1    MR. POWELL:  From this man?

2    THE COURT:  Yes.

3    MR. POWELL:  Yes.

4    THE COURT:  All right.

5  BY MR. POWELL:

6  Q    Mr. Beard, did you produce any evidence, like we just got

7  through doing here in this court, when you went to the

8  detention hearing?

9  A    No, I was not allowed to.

10  Q    Why is that?

11  A    To my understanding, whatever comes into the reports is

12  deemed to be true, and the attorneys pretty much spoke on our

13  behalf.  We didn't even speak.

14  Q    Okay.  So you didn't testify at the detention hearing?

15  A    No, I did not.

16  Q    Did Ms. Perez testify at the detention hearing?

17  A    No, she didn't.

18  Q    Did anybody, even from the other side, testify at the

19  detention hearing?

20  A    No.

21  Q    Did you, at any point during this process in the juvenile

22  court, actually produce evidence, again, kind of like what

23  we've been doing here?

24  A    I gave my testimony at the jurisdiction.

25  Q    Jurisdiction, what?

Beard - Direct (Resumed) by Powell

1  A    At the jurisdiction hearing.

2  Q    When was that?

3  A    I don't recall the exact date, but it was a little after

4  the detention hearing, I want to say maybe like a couple

5  months.

6  Q    Okay.  Were you still represented by counsel?

7  A    I was.

8  Q    And you testified, you said?

9  A    Yes, I did.

10  Q    Other than testimony, which is a form of evidence, were

11  there any documents that your attorney maybe put into evidence,

12  again, like what we were just doing?

13  A    No, I didn't have any documents.

14  Q    Okay.  How long were you on the stand?

15  A    Maybe a few hours, it was all morning.

16  Q    Did anyone from the agency testify before you got on the

17  stand?

18  A    No.

19  Q    Okay.  After you came off the stand, did anyone else

20  testify?

21  A    Hilda, briefly.

22  Q    And how long was "briefly"?

23  A    I want to say between 20 to 30 minutes, if that.

24  Q    Okay.

25       THE COURT:  You each had your own lawyer, correct?

MARYANN VALENOTI - U.S. DISTRICT COURT - (916)930-4275

Beard - Direct (Resumed) by Powell

1    THE WITNESS:  That is correct, yes.

2  BY MR. POWELL:

3  Q    She had hired Mr. Chase?

4  A    Yes.

5  Q    He stayed her attorney the whole time?

6  A    He did.

7  Q    And then was it scheduled to continue for the rest of the

8  day or what happened after; why was she only on the stand --

9  A    It was supposed to be scheduled to continue to the rest of

10  the day, but during the break we were made an offer -- or at

11  least I was.

12  Q    Okay.  And what was your offer?

13  A    I don't recall the exact details of --

14    THE COURT:  Hang on.  Did you learn of the offer

15  through your attorney?

16    THE WITNESS:  Yes.

17    THE COURT:  You don't want to get into attorney-client

18  privilege.

19    MR. POWELL:  I absolutely have no problem with it,

20  Your Honor, neither does my client.

21    THE COURT:  I don't know if his attorney does, but the

22  privilege belongs to him, he can waive it if he wants.

23    Okay, go ahead.

24    THE WITNESS:  I'll waive it.  He just stated to me

25  that I could get N    back that day and then didn't really

Beard - Direct (Resumed) by Powell

1    disclose all of the details as to why.

2            THE COURT:  So this was at the jurisdiction hearing?

3            THE WITNESS:  That is correct.

4    BY MR. POWELL:

5    Q    And it's before the jurisdiction hearing is over; right?

6    A    Yes.

7    Q    And was there any discussion about these petitions that we

8    just looked at -- or we looked at one.  Was there any

9    discussion about allegations being modified to allow for your

10   child to come home?

11   A    I remember something to that nature.  I just don't recall

12   exactly as to what was going to be modified.

13   Q    So would there have been any limit to what you would have

14   allowed the allegations to be modified to in order to receive

15   your child back in your care?

16           MR. WHITEFLEET:  Objection, calls for speculation.

17           THE COURT:  Sustained.

18   BY MR. POWELL:

19   Q    So all you know, as you sit here today, is there was an

20   offer to get your son back, you don't know if there was any

21   quid pro quo?

22   A    Yes, and frankly, I didn't care.

23   Q    I would like to now ask you a little bit about your

24   damages overall from this incident -- strike that.

25           Did you speak with Shari Johnson at anytime after you got

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Beard - Direct (Resumed) by Powell

1   your son back?

2   A    No, I -- well, I spoke with her after and prior to getting

3   my son back.

4   Q    And what topics of conversation did you have with Shari

5   Johnson before you got your son back?

6   A    She brought up a scheduling, like a -- kind of like the

7   holiday schedule type thing and how a certain schedule would

8   work between the time he had with me and the time he had with

9   his mother.  She told me that Hilda wanted all of the holidays

10  and what I was going to do about that and told me that I pretty

11  much have to pick when I wanted him.

12       After she gave him back to me, she told me where my cousin

13  lived, because that's where N    was staying, and she told me,

14  "Don't make me regret this."  And then after I got N    back,

15  it was just a very brief conversation when I was bringing him

16  to visit with his mom.

17  Q    Okay.  Nothing troubling about that brief visit

18  conversation?

19  A    No, she was actually quite pleasant during that time.

20  Q    Did you understand her to have the capacity during those

21  proceedings to have returned your son sooner?

22           MR. WHITEFLEET:  Objection, calls for speculation.

23           THE COURT:  Sustained.

24  BY MR. POWELL:

25  Q    Did Mrs. Johnson say anything to you about what ability

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Beard - Direct (Resumed) by Powell

1    she had, if any, to return your son sooner than the October 6

2    date the child was returned?

3              MR. WHITEFLEET:  Objection, leading.

4              THE COURT:  Overruled.  Go ahead.

5              THE WITNESS:  I briefly spoke to her a few times after

6    my visitations pleading to have my son back, and she told me

7    that it had to go through the court process.  So that was my

8    understanding, that I had to continue to go through this

9    process to get him back.

10   BY MR. POWELL:

11   Q    Okay.  And how much longer until the case was completely

12   closed and even Ms. Perez was allowed to have N    in her care

13   after you got him?

14             MR. WHITEFLEET:  Objection, compound.

15             THE COURT:  Yeah, it is.  Focus on him.

16   BY MR. POWELL:

17   Q    How long after, in terms of time, you received custody of

18   N    until Ms. Perez could have -- have the child in her

19   possession?

20             MR. WHITEFLEET:  Objection, calls for speculation,

21   it's vague.

22             THE COURT:  It is vague.  Sustained.

23   BY MR. POWELL:

24   Q    Before your child was taken, did N    reside with his

25   mother for the most part?

Beard - Direct (Resumed) by Powell

1   A    Yes.

2          MR. WHITEFLEET:  Objection, asked and answered.

3          THE COURT:  The answer is yes, go ahead, next

4   question.

5   BY MR. POWELL:

6   Q    At some point in time after the juvenile dependency

7   process, did N    resume primarily living with his mother?

8   A    No.

9          MR. WHITEFLEET:  Objection, vague as to time.

10         THE COURT:  You said no?

11         THE WITNESS:  Correct.

12         THE COURT:  Can you specify?

13  BY MR. POWELL:

14  Q    Were you given exit orders from the juvenile court?

15  A    Yes, I was.

16  Q    And what did those specify?

17  A    We had to go on a week-to-week basis with N   .

18  Q    So you shared the kid equally?

19  A    Correct.

20  Q    When did Ms. Perez get to enjoy the bounty of the

21  week-on-week-off visitation?

22  A    It was following my first week.  I had to bring him to his

23  visitation with her and CPS, or the agency, and shortly after

24  she was allowed to have N    -- it was after his first

25  birthday, I remember that.

Beard - Direct (Resumed) by Powell

1  Q   So when you say you were bringing N    to the agency, is
2  that for supervised visits?
3  A   Yes.  I had to go into the room where foster parents go
4  into when they bring a child to visit with their parents.
5  Q   So you couldn't visit your child in the presence of the
6  child's mother for a week?
7  A   Correct.
8  Q   Did you have any visits with the mother other than that
9  first one that you told us about earlier today for two hours?
10  A   We had a couple more, but after that they were separate.
11  Q   Okay.  And do you understand why that was?
12  A   I actually made a request to the court that they be
13  separate because she was breastfeeding at the time, and I
14  barely got to see him, plus it would give N    a little bit
15  more time with both parents instead of just the one hour.
16  Q   And that was -- did you discuss that with Ms. Perez ahead
17  of time?
18  A   I did.
19  Q   And no problem?
20  A   No.
21  Q   How would you describe you two as co-parenting up until
22  they took your child?
23  A   I thought we did wonderful.
24  Q   So when would you say the case was completely closed?
25  A   It was April of 2020, I want to say.

Beard - Direct (Resumed) by Powell

1  Q    Not March 27 of 2029?

2  A    That could be.  I just remember getting a call from the

3  third attorney that I had on the case stating that it was

4  closed.  I believe her name was Shelby Emore.

5  Q    Have you had any further entanglements with CPS, CFS?

6            MR. WHITEFLEET:  Objection, relevance.

7            THE COURT:  Sustained.

8            MR. POWELL:  It would go to damages, Your Honor, but

9  I'll just go to damages.

10           THE COURT:  It's the word "entanglements."

11 BY MR. POWELL:

12 Q    Sir, I'd like you to try and describe the ways in which

13 this has harmed you, this experience with the removal of N  .

14 A    Honestly, I don't really trust any government entity

15 anymore, especially the court system.  I wanted to be a lawyer

16 for a long time, and I believed in the court system, and it

17 wasn't until after the removal of my son and the things that

18 transpired afterwards, it just shook my lack of faith with it.

19      I think about it from time to time, about those months I

20 didn't have him, I know that I missed milestones.  I missed out

21 on him walking.  I missed out on him saying "mom," he was

22 calling my cousin "mom," and that was a pretty big deal for

23 Hilda and I.

24      I have a daughter who's a year old now, and I look at her

25 when she's -- when she was nine months -- eight months to the

Beard - Direct (Resumed) by Powell

1   12 months, and she looks just like my son.  I mean, you take

2   the earrings off and bam, you got N⎯⎯  all over again.  When I

3   look at her, I see him, and I see the time I missed with him,

4   and I see the -- I have a picture of him from when he was eight

5   months.  It's one of those professional old school photos

6   taken.  I have a photo album that I dedicated to him from when

7   he was a baby, and I have three-month span of photos that I

8   don't have, with the exception of that stupid visitation room.

9        There's times where I look at him and I just come to

10  realize, like, what the hell happened and why that happened to

11  him, and why it happened to me, and why it happened to her when

12  we didn't do anything to deserve it.  And N⎯⎯ 's such a

13  sweetheart, he's such a good kid, and for him to be taken away

14  from a breastfeeding mom, for him to be taken away from a

15  loving father and put with two people who didn't even know who

16  the hell he was.

17       MR. WHITEFLEET:  I appreciate the testimony in terms

18  of damages, but I think we've gone far afield in terms of his

19  damages as opposed to now --

20       THE COURT:  Sustained.

21  BY MR. POWELL:

22  Q   How about this:  Did you notice any changes in N⎯⎯  that

23  you felt were attributable to this change in --

24       MR. WHITEFLEET:  Objection.

25       MR. POWELL:  Let me finish.

Beard - Direct (Resumed) by Powell

1      THE COURT:  Let him finish the question.

2   BY MR. POWELL:

3   Q   -- this change in his living circumstances?

4      MR. WHITEFLEET:  Objection, vague, lacks foundation.

5      THE COURT:  Sustained.

6   BY MR. POWELL:

7   Q   Do you believe your son was completely unharmed by the

8   removal?

9   A   Hell, no.

10      MR. WHITEFLEET:  Objection, lacks foundation.

11      THE COURT:  Sustained.  The answer will be stricken.

12   The jury will disregard.

13      THE WITNESS:  My son was harmed.

14      THE COURT:  Don't answer the question when I sustain

15   an objection, you know that.  The jury will disregard that last

16   comment.  It's an improper question.

17   BY MR. POWELL:

18   Q   Did you see any damages in N     ?

19   A   Yes.

20      MR. WHITEFLEET:  I'll object.  This calls for a legal

21   conclusion.

22      THE COURT:  Sustained.  Answer will be stricken.

23   BY MR. POWELL:

24   Q   Did you see any changes in N    's behavior from before he

25   was taken to when he was returned?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Beard - Direct (Resumed) by Powell

1          MR. WHITEFLEET:  Objection, lacks foundation.

2          THE COURT:  Sustained.

3  BY MR. POWELL:

4  Q   Before your son was taken, would you recognize the way

5  that your son would behave?

6  A   Yes.

7          MR. WHITEFLEET:  Objection, that's leading and

8  conclusion, argumentative.

9          THE COURT:  Sustained, sustained.  You need to lay a

10  foundation.

11         MR. POWELL:  Observation, Your Honor, I felt was

12  foundation enough.

13         THE COURT:  It's not, not when a child's nine and a

14  half months old.

15  BY MR. POWELL:

16  Q   How about this:  Would you say your baby had a demeanor as

17  a baby before he was taken?

18         MR. WHITEFLEET:  Objection, vague.

19         THE COURT:  Sustained.  You also -- how often did he

20  see his baby?  You know, when did he see his baby?

21         MR. POWELL:  He testified everyday.

22         THE COURT:  Everyday?

23         THE WITNESS:  Yeah, everyday.  Yeah, I saw him

24  everyday.

25         THE COURT:  Before he was removed?

Beard - Direct (Resumed) by Powell

1      THE WITNESS:  Yes, sir.

2      THE COURT:  You went by everyday?

3      THE WITNESS:  Every single day.  I didn't miss a day

4  with my son.

5      THE COURT:  Okay.  And then when you got him back?

6      THE WITNESS:  When I got him back --

7      THE COURT:  You saw him every other week, right?

8      THE WITNESS:  I saw him every other week, yeah.

9      THE COURT:  Okay.  I just wanted to lay a foundation

10 for him to testify.

11     MR. POWELL:  About the damage to his son.

12     THE COURT:  Well, he can't talk about the damage to

13 his son, that's a legal conclusion.

14     MR. POWELL:  I just need to try a little bit more,

15 Your Honor.

16     THE COURT:  Go ahead.

17 BY MR. POWELL:

18 Q    Did you see any changes in behavior in your son from the

19 time before he was taken until the time you got him back?

20     MR. WHITEFLEET:  Objection, lacks foundation.

21     THE COURT:  I'm going to allow that.  Did you see any

22 changes?  I want to see what the answer is.

23     THE WITNESS:  Yes, I did.

24 BY MR. POWELL:

25 Q    Can you describe what you saw?

Beard - Direct (Resumed) by Powell

1         MR. WHITEFLEET:  Objection, vague as to time.

2         THE COURT:  Right after he got him back -- before he

3  got taken until when you got him back, what did you notice?

4         THE WITNESS:  Anytime I left him with somebody else or

5  I left the room, he would start screaming.

6  BY MR. POWELL:

7  Q   I take it you had to occasionally leave the room?

8  A   Yes, if I had to use the restroom or cook, yes?

9         THE COURT:  How old was he when you got him back?

10        THE WITNESS:  He was almost a year old.

11        THE COURT:  When is his birthday?

12        THE WITNESS:  October 20.

13        THE COURT:  You got him back in --

14        THE WITNESS:  I got him October 6, 2019, which is

15  right about three weeks before he was a year old.

16        THE COURT:  So before his first birthday you got him

17  back?

18        THE WITNESS:  Yes.

19        THE COURT:  And then he was taken away around nine and

20  a half months, correct?

21        THE WITNESS:  Before nine months, yeah, around eight

22  and a half to nine months.

23        THE COURT:  Okay.  So you noticed that he would scream

24  when you left the room.  What else?

25        THE WITNESS:  He would throw tantrums, and he would

Beard - Direct (Resumed) by Powell

 1   constantly cry.  There were times where I did have to go to

 2   work, and he was being left with a family member, and I would

 3   be told afterwards that he would be crying a lot.

 4        THE COURT:  You can't testify as to what a family

 5   member told you.

 6        THE WITNESS:  I understand.  But when I was around

 7   him, if I left to the restroom, which was right next to my

 8   room, I could audibly hear him cry while my cousin was in the

 9   room with him just keeping an eye on him.

10   BY MR. POWELL:

11   Q    Were there any changes in what it took to soothe him when

12   he was crying -- strike that.

13        I assume N    cried even before he was taken.

14   A    Yes.

15   Q    And then you've indicated he would cry whenever you left

16   when you got him back, right?

17   A    Correct.

18   Q    Was there any changes in what you had to do in order to

19   soothe him?

20   A    Well, with me soothing him, when he would originally cry

21   before he was taken, his mom would breastfeed him.  I,

22   obviously, don't have that option.  So I would go straight to

23   the breast milk with the bottle.  I played different songs for

24   him, and I would have to sing to him and make eye contact to

25   make sure he knew I was there.

Beard - Direct (Resumed) by Powell

1   Q    So breast milk was off the table by the time you got him
2   back?
3        MR. WHITEFLEET:  Objection, argumentative, vague as to
4   time.
5        THE COURT:  It's not argumentative.  What's your
6   objection?
7   BY MR. POWELL:
8   Q    So --
9        THE COURT:  Hang on.  Overruled.
10       Go ahead.
11       THE WITNESS:  Thank you.  So breast milk wasn't off
12  the table, it was just being produced from a bottle because
13  she -- Hilda would be able to bring the breast milk when we'd
14  switch off, but it's different when a baby is nursing, they
15  connect more with the breast and the body versus the bottle.
16       MR. WHITEFLEET:  Well, objection to that last part.
17       THE COURT:  Last part, lack of foundation.
18  BY MR. POWELL:
19  Q    How about you, sir, did you have any physical
20  manifestations of what you considered to be harm to you that
21  was related to this event?
22  A    I lost sleep, extreme loss of appetite, my thought process
23  was a one-train-thought process.  It was getting my son back.
24  I didn't really think about anything else other than that.
25  Lost a lot of -- I lost a significant amount of income because